Joseph M. Alioto, Esq. (SBN 42680)
Tatiana V. Wallace, Esq. (SBN 233939)
**ALIOTO LAW FIRM**
One Sansome Street, 14th Floor
San Francisco, CA 94104
Tel:  (415) 434-8900
Fax:  (415) 434-9200
Email:  jmalioto@aliotolaw.com


Ronald D. Foreman, Esq. (SBN 61148)
Ian. A. Hansen, Esq. (SBN 255449)
**FOREMAN & BRASSO**
850 Montgomery Street, Suite 300
San Francisco, CA 94133
Telephone:  (415) 433-3475
Facsimile:  (415) 781-8030
Email:  foremanandbrasso@foremanandbrasso.com

Attorneys for Plaintiffs Pamela Faust, Len Marazzo, Lisa McCarthy, Deborah Rubinsohn, and Gary Talewsky

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAMELA FAUST, LEN MARAZZO, LISA McCARTHY, DEBORAH RUBINSOHN, and GARY TALEWSKY,<br><br>    Plaintiffs,<br><br>vs.<br><br>PARAMOUNT SKYDANCE CORPORATION (formerly Paramount Global), and SKYDANCE MEDIA, LLC,<br><br>    Defendants. | Case No.<br><br><br>**COMPLAINT FOR VIOLATION OF SECTION 7 OF THE CLAYTON ACT; TREBLE DAMAGES UNDER SECTION 4; AND INJUNCTIVE RELIEF UNDER SECTION 16** |

### I.    INTRODUCTION

1.    This is a private antitrust action for violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, seeking treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, and injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26. It charges that Paramount

**COMPLAINT FOR VIOLATION OF SECTION 7 OF THE**      **CASE NO.**
**CLAYTON ACT; TREBLE DAMAGES UNDER SECTION 4;**
**AND INJUNCTIVE RELIEF UNDER SECTION 16**

1

Skydance's proposed $110 billion acquisition of Warner Bros. Discovery violates Section 7 of the Clayton Act because it may substantially lessen competition by eliminating a significant rival. Plaintiffs are threatened with loss or damage due to increased prices, reduced production, reduced quality, and reduced consumer choice.

2. The violation was preceded by Skydance Media's $8 billion acquisition of Paramount Global, which also constitutes a violation of Section 7. That acquisition lessened competition and had anticompetitive effects, including increased prices, decreased quality, and decreased consumer choice.

3. Plaintiffs are subscribers and individual viewers of streaming and cable television programming, consumers of news media, and consumers of theatrical exhibition.

4. Plaintiffs seek an order prohibiting Paramount's acquisition of Warner Bros. Discovery and an order divesting Paramount Skydance of any interest in Paramount Global.

5. On April 23, 2026, Warner Bros. Discovery stockholders voted to approve the proposed transaction with Paramount Skydance. That approval removed a major condition to the transaction and materially increased the immediacy of the threatened antitrust injury alleged in this Complaint. The transaction has not closed and remains subject to regulatory approvals and other closing conditions, meaning effective injunctive relief remains available before the competitive harm becomes locked in.

6. As a private action, this case is brought separately and apart from, and without regard to, any prosecution by any governmental agency.

## II.    LEGAL STANDARDS

7. Section 7 of the Clayton Act prohibits a person engaged in commerce, or in any activity affecting commerce, from acquiring, "directly or indirectly," the whole or any part of the

**COMPLAINT FOR VIOLATION OF SECTION 7 OF THE       CASE NO.**
**CLAYTON ACT; TREBLE DAMAGES UNDER SECTION 4;**
**AND INJUNCTIVE RELIEF UNDER SECTION 16**

stock, share capital, or assets of another person engaged in commerce, where, in any line of commerce and in any section of the country, "the effect of the acquisition may be substantially to lessen competition, or tend to create a monopoly." A company's growth through acquisitions reflects a different economic reality than growth through internal expansion. Internal expansion typically responds to increased demand and tends to increase investment, jobs, and output. By contrast, expansion through acquisition is more likely to reduce consumer choice without increasing industry capacity, jobs, or output. For these reasons, Congress disapproved of successive acquisitions, and Section 7 was enacted to prevent even small acquisitions that contribute to industry concentration. *Brown Shoe Co. v. United States*, 370 U.S. 294, 345 n.72 (1962).

8.      Competitive harms are not limited to price. Competition includes output, quality, variety, and innovation, and a transaction may substantially lessen competition by reducing rivalry on any of these dimensions. *Brown Shoe*, 370 U.S. at 320–23. In news markets, firms compete through investments in newsgathering, investigative reporting, editorial resources, programming formats, and viewpoint diversity. By eliminating an independent competitor and reducing the number of meaningful rivals, the challenged acquisition may substantially lessen competition by weakening incentives to compete on these non-price dimensions. It would make it more likely that Paramount will cut costs by reducing news output, lowering quality, and narrowing the variety of news programming, including flagship public-affairs programming.

9.      Section 7 also reaches acquisitions that contribute to or accelerate a trend toward concentration by eliminating an independent competitor and narrowing the field of meaningful rivals. *United States v. Von's Grocery Co.*, 384 U.S. 270 (1966); *United States v. Pabst Brewing Co.*, 384 U.S. 546 (1966). Skydance's nontrivial acquisition of Paramount Global is itself

**COMPLAINT FOR VIOLATION OF SECTION 7 OF THE        CASE NO.**
**CLAYTON ACT; TREBLE DAMAGES UNDER SECTION 4;**
**AND INJUNCTIVE RELIEF UNDER SECTION 16**

3

powerful evidence of the very "rising tide" of concentration that Section 7 is designed to arrest in its incipiency. That consolidation trend is further demonstrated by other recent major combinations in the motion picture and streaming industries, including Disney's acquisition of 21st Century Fox for approximately $71 billion in 2019 and Amazon's acquisition of MGM for approximately $8.5 billion in 2021. Taken together with the Skydance–Paramount transaction, these acquisitions show an industry moving by successive combinations toward fewer independent rivals, exactly the consolidation backdrop that heightens the competitive threat posed by the next merger, even if the combined firm remains smaller than the largest platforms.

10.    Even where the post-acquisition firm remains smaller than the largest industry player, Section 7 condemns acquisitions that eliminate an independent competitor. In *Pabst*, the Supreme Court enjoined a merger between the nation's tenth-largest brewer and the fifth-largest, even though the combined firm accounted for only 4.49% of national beer sales. *Pabst*, 384 U.S. at 550–52. Likewise, in *Von's*, the Court enjoined a merger between the No. 3 and No. 6 firms in the market even though their combined share was only 7.5%, because the merger eliminated an independent rival and advanced a consolidation trend. *Von's*, 384 U.S. at 272–73, 277–78. These cases foreclose any defense that an acquisition is lawful merely because the acquiring entity remains smaller than Netflix, Amazon, or Disney; the question is whether the deal removes a meaningful competitor and, against the backdrop of industry consolidation, may substantially lessen competition in the relevant line of commerce.

11.    Courts do not require proof that an acquisition will necessarily produce coordinated or oligopoly pricing effects before intervening. As the Seventh Circuit explained, the Supreme Court's core Section 7 decisions "establish the illegality of any nontrivial acquisition of a competitor," because "the elimination of a significant rival was thought by itself to infringe"

COMPLAINT FOR VIOLATION OF SECTION 7 OF THE          CASE NO.
CLAYTON ACT; TREBLE DAMAGES UNDER SECTION 4;
AND INJUNCTIVE RELIEF UNDER SECTION 16

the values embodied in Section 7's incipiency standard, and "[n]one of these decisions has been overruled." *Hospital Corp. of Am. v. FTC*, 807 F.2d 1381, 1385 (7th Cir. 1986).

12.    Section 16 authorizes injunctive relief against threatened loss or damage from antitrust violations. Because the harms alleged here flow from market structure and the loss of independent competitive constraints, they are irreparable in the antitrust sense. Structural relief is appropriate where the structure is the source of the harm. *Brown Shoe*, 370 U.S. at 344.

13.    Laches does not bar a timely Section 16 action brought to prevent a threatened acquisition before closing. Laches requires unreasonable delay and resulting prejudice. A plaintiff does not unreasonably delay by filing after a proposed transaction becomes concrete, imminent, and judicially fit for injunctive review, particularly where the transaction has not closed and the requested relief would preserve competition rather than unwind completed reliance interests. Transaction parties cannot create laches by racing toward closing while publicly acknowledging that completion remains subject to stockholder approval, regulatory review, and other closing conditions.

