Joseph M. Alioto, Esq. (SBN 42680)
Tatiana V. Wallace, Esq. (SBN 233939)
**ALIOTO LAW FIRM**
One Sansome Street, 14th Floor
San Francisco, CA 94104
Tel:  (415) 434-8900
Fax: (415) 434-9200
Email:  jmalioto@aliotolaw.com


Ronald D. Foreman, Esq. (SBN 61148)
Ian. A. Hansen, Esq. (SBN 255449)
**FOREMAN & BRASSO**
850 Montgomery Street, Suite 300
San Francisco, CA 94133
Telephone:  (415) 433-3475
Facsimile:  (415) 781-8030
Email:  foremanandbrasso@foremanandbrasso.com
Attorneys for Plaintiffs Pamela Faust, Len Marazzo, Lisa McCarthy, Deborah Rubinsohn, and Gary Talewsky

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAMELA FAUST, LEN MARAZZO, LISA McCARTHY, DEBORAH RUBINSOHN, and GARY TALEWSKY,<br><br>      Plaintiffs,<br><br>vs.<br><br>PARAMOUNT SKYDANCE CORPORATION (formerly Paramount Global), and SKYDANCE MEDIA, LLC,<br><br>      Defendants. | Case No. 4:26-CV-03790-AMO<br><br>**MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:          July 16, 2026<br>Time:         2:00 p.m.<br>Judge:       Judge Araceli Martínez-Olguín<br>Courtroom: 10 |

**NOTICE OF MOTION AND MOTION**

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that on July 16, 2026, at 2:00 p.m., or as soon thereafter as the matter may be heard, Plaintiffs will and hereby do move this Court for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a), enjoining Paramount Skydance Corporation's proposed acquisition of Warner Bros. Discovery under Sections 7 and 16 of the Clayton Act, 15 U.S.C. §§ 18 and 26.

**REQUESTED RELIEF**

Pursuant to Rule 65(a) and Section 16 of the Clayton Act, 15 U.S.C. § 26, Plaintiffs seek an order from the Court enjoining Defendants Paramount Skydance Corporation and Skydance Media, LLC, together with their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, from consummating Paramount Skydance Corporation's proposed acquisition of Warner Bros. Discovery, until a trial on the merits may be conducted by the Court to determine whether the combination is unlawful under Section 7 of the Clayton Act, 15 U.S.C. § 18.

MOTION FOR PRELIMINARY INJUNCTION                                    CASE NO. 4:26-CV-03790-AMO

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION ....................................................................................2

REQUESTED RELIEF ...........................................................................................................2

MEMORANDUM OF POINTS AND AUTHORITIES ..............................................................5

I. INTRODUCTION ...............................................................................................................5

II. FACTUAL BACKGROUND ..............................................................................................7

III. LEGAL STANDARD .......................................................................................................10

IV. ARGUMENT .................................................................................................................11

   A. Article III Standing and Antitrust Injury. ...................................................................11

   B. Plaintiffs Are Likely to Succeed on the Merits. ..........................................................12

      1. Sections 7 and 16 Establish a Broad Private Right to Stop Anticompetitive Acquisitions. ...................................................................................................................12

         a. Section 7 Was Designed to Stop Anticompetitive Acquisitions in Their Incipiency. ...............................................................................................................12

         b. Section 16 Authorizes Private Plaintiffs to Seek Injunctive Relief. ....................13

         c. Plaintiffs' Burden Under Section 7 Is Exceptionally Low. .................................13

         d. Plaintiffs Need Only Show Injury in One Relevant Market. .............................14

      2. The Proposed Acquisition Threatens Cognizable Antitrust Injury. .........................14

         a. The Proposed Acquisition Would Eliminate a Significant Independent Competitor. ...............................................................................................................14

         b. Antitrust Injury Includes Loss of Choice, Output, Quality, and Independent Market Alternatives. ..................................................................................................15

         c. The Acquisition Would Increase Paramount's Ability and Incentive to Injure Competition. .............................................................................................................15

      3. Plaintiffs Have Properly Defined the Relevant Markets. ........................................16

         a. The Relevant Geographic Market Is the United States. .....................................16

         b. Plaintiffs Allege Three Relevant Product Markets. ...........................................17

         c. The Relevant Markets Are Grounded in Commercial Reality. ...........................17

      4. The Acquisition May Substantially Lessen Competition in Each Relevant Market. 19

         a. Premium Video Distribution. .........................................................................19

         b. National Television News. ..............................................................................19

         c. Theatrical Film Production. ............................................................................21

   C. Plaintiffs Are Likely to Suffer Irreparable Injury Without Preliminary Relief. ...........21

      1. Section 16 Authorizes Relief for Threatened Loss of Competition. .........................22

      2. The Threatened Injury Is Imminent Because the Transaction Has Been Approved and Is Expected to Close Soon. ...........................................................................................22

      3. The Threatened Injury Is Structural and Difficult to Unwind. ...............................23

   D. The Balance of Equities Tips Sharply in Plaintiffs' Favor. ..........................................24

      1. Preserving the Status Quo Is Less Disruptive Than Unwinding an Integrated Media Company. ...................................................................................................................24

      2. Preliminary Relief Serves the Public Interest in Preserving Competition. ...............24

      3. The Requested Injunction Is Specific and Administrable. .......................................25

   E. The Bond Should Be Set at Zero. ...............................................................................25

V. CONCLUSION ................................................................................................................26

MOTION FOR PRELIMINARY INJUNCTION                   CASE NO. 4:26-CV-03790-AMO

# TABLE OF AUTHORITIES

*Cases*

*All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) ...............................10, 13

*Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011 (9th Cir. 2016) ........................22, 24, 25, 26

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ........5, 7, 12, 13, 14, 16, 17, 18, 19, 23

*California v. Am. Stores Co.*, 492 U.S. 1301 (1989) ................................................................22

*California v. Am. Stores Co.*, 495 U.S. 271 (1990) ...................................6, 12, 13, 22

*Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104 (1986) ......................................11

*Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878 (9th Cir. 2003)........25

*Fed. Trade Comm'n v. Elders Grain, Inc.*, 868 F.2d 901 (7th Cir. 1989) ..............................14

*Glen Holly Ent., Inc. v. Tektronix Inc.*, 343 F.3d 1000 (9th Cir. 2003)...................................15

*GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199 (9th Cir. 2000) .........................................24

*Hosp. Corp. of Am. v. Fed. Trade Comm'n*, 807 F.2d 1381 (7th Cir. 1986) ...........................14

*In re Nexstar-TEGNA Merger Litig.*, No. 2:26-cv-00976-TLN-CKD, 2026 U.S. Dist. LEXIS 85526 (E.D. Cal. Apr. 17, 2026).......................................................5, 10, 13, 23, 25

*Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979 (9th Cir. 2000) ...............................25

*Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038 (9th Cir. 2008)...................................18

*Olin Corp. v. Fed. Trade Comm'n*, 986 F.2d 1295 (9th Cir. 1993).........................................17

*PlusPass, Inc. v. Verra Mobility Corp.*, No. CV-21-01403-PHX-JJT, 2021 U.S. Dist. LEXIS 201843 (D. Ariz. Oct. 19, 2021) ...................................................................................18

*Reilly v. Hearst Corp.*, 107 F. Supp. 2d 1192 (N.D. Cal. 2000)...............................17, 20, 21

*St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775 (9th Cir. 2015) ................................................................................................................10, 16

*Steves & Sons, Inc. v. JELD-WEN, Inc.*, 345 F. Supp. 3d 614 (E.D. Va. 2018), aff'd in part, vacated in part, 988 F.3d 690 (4th Cir. 2021) ..............................................................23

*United States v. Acorn Eng'g Co.*, No. C-80-1796, 1981 U.S. Dist. LEXIS 13943 (N.D. Cal. June 18, 1981) ...................................................................................................................24

*United States v. Aluminum Co. of Am.*, 377 U.S. 271 (1964) ..................................................14

*United States v. Cont'l Can Co.*, 378 U.S. 441 (1964) ............................................................14

*United States v. Pabst Brewing Co.*, 384 U.S. 546 (1966) ......................................................14

*United States v. Paramount Pictures, Inc.*, 334 U.S. 131 (1948) ..............................................6

*United States v. Phila. Nat'l Bank*, 374 U.S. 321 (1963)...............................................6, 10, 14

*United States v. Swift & Co.*, 286 U.S. 106 (1932).....................................................................6

*United States v. Topco Assocs., Inc.*, 405 U.S. 596 (1972) ...............................................11, 26

*United States v. Von's Grocery Co.*, 384 U.S. 270 (1966) ...............................................12, 14

*Univ. of Tex. v. Camenisch*, 451 U.S. 390 (1981)...............................................................5, 24

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ......................................................10

*Statutes and Rules*

15 U.S.C. § 18......................................................................................5, 12, 14, 17

15 U.S.C. § 26......................................................................................10, 12, 13, 22

Fed. R. Civ. P. 65(a) ............................................................................................5, 10

Fed. R. Civ. P. 65(c) ..........................................................................................25, 26

## MEMORANDUM OF POINTS AND AUTHORITIES
## I. INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 65(a), Plaintiffs seek a preliminary injunction temporarily stopping Paramount Skydance Corporation from consummating, closing, integrating, or otherwise implementing its proposed acquisition of Warner Bros. Discovery until an accelerated trial on the merits can be held. The purpose of a preliminary injunction is to preserve the parties' relative positions until trial. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *In re Nexstar-TEGNA Merger Litig.*, No. 2:26-cv-00976-TLN-CKD, 2026 U.S. Dist. LEXIS 85526, at *15 (E.D. Cal. Apr. 17, 2026). Paramount Skydance and Warner Bros. Discovery are major competitors across studios, direct-to-consumer streaming, broadcast television, cable, national news, sports, film, television, gaming, and related media businesses. Warner Bros. Discovery owns Warner Bros. Pictures, HBO, HBO Max, Discovery, TNT, TBS, CNN, and other nationally significant assets. Paramount's proposed acquisition would eliminate Warner Bros. Discovery as an independent competitor and place major entertainment, streaming, theatrical, and news assets under one owner. Compl. ¶¶ 18-20, 60-81, 85-118.

The transaction is not speculative. Paramount determined to acquire Warner Bros. Discovery, and Warner Bros. Discovery stockholders voted on April 23, 2026, to approve the proposed transaction. Warner Bros. Discovery announced that the transaction is expected to close in the third quarter of 2026, subject to customary closing conditions, including regulatory clearances. Compl. ¶¶ 72-74. An injunction now would preserve competition before closing. Without it, Paramount may consummate the acquisition and create the structural injury Section 7 forbids.

Section 7 prohibits acquisitions "in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition […] may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. Congress used this language to require only a reasonable probability of lessening competition and to stop concentration in its incipiency. *Brown Shoe Co. v. United States*, 370 U.S. 294, 317, 323 (1962).

MOTION FOR PRELIMINARY INJUNCTION                    CASE NO. 4:26-CV-03790-AMO

Congress also made private enforcement integral to the Clayton Act. Section 16 authorizes private plaintiffs threatened with loss or injury from an antitrust violation to seek injunctive relief, and the Supreme Court has held that private enforcement "was in no sense an afterthought." The Court went on to say: "The Act's other provisions manifest a clear intent to encourage vigorous private litigation against anticompetitive mergers." *California v. Am. Stores Co.*, 495 U.S. 271, 275, 284 (1990).

Courts evaluating proposed or recently consummated media mergers ask practical questions: which products consumers and distributors treat as substitutes; where buyers can turn for alternative sources of supply; whether the merger increases concentration and bargaining leverage; whether regulatory clearance displaces judicial antitrust review; and whether integration would make a later divestiture ineffective. Those principles support preliminary relief here. The proposed acquisition would combine independent competitors and valuable media assets before trial. The asserted justification is the familiar refrain that the acquirer needs greater scale to compete with larger platforms. That argument has already been rejected in *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 370 (1963).

This is also not the first time federal antitrust law has addressed concentration and exclusionary control in the motion-picture industry. More than seventy-five years ago, the Supreme Court reviewed antitrust violations involving major motion-picture companies, including Paramount and Warner Bros., and held that practices affecting production, distribution, exhibition, licensing, and first-run access could suppress competition and warrant structural relief. *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 140-41, 149-55, 171-75 (1948). Although today's distribution channels include streaming platforms and national television networks, the same antitrust principle applies: firms controlling essential media assets may not consolidate independent rivals in ways that reduce output, choice, quality, and competitive access. Moreover, the courts have repeatedly recognized that "[s]ize carries with it an opportunity for abuse that is not to be ignored when the opportunity is proved to have been utilized in the past." *United States v. Swift & Co.*, 286 U.S. 106, 116 (1932). The United States'

MOTION FOR PRELIMINARY INJUNCTION                    CASE NO. 4:26-CV-03790-AMO

policy is that firms should grow internally through competition rather than by acquiring competitors. Internal growth more often reflects increased demand for the firm's products and is more likely to bring additional investment, jobs, and output. Expansion by merger, by contrast, may reduce consumer choice without adding industry capacity, jobs, or output. Section 7 was enacted for that reason: to prevent successive acquisitions, including even small mergers that increase industry concentration. *Brown Shoe*, 370 U.S. at 345 n.72.