14.    Here, Skydance's nontrivial acquisition of Paramount Global and the proposed nontrivial acquisition of Warner Bros. Discovery reflect the same strategy of refusing to compete by building better products, investing, innovating, or winning customers through rivalry on the merits, but instead pursuing scale through consolidation that eliminates independent rivals and weakens the competitive constraints that protect consumers. That is exactly the consolidation logic Section 7 rejects. The Clayton Act assumes firms should create value by competing harder, not by buying up competitors to achieve scale and eliminate competitive constraints. Section 7 protects competition, not a company's preference to grow through acquisition rather than earn its position in the market. *Brown Shoe*, 370 U.S. at 344; *Von's Grocery*, 384 U.S. at 277–79;

**COMPLAINT FOR VIOLATION OF SECTION 7 OF THE       CASE NO.**
**CLAYTON ACT; TREBLE DAMAGES UNDER SECTION 4;**
**AND INJUNCTIVE RELIEF UNDER SECTION 16**

*Hospital Corp. of Am.*, 807 F.2d at 1385.

15.    Courts have also recognized that media-consolidation transactions can generate unique incentives for political "horse trading" that have nothing to do with competition on the merits and everything to do with leveraging editorial power to obtain political or regulatory support. In *Reilly v. Hearst Corp.*, the court described sworn testimony that a newspaper publisher offered to "horse trade favorable editorial coverage of the mayor in return for [the mayor's] support" for its acquisition of a rival, treating editorial treatment as bargaining currency to advance a transaction and eliminate governmental challenge. The *Reilly* court further found evidence that the transaction structure was selected not because it was economically justified, but because it was perceived as necessary to secure political and regulatory clearance, stating that "Hearst has no economic reason or justification … except its belief that this transaction was necessary to shake loose political and regulatory approval." The court described the resulting arrangement as "the product of politics … grossly inefficient and probably anticompetitive." *Reilly v. Hearst Corp.*, 107 F. Supp. 2d 1192, 1209 (N.D. Cal. 2000).

16.    Plaintiffs allege that the same dynamic is present here. On information and belief, the challenged transactions involve behind-the-scenes political machinations regarding news assets and editorial direction as a condition of the challenged acquisitions. Plaintiffs allege that such political horse trading is anticompetitive and reduces consumers' access to credible, independent, and diverse national news programming.

### III.    PARTIES

17.    Plaintiffs Pamela Faust, Len Marazzo, Lisa McCarthy, Deborah Rubinsohn, and Gary Talewsky are five natural persons residing in the United States. Plaintiffs are consumers of video and news media who watch entertainment and news programming via streaming services, cable television, and/or theatrical distribution and are exposed to the competitive effects of

COMPLAINT FOR VIOLATION OF SECTION 7 OF THE                CASE NO.
CLAYTON ACT; TREBLE DAMAGES UNDER SECTION 4;
AND INJUNCTIVE RELIEF UNDER SECTION 16

Defendants' conduct through price and non-price terms, programming availability, quality, and viewpoint diversity.

18.    Defendant Paramount Skydance Corp. ("Paramount") is a corporation organized under the laws of the State of Delaware, with its principal place of business in New York, New York. Paramount is a global media and entertainment company operating through three principal business segments: Studios, Direct-to-Consumer, and TV Media. Paramount Skydance owns and controls a portfolio of major entertainment, broadcast, cable, streaming, news, sports, animation, film, television, interactive/games, and related media assets, including Paramount Pictures, Paramount Television, CBS, CBS News, CBS Sports, Nickelodeon, MTV, BET, Comedy Central, Showtime, Paramount+, Paramount TV, and Skydance's Animation, Film, Television, Interactive/Games, and Sports divisions.

19.    Defendant Skydance Media ("Skydance") was, before Paramount Global's acquisition by Skydance, an independent production company producing high-budget, prestige film and television programming to multiple competing distributors and platforms. Following consummation, Paramount and Skydance operated as a single entity, Paramount Skydance Corp., under the leadership of David Ellison as Chairman and CEO and Jeff Shell as President.

20.    The targeted company, Warner Bros. Discovery, is a global media and entertainment company that creates and distributes branded content across television, film, streaming, and gaming. Warner Bros. Discovery owns and controls a broad portfolio of major entertainment, news, sports, cable, streaming, motion-picture, television-production, animation, and gaming assets, including Discovery Channel, HBO Max, discovery+, CNN, DC, TNT Sports, Eurosport, HBO, HGTV, Food Network, OWN, Investigation Discovery, TLC, Magnolia Network, TNT, TBS, truTV, Travel Channel, Animal Planet, Science Channel, Warner Bros.

**COMPLAINT FOR VIOLATION OF SECTION 7 OF THE**          **CASE NO.**
**CLAYTON ACT; TREBLE DAMAGES UNDER SECTION 4;**
**AND INJUNCTIVE RELIEF UNDER SECTION 16**

Motion Picture Group, Warner Bros. Television Group, Warner Bros. Pictures Animation, Warner Bros. Games, New Line Cinema, Cartoon Network, Adult Swim, Turner Classic Movies, Discovery en Español, Hogar de HGTV, and related brands and properties.

## IV.    JURISDICTION AND VENUE

21.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337 because this action arises under federal antitrust law, including Sections 4, 7, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 18, and 26.

22.    This Court has personal jurisdiction over Defendants because they conduct business throughout the United States and purposefully direct their conduct toward U.S. consumers, including Plaintiffs.

23.    Venue is proper under 28 U.S.C. § 1391 and Section 12 of the Clayton Act, 15 U.S.C. § 22, because Defendants transact business and the challenged conduct has effects in this District.

## V.    STANDING AND ANTITRUST INJURY

24.    Plaintiffs are individual consumers who purchase and consume filmed entertainment and news programming through multiple channels, including monthly streaming subscriptions, cable or pay-TV packages, per-title digital rentals and premium rentals, and theatrical exhibition. Plaintiffs are directly exposed to the price and non-price competitive effects of Defendants' lessening of competition.

25.    Plaintiffs do not assert a generalized grievance about media consolidation. Plaintiffs are purchasers and consumers in the affected markets. They pay for streaming services, cable or live-TV packages, theatrical movie tickets, and related premium video products, and they personally receive less value when competition is reduced through higher prices, reduced output, narrowed content choice, reduced promotional availability, diminished news quality, and

COMPLAINT FOR VIOLATION OF SECTION 7 OF THE        CASE NO.
CLAYTON ACT; TREBLE DAMAGES UNDER SECTION 4;
AND INJUNCTIVE RELIEF UNDER SECTION 16

fewer independent sources of premium programming.

26.    The acquisition of Paramount Global by Skydance Media has already occurred. By reason of that nontrivial acquisition, Plaintiffs have been injured in fact, as prices have increased, consumer choice has diminished, and output and quality have been reduced, including the quality of news programming.

27.    Plaintiffs are threatened with imminent loss or injury if the proposed acquisition of Warner Bros. Discovery by Paramount is consummated. These injuries include increased prices, diminished consumer choice, reduced output and quality of entertainment and news programming, less consumer choice, and degradation of non-price dimensions of competition in national news, including credibility, editorial independence, investigative vigor, output, and viewpoint diversity.

28.    Plaintiffs Len Marazzo, Deborah Rubinsohn, and Gary Talewsky are current Paramount+ subscribers and have been since approximately 2021. After consummation of the Paramount Global acquisition on August 7, 2025, Paramount implemented a Paramount+ price increase effective January 15, 2026, increasing the Essential tier price by 12.516% and the Premium tier price by 7.698%. Each of these Plaintiffs paid the increased amount on or after January 15, 2026, and therefore suffered direct out-of-pocket harm in the form of subscription charges that were higher by a percentage than they would have paid absent the acquisition.

29.    The Paramount+ price increase was a concrete monetary injury to Plaintiffs Marazzo, Rubinsohn, and Talewsky. Each paid money out of pocket for Paramount+ after the January 15, 2026 price increase, and each paid more than he or she would have paid absent the acquisition. That overcharge is an injury to business or property and is redressable through damages under Section 4 of the Clayton Act.