Plaintiffs do not ask the Court to decide the ultimate merits today. Plaintiffs ask only that the Court preserve the status quo until trial. Paramount can integrate Warner Bros. Discovery's studios, streaming assets, theatrical distribution operations, licensing strategy, release strategy, nationally significant news assets, writers, directors, actors, and other moviemaking personnel into a single firm, concentrating control of those assets in the hands of a few. Once that occurs, the loss of independent competition will be difficult, if not impossible, to restore. The requested injunction is narrow and administrable: Plaintiffs seek an order enjoining Paramount Skydance Corporation, Skydance Media, LLC, and all persons acting in concert with them from consummating, closing, integrating, or otherwise implementing Paramount Skydance's proposed acquisition of Warner Bros. Discovery pending trial on the merits. The case can be ready for trial in September 2026, before the transaction closes, the industry's competitive structure is irreversibly altered, and Warner Bros. Discovery ceases to exist.

## II. FACTUAL BACKGROUND

Paramount Skydance Corporation is a global media and entertainment company operating through Studios, Direct-to-Consumer, and TV Media. Its portfolio includes Paramount Pictures, Paramount Television, CBS, CBS News, CBS Sports, 60 Minutes, Nickelodeon, MTV, BET, Comedy Central, Showtime, Paramount+, Paramount TV, and Skydance's animation, film, television, interactive/games, and sports divisions. Compl. ¶ 18. Paramount also controls a substantial film and television library, including *The Godfather*, *Titanic*, *Forrest Gump*, *Mission: Impossible*, *Transformers*, *Top Gun*, *Star Trek*, *A Quiet Place*, and other classic and commercially significant motion pictures. Before acquiring Paramount Global, Skydance Media

MOTION FOR PRELIMINARY INJUNCTION                    CASE NO. 4:26-CV-03790-AMO

was an independent production company producing high-budget film and television programming for multiple competing distributors and platforms. Compl. ¶ 19.

Warner Bros. Discovery creates and distributes branded content across television, film, streaming, and gaming. It owns major entertainment, news, sports, cable, streaming, motion-picture, television-production, animation, and gaming assets, including HBO Max, discovery+, CNN, DC, TNT Sports, HBO, Warner Bros. Motion Picture Group, Warner Bros. Television Group, Warner Bros. Games, New Line Cinema, Cartoon Network, Adult Swim, and related properties. Compl. ¶ 20. Warner Bros. Discovery likewise controls a substantial film and television library, including Warner Bros. films, HBO originals, *DC Universe*, the *Wizarding World of Harry Potter*, *Game of Thrones*, *Middle-earth*, *Looney Tunes*, *Scooby-Doo*, and other classic and commercially significant motion pictures and television properties.

The proposed acquisition follows Skydance's completed acquisition of Paramount Global, which closed on August 7, 2025. Compl. ¶¶ 47-59. Plaintiffs allege that the transaction lessened competition by eliminating Skydance as an independent producer and causing consumer injury through Paramount+ price increases effective January 15, 2026. Compl. ¶¶ 26, 28-29, 90-92. It provides concrete evidence that reduced competitive constraints can translate into consumer injury. Compl. ¶¶ 85, 91, 98.

Shortly after the Skydance-Paramount transaction, Paramount turned to Warner Bros. Discovery. In September 2025, David Ellison met with Paramount's board to discuss buying Warner Bros. Discovery as the way to "compete" with Amazon, Disney, and Netflix. Compl. ¶ 60. On December 8, 2025, Paramount launched a hostile offer valuing Warner Bros. Discovery at approximately *$108.4 billion* in enterprise value ($108,400,000,000), one of the largest acquisition prices in U.S. history. Compl. ¶ 66. On February 17, 2026, Warner Bros. Discovery reopened negotiations with Paramount after Netflix granted a limited waiver permitting Paramount to submit a best-and-final offer. Compl. ¶ 67. On February 26, 2026, Warner Bros. Discovery confirmed that it considered Paramount's increased bid superior to Netflix's offer,

MOTION FOR PRELIMINARY INJUNCTION                                    CASE NO. 4:26-CV-03790-AMO

triggering a contractual match period. Compl. ¶ 69.

Paramount's revised proposal valued Warner Bros. Discovery at $110.9 billion and included additional deal protections and incentives, including a ticking fee, a regulatory termination fee, and Paramount's agreement to pay the $2.8 billion termination fee Warner Bros. Discovery would owe Netflix if it terminated the Netflix agreement. Compl. ¶ 70. Netflix declined to match Paramount's revised proposal, and Warner Bros. Discovery announced Paramount as the winning acquirer. Compl. ¶ 72.  (If the acquisition were by Netflix, it would be equally unlawful.)

On April 23, 2026, Warner Bros. Discovery stockholders voted to approve the proposed transaction. Warner Bros. Discovery announced that the transaction was expected to close in the third quarter of 2026, subject to customary closing conditions, including regulatory clearances. Compl. ¶ 73. That vote satisfied a major closing condition and made Plaintiffs' threatened injury substantially more imminent. Compl. ¶ 74.

Plaintiffs are consumers in the affected markets. They purchase streaming services, cable or live-TV packages, theatrical movie tickets, and related premium video products. Compl. ¶¶ 24-46. Marazzo, Rubinsohn, and Talewsky are current Paramount+ subscribers who paid increased subscription charges after the January 15, 2026, Paramount+ price increase. Compl. ¶¶ 28-29. Faust and McCarthy are prospective Paramount+ subscribers deterred by increased costs and reduced consumer-friendly terms. Compl. ¶¶ 30-31. Plaintiffs also pay for packages that include national television news programming, including CNN and CBS, and all Plaintiffs intend to continue attending theatrical movies, including recent and upcoming pictures released by Paramount and Warner Bros. Discovery such as *Mission: Impossible*, *Scream*, *Sonic the Hedgehog*, *Top Gun*, *The Running Man*, *Superman*, *The Batman*, *Dune*, *Barbie*, *Sinners*, and other major theatrical releases. Compl. ¶¶ 32-42.

The proposed acquisition threatens Plaintiffs with concrete injury because it would eliminate Warner Bros. Discovery as an independent competitor and further concentrate control

over premium programming and nationally significant news assets, giving the combined firm greater ability and incentive to worsen consumer-facing terms, reduce output and variety, restrict licensing, alter release windows, degrade non-price competition in national television news, and diminish the diversity of editorial judgment and investigative reporting. Compl. ¶¶ 40, 44-46.