**COMPLAINT FOR VIOLATION OF SECTION 7 OF THE     CASE NO.**
**CLAYTON ACT; TREBLE DAMAGES UNDER SECTION 4;**
**AND INJUNCTIVE RELIEF UNDER SECTION 16**

30.    Plaintiffs Pamela Faust and Lisa McCarthy are not current Paramount+ subscribers. Ms. Faust maintains multiple paid streaming subscriptions, including Netflix and Apple TV+, and Ms. McCarthy subscribes to Amazon Prime Video and uses other streaming services primarily when offered through free promotions. Ms. Faust and Ms. McCarthy are prospective Paramount+ subscribers who would consider subscribing to access Paramount+ premium programming. The post-acquisition Paramount+ price increase, effective January 15, 2026, raised the cost of entry and reduced Ms. Faust's and Ms. McCarthy's ability to add Paramount+ as a competitive alternative or to rotate subscriptions among services. Plaintiffs further allege that Paramount+ reduced consumer-friendly promotional mechanisms, including the retirement of free trials and reduced discounting, increasing the up-front cost and risk of sampling the service and raising switching and sampling costs. Ms. Faust and Ms. McCarthy were deterred from subscribing or re-subscribing by these increased costs and reduced consumer-friendly terms.

31.    Plaintiffs Faust and McCarthy are not asserting injury as mere observers of the market. Each has purchased streaming services, considers streaming services reasonably interchangeable at the margin, and would consider purchasing Paramount+ if it were offered at competitive prices and consumer-friendly terms. The post-acquisition price increase and reduction in promotional mechanisms made Paramount+ a less attractive substitute and reduced their practical ability to rotate subscriptions among competing services. Their injury is the loss of a competitive purchasing option and the increased cost of adding Paramount+ to their streaming mix.

32.    Plaintiffs purchase multi-channel video programming that includes access to nationally significant television news programming, including CNN and CBS. Plaintiff Len

**COMPLAINT FOR VIOLATION OF SECTION 7 OF THE**          **CASE NO.**
**CLAYTON ACT; TREBLE DAMAGES UNDER SECTION 4;**
**AND INJUNCTIVE RELIEF UNDER SECTION 16**

10

Marazzo subscribes to DirecTV and Hulu+Live TV and watches CNN. Plaintiff Lisa McCarthy subscribes to DirecTV (Ultimate package) and watches CNN. Plaintiff Deborah Rubinsohn subscribes to Verizon FiOS, Hulu+Live TV, and Philo and watches CNN. Plaintiff Gary Talewsky subscribes to Hulu+Live TV through a T-Mobile package and also receives traditional cable service. Skydance's acquisition of Paramount was approved on the explicit condition that CBS News operate under viewpoint restraints, in a context where Skydance understood it needed to align CBS News's editorial posture with the Trump Administration, which reduced the credibility, editorial independence, and investigative vigor of its reporting and therefore diminished the value of the CBS News channel as part of the paid cable packages that Plaintiffs purchase.

33.     Plaintiffs pay for packages that include national television news programming, and the value of those packages depends in part on the availability of credible, independent, and competing national news sources. When acquisition-related conditions and common ownership reduce editorial independence, investigative vigor, and viewpoint diversity, Plaintiffs receive a product of lower quality and lower value than the product for which they paid. Plaintiffs' injury is not disagreement with any particular viewpoint; it is the diminished quality, independence, and competitive value of national television news programming included in the paid packages they purchase.

34.     Plaintiffs purchase and use multiple streaming subscriptions and/or video packages and choose among services based on price, availability, and quality of premium programming. Ms. Faust subscribes to Netflix and Apple TV+ and attends theatrical films. Mr. Marazzo subscribes to streaming services including Paramount+, Netflix, and Max and maintains multiple subscriptions. Ms. McCarthy subscribes to Prime Video and uses additional services

**COMPLAINT FOR VIOLATION OF SECTION 7 OF THE           CASE NO.**
**CLAYTON ACT; TREBLE DAMAGES UNDER SECTION 4;**
**AND INJUNCTIVE RELIEF UNDER SECTION 16**

primarily when offered through free promotions. Ms. Rubinsohn subscribes to streaming services, including Paramount+, Netflix, Max, Hulu/Disney+, and others, and maintains multiple subscriptions. Mr. Talewsky subscribes to Netflix and Paramount+ through a T-Mobile package. Plaintiffs allege that the Paramount acquisition eliminated Skydance as an independent producer that previously produced premium programming for multiple competing distributors, thereby diminishing the independent sources of premium programming available across competing platforms used by Plaintiffs.

35.    Plaintiff Len Marazzo intends to continue subscribing to Paramount+, Netflix, Max, DirecTV, Hulu+Live TV, and other premium video or live-TV services, and intends to continue watching CNN and other national television news programming through paid video packages. He also intends to continue attending theatrical movies.

36.    Plaintiff Deborah Rubinsohn intends to continue subscribing to Paramount+, Netflix, Max, Hulu/Disney+, Verizon FiOS, Hulu+Live TV, Philo, and other premium video or live-TV services, and intends to continue watching national television news programming through paid video packages. She also intends to continue attending theatrical movies.

37.    Plaintiff Gary Talewsky intends to continue receiving Paramount+, Netflix, Hulu+Live TV, cable service, and other premium video or live-TV services, and intends to continue watching national television news programming through paid video packages. He also intends to continue attending theatrical movies.

38.    Plaintiff Pamela Faust intends to continue purchasing paid streaming services, including Netflix and Apple TV+, and would consider purchasing Paramount+ or other premium video services if offered at competitive prices and terms. She also intends to continue attending theatrical movies.

**COMPLAINT FOR VIOLATION OF SECTION 7 OF THE        CASE NO.**
**CLAYTON ACT; TREBLE DAMAGES UNDER SECTION 4;**
**AND INJUNCTIVE RELIEF UNDER SECTION 16**

12

39.    Plaintiff Lisa McCarthy intends to continue purchasing or using Prime Video, DirecTV, promotional streaming services, and other premium video or live-TV services, and would consider purchasing Paramount+ or other premium video services if offered at competitive prices and terms. She also intends to continue attending theatrical movies and watching CNN through her paid DirecTV package.

40.    Plaintiffs are threatened with further imminent loss or injury if Paramount's proposed acquisition of Warner Bros. Discovery is consummated because it would eliminate Warner Bros. Discovery as an independent competitor and further concentrate control over premium programming and nationally significant news assets, diminishing consumer choice and increasing the combined firm's ability and incentive to worsen consumer-facing terms, reduce output and variety of premium content, and degrade non-price competition in national television news.

41.    Plaintiffs are all routine theatrical moviegoers. Plaintiffs allege that if Paramount's proposed acquisition of Warner Bros. Discovery is consummated, the combined firm will reduce theatrical film output and narrow release slates, leaving moviegoers with fewer theatrical titles, less genre and budget variety, and fewer meaningful alternatives at local theaters, thereby diminishing the value of the theatrical experience by making trips to the movies less likely to offer appealing options and reducing the ability to substitute among titles when a particular film is unavailable, sold out, or unappealing.

42.    Plaintiffs intend to continue attending theatrical motion pictures in the future. They choose whether to attend movies based on the availability, variety, quality, release timing, and theater placement of first-run films. If Paramount acquires Warner Bros. Discovery, Plaintiffs will face fewer independent theatrical-distribution decisionmakers, fewer competing

**COMPLAINT FOR VIOLATION OF SECTION 7 OF THE**          **CASE NO.**
**CLAYTON ACT; TREBLE DAMAGES UNDER SECTION 4;**
**AND INJUNCTIVE RELIEF UNDER SECTION 16**

release slates, reduced genre and budget variety, and fewer meaningful alternatives at local theaters. Those injuries are concrete to Plaintiffs as moviegoers because they reduce the value and availability of theatrical choices Plaintiffs expect to purchase.

43.    Plaintiffs' injuries are fairly traceable to Skydance's acquisition of Paramount Global. The acquisition's elimination of an independent producer increased Paramount's ability and incentive to raise consumer prices and worsen consumer-facing terms, as evidenced by the post-acquisition price increases for Paramount+ effective January 15, 2026. The acquisition also reduced competition on non-price dimensions in national television news, including editorial independence, credibility, and investigative output, which threatens consumers with degraded news quality and diminished viewpoint diversity.

44.    Plaintiffs' threatened injuries are fairly traceable to Paramount's proposed acquisition of Warner Bros. Discovery. By consolidating ownership and control over premium video programming assets and nationally significant news properties, the acquisition may substantially lessen competition and increase Paramount's ability and incentive to raise consumer prices and worsen consumer-facing terms, reduce theatrical output, and diminish independent editorial rivalry and the quality and diversity of news programming.