### III. LEGAL STANDARD

The Court may grant a preliminary injunction under Federal Rule of Civil Procedure 65(a) and Section 16 of the Clayton Act, 15 U.S.C. § 26. Courts consider: (1) likelihood of success on the merits; (2) likelihood of irreparable injury; (3) the balance of equities; and (4) the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). The Ninth Circuit applies a sliding scale: "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies*, 632 F.3d at 1131. A preliminary injunction is proper where there are "serious questions going to the merits" and the balance of hardships "tips sharply in [plaintiff's] favor." *All. for the Wild Rockies*, 632 F.3d at 1131-35. Plaintiffs satisfy both formulations.

Section 7 is predictive and practical. The Court need not find certainty of future injury, only that the acquisition may substantially lessen competition in any relevant line of commerce. *St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 788 (9th Cir. 2015). The same framework was applied in *Nexstar-TEGNA*, where the court emphasized that Section 7 focuses on probabilities, not certainties, and asks whether the acquisition is likely to change competitive conditions in the future. *Nexstar-TEGNA*, 2026 U.S. Dist. LEXIS 85526, at *22-24. The same principle controls here. Defendants may argue that Paramount needs Warner Bros. Discovery to achieve scale against Netflix, Amazon, and Disney. Again, this argument is an excuse that has been rejected by the Supreme Court and is not a defense to Section 7. *Philadelphia Natl. Bank,* 374 U.S. 321*, supra*.  Section 7 does not permit a firm to eliminate an independent competitor merely because an acquisition is faster than organic investment, licensing, innovation, or competition on the merits.  An antitrust violation cannot be excused in

one market because certain private citizens or groups believe it might be beneficial in another market. *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 609 (1972).

## IV. ARGUMENT

### A. Article III Standing and Antitrust Injury.

This case is not a generalized grievance about media consolidation. Plaintiffs are purchasers and consumers in the affected markets. They buy streaming services, pay-TV or live-TV packages, national television news programming, and theatrical movie tickets, and they are directly exposed to the price and non-price effects of Defendants' conduct.

Plaintiffs' standing allegations are plaintiff-specific. Marazzo, Rubinsohn, and Talewsky are current Paramount+ subscribers who paid increased subscription charges after Paramount implemented post-acquisition price increases effective January 15, 2026. That overcharge is a concrete monetary injury and a substantial threat exists that prices will be increased if Paramount is allowed to unlawfully acquire Warner Brothers. Faust and McCarthy are not current Paramount+ subscribers; they participate in the streaming market and were deterred from adding or re-adding Paramount+ by reason of Paramount's recent price hike, immediately after Skydance acquired Paramount, and reduced consumer-friendly promotional terms. All Plaintiffs allege continued participation in premium video, national television news, and theatrical distribution markets. Plaintiffs further allege specific purchasing conduct, specific services, specific post-acquisition price increases, continued market participation, traceability, redressability and the loss of creativity by reason of the potential job losses by writers, directors, actors, support personnel and studios. Their threatened injuries are concrete, particularized, and tied to the markets in which competition is allegedly restrained.

That is the type of threatened loss Section 16 reaches. For injunctive relief, a plaintiff need only show threatened loss or damage of the type the antitrust laws were designed to prevent and flowing from the conduct that makes the acquisition unlawful. *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 110-13 (1986). Plaintiffs allege exactly that: higher subscription

MOTION FOR PRELIMINARY INJUNCTION                                  CASE NO. 4:26-CV-03790-AMO

charges, reduced consumer-facing terms, fewer independent premium-video alternatives, diminished national-news quality and independence, and reduced theatrical output and variety and the potential job loss in the creative industries including writers, directors, actors, support personnel and studios.

Congress expressly authorized "any person" threatened with loss or damage by an antitrust violation to seek injunctive relief under Section 16 of the Clayton Act. 15 U.S.C. § 26. The question is whether these Plaintiffs have standing, whether they are threatened with antitrust injury from this transaction, and whether the proposed acquisition may substantially lessen competition. Plaintiffs satisfy those requirements here.

**B. Plaintiffs Are Likely to Succeed on the Merits.**
  **1. Sections 7 and 16 Establish a Broad Private Right to Stop Anticompetitive Acquisitions.**
    **a. Section 7 Was Designed to Stop Anticompetitive Acquisitions in Their Incipiency.**

This lawsuit presents a straightforward Section 7 issue: the Clayton Act outlaws acquisitions where "in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition […] may be substantially to lessen competition or to tend to create a monopoly." 15 U.S.C. § 18. Congress used that language to stop concentration in its incipiency, before a merger fully ripened into an actual restraint. *Brown Shoe*, 370 U.S. at 323; *United States v. Von's Grocery Co.*, 384 U.S. 270, 276 (1966); *Am. Stores*, 495 U.S. at 275. That prospective focus is central to Section 7: the statute does not require certainty, only a probable threat that the acquisition may substantially lessen competition or tend to create a monopoly. The Supreme Court has explained why that probable threat matters to consumer welfare: internal expansion is more likely to reflect increased consumer demand and to produce increased investment, jobs, output, and choice, while expansion through merger is more likely to reduce available consumer choice without increasing industry capacity, jobs, or output. *Brown Shoe*, 370 U.S. at 345, (emphasis added).

Paramount's acquisition of Warner Bros. Discovery would eliminate an independent

MOTION FOR PRELIMINARY INJUNCTION                                CASE NO. 4:26-CV-03790-AMO

competitor in multiple relevant markets. It would combine Paramount+ and HBO Max; CBS News and CNN; Paramount Pictures and Warner Bros. Pictures; and the broader television, film, streaming, cable, sports, and entertainment assets of both companies. Compl. ¶¶ 18-20, 85-118. At this stage, Plaintiffs raise serious questions going to the merits. *All. for the Wild Rockies*, 632 F.3d at 1131-32.  The Chief Judge of the Eastern District of California, Judge Troy L. Nunley, recently extended a TRO to a Preliminary Injunction in the attempt by Nexstar to acquire Tegna. *Nexstar-TEGNA*, 2026 U.S. Dist. LEXIS 85526, at *66-70.

### b.  Section 16 Authorizes Private Plaintiffs to Seek Injunctive Relief.

Congress established a private right of action to help stop anticompetitive mergers that, through incremental combinations, destroy competition and tend to lead to monopolies and oligopolies. Section 16 provides that "[a]ny person . . . shall be entitled to sue for and have injunctive relief . . . against threatened loss or damage" from an unlawful merger or acquisition. 15 U.S.C. § 26.  As *American Stores* explained, the Clayton Act "manifest[s] a clear intent to encourage vigorous private litigation against anticompetitive mergers" and to "subject mergers to searching scrutiny." *Am. Stores*, 495 U.S. at 284-85.