45.    Plaintiffs' threatened injuries became more imminent after Warner Bros. Discovery stockholders approved the Paramount transaction on April 23, 2026. That approval increased the likelihood of consummation and shortened the path to closing, thereby heightening Plaintiffs' threatened loss or damage in the Premium Video Distribution Market, National TV News Market, and Theatrical Distribution Market.

46.    Plaintiffs' injuries are redressable by the relief requested. Treble damages would compensate Plaintiffs Marazzo, Rubinsohn, and Talewsky for the overcharges they paid after the

Paramount+ price increase. Divestiture of Paramount Global would restore Skydance and Paramount to independent competitive decision-making and reduce the continuing effects of the completed acquisition. An injunction prohibiting Paramount's acquisition of Warner Bros. Discovery would prevent further consolidation before it occurs and preserve Warner Bros. Discovery as an independent competitor in premium video distribution, national television news, and theatrical distribution.

## VI.    FACTUAL BACKGROUND AND TRANSACTION TIMELINES

### A.    Skydance Acquisition of Paramount Global (Consummated August 7, 2025)

47.    On July 2, 2024, Skydance reached a preliminary agreement regarding a three-way transaction involving Skydance, National Amusements, and Paramount, referred to as "New Paramount."

48.    On July 7, 2024, Skydance Media announced an $8 billion deal to acquire Paramount Global, forming a new entity, Paramount Skydance Corporation, with an enterprise valuation of approximately $28 billion.

49.    The acquisition was structured in phases, including the purchase of National Amusements by a Skydance investor group, payments to Paramount shareholders, and an infusion of capital into Paramount.

50.    During the period in which Skydance's acquisition of Paramount Global was pending regulatory approval, Paramount paid $16 million to settle litigation brought by President Donald Trump, in his individual capacity, against CBS, the Paramount-owned network that broadcasts *60 Minutes*. On information and belief, the lawsuit was baseless because it was premised on editorial decisions regarding an interview of then–Vice President Kamala Harris, and Paramount had no legitimate economic reason or justification to pay $16 million to settle that suit during the regulatory-approval period except its belief that doing so was necessary to

COMPLAINT FOR VIOLATION OF SECTION 7 OF THE          CASE NO.
CLAYNT ACT; TREBLE DAMAGES UNDER SECTION 4;
AND INJUNCTIVE RELIEF UNDER SECTION 16

15

secure political and regulatory approval for Skydance's acquisition of Paramount Global, mirroring the type of political "horse trading" condemned in *Reilly v. Hearst Corp.*, 107 F. Supp. 2d 1192, 1209 (N.D. Cal. 2000). On information and belief, Paramount's $16 million settlement payment to President Trump was not an ordinary litigation settlement, but a quid pro quo intended to secure governmental approval of Skydance's acquisition of Paramount Global, including FCC approval of the broadcast-license transfers and the United States Department of Justice's decision not to bring an action to enjoin the acquisition.

51.     After the settlement, CBS announced that it would not renew *The Late Show with Stephen Colbert*, whose host was a prominent critic of the Trump Administration and had publicly criticized Paramount's settlement of President Trump's lawsuit against CBS. On information and belief, CBS canceled or terminated *The Late Show with Stephen Colbert* because of Colbert's status as a critic of the Trump Administration and his criticism of Paramount's settlement of President Trump's lawsuit against CBS.

52.     After consummation of Skydance's acquisition of Paramount Global, CBS implemented changes to CBS News leadership and practices that Plaintiffs allege were aligned with the preferences of the Trump Administration.

53.     Paramount's broadcast-license transfers required Federal Communications Commission approval as part of the approval process for Skydance's acquisition of Paramount Global.

54.     The FCC approved the broadcast-license transfers associated with Skydance's acquisition of Paramount Global by a 2–1 vote.

55.     The dissenting FCC commissioner issued a public dissent criticizing the approval and the conditions associated with it, describing the agency's actions as an erosion of First

COMPLAINT FOR VIOLATION OF SECTION 7 OF THE          CASE NO.
CLAYTON ACT; TREBLE DAMAGES UNDER SECTION 4;
AND INJUNCTIVE RELIEF UNDER SECTION 16

16

Amendment protections and warning that the American public will ultimately pay the price.

56.    In that dissent, the commissioner described the FCC's involvement and conditions as "unprecedented" and identified conditions and requirements imposed in connection with approval, including the elimination of corporate DEI programs and requirements affecting CBS News governance and newsroom decision-making.

57.    As part of the FCC's approval conditions, CBS agreed to appoint an ombudsperson to monitor CBS News, including receiving and evaluating complaints regarding bias and related concerns, and to report within the CBS News organizational structure as specified in the FCC-related commitments.

58.    The acquisition closed on August 7, 2025, after Paramount paid $16 million to settle President Trump's lawsuit against CBS during the regulatory-approval period, CBS announced the end of *The Late Show with Stephen Colbert* after Colbert criticized the settlement, and the FCC approved the license transfers subject to conditions affecting CBS News governance, newsroom oversight, and corporate policy, all of which Plaintiffs allege reflected political pressure and transaction-related concessions to the Trump Administration rather than ordinary competition on the merits.

59.    After closing, Skydance CEO David Ellison became Chairman and CEO of Paramount Skydance, and Jeff Shell became President.

**B.    Proposed Paramount Acquisition of Warner Bros. Discovery**

60.    In September 2025, David Ellison met with Paramount's board to discuss buying Warner Bros. Discovery as the way to "compete" with Amazon, Disney, and Netflix, signaling that the company's chosen response was to eliminate an independent competitor and aggregate scale rather than earn competitiveness through better programming, better pricing, and better consumer-facing offerings.

**COMPLAINT FOR VIOLATION OF SECTION 7 OF THE        CASE NO.**
**CLAYTON ACT; TREBLE DAMAGES UNDER SECTION 4;**
**AND INJUNCTIVE RELIEF UNDER SECTION 16**

61.    A few days later, Ellison visited Warner Bros. Discovery CEO David Zaslav's home to propose a $19-per-share cash-and-stock bid, later formalized in a letter that set the cash component at approximately 60%. At the time, Zaslav was planning to split Warner Bros. Discovery into a movie studio and streaming company and a television network business, and Warner Bros. Discovery refused the deal.

62.    Paramount increased its offers repeatedly. Later in September 2025, Paramount raised its proposal to $22 per share, with approximately 67% cash, included a $2 billion payment if Paramount's proposed acquisition of Warner Bros. Discovery did not pass regulatory review, and proposed that Zaslav remain as co-CEO and co-chairman of the combined company.

63.    A third offer on October 13 increased the bid to $23.50 per share with approximately 80% cash, again without success.

64.    After Paramount's attempts, Warner Bros. Discovery announced it was reviewing strategic alternatives after receiving unsolicited interest from multiple parties. Bidders reportedly included Netflix, Comcast (through NBCUniversal), and Paramount Skydance. Warner Bros. Discovery opened an auction process that proceeded through non-binding proposals and binding bids.

65.    During that process, Paramount Skydance continued to pursue the acquisition of Warner Bros. Discovery, including bids to acquire the full company, including its cable networks and Warner Bros. Discovery's interest in CNN. At the same time, other bidders reportedly focused solely on Warner Bros. Discovery's studios and streaming assets.

66.    On December 8, 2025, Paramount Skydance launched a hostile all-cash offer of $30 per share for Warner Bros. Discovery, valuing Warner Bros. Discovery at approximately $108.4 billion in enterprise value, supported by equity backing and debt commitments. Warner

**COMPLAINT FOR VIOLATION OF SECTION 7 OF THE**          CASE NO.
**CLAYTON ACT; TREBLE DAMAGES UNDER SECTION 4;**
**AND INJUNCTIVE RELIEF UNDER SECTION 16**

Bros. Discovery's board indicated it would review the proposal and later rejected it. At the same time, Warner Bros. Discovery pursued an agreement with Netflix for Warner Bros. Discovery's studios and streaming assets.

67.    On February 17, 2026, Warner Bros. Discovery stated it would reopen negotiations with Paramount Skydance after Netflix granted a limited waiver to permit Paramount to submit a best and final offer, and Warner Bros. Discovery confirmed it received a revised offer from Paramount shortly thereafter.