Congress understood the pervasive injuries caused by concentration through acquisitions. *Brown Shoe*, 370 U.S. at 317-18. Section 16 implements that purpose by permitting private litigants to seek injunctive relief before an unlawful acquisition closes. *Nexstar-TEGNA* confirms the same point in the media-merger context: interim relief is appropriate to preserve independent competition before integration makes it difficult to reverse the loss of competition. *Nexstar-TEGNA*, supra at *66-70.

### c.  Plaintiffs' Burden Under Section 7 Is Exceptionally Low.

The word "may" in Section 7 means Plaintiffs need not prove actual anticompetitive effects or certainty of harm. They need only show a reasonable probability that the acquisition will substantially lessen competition, often demonstrated by the elimination of a significant competitor. Again, as the Supreme Court said in stating the policy, it need only be "more likely". *Brown Shoe*, 370 U.S. at 323. Requiring certainty would defeat Section 7's purpose of reaching

MOTION FOR PRELIMINARY INJUNCTION                                   CASE NO. 4:26-CV-03790-AMO

incipient restraints before they mature into actual restraints. Id. at 323 n.39. Doubts are resolved against the transaction. *Fed. Trade Comm'n v. Elders Grain, Inc.*, 868 F.2d 901, 906 (7th Cir. 1989).

Congress meant to "clamp down with vigor on mergers," *Von's Grocery*, 384 U.S. at 276, and to "prevent accretions of power" too small for the Sherman Act. *United States v. Aluminum Co. of Am.*, 377 U.S. 271, 280 (1964). The Supreme Court has repeatedly prohibited acquisitions involving market shares far below those alleged here. *Brown Shoe*, 370 U.S. at 298; *United States v. Cont'l Can Co.*, 378 U.S. 441, 461 (1964); *Aluminum Co.*, 377 U.S. at 280-81; *Von's Grocery*, 384 U.S. at 272-74; *United States v. Pabst Brewing Co.*, 384 U.S. 546, 550 (1966). Judge Posner summarized the governing precedent, none of which has been overruled, as establishing "the illegality of any nontrivial acquisition of a competitor," and emphasized that the elimination of a significant rival itself infringes the values embodied in Section 7. *Hosp. Corp. of Am. v. Fed. Trade Comm'n*, 807 F.2d 1381, 1385 (7th Cir. 1986).

### d. Plaintiffs Need Only Show a Probable Threat of Injury in One Relevant Market.

Section 7 requires only a reasonable probability of lessening competition "in any line of commerce" or "in any activity affecting commerce" in "any section of the country." 15 U.S.C. § 18. A defendant may not defeat likely injury in one market by arguing possible benefits in another. *Phila. Nat'l Bank*, 374 U.S. at 370. Here, the evidence will show that Plaintiffs may suffer injury and damage in at least three different relevant markets: premium video distribution, national television news programming, and theatrical film production. Compl. ¶ 85.

### 2. The Proposed Acquisition Threatens Cognizable Antitrust Injury.
### a. The Proposed Acquisition Would Eliminate a Significant Independent Competitor.

The proposed acquisition would substantially increase concentration and eliminate head-to-head rivalry. Warner Bros. Discovery is not a marginal or failing participant. It is a major independent competitor with substantial streaming, studio, theatrical, cable, and national news assets. Paramount's acquisition would internalize that competition and place formerly

independent assets under a single owner. The same structural analysis applies here. Where two media firms control assets that constrain each other, the merger eliminates external rivalry and substitutes internal control. After closing, Paramount would no longer have to compete with Warner Bros. Discovery for subscribers, licensing opportunities, theatrical release strategy, or the national news audience and reputation. That loss of independent rivalry is itself a cognizable Section 7 concern, particularly where the combined firm would control a broader portfolio of valuable content and distribution assets.

**b. Antitrust Injury Includes Loss of Choice, Output, Quality, and Independent Market Alternatives.**

The injury is not limited to price. Competition also occurs through output, quality, variety, innovation, licensing, release cadence, theatrical windows, editorial independence, and newsgathering by reporters.  A merger that eliminates independent decision-making on those dimensions may substantially lessen competition before any immediate price increase. *Glen Holly Ent., Inc. v. Tektronix Inc.*, 343 F.3d 1000, 1011 (9th Cir. 2003).

Media markets compete on non-price dimensions that matter to consumers. In broadcast television, courts have recognized that common ownership may reduce the amount, variety, and quality of news even when the product remains available in some form. The same is true here. Common ownership of CBS News and CNN would reduce independent editorial and reputational constraints; common ownership of Paramount+ and HBO Max would reduce independent programming, licensing, and promotional rivalry; and common ownership of Paramount Pictures and Warner Bros. Pictures would reduce independent theatrical greenlighting, release, and slate decisions.

**c. The Acquisition Would Increase Paramount's Ability and Incentive to Injure Competition.**

The transaction would increase Paramount's ability and incentive to restrict licensing, alter windowing, reduce output, narrow release slates, worsen consumer-facing terms and control editorial and reportorial independence. In premium video distribution, the combined firm would

MOTION FOR PRELIMINARY INJUNCTION                                CASE NO. 4:26-CV-03790-AMO

control a larger library and subscriber base. In theatrical distribution, it would reduce the number of independent studio-distributors competing for release dates, screens, premium formats, and theatrical windows. In national television news, it would place CBS News, including 60 Minutes, and CNN under common ownership.

The leverage theory is concrete, not speculative. A merger can substantially lessen competition where it increases the combined firm's bargaining power over distributors, exhibitors, advertisers, or consumers. *St. Alphonsus*, 778 F.3d at 786-87. Here, Paramount would acquire additional must-have programming and a larger streaming library. That library would include Warner Bros.' deep catalog of classic films, including *Casablanca*, *The Wizard of Oz*, *Gone with the Wind*, *Singin' in the Rain*, and *The Shining*, as well as major film and television properties such as *Harry Potter*, *Game of Thrones*, *Dune*, *The Batman*, and *Barbie*. Paramount would also acquire a major theatrical studio and substantial creative output from writers, directors, actors, producers, and other moviemaking personnel. That expanded portfolio would increase Paramount's ability to demand higher prices, impose worse terms, restrict licensing, alter windowing, reduce independent output, eliminate Warner Bros. Discovery as an independent studio, and diminish the diversity of creative content available to consumers.

### 3. Plaintiffs Have Properly Defined the Relevant Markets.
#### a. The Relevant Geographic Market Is the United States.

The relevant geographic market is the United States. "Congress prescribed a pragmatic, factual approach to the definition of the relevant market and not a formal, legalistic one." *Brown Shoe*, 370 U.S. at 336. The proper market must "correspond to the commercial realities of the industry and be economically significant." Id. at 336-37. It is the "area of effective competition where buyers can turn for alternate sources of supply." *St. Alphonsus*, 778 F.3d at 784. The United States is the relevant geographic market because streaming services, pay-TV packages, cable programming, theatrical film production decisions, release calendars, marketing, advertising, carriage negotiations, content rights, independent and diversified editorial judgment, and independent investigative reporting are organized, priced, and monetized on a U.S. basis.