68.    According to public reporting from February 2026, Paramount CEO David Ellison met privately with President Trump at the White House during the week of February 9–15, 2026, during which they reportedly had two wide-ranging conversations. Shortly thereafter, on February 21, 2026, President Trump posted on Truth Social demanding that Netflix "IMMEDIATELY" remove Susan Rice, a member of the Democratic Party and former director of the United States Domestic Policy Council, from its board "or suffer the consequences," despite having publicly claimed he was "not involved" in the contemporaneous bidding contest involving Netflix and Paramount for Warner Bros. Discovery.

69.    On February 26, 2026, Warner Bros. Discovery confirmed that it considered Paramount's increased bid superior to Netflix's offer, triggering a contractual period during which Netflix could improve its offer.

70.    Warner Bros. Discovery's February 26, 2026 announcement stated that Paramount's revised proposal valued Warner Bros. Discovery at $31.00 per share in cash, and included additional deal protections and incentives, including a ticking fee, a regulatory termination fee, and Paramount's agreement to pay the $2.8 billion termination fee Warner Bros. Discovery would owe Netflix if Warner Bros. Discovery terminated the Netflix agreement. On

**COMPLAINT FOR VIOLATION OF SECTION 7 OF THE       CASE NO.**
**CLAYTON ACT; TREBLE DAMAGES UNDER SECTION 4;**
**AND INJUNCTIVE RELIEF UNDER SECTION 16**

information and belief, these deal protections and payments were anticompetitive acts in furtherance of the Section 7 violation because they were intended to impede competing bids, neutralize Netflix's contractual position, induce Warner Bros. Discovery to abandon the Netflix transaction, and lock up Warner Bros. Discovery for Paramount notwithstanding the anticompetitive effects of combining Paramount and Warner Bros. Discovery.

71.     Warner Bros. Discovery further announced that, under the Netflix acquisition agreement, Warner Bros. Discovery's notice to Netflix of the Company Superior Proposal triggered a four-business-day match period during which Netflix had the right to propose revisions so that Paramount's proposal would cease to constitute a Company Superior Proposal.

72.     Public statements by Netflix confirmed that it declined to match Paramount's revised proposal. Upon Netflix's decision not to improve its offer, Warner Bros. Discovery announced Paramount as the winning bidder, positioning Paramount to acquire Warner Bros. Discovery's assets, including CNN, a nationally significant news property.[1]

73.     On April 23, 2026, Warner Bros. Discovery stockholders voted to approve the proposed transaction with Paramount Skydance at Warner Bros. Discovery's Special Meeting of Stockholders. Warner Bros. Discovery announced that, based on the preliminary vote count, stockholders overwhelmingly approved the adoption of the merger agreement with Paramount. Warner Bros. Discovery further announced that the transaction was expected to close in the third quarter of 2026, subject to customary closing conditions, including regulatory clearances.

---

[1] Plaintiffs allege that Netflix was outbid by Paramount and thereby lost the Warner Bros. Discovery transaction. Plaintiffs do not allege that the proposed Netflix acquisition of Warner Bros. Discovery would have been lawful or procompetitive. To the contrary, Plaintiffs allege that a Netflix acquisition of Warner Bros. Discovery also would have violated Section 7 because it would have eliminated Warner Bros. Discovery as an independent competitor and further concentrated premium video distribution, streaming, filmed entertainment, and related media assets in an already concentrated market. Plaintiffs allege that Paramount's acquisition presents additional and distinct competitive injury, including the common ownership of CBS News and CNN. Plaintiffs further allege that both proposed transactions reflect the same unlawful consolidation trend that Section 7 forbids.

**COMPLAINT FOR VIOLATION OF SECTION 7 OF THE**          **CASE NO.**
**CLAYTON ACT; TREBLE DAMAGES UNDER SECTION 4;**
**AND INJUNCTIVE RELIEF UNDER SECTION 16**

74. The April 23, 2026, stockholder vote materially changed the posture of the proposed acquisition. Before that vote, the transaction remained contingent on Warner Bros. Discovery stockholder approval. After that vote, a major closing condition had been satisfied, and the threatened injury to Plaintiffs became substantially more imminent because the remaining barriers to consummation were principally regulatory and closing-condition barriers rather than stockholder approval.

75. Public reporting contemporaneous with these events reflects that CNN was a focal point of political and market attention surrounding the Warner Bros. Discovery bidding process and the identity of the ultimate acquirer.

76. Public reporting quotes Netflix's co-CEO Ted Sarandos describing President Trump's interest in the Warner Bros. Discovery transaction as materially tied to CNN, stating: "Once it was clear that we weren't in the CNN business, it was a lot less interesting. He didn't care that much more about our deal."

77. On information and belief, treating the ownership and control of CNN as a matter of political leverage is evidence that the Warner Bros. Discovery sale process was not driven solely by ordinary commercial considerations, but also by political considerations and horse trading over a major national news outlet.

78. On information and belief, political leverage over the ownership and editorial direction of a major news network is itself a competitive injury in the national television news market, because competition in that market depends on independent editorial decision-making and independent centers of newsroom control, not merely on nominal ownership labels.

79. By placing CNN and other news assets under Paramount's control as part of a broader consolidation strategy, Paramount's proposed acquisition of Warner Bros. Discovery

**COMPLAINT FOR VIOLATION OF SECTION 7 OF THE       CASE NO.**
**CLAYTON ACT; TREBLE DAMAGES UNDER SECTION 4;**
**AND INJUNCTIVE RELIEF UNDER SECTION 16**

would reduce the number of independent owners capable of sustaining national television news operations at scale and weaken competitive constraints that protect editorial rivalry, investigative resources, and viewpoint diversity.

80.     On information and belief, during his visit to Washington, David Ellison offered assurances to Trump Administration officials that if he bought Warner Bros. Discovery, he would make sweeping changes to CNN, a common target of President Trump's criticism. According to reporting from The Wall Street Journal and subsequent coverage in December 2025, Donald Trump told people close to him that he wanted to see CNN under new ownership and that any sale of its parent company (Warner Bros. Discovery) includes significant changes to the network's programming.

81.     These allegations underscore the foreseeable risk that Paramount's proposed acquisition of Warner Bros. Discovery will constrain editorial independence and lessen non-price competition in the National TV News Market by placing CNN and CBS News under common ownership and subjecting them to heightened political pressures, leaving the public with fewer viable, independent news options.

C.     **Timeliness and Absence of Laches**

82.     Plaintiffs did not unreasonably delay in bringing this action. The challenged Warner Bros. Discovery transaction developed through a changing, contested sale process involving competing bidders, evolving transaction structures, a Netflix agreement, a later Paramount superior proposal, Netflix's matching rights, Netflix's decision not to match, and then Warner Bros. Discovery stockholder approval. Plaintiffs acted after Paramount emerged as the winning bidder and after the transaction became sufficiently concrete and imminent to support injunctive relief under Section 16.

**COMPLAINT FOR VIOLATION OF SECTION 7 OF THE          CASE NO.
CLAYTON ACT; TREBLE DAMAGES UNDER SECTION 4;
AND INJUNCTIVE RELIEF UNDER SECTION 16**

83.     The April 23, 2026, stockholder vote removed a major condition to closing and made the threatened injury more immediate. Plaintiffs are not required to sue at the first rumor, expression of interest, rejected offer, competing bid, or preliminary proposal. Filing before the transaction became fixed would have invited arguments that the claim was speculative, unripe, or not directed at an actual acquisition likely to proceed.

84.     Any alleged delay has prejudiced no Defendant. The transaction has not closed. The requested relief would preserve the status quo by preventing consummation of an unlawful acquisition. Defendants entered and continued the transaction with knowledge that it remained subject to stockholder approval, regulatory clearances, antitrust scrutiny, and possible litigation. Any transaction expenses, integration planning, financing commitments, public-relations efforts, or regulatory submissions undertaken before closing are ordinary and voluntary transaction costs, not cognizable prejudice caused by Plaintiffs.

## VII.    RELEVANT MARKETS AND COMPETITION; ANTICOMPETITIVE EFFECTS

85.     Skydance's completed acquisition of Paramount Global and Paramount's proposed acquisition of Warner Bros. Discovery lessen competition across at least three relevant product markets: (i) premium video programming distribution, (ii) national television news programming, and (iii) theatrical distribution. The completed acquisition provides concrete evidence of how reduced competitive constraints translate into consumer harm, and the proposed transaction would extend and amplify those harms by eliminating additional independent rivals and internalizing competitive decision-making under common ownership.