Compl. ¶¶ 89, 102, 112. Competitive conditions are substantially nationwide. That market definition is especially appropriate where, as here, the challenged transaction affects media competition and the independence of editorial voices. See *Reilly*, 107 F. Supp. 2d 1192.

### b. Plaintiffs Allege Three Relevant Product Markets.

Section 7 reaches acquisitions that may substantially lessen competition in "any line of commerce." 15 U.S.C. § 18. The "outer boundaries" of a product market are determined by reasonable interchangeability of use. *Brown Shoe*, 370 U.S. at 325. Courts consider practical indicia such as industry recognition, peculiar characteristics and uses, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors. Id.; *Olin Corp. v. Fed. Trade Comm'n*, 986 F.2d 1295, 1299 (9th Cir. 1993).

Plaintiffs allege three relevant product markets. The Premium Video Distribution Market includes the distribution of premium video entertainment programming through subscription streaming services, cable television, and related offerings. Compl. ¶¶ 86-89. The National TV News Market includes the production and distribution of national television news programming. Compl. ¶¶ 99-104. The Theatrical Film Production Market includes competition among major studios for screen access, showtimes, premium formats, marketing commitments, release dates, and exclusive theatrical windows. Compl. ¶¶ 109-112.

### c. The Relevant Markets Are Grounded in Commercial Reality.

These markets are grounded in commercial reality. They are not "all entertainment" or "all media," but economically meaningful markets in which firms compete over distinct products, customers, pricing structures, distribution channels, and non-price dimensions of quality.

In premium video, consumers purchase professionally produced, high-budget film and television programming; short-form user-generated content, social-media video, and casual internet entertainment are not reasonable substitutes for premium scripted programming, franchise films, prestige series, and high-value libraries. In national television news, major

MOTION FOR PRELIMINARY INJUNCTION                    CASE NO. 4:26-CV-03790-AMO

national networks and broadcast news divisions compete for national audiences, advertising, carriage, reputation, credibility, newsgathering capacity, investigative resources, and editorial independence. In theatrical production, major studios compete for release dates, marketing commitments, premium-format screens, screen access, showtimes, exhibitor terms, and theatrical windows.

Market definition is practical, not formalistic. The outer boundaries of a product market are determined by reasonable interchangeability of use and cross-elasticity of demand. *Brown Shoe*, 370 U.S. at 325; *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008). The inquiry does not require products to be identical, nor does it require the market to include every product competing for consumer attention at the margins. The question is whether consumers can turn to other products as reasonable substitutes for the products at issue. Applied here, Defendants cannot defeat the premium-video market by pointing to short-form social media, user-generated video, or casual internet entertainment. Those products do not discipline pricing, quality, licensing, or programming decisions for high-budget scripted series, prestige television, franchise films, premium libraries, and studio-produced entertainment. Nor can Defendants defeat the national television news market by pointing to local news, newspapers, radio, digital commentary, or social media. Those sources do not provide the same national live infrastructure, institutional reputation, carriage relationships, or independent network-level newsroom capacity. And at-home streaming does not discipline the first-run theatrical market because theatrical exhibition involves event viewing, premium formats, screen access, release windows, and exhibitor-mediated distribution.

*PlusPass, Inc. v. Verra Mobility Corp.*, No. CV-21-01403-PHX-JJT, 2021 U.S. Dist. LEXIS 201843, at *12-16 (D. Ariz. Oct. 19, 2021), supports the same practical approach. A broader market does not automatically defeat a more focused market definition. The relevant market must reflect where buyers can actually turn for alternatives and must correspond to commercial realities.

### 4. The Acquisition May Substantially Lessen Competition in Each Relevant Market.

#### a. Premium Video Distribution.

Paramount and Warner Bros. Discovery are meaningful independent competitors in premium video distribution. Before the proposed transaction, Warner Bros. Discovery's U.S. streaming revenue was approximately $10.3 billion, and Paramount's was approximately $7.6 billion. Compl. ¶ 94. Combining their streaming businesses would create a service with approximately $17.9 billion in U.S. streaming revenue, moving the merged firm closer to leading platforms and eliminating direct rivalry between previously independent services. Compl. ¶ 95. Subscriber data confirms the same point. Before the proposed transaction, HBO Max had approximately 128 million subscribers, and Paramount+ had approximately 79.1 million. Compl. ¶ 96. The combined service would have approximately 207.1 million subscribers, vaulting it ahead of Amazon Prime Video and leaving consumers with fewer independent premium-video alternatives at scale. Compl. ¶ 97.

The completed Skydance-Paramount transaction provides direct evidence of consumer-facing injury. Immediately after acquiring Paramount, Skydance-Paramount increased Paramount+ prices effective January 15, 2026, and Marazzo, Rubinsohn, and Talewsky paid those increased charges. Compl. ¶¶ 28-29, 91, 98. A price increase following an acquisition is classic antitrust injury because it shows the very evil Section 7 is designed to prevent: eliminating independent competition and then using the resulting market power to charge consumers more. *Brown Shoe*, 370 U.S. at 345 & n.72. The likely consumer harm from Paramount's proposed acquisition of Warner Bros. Discovery is therefore not speculative. Paramount's likelihood of raising prices after acquiring Warner Bros. Discovery is demonstrated by the fact that, immediately after acquiring Paramount, it raised prices to consumers.

#### b. National Television News.

National television news is distinct because national news networks and broadcast news

divisions compete for a nationwide audience, national advertising, pay-TV carriage, reputation, credibility, editorial independence, investigative vigor, breadth of coverage, and viewpoint diversity. Compl. ¶¶ 99-104. The proposed acquisition would place CBS News, producer of 60 Minutes, and CNN, America's first and longest-running 24-hour cable news network, under a single owner, giving that owner the power to control editorial direction and to terminate television hosts and other individuals who express views contrary to the owners' political beliefs. Compl. ¶¶ 40, 44, 79-81. That consolidation would reduce independent editorial and reputational constraints and increase the risk of coordinated, uniform, or politically influenced programming decisions that diminish credibility, editorial independence, investigative output, breadth, and viewpoint diversity. Compl. ¶¶ 32-33, 78-81, 103-108.

This is an antitrust theory, not a request that the Court police viewpoint or editorial content. The competitive injury is the loss of independent decision-making in a market where firms compete on credibility, editorial independence, investigative resources, newsgathering capacity, reputation, breadth of coverage, and audience trust. Consolidation can reduce quality by replacing separate newsrooms, leadership, and editorial incentives with common ownership and control. Those are non-price competitive dimensions that matter to viewers who watch the programming, to advertisers who pay to reach those viewers, and to distributors who pay to carry the programming.