### A.  Premium Video Distribution Market

86.     One relevant market is the distribution of premium video entertainment

**COMPLAINT FOR VIOLATION OF SECTION 7 OF THE            CASE NO.**
**CLAYTON ACT; TREBLE DAMAGES UNDER SECTION 4;**
**AND INJUNCTIVE RELIEF UNDER SECTION 16**

programming to consumers in the United States (the "Premium Video Distribution Market"), including subscription streaming services, cable television, and related offerings through which consumers watch premium entertainment programming. Firms compete in this market on price and on non-price terms that matter to consumers, including content availability and variety, release cadence, bundles and tiers, promotions and free trials, and advertising load.

87.    The Premium Video Distribution Market is distinct from non-premium video and other forms of entertainment because consumers demand professionally produced, high-budget film and television programming featuring recognized talent, high production values, and franchise or prestige attributes, and they purchase or subscribe to services to access that programming. Consumers do not view short-form user-generated content, social-media video, or other non-premium entertainment options as reasonably interchangeable substitutes for premium film and television programming, particularly for marquee releases, franchise installments, and premium series.

88.    Providers in the Premium Video Distribution Market compete by setting subscription prices, tiering, and consumer-facing terms, and by controlling content libraries, release cadence, and availability windows. Because consumers typically assemble a bundle of services and cannot feasibly subscribe to every offering at once, changes in pricing, advertising load, promotions, and content availability materially affect consumer choice, churn, and the value consumers receive. These competitive dynamics make the Premium Video Distribution Market a relevant antitrust product market in which the loss of an independent rival can predictably lead to higher prices and worse consumer-facing terms.

89.    The geographic market for Premium Video Distribution is the United States because services are marketed, priced, and offered on a U.S. basis; content rights and licensing

**COMPLAINT FOR VIOLATION OF SECTION 7 OF THE**          **CASE NO.**
**CLAYTON ACT; TREBLE DAMAGES UNDER SECTION 4;**
**AND INJUNCTIVE RELIEF UNDER SECTION 16**

are negotiated with U.S. territorial restrictions; and competitive conditions, distributor relationships, and consumer options are substantially uniform nationwide.

90.     Before the acquisition, Skydance operated as an independent producer, packaging, financing, and producing high-budget, prestige film and television programming for distribution by multiple competing studios and streaming platforms. Skydance's pre-acquisition slate demonstrates its significance as an independent producer of premium programming. Skydance was a producer and financier on *Top Gun: Maverick* (2022), and it produced high-impact television for downstream distributors, including *Reacher* for Amazon Prime Video and *Grace and Frankie* for Netflix. Following the acquisition, Skydance Television became part of a revived Paramount Television Studios, while Skydance's film and animation divisions integrated into the broader Paramount studio portfolio. The acquisition may substantially lessen competition by eliminating Skydance as an independent rival to Paramount, thereby reducing the number of separate firms making greenlight, packaging, financing, and allocation decisions for premium projects. With one fewer independent producer, competitive pressure is reduced, and that harm reaches consumers through lower quality and variety, and fewer independent sources of premium programming available across competing platforms.

91.     The completed transaction also provides direct evidence of consumer harm in the Premium Video Distribution Market. After the acquisition was consummated, Paramount announced and implemented price increases for Paramount+ effective January 15, 2026, reflecting weakened competitive constraints and causing direct out-of-pocket harm and reduced value for consumers.

92.     The foregoing is the opposite of the competitive outcome Section 7 is designed to protect. If Skydance had competed as Congress intended, it would have built its own slate and

expanded as an independent rival, constraining Paramount through head-to-head competition. Instead, Skydance acquired Paramount and integrated its previously independent production operations into Paramount's studio structure, replacing potential rivalry with consolidation.

93.    Paramount's proposed acquisition of Warner Bros. Discovery would further lessen competition in the Premium Video Distribution Market by eliminating Warner Bros. Discovery as an independent rival distributor of premium video programming and placing its streaming offerings, premium brands, and content libraries under Paramount's common ownership and control. That would reduce the number of meaningful alternatives available to consumers and increase the combined firm's ability and incentive to raise prices and worsen consumer-facing terms.

**COMPLAINT FOR VIOLATION OF SECTION 7 OF THE       CASE NO.**
**CLAYTON ACT; TREBLE DAMAGES UNDER SECTION 4;**
**AND INJUNCTIVE RELIEF UNDER SECTION 16**

94.     Warner Bros. Discovery and Paramount are each meaningful independent competitors in premium video distribution. Before the proposed transaction, Warner Bros. Discovery's U.S. streaming revenue was approximately $10.3 billion, and Paramount's was approximately $7.6 billion, demonstrating that each separately constrains other major streaming services.



**Domestic Rankings of Top U.S. Video Streaming Services**
Revenues (Pre-Merger - 2024)

Source: hollywoodreporter.com

95.    Combining Paramount+ and Warner Bros. Discovery's streaming businesses would create a service with approximately $17.9 billion in U.S. streaming revenue, placing the merged firm closer to the leading streaming platforms and eliminating direct rivalry between those previously independent services.



## Domestic Rankings of Top U.S. Video Streaming Services
### Revenues (Post-Merger)

Source: hollywoodreporter.com

96.    Subscriber data likewise confirms that both firms are substantial competitors. Before the proposed transaction, HBO Max had approximately 128 million subscribers, and Paramount+ had approximately 79.1 million subscribers, making each an important independent source of premium programming and consumer choice.

## Domestic Rankings of Top U.S. Video Streaming Services
### Number of Subscribers (Pre-Merger*)



*Q1 2023 - Q4 2025 data

Source: flixpatrol.com/streaming-services/subscribers

**COMPLAINT FOR VIOLATION OF SECTION 7 OF THE        CASE NO.
CLAYTON ACT; TREBLE DAMAGES UNDER SECTION 4;
AND INJUNCTIVE RELIEF UNDER SECTION 16**

97.    The combined service would have approximately 207.1 million subscribers, vaulting it ahead of Amazon Prime Video and leaving consumers with fewer independent premium-video alternatives at scale.



Domestic Rankings of Top U.S. Video Streaming Services
Number of Subscribers (Post-Merger)

*Q1 2023 - Q4 2025 data

Source: flixpatrol.com/streaming-services/subscribers

COMPLAINT FOR VIOLATION OF SECTION 7 OF THE    CASE NO.
CLAYTON ACT; TREBLE DAMAGES UNDER SECTION 4;
AND INJUNCTIVE RELIEF UNDER SECTION 16

30

98.    The completed Skydance-Paramount transaction also provides direct evidence of consumer-facing harm. The average monthly prices charged by leading streaming services, including Paramount+, have increased materially over time, and Paramount+ implemented a post-acquisition price increase effective January 15, 2026, consistent with weakened competitive constraints and worsened consumer-facing terms.

B.  National TV News Market

99.    A second relevant market is the production and distribution of national television news programming to consumers in the United States (the "National TV News Market"). Competition includes audience, advertising, carriage, and reputation, and it turns on non-price quality dimensions valued by consumers, including credibility, editorial independence, investigative vigor, breadth of coverage, and viewpoint diversity.

100.    National television news programming is a distinct product market because it is produced and distributed through national news networks and national broadcast news divisions that compete for a nationwide audience, national advertising, pay-TV carriage, and reputation. National TV news has unique characteristics valued by consumers, including nationwide newsgathering capacity, access to sources and correspondents, live coverage infrastructure, and institutional brand credibility that consumers rely on when choosing among major national outlets.

101.    Local television news, newspapers, digital-only outlets, social media, and radio are not reasonably interchangeable substitutes for national TV news for consumers because they do not offer the same national scope, continuous live coverage, and branded, nationally distributed programming formats. Consumers commonly choose among major national news brands based on credibility and editorial independence, and those brands impose competitive and

**COMPLAINT FOR VIOLATION OF SECTION 7 OF THE      CASE NO.**
**CLAYTON ACT; TREBLE DAMAGES UNDER SECTION 4;**
**AND INJUNCTIVE RELIEF UNDER SECTION 16**

reputational constraints on one another on non-price dimensions, including investigative investment, breadth of coverage, and viewpoint diversity.

102. The geographic market is national because distribution, branding, advertising, and competitive effects are nationwide. Major national news programs are offered nationwide through cable, satellite, and streaming pay-TV packages and are monetized through national advertising and national carriage arrangements.