This risk is not hypothetical. Plaintiffs allege that the Skydance-Paramount approval occurred in a political and regulatory environment that influenced CBS News governance and editorial independence, including Paramount's $16 million settlement of President Trump's frivolous lawsuit against CBS during the approval period, CBS's decision not to renew The Late Show with Stephen Colbert after Colbert criticized the settlement, and FCC-related governance conditions affecting CBS News. Compl. ¶¶ 50-58, 103-104.  Plaintiffs further allege that CNN was a focal point of political and market attention surrounding the Warner Bros. Discovery bidding process. Compl. ¶¶ 75-81. That kind of political leverage over media ownership has appeared before. In *Reilly v. Hearst Corp.,* the challenged newspaper acquisition allegedly

MOTION FOR PRELIMINARY INJUNCTION                                CASE NO. 4:26-CV-03790-AMO

occurred in an environment in which political officials would not criticize the merger in exchange for favorable news coverage. *Reilly*, 107 F. Supp. 2d 1192. Reilly therefore shows why the concern here is not abstract: political leverage over media ownership becomes anticompetitive when government approval is exchanged for favorable coverage.

### c.   Theatrical Film Production.

Theatrical film production is a distinct relevant market. Major studio-producers compete for screen access, showtimes, premium large-format placements, marketing commitments, release dates, exclusive theatrical windows, first run and day and date exhibition. Compl. ¶ 109. Competition is shaped by bottlenecks, including finite screen capacity, limited premium-format auditoriums, and constrained peak-period showtimes. Compl. ¶ 111.

If the acquisition is consummated, the combined firm would have increased ability and incentive to reduce theatrical film output and narrow release slates, leaving moviegoers with fewer titles, less genre and budget variety, and fewer meaningful alternatives at local theaters. Compl. ¶ 114. Before the proposed transaction, the four largest U.S./Canada studios shown in the Complaint's chart had a combined top-four share of approximately 66.1%, while Paramount accounted for approximately 10.2% on its own. Compl. ¶ 115.

If Paramount acquires Warner Bros. Discovery, the transaction would create a single firm with approximately 23.6% market share, making it the largest studio in the United States. The post-merger top four studios would have a combined share of approximately 76.3%. Compl. ¶ 116. The transaction would increase top-four concentration by approximately 10.2 percentage points and eliminate Paramount as an independent studio competitor. Historical box-office performance confirms both companies are major theatrical competitors. Compl. ¶¶ 117-118.

## C.   Plaintiffs Are Likely to Suffer Irreparable Injury Without Preliminary Relief.

Plaintiffs purchase and consume premium video, pay-TV, national television news, and theatrical motion pictures. Compl. ¶¶ 24-46. They are threatened with higher prices, reduced output, reduced quality, diminished consumer choice, reduced promotional availability, fewer

independent sources of premium programming, fewer independent editorial decision-makers, reduced theatrical output, narrowed release slates, and fewer meaningful alternatives at local theaters. Compl. ¶¶ 24-46, 85-118.

### 1. Section 16 Authorizes Relief for Threatened Loss of Competition.

Section 16 authorizes injunctive relief against "threatened loss or damage by a violation of the antitrust laws." 15 U.S.C. § 26. Justice O'Connor, in granting the stay against American Stores acquisition, recognized that a threatened lessening of competition is "precisely the kind of irreparable injury that injunctive relief under § 16 of the Clayton Act was intended to prevent." *California v. Am. Stores Co.*, 492 U.S. 1301, 1304 (1989) (O'Connor, J., in chambers). The Supreme Court later confirmed in the same litigation that § 16 authorizes private injunctive relief, including divestiture where appropriate and encourages vigorous private litigation against anticompetitive mergers. *Am. Stores*, *supra*, 495 U.S. at 281-85. The Ninth Circuit likewise holds that "[a] lessening of competition constitutes an irreparable injury under our case law." *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1023 (9th Cir. 2016).

### 2. The Threatened Injury Is Imminent Because the Transaction Has Been Approved and Is Expected to Close Soon.

Paramount's acquisition may substantially lessen competition in the relevant markets. That is enough to show threatened irreparable injury, especially because the transaction has not yet closed, even though stockholders have approved it, and Warner Bros. Discovery expects to close in the third quarter of 2026, subject to regulatory clearances. Compl. ¶¶ 73-74. Preliminary relief is necessary now to prevent the loss of competition before it becomes embedded in market structure.

Plaintiffs cannot rely on federal merger review to protect them from that injury. Public reports indicate that Gail Slater, then the Assistant Attorney General for the Antitrust Division, and her entire team at the Antitrust Division was forced to resigned after the White House sought her removal, leaving the Antitrust Division without accountable leadership and no desire to review major mergers that the administration wants to control, including the proposed

MOTION FOR PRELIMINARY INJUNCTION                                    CASE NO. 4:26-CV-03790-AMO

acquisition of Warner Bros. Under these circumstances, this Court's injunctive authority is the only realistic mechanism to preserve competition before the transaction closes and Warner Bros. Discovery ceases to exist as an independent competitor.

The threatened injury is immediate because closing would alter the competitive conditions that Plaintiffs challenge. A plaintiff need not wait until every price increase or quality reduction has already occurred. The point of Section 16 is to prevent threatened antitrust injury before it becomes embedded in the market. *Brown Shoe*, 370 U.S. at 317, 323, recognized that immediacy may exist where the merger, or particular aspects of the merger, cannot be undone.

### 3.   The Threatened Injury Is Structural and Difficult to Unwind.

The threatened injury is structural. If the transaction closes, Warner Bros. Discovery will cease to operate as an independent competitor, and Paramount may integrate assets, personnel, licensing strategy, release strategy, streaming operations, theatrical distribution decisions, national news assets, including large scale job reductions and limiting production output. Damages cannot fully remedy that loss of independent competition after the fact. Divestiture after trial is not an adequate substitute for preserving the status quo now. Divestiture may remain possible where the acquired assets stay operationally separate, employees remain with the facility, and independent systems are maintained during litigation. See *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 345 F. Supp. 3d 614, 631, 661 (E.D. Va. 2018), aff'd in part, vacated in part, 988 F.3d 690 (4th Cir. 2021).  In this case, if the acquisition were allowed, when Paramount integrates Warner Bros. Discovery's personnel, contracts, release strategies, streaming operations, licensing policies, and news assets, restoring Warner Bros. Discovery as an independent competitor would become far more difficult.