103. Plaintiffs consume news media, including CBS and CNN, and value credibility, editorial independence, and viewpoint diversity as core competitive dimensions. CBS News is a major Paramount property, and Plaintiffs allege that the acquisition review and approval occurred in a political and regulatory environment that influenced CBS News's governance and editorial independence. During the review period, Donald Trump was elected to a second term as President and continued to pursue a lawsuit against CBS. Plaintiffs allege that Paramount paid $16 million to settle that lawsuit during the approval period, and that Paramount chose not to renew *The Late Show with Stephen Colbert* after Colbert criticized the settlement on air. Plaintiffs further allege that, after the acquisition, David Ellison made changes to CBS News leadership and practices consistent with diminished editorial independence.

104. Plaintiffs also allege that FCC approval of Skydance's acquisition of Paramount Global and the associated license transfer were conditioned on governance and policy changes affecting CBS News that operated as viewpoint restraints, including the creation of an ombudsman to monitor CBS News and other internal corporate policy conditions. These conditions and changes, as alleged, lessened non-price competition by centralizing and constraining editorial decision-making and increasing the risk of political influence over programming and newsroom judgment, thereby diminishing the independence, credibility,

COMPLAINT FOR VIOLATION OF SECTION 7 OF THE           CASE NO.
CLAYTON ACT; TREBLE DAMAGES UNDER SECTION 4;
AND INJUNCTIVE RELIEF UNDER SECTION 16

32

investigative vigor, and viewpoint diversity that consumers rely on when choosing and consuming national news programming.

105.    Warner Bros. Discovery is a substantial independent competitor in U.S. news and media markets. Before the proposed transaction, Warner Bros. Discovery generated approximately $37.86 billion in annual revenue, and Paramount generated approximately $28.76 billion, confirming that Paramount seeks to acquire a major existing rival rather than a failing or marginal participant.



## Rankings of Top U.S. News Media Companies
Revenues (Pre-Merger - 2025)

Source: investopedia.com

COMPLAINT FOR VIOLATION OF SECTION 7 OF THE    CASE NO.
CLAYTON ACT; TREBLE DAMAGES UNDER SECTION 4;
AND INJUNCTIVE RELIEF UNDER SECTION 16

33

106.    Combining Paramount and Warner Bros. Discovery would create a firm with approximately $66.62 billion in annual revenue, elevating the combined company to the second-largest U.S. news media company by revenue behind Comcast. This increase in scale would materially concentrate ownership over nationally significant news and entertainment assets.



## Rankings of Top U.S. News Media Companies
### Revenues (Post-Merger)

Source: investopedia.com

COMPLAINT FOR VIOLATION OF SECTION 7 OF THE            CASE NO.
CLAYTON ACT; TREBLE DAMAGES UNDER SECTION 4;
AND INJUNCTIVE RELIEF UNDER SECTION 16

34

107.     Before the proposed acquisition, Warner Bros. Discovery and Paramount each held substantial market capitalization, further confirming that this transaction would eliminate an independent competitor of real market significance rather than merely consolidate insignificant assets.



## Rankings of Top U.S. News Media Companies
Market Capitalization (Pre-Merger - 2025)

Source: investopedia.com

**COMPLAINT FOR VIOLATION OF SECTION 7 OF THE     CASE NO.**
**CLAYTON ACT; TREBLE DAMAGES UNDER SECTION 4;**
**AND INJUNCTIVE RELIEF UNDER SECTION 16**

35

108.    The proposed transaction would create a combined firm with approximately $84.47 billion in market capitalization, again making it one of the largest U.S. media companies and increasing concentration in markets that include nationally significant television news.



### Rankings of Top U.S. News Media Companies
Market Capitalization (Post-Merger)

Source: investopedia.com

C.  Theatrical Distribution Market

109.    A third relevant market is theatrical distribution, where major studio-distributors compete for competitively significant distribution advantages, including screen access and showtimes, premium large-format placements (such as IMAX and Dolby Cinema), nationwide marketing commitments, release dates, and the timing and length of exclusive theatrical windows. Studios also compete on the terms offered to exhibitors and on securing favorable release dates and sustained runs. These downstream competitive dynamics determine how many

**COMPLAINT FOR VIOLATION OF SECTION 7 OF THE       CASE NO.**
**CLAYTON ACT; TREBLE DAMAGES UNDER SECTION 4;**
**AND INJUNCTIVE RELIEF UNDER SECTION 16**

films reach theaters, how widely they are shown, and how much choice and variety moviegoers have at any given time.

110.   Theatrical exhibition is a distinct product market because consumers and exhibitors value first-run, out-of-home viewing in a theater environment, and because theatrical release windows, box-office pricing, and exhibition terms differ materially from home viewing via streaming or video-on-demand. For wide-release films, a theatrical run is not reasonably interchangeable with immediate home availability because the theatrical window confers unique value, including event viewing, premium formats, and time-sensitive access that consumers cannot replicate at home.

111.   Competition in theatrical distribution is shaped by bottlenecks that do not exist in home distribution, including finite screen capacity, limited premium-format auditoriums, and constrained showtimes during peak periods. As a result, major studio-distributors compete intensely for release dates, premium-format access, and sustained runs. Changes in the number of independent studio-producers may substantially lessen competition by reducing output, narrowing slates, and diminishing the choice and variety available to moviegoers at local theaters.

112.   The relevant geographic market is the United States because major theatrical distribution decisions, release calendars, marketing campaigns, and exhibitor negotiations are planned and executed on a nationwide basis, and because the competitive significance of wide release, premium-format allocation, and exclusivity windows is determined through national distribution strategy and national exhibitor relationships.

113.   The completed transaction illustrates the broader harm from replacing potential entry with consolidation rather than expanding output through independent rivalry. By

**COMPLAINT FOR VIOLATION OF SECTION 7 OF THE       CASE NO.**
**CLAYTON ACT; TREBLE DAMAGES UNDER SECTION 4;**
**AND INJUNCTIVE RELIEF UNDER SECTION 16**

integrating Skydance's production decision-making into Paramount's studio structure, the acquisition reduced the number of independent decision centers competing for influence over slate formation and distribution strategy, weakening the competitive pressure that would otherwise discipline output, variety, and consumer-facing value across Paramount's distribution channels.

114.    If Paramount's proposed acquisition of Warner Bros. Discovery is consummated, the combined firm would have increased ability and incentive to reduce theatrical film output and narrow release slates, substantially lessening competition by leaving moviegoers with fewer theatrical titles, less genre and budget variety, and fewer meaningful alternatives at local theaters.

115.    Before the proposed transaction, the four largest U.S./Canada motion-picture studios shown in the chart were Disney at approximately 21.4%, Universal at approximately 20.2%, Warner Bros. at approximately 13.4%, and Sony/Columbia at approximately 11.1%, for a combined top-four share of approximately 66.1%. Paramount separately accounted for approximately 10.2% of the market.

**COMPLAINT FOR VIOLATION OF SECTION 7 OF THE**          **CASE NO.**
**CLAYTON ACT; TREBLE DAMAGES UNDER SECTION 4;**
**AND INJUNCTIVE RELIEF UNDER SECTION 16**

116.    If Paramount acquires Warner Bros. Discovery, Paramount and Warner Bros. would combine into a single firm with approximately 23.6% market share, making the combined Paramount/Warner Bros. entity the largest studio shown in the chart. The post-merger top four studios would be Paramount/Warner Bros. at approximately 23.6%, Disney at approximately 21.4%, Universal at approximately 20.2%, and Sony/Columbia at approximately 11.1%, for a combined top-four share of approximately 76.3%. The proposed transaction, therefore, would not merely combine two studios; it would increase top-four concentration by approximately 10.2 percentage points and eliminate Paramount as an independent studio competitor.

## Market Share of Motion Picture Studios In U.S. and Canada



Source: statista.com

COMPLAINT FOR VIOLATION OF SECTION 7 OF THE          CASE NO.
CLAYTON ACT; TREBLE DAMAGES UNDER SECTION 4;
AND INJUNCTIVE RELIEF UNDER SECTION 16

39

117.    Historical box-office performance confirms that both companies are major competitors in the theatrical market. Before the proposed transaction, Warner Bros. and Paramount had generated approximately $25.54 billion and $19.32 billion in total domestic box-office revenue, respectively, over the measured period from 1997 to 2026.



## Rankings of Top U.S. Motion Picture Studios
Total Domestic Box Office Revenues (Pre-Merger -1997-2026)

Source: thenumbers.com

118.    Combining Paramount and Warner Bros. would yield approximately $44.86 billion in domestic box-office revenues over the measured period, making the combined firm the leading theatrical studio and increasing its leverage over release slates, premium screens, and exhibition terms.