The requested injunction would preserve the status quo until trial. Allowing the transaction to close would risk locking in a changed market structure before the Court can adjudicate the merits. See *NEXSTAR-Tegna,* supra. Once assets are combined, employees moved, contracts revised, content strategy changed, licensing centralized, and news operations

placed under common control, restoring the pre-merger competitive structure becomes far more difficult. Preliminary relief is necessary because the injury is not merely that Plaintiffs may pay more later. The injury is that the competitive process itself will be altered before trial.

### D. The Balance of Equities Tips Sharply in Plaintiffs' Favor.

#### 1. Preserving the Status Quo Is Less Disruptive Than Unwinding an Integrated Media Company.

Plaintiffs seek only a temporary order preserving the status quo until trial. Defendants seek permission to consummate and begin implementing a transaction that would eliminate Warner Bros. Discovery as an independent competitor. If Defendants ultimately prevail, the transaction can proceed later. If Plaintiffs ultimately prevail after closing, restoring competition would be far more difficult.

The requested injunction serves the ordinary purpose of preliminary relief: preserving the relative positions of the parties until trial. *Camenisch*, 451 U.S. at 395. The status quo is the last uncontested position before the controversy, not the post-closing structure Defendants seek to create. *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000). Maintaining Warner Bros. Discovery as an independent competitor pending trial is therefore less disruptive than allowing consummation and later attempting divestiture.

#### 2. Preliminary Relief Serves the Public Interest in Preserving Competition.

The public interest favors preliminary relief. The central purpose of the antitrust laws is to preserve competition. *Boardman*, 822 F.3d at 1024. That interest is especially strong where the transaction threatens national markets for premium video programming, theatrical production, and national television news. Preserving Warner Bros. Discovery as an independent competitor pending trial protects competitive prices, output, quality, variety, and independent editorial rivalry. The public interest also favors preserving the possibility of effective divestiture. *United States v. Acorn Eng'g Co.*, No. C-80-1796, 1981 U.S. Dist. LEXIS 13943, at *3 (N.D. Cal. June 18, 1981). The public interest is not limited to lower prices; it includes preserving competition in output, quality, variety, innovation, and independent editorial rivalry. The Ninth

MOTION FOR PRELIMINARY INJUNCTION                    CASE NO. 4:26-CV-03790-AMO

Circuit has recognized that preserving competition is vital to the public interest. *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 988 (9th Cir. 2000); *Boardman*, 822 F.3d at 1023-24.

Delay is far less disruptive than consummation followed by divestiture. Defendants face only a delay in the transaction, which remains subject to so-called regulatory approval and other closing conditions. By contrast, if the acquisition proceeds and Plaintiffs ultimately prevail, the Court would face the far more disruptive task of attempting to unwind an integrated media company.

### 3.   The Requested Injunction Is Specific and Administrable.

The requested injunction is specific and administrable. Plaintiffs seek an order prohibiting Paramount Skydance Corporation, Skydance Media, LLC, their officers, agents, servants, employees, attorneys, and all persons acting in concert with them from consummating, closing, integrating, or otherwise implementing the proposed acquisition until trial or further order of the Court. That relief is directly tied to the threatened injury. It preserves Warner Bros. Discovery as an independent competitor and prevents irreversible integration of assets that Plaintiffs allege would substantially lessen competition. Courts can enter practical hold-separate and anti-integration relief in media-merger cases to preserve effective relief pending adjudication. *Nexstar-TEGNA*, 2026 U.S. Dist. LEXIS 85526, at *84-89.

### E.   The Bond Should Be Set at Zero.

Rule 65(c) requires security only in an amount the Court "considers proper" to cover costs and damages sustained by a party later found to have been wrongfully enjoined. Fed. R. Civ. P. 65(c). The Ninth Circuit gives district courts wide discretion in setting that amount, including discretion to set the bond at zero where there is no evidence that the enjoined party will suffer damages from the injunction. *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003).

The Court should set the bond at zero here. Plaintiffs seek only to preserve the status quo until trial by preventing Defendants from closing and integrating the proposed acquisition.

Defendants have not shown that a temporary injunction pending trial would cause compensable damages, as opposed to a delay in a transaction that remains subject to so-called regulatory approval and other closing conditions. A delay in consummating an acquisition is not itself evidence of damages recoverable on a Rule 65(c) bond. A zero bond is especially appropriate because this case seeks to vindicate important public interests through private antitrust enforcement. Plaintiffs are individual consumers, not commercial competitors seeking tactical leverage. Requiring them to post security for a proposed $110 billion transaction would effectively deny them access to the injunctive remedy expressly provided by Congress in Section 16 of the Clayton Act. Because Defendants have offered no evidence of recoverable damages from a status quo injunction, and because the public interest favors preserving competition pending trial, the Court should require no bond.

### V. CONCLUSION

Plaintiffs have shown, at a minimum, serious questions going to the merits, and the balance of hardships tips sharply in favor of preserving the status quo. The proposed acquisition would eliminate Warner Bros. Discovery as an independent competitor, increase concentration, and threaten competitive injuries, both price and non-price, in multiple relevant markets. Those threatened injuries are directly contrary to the public interest because "the central purpose of the antitrust laws, state and federal, is to preserve competition," which is "vital to the public interest." *Boardman*, 822 F.3d at 1024.

The antitrust laws prevent economic power from concentrating in too few firms. Justice Marshall stated that "[a]ntitrust laws in general…are the Magna Carta of free enterprise," stating that they are "…as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms". *United States v. Topco Assocs., Inc.*, 405 U.S. 596, *supra*, 610 (1972).

Plaintiffs will show that Paramount's acquisition of Warner Bros. Discovery may substantially lessen competition in premium video distribution, national television news, and

MOTION FOR PRELIMINARY INJUNCTION                    CASE NO. 4:26-CV-03790-AMO

theatrical film production. Preserving Warner Bros. Discovery as an independent competitor until trial is therefore in the public interest. If the transaction closes before trial, the structural injury will be difficult to unwind. If the injunction issues and Defendants later prevail, the only consequence is delay. Section 16 authorizes preliminary relief precisely to prevent threatened antitrust injury before it becomes irreversible. For all the foregoing reasons, the Court should preliminarily enjoin Paramount Skydance's proposed acquisition of Warner Bros. Discovery pending trial on the merits.

DATED: May 20, 2026                    ALIOTO LAW FIRM


                                        /s/ Joseph M. Alioto
                                       Joseph M. Alioto, Esq.
                                       Tatiana V. Wallace, Esq.
                                       Attorneys for Plaintiffs

                                       FOREMAN & BRASSO

                                        /s/ Ronald D. Foreman
                                       Ronald D. Foreman, Esq.
                                       Ian. A. Hansen, Esq.
                                       Attorneys for Plaintiffs

MOTION FOR PRELIMINARY INJUNCTION                    CASE NO. 4:26-CV-03790-AMO