## Rankings of Top U.S. Motion Picture Studios
### Total Domestic Box Office Revenues (Post-Merger)

Source: thenumbers.com

### VIII.   CLAIMS FOR RELIEF

**Count I – Violation of Section 7 of the Clayton Act, 15 U.S.C. § 18; Treble Damages Under Section 4, 15 U.S.C. § 15; and Injunctive Relief Under Section 16, 15 U.S.C. § 26 (Skydance's Acquisition of Paramount Global)**

119.    Plaintiffs reallege and incorporate by reference the allegations set forth above.

120.    Skydance's acquisition of Paramount Global is an acquisition within the meaning of Section 7 of the Clayton Act.

**COMPLAINT FOR VIOLATION OF SECTION 7 OF THE      CASE NO.**
**CLAYTON ACT; TREBLE DAMAGES UNDER SECTION 4;**
**AND INJUNCTIVE RELIEF UNDER SECTION 16**

121.    Skydance's nontrivial acquisition of Paramount Global substantially lessened competition in the relevant lines of commerce alleged in this Complaint, including (a) the production of premium filmed entertainment and video programming to U.S. consumers, (b) the production and distribution of national television news programming to U.S. consumers, and (c) the production and distribution of theatrical films for U.S. moviegoers in the United States.

122.    Skydance's acquisition of Paramount Global violated Section 7 because it eliminated Skydance as an independent producer of premium film and television programming, internalized Skydance's content pipeline within a major incumbent distributor, and increased the combined firm's ability and incentive to foreclose rivals through exclusivity, windowing control, delayed licensing, and other restrictions across theatrical, broadcast, cable, and streaming channels.

123.    Skydance's acquisition of Paramount Global further violates Section 7 because it lessened non-price competition in national news programming by consolidating and constraining editorial governance at CBS News through acquisition-related conditions and post-acquisition governance changes, thereby lessening competition on credibility, editorial independence, investigative output, and viewpoint diversity.

124.    Plaintiffs Len Marazzo, Deborah Rubinsohn, and Gary Talewsky have sustained injury and damage by reason of Skydance's acquisition of Paramount Global, including direct out-of-pocket harm from Paramount's post-acquisition Paramount+ price increase effective January 15, 2026. Plaintiffs Marazzo, Rubinsohn, and Talewsky paid increased subscription charges after Paramount raised Paramount+ subscription prices and therefore suffered damages in the form of subscription charges that were higher than they would have paid absent the acquisition. Plaintiffs Marazzo, Rubinsohn, and Talewsky are therefore entitled to treble

damages, costs of suit, and reasonable attorneys' fees under Section 4 of the Clayton Act, 15 U.S.C. § 15.

125.    Plaintiffs are threatened with injury and damage by reason of Skydance's acquisition of Paramount Global and have no adequate remedy at law. Plaintiffs are therefore entitled to injunctive and other equitable relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, including an order requiring Paramount Skydance to divest itself of any and all interest in Paramount Global and such other structural relief as necessary to restore competition.

**Count II – Violation of Section 7 of the Clayton Act, 15 U.S.C. § 18; Injunctive Relief Under Section 16, 15 U.S.C. § 26**
**(Paramount's proposed acquisition of Warner Bros. Discovery)**

126.    Plaintiffs reallege and incorporate by reference the allegations set forth above.

127.    Paramount's proposed acquisition of Warner Bros. Discovery is an acquisition within the meaning of Section 7 of the Clayton Act.

128.    Paramount's proposed acquisition of Warner Bros. Discovery may substantially lessen competition in the relevant lines of commerce alleged in this Complaint, including (a) the production and distribution of premium video programming to U.S. consumers, including across broadcast, cable, and streaming channels; (b) the production and distribution of national television news programming to U.S. consumers, including across broadcast, cable, and streaming channels; and (c) the production of theatrical films for U.S. moviegoers in the United States.

129.    Paramount's proposed acquisition of Warner Bros. Discovery violates Section 7 because it may substantially lessen competition in premium video programming, cable and pay-TV programming, streaming distribution, and theatrical production by eliminating Warner Bros. Discovery as an independent competitor and increasing Paramount's ability and incentive to raise prices, reduce output, narrow slates, reduce quality, and worsen consumer-facing terms,

COMPLAINT FOR VIOLATION OF SECTION 7 OF THE          CASE NO.
CLAYTON ACT; TREBLE DAMAGES UNDER SECTION 4;
AND INJUNCTIVE RELIEF UNDER SECTION 16

including through control of distribution, exclusivity, windowing, and licensing.

130.    Paramount's proposed acquisition of Warner Bros. Discovery violates Section 7 because it may substantially lessen competition in national television news programming by placing CBS News and CNN under common ownership and control, reducing independent editorial and reputational constraints, and increasing the risk of coordinated, uniform, or politically influenced programming decisions that diminish credibility, editorial independence, investigative output, and viewpoint diversity.

131.    Plaintiffs are threatened with imminent loss or damage by reason of Paramount's proposed acquisition of Warner Bros. Discovery and have no adequate remedy at law. Plaintiffs are therefore entitled to injunctive and other equitable relief under Section 16 of the Clayton Act, 15 U.S.C. § 26.

132.    Plaintiffs' claim for injunctive relief against Paramount's proposed acquisition of Warner Bros. Discovery is timely and is not barred by laches. Plaintiffs filed before consummation, after the proposed transaction became concrete and imminent, and while effective injunctive relief remains available. Defendants have suffered no cognizable prejudice from the timing of this action because the transaction remains unconsummated and subject to regulatory review and closing conditions.

## IX.    JURY TRIAL DEMAND

133.    Plaintiffs demand a trial by jury on all claims and issues for which a jury trial is available, including any claims for legal damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## X.    PRAYER FOR RELIEF

Wherefore, Plaintiffs request that judgment be entered and request the following relief from this Honorable Court:

**COMPLAINT FOR VIOLATION OF SECTION 7 OF THE**          **CASE NO.**
**CLAYTON ACT; TREBLE DAMAGES UNDER SECTION 4;**
**AND INJUNCTIVE RELIEF UNDER SECTION 16**

A.  Declaring, finding, adjudging, and decreeing that Skydance's acquisition of Paramount Global violated Section 7 of the Clayton Act, 15 U.S.C. § 18.

B.  Ordering that Paramount Skydance be required to divest itself of any and all interest in Paramount Global.

C.  Appointing a special master to administer and implement the divestiture.

D.  Awarding Plaintiffs Len Marazzo, Deborah Rubinsohn, and Gary Talewsky treble damages, costs of suit, and reasonable attorneys' fees under Section 4 of the Clayton Act, 15 U.S.C. § 15.

E.  Declaring, finding, adjudging, and decreeing that the agreement of Paramount Skydance to acquire Warner Bros. Discovery violates Section 7 of the Clayton Act, 15 U.S.C. § 18, and must be enjoined.

F.  Preliminarily and permanently enjoining Paramount Skydance from consummating the proposed acquisition of Warner Bros. Discovery.

G.  Awarding Plaintiffs all costs, attorneys' fees, and other amounts recoverable by law.

H.  Granting such other and further relief as the Court deems just and proper.

DATED: April 30, 2026                    **ALIOTO LAW FIRM**

                                         /s/ *Joseph M. Alioto*_____
                                         Joseph M. Alioto, Esq.
                                         Tatiana V. Wallace, Esq.
                                         Attorneys for Plaintiffs


                                         **FOREMAN & BRASSO**

                                         /s/ *Ronald D. Foreman*_____

                                         /s/ *Ian A. Hansen*_____
                                         Ronald D. Foreman, Esq.
                                         Ian. A. Hansen, Esq.
                                         Attorneys for Plaintiffs

**COMPLAINT FOR VIOLATION OF SECTION 7 OF THE          CASE NO.**
**CLAYTON ACT; TREBLE DAMAGES UNDER SECTION 4;**
**AND INJUNCTIVE RELIEF UNDER SECTION 16**

**ATTESTATION**

In compliance with Civil L.R. 5-1(i)(3), I, Ian A. Hansen, attest that I have obtained concurrence in the filing of this document from each of the other signatories.

Dated: April 30, 2026                    By:    /s/ *Ian A. Hansen*_____
                                                Ian A. Hansen, Esq.

**COMPLAINT FOR VIOLATION OF SECTION 7 OF THE          CASE NO.**
**CLAYTON ACT; TREBLE DAMAGES UNDER SECTION 4;**
**AND INJUNCTIVE RELIEF UNDER SECTION 16**

46