Jeffrey L. Kessler (*pro hac vice*)
**WINSTON TAYLOR LLP**
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-4698
Facsimile: (212) 294-4700
jeffrey.kessler@winstontaylor.com

Conor A. Reidy (*pro hac vice*)
Kevin B. Goldstein (*pro hac vice*)
**WINSTON TAYLOR LLP**
300 N. LaSalle Drive
Chicago, IL 60654-3406
Telephone: (312) 558-7542
Facsimile: (312) 558-5700
conor.reidy@winstontaylor.com
kevin.goldstein@winstontaylor.com

Jeanifer E. Parsigian (SBN 289001)
Matthew R. DalSanto (SBN 282458)
**WINSTON TAYLOR LLP**
101 California Street, 21st Floor
San Francisco, CA 94111-5891
Telephone: (415) 591-1469
Facsimile: (415) 591-1400
jeanifer.parsigian@winstontaylor.com
matthew.dalsanto@winstontaylor.com

Matthew R. Huppert (*pro hac vice*)
**WINSTON TAYLOR LLP**
1901 L St NW
Washington, DC 20036-3506
Telephone: (202) 282-5004
Facsimile: (202) 282-5100
matthew.huppert@winstontaylor.com

*Attorneys for Defendants Paramount Skydance Corporation and Skydance Media, LLC*

*Additional counsel on signature page*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| PAMELA FAUST, LEN MARAZZO, LISA McCARTHY, DEBORAH RUBINSOHN, and GARY TALEWSKY<br><br>Plaintiffs,<br><br>vs.<br><br>PARAMOUNT SKYDANCE CORPORATION (formerly Paramount Global), and SKYDANCE MEDIA, LLC,<br><br>Defendants. | Case No. 4:26-cv-03790-AMO<br><br>**DEFENDANTS PARAMOUNT SKYDANCE CORPORATION AND SKYDANCE MEDIA, LLC'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Hearing Date:   July 16, 2026<br>                       Jt. Stip. Pending, requesting<br>                       hearing on July 2, 2026<br>Time:            2:00 PM<br>Judge:           Hon. Araceli Martínez-Olguín<br>Courtroom:    TBD |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................................1

THE RECORD PRESENTED ...............................................................................................2

    A.    THE MERGER TRANSACTION .............................................................2

    B.    PLAINTIFFS SUBMIT NO EVIDENCE TO SUPPORT THEIR PRELIMINARY INJUNCTION MOTION ..........................................................3

    C.    THE TRANSACTION WILL GENERATE SIGNIFICANT PROCOMPETITIVE BENEFITS ......................................................................3

        1.    Post-Merger Paramount Plans to Increase Its Investment in Theatrical Releases ...............................................................................3

        2.    The Merger Will Give Paramount the Scale and Content It Needs to Put Greater Competitive Pressure on Its Much Larger Streaming Rivals ...................................................................4

        3.    The Merger Will Create a More Resilient and More Sustainable Business Model for Television Networks ...................................5

    D.    PARAMOUNT WILL SUFFER SIGNIFICANT HARM IF THE MERGER IS DELAYED ..................................................................................5

LEGAL STANDARD............................................................................................................6

ARGUMENT ........................................................................................................................6

    I.    PLAINTIFFS DO NOT HAVE ARTICLE III OR ANTITRUST STANDING ................6

    A.    PLAINTIFFS HAVE NOT CLEARLY SHOWN THE CONCRETE, PARTICULARIZED, AND IMMINENT INJURY NECESSARY TO ESTABLISH ARTICLE III STANDING..............................................................6

    B.    PLAINTIFFS' HAVE NOT CLEARLY SHOWN ANTITRUST INJURY ..........9

        1.    Alleged Losses of "Viewpoint Diversity" and "Editorial Independence" in the Alleged National TV News Market Are Not Cognizable Antitrust Injuries ..................................................9

        2.    Plaintiffs Cannot Show Antitrust Injury in the Alleged Theatrical Distribution Market......................................................................10

    II.    PLAINTIFFS FAIL TO MAKE ANY SHOWING, LET ALONE A CLEAR SHOWING, THAT THEY ARE LIKELY TO SUCCEED ON THE MERITS ...............10

    A.    PLAINTIFFS MAKE NO CLEAR SHOWING OF ANY COGNIZABLE ANTITRUST MARKET ...............................................................................12

        1.    No Evidence of a National Television News Programming Market .........13

i

2.    No Evidence of a Theatrical Distribution Market.....................................13

3.    No Evidence of a Premium Video Distribution Market ...........................14

B.    PLAINTIFFS FAIL TO MAKE A CLEAR SHOWING OF A LIKELY AND SUBSTANTIAL LESSENING OF COMPETITION ...........................................15

III.    THE MERGER SHOULD NOT BE ENJOINED BECAUSE IT IS LIKELY TO BENEFIT COMPETITION AND CONSUMERS ...........................................................19

A.    THE MERGER IS LIKELY TO INCREASE COMPETITION BY MAKING PARAMOUNT A STRONGER RIVAL TO NETFLIX AND OTHER LEADING STREAMERS ......................................................................................19

B.    THE MERGER IS LIKELY TO INCREASE OUTPUT AND QUALITY IN STREAMING, FILM PRODUCTION, AND TELEVISION NETWORKS........20

IV.    PLAINTIFFS HAVE MADE NO SHOWING OF IMMINENT OR ACTUAL IRREPARABLE INJURY ......................................................................................................21

V.    THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST WEIGH HEAVILY IN FAVOR OF DEFENDANTS...................................................................23

VI.    PLAINTIFFS SHOULD BE REQUIRED TO POST A BOND ......................................25

CONCLUSION...........................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*All. for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) ...............................................................................................24

*AlliedSignal, Inc. v. B.F. Goodrich Co.*,
183 F.3d 568 (7th Cir. 1999) ....................................................................................................9

*Am. Encore v. Fontes*,
152 F.4th 1097 (9th Cir. 2025) ............................................................................................7, 8

*In re Apple iPhone Antitrust Litig.*,
2013 WL 4425720 (N.D. Cal. Aug. 15, 2013) ........................................................................7

*Beaty v. Brewer*,
649 F.3d 1071 (9th Cir. 2011) ...............................................................................................21

*Bennett v. Isagenix Int'l LLC*,
118 F. 4th 1120 (9th Cir. 2024) ..........................................................................................6, 24

*Berlyn, Inc. v. Gazette Newspapers, Inc.*,
157 F. Supp. 2d 609 (D. Md. 2001) .........................................................................................9

*Bradt v. T-Mobile US, Inc.*,
2020 WL 1809716 (N.D. Cal. Feb. 28, 2020) ..................................................................20, 22

*Brown v. Nat'l Football League, Inc.*,
-- F. Supp. 3d --, 2026 WL 279599 (S.D.N.Y. Feb. 3, 2026) ................................................8

*California v. Sutter Health Sys.*,
130 F. Supp. 2d 1109 (N.D. Cal. 2001) .................................................................................16

*California v. Sutter Health Sys.*,
84 F. Supp. 2d 1057 (N.D. Cal. 2000) ...................................................................................12

*Cargill, Inc. v. Monfort of Colo., Inc.*,
479 U.S. 104 (1986).................................................................................................................9

*Carter Hawley Hale Stores, Inc. v. Limited, Inc.*,
587 F. Supp. 246 (C.D. Cal. 1984) ........................................................................................14

*Christian Schmidt Brewing Co. v. G. Heileman Brewing Co.*,
753 F.2d 1354 (6th Cir. 1985) .................................................................................................9

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013).................................................................................................................8

*Coronavirus Rep. v. Apple, Inc.*,
85 F.4th 948 (9th Cir. 2023) .................................................................................................12

*Delco LLC v. Giant of Maryland*,
  2007 WL 3307018 (D.N.J. Nov. 8, 2007) ......................................................................................21

*Demartini v. Microsoft Corp.*,
  662 F. Supp. 3d 1055 (N.D. Cal. 2023) ................................................................................. *passim*

*Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*,
  732 F.2d 480 (5th Cir. 1984) ........................................................................................................16

*E. R. R. Presidents Conf. v. Noerr Motor Freight, Inc.*,
  365 U.S. 127 (1961) ......................................................................................................................10

*Freeland v. Nippon Steel Corp.*,
  -- F. Supp. 3d --, 2026 WL 747417 (N.D. Cal. Mar. 17, 2026) .....................................................10

*Freeman v. ABC Legal Servs., Inc.*,
  877 F. Supp. 2d 919 (N.D. Cal. 2012) ...........................................................................................7

*Fry v. Capital One Fin. Corp.*,
  2025 WL 1397163 (N.D. Cal. May 14, 2025) ........................................................................ *passim*

*FTC v. Arch Coal, Inc.*,
  329 F. Supp. 2d 109 (D.D.C. 2004) ...............................................................................................19

*FTC v. Lab. Corp. of Am.*,
  2011 WL 3100372 (C.D. Cal. Feb. 22, 2011)......................................................................16, 17, 20

*FTC v. Meta Platforms Inc.*,
  654 F. Supp. 3d 892 (N.D. Cal. 2023) ...........................................................................................18

*FTC v. Microsoft Corp.*,
  681 F. Supp. 3d 1069 (N.D. Cal. 2023) ...............................................................................11, 18, 24

*FTC v. Qualcomm Inc.*,
  969 F.3d 974 (9th Cir. 2020) .........................................................................................................12

*FTC v. Tempur Sealy Int'l, Inc.*,
  768 F. Supp. 3d 787 (S.D. Tex. 2025) ...........................................................................................14

*Gerlinger v. Amazon.com Inc.*,
  526 F.3d 1253 (9th Cir. 2008) ........................................................................................................6

*Ginsberg v. INBEV SA/NV*,
  2008 WL 4965859 (E.D. Mo. Nov. 18, 2008)............................................................................22, 25

*Gonzalez v. Arizona*,
  485 F.3d 1041 (9th Cir. 2007) .......................................................................................................15

*Gorlick Distribut. Ctr., LLC v. Car Sound Exhaust Sys., Inc.*,
  723 F.3d 1019 (9th Cir. 2013) ...................................................................................................12, 13

*Hicks v. PGA Tour, Inc.*,
  897 F.3d 1109 (9th Cir. 2018) .......................................................................................................12

iv

*hiQ Labs, Inc. v. LinkedIn Corp.*,
   485 F. Supp. 3d 1137 (N.D. Cal. 2020) ...............................................................................15

*Hogan v. Amazon.com, Inc.*,
   2025 WL 869202 (9th Cir. Mar. 20, 2025) ..........................................................................10

*Hoosier Energy Rural Elec. Co-op., Inc. v. John Hancock Life Ins. Co.*,
   2008 WL 5216027 (S.D. Ind. Dec. 11, 2008) ......................................................................25

*Hospital Corp. of Am. v. FTC*,
   807 F.2d 1381 (7th Cir. 1986) .............................................................................................18

*Illumina, Inc. v. Qiagen, N.V.*,
   207 F. Supp. 3d 1081 (N.D. Cal. 2016) ...............................................................................25

*Kumar v. Koester*,
   131 F.4th 746 (9th Cir. 2025) ................................................................................................8

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992).................................................................................................................7

*Malaney v. UAL Corp.*,
   2010 WL 3790296 (N.D. Cal. Sept. 27, 2010) ............................................................. *passim*

*Malheur Forest Fairness Coal. v. Iron Triangle, LLC*,
   164 F.4th 710 (9th Cir. 2026) ..............................................................................................10

*McDermott v. Ampersand Pub., LLC*,
   593 F.3d 950 (9th Cir. 2010) ...............................................................................................10

*Miami Herald Pub. Co. v. Tornillo*,
   418 U.S. 241 (1974)..............................................................................................................10

*Murthy v. Missouri*,
   603 U.S. 43 (2024)..................................................................................................................8

*NAACP v. Claiborne Hardware Co.*,
   458 U.S. 886 (1982)..............................................................................................................10

*Nat'l Ass'n of Chain Drug Stores v. Express Scripts, Inc.*,
   2012 WL 3655459 (W.D. Pa. Aug. 27, 2012) ....................................................................22

*New York v. Kraft Gen. Foods, Inc.*,
   926 F. Supp. 321 (S.D.N.Y. 1995) ......................................................................................18

*Newcal Indus., Inc. v. Ikon Office Solution*,
   513 F.3d 1038 (9th Cir. 2008) ....................................................................................12, 13, 14

*In re Nexstar-Tegna Merger Litigation*,
   2026 WL 1049295 (E.D. Cal. Apr. 17, 2026).....................................................................22

*Olin Corp. v. FTC*,
   986 F.2d 1295 (9th Cir. 1993) .............................................................................................12

*Phototron Corp. v. Eastman Kodak Co.*,
  842 F.2d 95 (5th Cir. 1988) ...................................................................................................9

*Pimentel v. Dreyfus*,
  670 F.3d 1096 (9th Cir. 2012) ...............................................................................................6

*Reilly v. Hearst Corp.*,
  107 F. Supp. 2d 1192 (N.D. Cal. 2000) .................................................................................9

*Roe v. City & Cnty. of S.F.*,
  2026 WL 898262 (N.D. Cal. Mar. 30, 2026) ........................................................................7

*Roe v. Critchfield*,
  137 F.4th 912 (9th Cir. 2025) ...........................................................................................6, 11

*Sanner v. Bd. of Trade of Chi.*,
  62 F.3d 918 (7th Cir. 1995) ...................................................................................................7

*Shaterian v. Wells Fargo Bank, Nat'l Ass'n*,
  2011 WL 2314151 (N.D. Cal. June 10, 2011) .....................................................................11

*Somers v. Apple, Inc.*,
  729 F.3d 953 (9th Cir. 2013) ...............................................................................................10

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) ................................................................................................................8

*St. Alphonsus Med. Ctr. - Nampa, Inc. v. St. Luke's Health Sys.*,
  778 F.3d 775 (9th Cir. 2015) .............................................................................10, 13, 16, 19

*Taleff v. Sw. Airlines Co.*,
  828 F. Supp. 2d 1118 (N.D. Cal. 2011) ...............................................................................23

*Tundra v. Faire Wholesale, Inc.*,
  2024 WL 589097 (N.D. Cal. Feb. 13, 2024) .......................................................................15

*United States v. Anthem, Inc.*,
  855 F.3d 345 (D.C. Cir. 2017) .............................................................................................16

*United States v. Carilion Health Sys.*,
  707 F. Supp. 840 (W.D. Va. 1989) ......................................................................................20

*United States v. Oracle Corp.*,
  331 F. Supp. 2d 1098 (N.D. Cal. 2004) ...............................................................................18

*W. Airlines, Inc. v. Int'l Bhd. of Teamsters*,
  480 U.S. 1301 (1987) ...........................................................................................................24

*Winter v. Nat. Res. Def. Council*,
  555 U.S. 7 (2008) ....................................................................................................................6

**Statutes**

15 U.S.C. § 18 .............................................................................................................................15

vi

**Other Authorities**

Fed. R. Civ. P. 65(c) ........................................................................................................................25

U.S. Dep't of Justice & FTC, Merger Guidelines § 2.1 (2023) .................................................18

## **INTRODUCTION**

This case concerns the future of the entertainment industry and a misguided attempt by Plaintiffs to politicize antitrust law. The entertainment industry stands at a crossroads. Year after year, traditional movie studios and theaters have suffered as viewers' habits have shifted toward streaming video. Creative workers of all stripes—from writers and actors to stagehands and technical experts—have been impacted. The merger of Paramount and Warner Bros. Discovery presents an opportunity to revitalize Hollywood and the industry at large by creating greater competition that benefits consumers, theaters, and workers alike. The rationale for the transaction is driven by the fundamental truth that *content is king*. To compete most effectively against leading streaming platforms like Netflix and Disney+, the merging parties require greater scale and investment in high-quality, compelling content that will drive moviegoers to theaters and attract viewers to cable television and streaming services.

Today, Paramount and Warner Bros. are sub-scale streaming competitors confronting three much larger rivals: Netflix, Disney+, and Amazon Prime Video. Combining the two companies' libraries will offer consumers a more attractive alternative and generate real competition with the three largest streaming platforms. Competing against highly scaled streaming platforms also requires significant investment in new and exciting content. Indeed, following the merger of Paramount and Skydance, the combined company has nearly *doubled* its theatrical film output, and Paramount has committed to releasing 30 feature films in theaters annually following the Warner Bros. transaction. Paramount's strategy also makes good sense: releasing feature films in theaters generates audience excitement for the films' subsequent move to streaming, driving subscribers and streaming viewership.

Once complete, the transaction will fuel greater competition by offering a stronger, better scaled rival to Netflix, Disney, and Amazon, and consumers and workers will benefit from the expanded investment and output that it will unlock. Plaintiffs, however, seek a preliminary injunction to block this industry-transforming merger from closing. As set forth in this opposition, Plaintiffs' motion is an empty shell, unsupported by any facts or expert testimony and does not come close to satisfying their heavy burden to obtain the extraordinary remedy of a preliminary injunction. It would be unprecedented to enjoin a merger on such a barren record.

In a futile effort to compensate for their lack of evidence, Plaintiffs lob baseless political attacks

1

against the merger.  This clumsy attempt to politicize antitrust litigation, untethered to any established antitrust principles or law, has no place in this courthouse and must be rejected.  The injunction Plaintiffs seek would also cause great harm: delaying or blocking the merger would harm competition rather than help it, and it would impose significant economic costs on Paramount.  Netflix and other scaled tech platforms stand to benefit from a weaker Paramount and Warner Bros., but consumers, theater owners and talent will suffer.  Whatever upside Plaintiffs might see in such an outcome, it is not a procompetitive one.  For the reasons that follow, the Court should deny Plaintiffs' motion.

## THE RECORD PRESENTED

### A.    THE MERGER TRANSACTION

In August 2025, Skydance Media merged with Paramount Global, bringing together two complementary entertainment industry businesses to form Paramount Skydance Corporation ("Paramount").  Compl. ¶¶ 48, 58.  Before that merger, Paramount Global operated various entertainment businesses, including producing and distributing movies and television programming, *see id*. ¶ 122, offering streaming services such as Paramount+, *id.* ¶ 28, operating the broadcast network CBS, *id*. ¶ 50, and offering a portfolio of cable television channels.  Skydance Media's pre-merger business, on the other hand, focused on producing movies and television and did not compete with Paramount Global in streaming services, television networks, or news.  *See id*. ¶¶ 18–19.  Pre-merger, Paramount Global's film studio, Paramount Pictures, was operating at a significant loss; in 2025, none of its eight films was profitable.  Goldberg Decl. ¶ 14.

On February 27, 2026, Paramount signed an agreement to acquire Warner Bros. Discovery ("Warner Bros.").  *See* Compl. ¶¶ 66–67, 69–73; Ex. 5, (Merger Agreement). Warner Bros. produces and distributes movies and television shows, owns several cable television networks (*e.g.,* HBO, CNN, TNT, TBS), and sells two different subscription streaming services (HBO Max and discovery+).  Compl. ¶ 20. Warner Bros. does not have a broadcast network like CBS.  On April 23, 2026, Warner Bros. stockholders approved Paramount's acquisition of Warner Bros., subject to customary regulatory clearances.  *Id*. ¶ 73.

### B.    PLAINTIFFS SUBMIT NO EVIDENCE TO SUPPORT THEIR PRELIMINARY INJUNCTION MOTION

Plaintiffs are five individual consumers of entertainment content.  On April 30, 2026, they filed the Complaint, and, three weeks later, filed the pending Motion for a Preliminary Injunction.  But Plaintiffs did not submit any evidence in support of their Motion.  They did not make any expert submissions, did not submit any fact declarations, and did not submit a single document, not even the merger agreement.  Plaintiffs' Motion relies solely on the unverified allegations in their Complaint and unsupported proclamations in their brief by Plaintiffs' counsel.

### C.    THE TRANSACTION WILL GENERATE SIGNIFICANT PROCOMPETITIVE BENEFITS

The merger will benefit consumers and other industry stakeholders in many ways. The combined entity will expand consumer choice, increase television and film production, and foster streaming service competition.  Goldberg Decl. ¶¶ 25, 28–32.  These benefits are made possible in part by the significant costs savings that the combined entity will be able achieve.  Gordon Decl. ¶¶ 6, 16.  Specifically, the merger is estimated to save over $6 billion in costs.  Gordon Decl. ¶ 5; Goldberg Decl. ¶ 27.  The sources of these savings include consolidating the different technology infrastructure underlying different streaming platforms, consolidating back-office enterprise technology, consolidating office real estate, and implementing more efficient marketing.  Gordon Decl. ¶¶ 7–12.  These savings will help Paramount increase its content production. *Id*. ¶¶ 16, 19.  Indeed, Paramount has committed to increase its investment in content generation and to release a minimum of 30 films in theaters per year.  Goldberg Decl. ¶¶ 23, 29; *see also* Ex. 2 (Press Release); Ex. 3 (Investor Presentation); Ex. 4 (Shareholder Letter).  Paramount will use its merger savings to invest in the content and technology that audiences care about, which will enable the merged firm's studios, streaming services, and television networks to compete more effectively and offer greater opportunities to actors, writers, directors and other members of the talent community.  Gordon Decl. ¶¶ 6, 11–12, 16; Goldberg Decl. ¶¶ 25–32.

#### 1.    Post-Merger Paramount Plans to Increase Its Investment in Theatrical Releases

Paramount has a history of increasing theatrical releases and expects to continue to do so post-

3

merger. Following the Skydance-Paramount transaction, Paramount nearly doubled its theatrical releases in 2026 compared to 2025. Goldberg Decl. ¶¶ 15, 29. With the Warner Bros. merger, Paramount has committed to continued theatrical releases. Indeed, theatrical releases are a key part of its post-merger strategy to invest in theatrical releases and later add the films to a combined streaming service to generate buzz to build demand and subscribers. *Id*. ¶¶ 28, 31. Paramount has repeatedly and publicly committed to release a minimum of 30 theatrical films per year. *Id*. ¶¶ 23, 29; *see also* Ex. 2 (Press Release); Ex. 3 (Investor Presentation); Ex. 4 (Shareholder Letter). To support the production of these films, Paramount will separately maintain Warner Bros. and Paramount film studios, along with each of their creative teams and lots. Goldberg Decl. ¶ 22; *see also* Ex. 2 (Press Release). Each of those films will have a minimum 45-day window in movie theaters before becoming available on any other platform. Goldberg Decl. ¶ 23. With the addition of Warner Bros., Paramount plans, post-merger, to continue growing the combined film release slate with the intention to be the producer with the most theatrical film releases in the United States. *Id*. ¶¶ 29, 31.

**2.    The Merger Will Give Paramount the Scale and Content It Needs to Put Greater Competitive Pressure on Its Much Larger Streaming Rivals**

The merger will combine the content in Paramount's Paramount+ and Warner Bros.' HBO Max to create a single, far more competitive library of streaming content. Goldberg Decl. ¶¶ 25–26, 31; Gordon Decl. ¶ 17; *see also* Compl. ¶¶ 18–20 (listing each entity's portfolio of film, entertainment, streaming, and related media assets); Ex. 2 (Press Release) (announcing intent to create a combined global streaming competitor). The combined streaming service will allow the combined company to offer consumers a broad range of complementary content—from prestige dramas to popular children's programming—on a single platform, without consumers having to pay for another streaming service, making it a more compelling product. Goldberg Decl. ¶ 25–26. A streaming product with more content will attract and retain more subscribers, generating more revenue that Paramount can invest back into more content for the streaming service to keep growing the amount of content that it will offer. *Id.* ¶¶ 31–32. The cost savings created by the merger are also expected to help Paramount improve its streaming technology and user interface, improving performance and consumers' user experience. Gordon Decl. ¶¶ 8, 16.

The merger, and the investment in the combined streaming service the merger will generate, will

4

enable Paramount to better compete against its much larger streaming rivals Netflix, Amazon Prime Video, and Disney+. Goldberg Decl. ¶ 25; Gordon Decl. ¶¶ 17–19. Today, the streaming services of both Paramount and Warner Bros. lack that scale, in terms of subscriber base, revenues, and content, which puts them at a competitive disadvantage and reduces their ability to invest in growing their services. Goldberg Decl. ¶ 25.

### 3. The Merger Will Create a More Resilient and More Sustainable Business Model for Television Networks

In an era when traditional, linear television networks are declining in popularity and profitability, the merger will provide the merged firm with the cash flow, cost-efficiencies, and technology-forward distribution pipeline necessary to support its combined slate of networks, including CBS, CNN, TBS, and the Discovery Channel. Goldberg Decl. ¶ 33. These networks have strong brands, and the merged firm plans to bolster them for a streaming and digital world. *Id.* For example, post-merger, Paramount intends to include programming from across its network portfolio on the combined streaming service, increasing user convenience and consumer access to network programming. *Id.; see also id.* ¶ 32. And the merged firm's complementary and unified portfolio of cable and free-to-air (*i.e.*, broadcast) networks will offer advertisers greater opportunities for cross-channel activations and sales. *Id.* ¶ 34. All the while, contrary to Plaintiffs' unsupported claims, CNN will remain editorially independent. *Id.* ¶ 35.

### D. PARAMOUNT WILL SUFFER SIGNIFICANT HARM IF THE MERGER IS DELAYED

Diligence for the merger began in September 2025. Goldberg Decl. ¶ 16. Paramount invested a significant amount of time and effort in assessing a potential five-year plan for the combined company before making its first formal acquisition offer. *Id.* The bidding process—spanning from September 2025 to February 2026, with the offer price rising from $19 to $31 per share—reflects the financial commitment and competitive pressure involved in securing the deal. *Id.* ¶ 18. Paramount's final $31-per-share bid also included a commitment to pay the breakup fee Warner Bros. owes Netflix, the other leading bidder, effectively bringing the total financial commitment to approximately $32 per share. *Id.* ¶ 19; Ex. 5 (Merger Agreement) § 6.17, Annex A. Paramount decided that this price was worth paying because of the significant anticipated synergies of the merged company, but any delay in closing will delay the

5

realization of these synergies.  Gordon Decl. ¶¶ 20–21.

Further, if the merger has not closed by September 30, 2026, Paramount must pay Warner Bros. shareholders an additional $0.25 per share per quarter (measured daily) until closing.  *Id*. ¶ 22; Ex. 5 (Merger Agreement) Annex A.  This would cost Paramount approximately $6.9 million each day the closing is delayed past September 30.  Gordon Decl. ¶ 22.  Any delay in closing would also result in continued carrying costs on committed financing, potential expiration or renegotiation of financing commitments, and ongoing uncertainty in the capital markets in which Paramount will need to raise funds.  *Id*. ¶ 23.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion."  *Roe v. Critchfield*, 137 F.4th 912, 921–22 (9th Cir. 2025).  Plaintiffs must make a "clear showing" that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm without injunctive relief, (3) the balance of equities tip in their favor, and (4) an injunction is in the public interest.  *Id*. at 922 (citing *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)).  "Likelihood of success on the merits 'is the most important' *Winter* factor and 'is a threshold inquiry.'"  *Id*.  Alternatively, Plaintiffs must establish "*serious questions going to the merits*" and that the balance of equities "*sharply*" favor Plaintiffs, along with showing that they will suffer irreparable harm and that the injunction is in the public interest.  *Bennett v. Isagenix Int'l LLC*, 118 F. 4th 1120, 1126 (9th Cir. 2024).  "At an irreducible minimum, though, the moving party must demonstrate a fair chance of success on the merits, or questions serious enough to require litigation."  *Pimentel v. Dreyfus*, 670 F.3d 1096, 1105–06 (9th Cir. 2012) (cleaned up).  Plaintiffs do not come close to satisfying any of these standards, as they offer no evidentiary support whatsoever for the "extraordinary" remedy they seek.

## ARGUMENT

**I.     PLAINTIFFS DO NOT HAVE ARTICLE III OR ANTITRUST STANDING**

**A.     PLAINTIFFS HAVE NOT CLEARLY SHOWN THE CONCRETE, PARTICULARIZED, AND IMMINENT INJURY NECESSARY TO ESTABLISH ARTICLE III STANDING**

Plaintiffs fail to establish standing under Article III, which "is required to establish a justiciable

6

case or controversy within the jurisdiction of the federal courts," *Gerlinger v. Amazon.com Inc.*, 526 F.3d 1253, 1256 (9th Cir. 2008).  Article III standing has three elements: (1) injury-in-fact, (2) traceability, *i.e.*, "a causal connection between the injury and the conduct complained of," and (3) redressability, *i.e.*, a likelihood "that the injury will be 'redressed by a favorable decision.'"  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).  At the preliminary injunction stage, Plaintiffs bear the burden of making "a 'clear showing' that [they are] likely to establish each element of standing."  *Am. Encore v. Fontes*, 152 F.4th 1097, 1110 (9th Cir. 2025).  In antitrust cases, plaintiffs must demonstrate standing in each alleged market.  *See In re Apple iPhone Antitrust Litig.*, 2013 WL 4425720, at *6 (N.D. Cal. Aug. 15, 2013).

Here, Plaintiffs do not make any showing, let alone a "clear showing" of standing to challenge the proposed Paramount-Warner Bros. merger.  They have submitted no evidence to support their claimed standing and instead rely only on the unverified allegations in their Complaint.  *See* Mot. at 11–12. This complete failure of proof, by itself, requires denying Plaintiffs' motion.  But even if the Court accepted Plaintiffs' unverified allegations as evidence, they would still fall short because they do not suggest any concrete, particularized injury likely to flow imminently from the merger.  Instead, Plaintiffs make only generic, conclusory assertions of increased prices, reduced output, and reduced consumer choice without linking any of these assertions to concrete, individual injuries to Plaintiffs.  *See, e.g.*, Compl. ¶¶ 1, 25, 27, 40.  Such allegations cannot satisfy the "clear showing" requirement as a matter of law.  *See, e.g.*, *Roe v. City & Cnty. of S.F.*, 2026 WL 898262, at *3 (N.D. Cal. Mar. 30, 2026) ("generalized contentions" of harm are insufficient to demonstrate standing).

Plaintiffs' assertion that three of them "paid increased subscription charges" for Paramount+ beginning in January 2026, *see* Mot. at 11, does not cure their lack of standing because that price increase occurred prior to the merger and thus is not "fairly traceable" to it.  *See Lujan*, 504 U.S. at 560.  A single historical price increase prior to the challenged merger is no showing, let alone a "clear showing," that the merger is likely to cause future price increases that would harm any of the Plaintiffs.  *See, e.g.*, *Fontes*, 152 F.4th at 1112 (single "isolated case" of historical harm "cannot by itself support standing for injunctive relief"); *Freeman v. ABC Legal Servs., Inc.*, 877 F. Supp. 2d 919, 926 (N.D. Cal. 2012) ("a single incident is insufficient to establish a likelihood of future injury").  Plaintiffs Faust's and McCarthy's allegations that the 2026 price increase has "deterred" them from subscribing to Paramount+ is likewise

7

insufficient to establish Article III standing. *See Sanner v. Bd. of Trade of Chi.*, 62 F.3d 918, 923–24 (7th Cir. 1995) (farmers "refraining from selling soybeans" based on "depressed price" of soybeans lacked Article III standing to assert antitrust claims).

Plaintiffs have also failed to present any evidence to make a clear showing that any alleged future injuries they will suffer are "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). Instead, they posit only "conjectural allegations of potential injuries," *Fontes*, 152 F.4th at 1113, detached from commercial realities and economic principles, to argue that the merger will usher in a parade of horribles, which in turn lack any connection to the Plaintiffs. *See, e.g.*, Compl. ¶¶ 27, 40. For example, in the "Theater Distribution" market, Plaintiffs speculate about "fewer theatrical titles, less genre and budget variety, and fewer meaningful alternatives at local theaters," Compl. ¶ 114, but they offer no evidence showing an imminent prospect of such harm taking place in a manner that will be "personal and individual" to any of the Plaintiffs. *Kumar v. Koester*, 131 F.4th 746, 751 (9th Cir. 2025).

Similarly, the Complaint's allegations that the merger will lead to a loss of "viewpoint diversity," "credibility," "editorial independence," or similar abstract concepts, Compl. ¶¶ 27, 43, 81, 130, are without any factual support. And, in any event, such an alleged intangible injury cannot provide a basis for Article III standing because it does not have "a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016). Plaintiffs' "ideological discomfort" with Paramount's editorial viewpoint "does not implicate any legally protected interest." *Brown v. Nat'l Football League, Inc.*, -- F. Supp. 3d --, 2026 WL 279599, at *7 (S.D.N.Y. Feb. 3, 2026); *see also Murthy v. Missouri*, 603 U.S. 43, 75 (2024).

Finally, in their Motion, Plaintiffs assert for the first time (and without evidence), that the merger will result in a "loss of creativity by reason of the potential job losses by writers, directors, actors, support personnel and studios." Mot. at 11. Not only did Plaintiffs fail to allege this in their Complaint or provide any evidence to support it in the Motion, but any lost "creativity" stemming from alleged "job losses" would not confer standing on Plaintiffs in any event because none of them claim to be employed in any of these jobs that they could lose. *See Demartini v. Microsoft Corp.*, 662 F. Supp. 3d 1055, 1061 (N.D. Cal. 2023) ("Plaintiffs do not contend the alleged anticompetitive effects in the labor market will damage them . . . thus, they do not have standing to pursue such claim.").

## B.    PLAINTIFFS' HAVE NOT CLEARLY SHOWN ANTITRUST INJURY

Plaintiffs further fail to make the required clear showing of antitrust injury to support their claims in any of the three markets alleged.  Antitrust injury is "threatened loss or damage of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful." *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 113 (1986).  A private plaintiff "must allege" such an injury "in order to seek injunctive relief" under the Clayton Act. *Id*.

Moreover, because antitrust injury bears upon the "likelihood of success on the merits of [their] Section 7 claim," *AlliedSignal, Inc. v. B.F. Goodrich Co.*, 183 F.3d 568, 574 (7th Cir. 1999), a plaintiff must make an evidentiary showing of antitrust injury to warrant a preliminary injunction in a Section 7 case. *See, e.g.*, *Phototron Corp. v. Eastman Kodak Co.*, 842 F.2d 95, 98 (5th Cir. 1988) (a "substantial likelihood of suffering an antitrust injury," supported by "more than mere pleading," is required to warrant preliminary injunction); *Christian Schmidt Brewing Co. v. G. Heileman Brewing Co.*, 753 F.2d 1354, 1357–58 (6th Cir. 1985) (plaintiff must make "sufficient showing of potential or threatened antitrust injury" that is "supported . . . with affidavits").  Because Plaintiffs have not submitted any affidavits, expert reports, or other evidence of any antitrust injury claimed to have been suffered by Plaintiffs in any of the alleged markets, Plaintiffs have not made the required clear showing of such an injury.

### 1.    Alleged Losses of "Viewpoint Diversity" and "Editorial Independence" in the Alleged National TV News Market Are Not Cognizable Antitrust Injuries

In addition to the lack of evidence for Plaintiffs' claims of injury from a purported loss of viewpoint diversity or editorial independence, such an abstract political injury would not provide Plaintiffs with antitrust standing to challenge the merger because they are not "the type [of injury] the antitrust laws were designed to prevent." *Cargill*, 479 U.S. at 113.  Antitrust laws "exclusively confine their scope to matters of economic consequence." *Reilly v. Hearst Corp.*, 107 F. Supp. 2d 1192, 1195 (N.D. Cal. 2000).  Thus, a loss of "viewpoint diversity" or similar political injury would be insufficient as a matter of law to establish antitrust standing. *See Berlyn, Inc. v. Gazette Newspapers, Inc.*, 157 F. Supp. 2d 609, 619 (D. Md. 2001) ("stilled independent editorial voices" and reduced "diverse viewpoints" are not cognizable antitrust injuries).  Indeed, it would violate the First Amendment for a court to enjoin a merger on the basis of how an acquiring party is likely to "exercise . . . editorial control over its content" because that

9

conduct is protected by the First Amendment. *McDermott v. Ampersand Pub., LLC*, 593 F.3d 950, 959 (9th Cir. 2010); *accord Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974).

Simply put, Plaintiffs' allegations of "political" harm in the National TV News Market—in addition to being factually unsupported—are not the type of injuries that can support a Clayton Act claim. *See, e.g., NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 914 (1982) (political boycotts do not violate the antitrust laws); *E. R. R. Presidents Conf. v. Noerr Motor Freight*, *Inc.*, 365 U.S. 127, 136 (1961) (petitioning the legislature is a protected activity under the First Amendment, not an antitrust violation).

### 2. Plaintiffs Cannot Show Antitrust Injury in the Alleged Theatrical Distribution Market

Moreover, Plaintiffs fail to clearly show a cognizable antirust injury in the alleged "Theatrical Distribution" market because they are not "participant[s] in" that market, *Malheur Forest Fairness Coal. v. Iron Triangle, LLC*, 164 F.4th 710, 733 (9th Cir. 2026), meaning they are neither "consumer[s] of [Paramount's] goods or services" in that market nor "a competitor of [Paramount] in" that market. *Somers v. Apple, Inc.*, 729 F.3d 953, 963 (9th Cir. 2013). Plaintiffs allege that this market involves competition among "major studio-distributors" to sell their content to "exhibitors," *i.e.*, movie theaters, Compl. ¶ 109, but Plaintiffs are neither exhibitors purchasing movie content nor studios seeking to produce and distribute movies. Rather, they are "moviegoers." Compl. ¶¶ 41–42. Because "Theatrical Distribution" and theatrical exhibition "are distinct," as Plaintiffs acknowledge, *see* Compl. ¶ 110, "Plaintiffs have not alleged antitrust injury," as any injuries Plaintiffs claim to have suffered as "moviegoers" would occur in a market different from the one in which the merger allegedly restrained competition. *Hogan v. Amazon.com, Inc.*, 2025 WL 869202, at *1 (9th Cir. Mar. 20, 2025); *accord Freeland v. Nippon Steel Corp.*, -- F. Supp. 3d --, 2026 WL 747417, at *3 (N.D. Cal. Mar. 17, 2026) (following *Hogan* and dismissing similar claims).

### II.    PLAINTIFFS FAIL TO MAKE ANY SHOWING, LET ALONE A CLEAR SHOWING, THAT THEY ARE LIKELY TO SUCCEED ON THE MERITS

To make a clear showing of a likelihood of success on the merits of their merger challenge under Section 7 of the Clayton Act, Plaintiffs have the burden to "establish a prima facie case that a merger is anticompetitive." *St. Alphonsus Med. Ctr. - Nampa, Inc. v. St. Luke's Health Sys.*, 778 F.3d 775, 783,

10

785–86, 788 (9th Cir. 2015). To satisfy this burden, Plaintiffs must come forward with actual evidence—expert testimony, data, declarations, or documents—that there is a "reasonable probability" that the merger will "substantially" lessen competition. *See FTC v. Microsoft Corp.*, 681 F. Supp. 3d 1069, 1083–85 (N.D. Cal. 2023), *aff'd*, 136 F.4th 954 (9th Cir. 2025); *Fry v. Capital One Fin. Corp.*, 2025 WL 1397163, at *2–3, 6 (N.D. Cal. May 14, 2025) (it is "well established" that "plaintiff's prediction of a merger's future impact on competition . . . ha[s] to be reasonably probable, rather than merely possible"). "[R]ely[ing] solely on conclusory allegations in [an] unverified complaint," as Plaintiffs do here, is "plainly insufficient to carry Plaintiffs' burden to establish a likelihood of success on the merits or raise serious questions going to the merits of their Section 7 claim." *Fry*, 2025 WL 1397163, at *3; *accord Shaterian v. Wells Fargo Bank, Nat'l Ass'n*, 2011 WL 2314151, at *4 (N.D. Cal. June 10, 2011) ("[P]laintiff may not support a motion for a preliminary injunction by merely pointing to his complaint and the facts alleged therein.").

Like Plaintiffs' failure to show standing, their failure to substantiate their merits assertions is fatal to their Motion at the outset because likelihood of success on the merits "is a threshold inquiry," such that "[i]n the absence of serious questions going to the merits," the court need not consider the other [preliminary injunction] factors." *Roe*, 137 F.4th at 922. Given that Plaintiffs and their counsel have previously had their merger challenges rejected for just this reason, there is no plausible excuse for their, once again, failing to present any evidence to try to establish a *prima facie* case. *Fry*, 2025 WL 1397163, at *2 ("[T]he Court finds that Plaintiffs' request [for a preliminary injunction] is cursory, unsupported by any record evidence, and falls far short of meeting the standard for a preliminary injunction.").

Plaintiffs cannot avoid this result by recycling their baseless assertion—previously rejected by numerous courts in this District—that Plaintiffs have an "exceptionally low" burden, Mot. at 13, to prove their Section 7 claim. *See, e.g.*, *Fry*, 2025 WL 1397163, at *2 (Plaintiffs' counsel "mischaracterize[s]" and "substantially understate[s]" applicable standard in arguing for a low burden); *Demartini.*, 662 F. Supp. 3d at 1063–644 (rejecting similar assertion by Plaintiffs' counsel as "ignor[ing] their pleading burden and Supreme Court law"). While Plaintiffs' counsel may long for an era when merger challenges were easier to sustain, that is not the law today. *See Fry*, 2025 WL 1397163, at *2–3 (criticizing "Plaintiffs' lax framing" of the likelihood of success on the merits standard).

11

Because Plaintiffs have not submitted a single piece of evidence to support their *prima facie* case, the Court should end its analysis there and deny the motion for a complete failure of proof. But, even if the Court were to credit the unverified allegations in the Complaint—which would be improper on a motion for a preliminary injunction—it would still reach the conclusion that Plaintiffs have not come close to meeting their burden to clearly show they are likely to succeed in proving a *prima facie* case.

### A.    PLAINTIFFS MAKE NO CLEAR SHOWING OF ANY COGNIZABLE ANTITRUST MARKET

"A threshold step in any antitrust case is to accurately define the relevant market, which refers to 'the area of effective competition.'" *FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020). "Failing to define a relevant market alone is fatal to an antitrust claim." *Coronavirus Rep. v. Apple, Inc.*, 85 F.4th 948, 957 (9th Cir. 2023). On a motion for preliminary injunction, the plaintiff bears the "burden of proving" the existence of a "well-defined" antitrust market. *California v. Sutter Health Sys.*, 84 F. Supp. 2d 1057, 1081 (N.D. Cal. 2000). To do so, Plaintiffs must show that the market "encompass[es] . . . all economic substitutes," the boundaries of which are "determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008). Cross-elasticity of demand is an economic concept that is "[t]he principle most fundamental to product market definition." *Coronavirus Rep.*, 85 F.4th at 955.[1] A market also cannot be "artificial" or "contorted to meet [plaintiffs'] needs." *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1121 (9th Cir. 2018).

Here, Plaintiffs have not submitted any expert testimony or facts in support of their alleged market. That failure of proof "alone is fatal to [Plaintiffs'] antitrust claim." *Coronavirus Rep.*, 85 F.4th at 957. But even if the Court considered Plaintiffs' allegations as if they were supported by evidence, all three of Plaintiffs' alleged markets would still fail as a matter of law because they do not "encompass . . . all economic substitutes," *Newcal*, 513 F.3d at 1045, and are not defined "such that there is cross-elasticity of demand" for the products they contain, *Gorlick Distribut. Ctr., LLC v. Car Sound Exhaust Sys., Inc.*, 723 F.3d 1019, 1025 (9th Cir. 2013). Instead, while Plaintiffs formulaically invoke the concept of

---

[1] Cross-elasticity of demand exists when "an increase in the price of one product leads to an increase in demand for another," and when that is so, "both products should be included in the relevant product market." *Olin Corp. v. FTC*, 986 F.2d 1295, 1298 (9th Cir. 1993).

12

"reasonable interchangeability," *see* Mot. at 17–18, they do not point to any facts that show how this principle supports their market definitions. The principle of cross-elasticity of demand focuses on whether some products could "deprive" other products "of significant levels of business," *Newcal*, 513 F.3d at 1045, if those other products increased price materially. *See also St. Alphonsus*, 778 F.3d at 784 (explaining "hypothetical monopolist" test). Plaintiffs do not allege, let alone demonstrate through evidence, any facts to show that any one of the three alleged markets satisfies the cross elasticity of demand test. *Newcal*, 513 F.3d at 1045; *Gorlick*, 723 F.3d at 1025.

### 1. No Evidence of a National Television News Programming Market

Plaintiffs' "National TV News" market has at least two specific deficiencies that make Plaintiffs' Section 7 claim in that market unlikely to succeed. *First*, Plaintiffs exclude various news products from the alleged market because they lack "continuous live coverage," Compl. ¶ 101, yet they include broadcast news (*e.g.*, CBS News) in the market, even though it too does not offer "continuous live coverage." *Second*, Plaintiffs fail to establish any facts that would explain why other forms of news media are not reasonable substitutes, with cross-elasticity of demand, for "national television news programming." *See Newcal*, 513 F.3d at 1045. Specifically, Plaintiffs do not address why major national news outlets and their constantly updated websites and apps that include video content (*e.g.*, *New York Times*, *Washington Post*, *Wall Street Journal*, *USA Today*), wire services (*e.g.*, AP, Reuters), or other online news publications (*e.g.*, Axios, The Atlantic), are not reasonably interchangeable with the attributes that the Motion claims define the "National TV News" market (*i.e.*, "national live infrastructure, institutional reputation, carriage relationships, or independent network-level newsroom capacity"). *See* Mot. at 18.

### 2. No Evidence of a Theatrical Distribution Market

Plaintiffs' "Theatrical Distribution" market has at least two specific deficiencies that make Plaintiffs' Section 7 claim in that market unlikely to succeed. *First*, the Complaint allegations upon which Plaintiffs' Motion relies conflates three distinct stages of the movie supply chain—production, distribution, and exhibition—and leaves unclear which of these functions is alleged to be in or outside the relevant market. *See* Mot. at 21 (citing Compl. ¶¶ 109, 111). *Second*, insofar as Plaintiffs allege a market for *producing* movies *distributed in theaters*, *see id.* (calling this market "theatrical film production"), Plaintiffs present no facts explaining why films produced for theatrical release are not reasonably

13

interchangeable with films produced for release through other forms of distribution, such as subscription streaming services or streaming video on-demand—especially since, in many cases, the same films may be distributed through both channels.  Plaintiffs' "arbitrary" decision, unsupported by evidence, to ignore or marginalize major movie production companies that indisputably compete with Paramount and Warner Bros., such as Netflix, Amazon, and Apple, is fatal to this alleged market.  *See FTC v. Tempur Sealy Int'l, Inc.*, 768 F. Supp. 3d 787, 816–18 (S.D. Tex. 2025).  Plaintiffs do not claim, let alone proffer evidence, that *producing* a feature film for theatrical release is meaningfully distinct from producing a film for release through other forms of distribution, and that omission makes this market untenable.

### 3.  No Evidence of a Premium Video Distribution Market

Plaintiffs' "Premium Video Distribution" market suffers from at least two specific deficiencies that make their Section 7 claim in that market unlikely to succeed.  *First*, the contours of this market are not "sufficiently concise and meaningful . . . to constitute a relevant product market."  *Carter Hawley Hale Stores, Inc. v. Limited, Inc.*, 587 F. Supp. 246, 250–54 (C.D. Cal. 1984).  Plaintiffs' description of the market leaves open-ended which forms of distribution it does and does not include.  For example, Plaintiffs allege the market includes "subscription streaming services, cable television, and *related offerings*," without identifying what products would be included within the category of "related offerings." Mot. at 17 (citing Compl. ¶ 86) (emphasis added).  That ambiguity makes it impossible to determine if the alleged market "encompass[es] . . . all economic substitutes." *Newcal*, 513 F.3d at 1045. *Second*, Plaintiffs fail to meaningfully define "premium" video content and instead rely on a conclusory, unsupported statement that "short-form user-generated content, social-media video, and casual internet entertainment" are not reasonable substitutes. *See* Mot. at 17–19.  The modifiers used by Plaintiffs to define this market are hopelessly opaque and incapable of identifying when a particular type of video content is being excluded or included.  *See id*. ("professionally produced," "high-budget," "prestige").  These vague adjectives are both over and under inclusive because Plaintiffs do not show that all content on subscription streaming services and cable television is "high-budget," "prestige," etc., and they do not attempt to show that major video distributors like YouTube, which have been gerrymandered out of the relevant market, compete vigorously to distribute "premium" content.  This arbitrary approach to defining a relevant market makes Plaintiffs unlikely to succeed on the merits.  *See, e.g.*, *Tundra v. Faire Wholesale, Inc.*, 2024 WL

14

589097, at *1 (N.D. Cal. Feb. 13, 2024) (Martínez-Olguín, J.) (markets modified by undefined adjectives are insufficient to state a Section 7 claim); *hiQ Labs, Inc. v. LinkedIn Corp.*, 485 F. Supp. 3d 1137, 1148 (N.D. Cal. 2020) (granting motion to dismiss where "parameters" of alleged market were "vague").

## B.   PLAINTIFFS FAIL TO MAKE A CLEAR SHOWING OF A LIKELY AND SUBSTANTIAL LESSENING OF COMPETITION

Section 7 prohibits only those acquisitions whose effect "may be substantially to lessen competition, or to tend to create a monopoly."  15 U.S.C. § 18.  Plaintiffs seek to lower the bar for establishing a *prima facie* case by misstating the Section 7 standard, arguing that a mere showing of a nontrivial acquisition of a significant rival is sufficient to prove anticompetitive harm.  Mot. at 14.  It is not.  "Merely alleging the elimination of a rival does not plausibly support an inference of an appreciable danger of anticompetitive effects in a relevant market."  *Demartini*, 662 F. Supp. 3d at 1065; *see also Fry*, 2025 WL 1397163, at *4 ("the elimination of a rival" is not enough to show anticompetitive effects); *Malaney v. UAL Corp.*, 2010 WL 3790296, at *7 (N.D. Cal. Sept. 27, 2010) ("proposed approach that any non-trivial acquisition of a significant rival is per se violative of the Clayton Act is wrong").

Because Plaintiffs have submitted no expert testimony, economic data, declarations, or other evidence to support their claim of a likely substantial lessening of competition in any of their alleged markets, it is impossible for them to meet their burden on this issue.  *See, e.g.*, *Fry*, 2025 WL 1397163, at *3 (plaintiffs must "provide some evidentiary support going to the merits of their prima facie burden under Section 7, as opposed to [relying] solely on conclusory allegations pled in their unverified complaint"); *Gonzalez v. Arizona*, 485 F.3d 1041, 1050 (9th Cir. 2007) (plaintiffs failed to demonstrate a likelihood of success on the merits because there was "no evidence in the record . . . to support [their] conclusion").  Indeed, Paramount is aware of no case in which any court has ever found that a plaintiff has met his burden of establishing a *prima facie* Section 7 case where the plaintiff chose not to submit any expert testimony or other evidence in support of his claim.

***Premium Video Distribution Market.***  Plaintiffs do not even allege, let alone substantiate, any market shares in their proposed Premium Video Distribution market.  Although "market share statistics alone are 'not conclusive indicators of anticompetitive effects,'" *Fry*, 2026 WL 751422, at *5, it is well established that to make a *prima facie* showing under Section 7, a plaintiff must establish *some* economic

15

facts about the affected markets—market shares, market concentration, or other market characteristics—that demonstrate "the merger will probably lead to anticompetitive effects." *St. Alphonsus*, 778 F.3d at 785; *id*. at 783 (describing plaintiff's burden as "establishment of a prima facie case on statistical evidence"); *United States v. Anthem, Inc.*, 855 F.3d 345, 349 (D.C. Cir. 2017) (*prima facie* case requires "showing that the transaction will lead to undue concentration"); *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 492 (5th Cir. 1984) (Section 7 plaintiff "may make a prima facie showing . . . in one of two ways," *i.e.*, "market share and market concentration statistics" or "other characteristics of the market"); *California v. Sutter Health Sys.*, 130 F. Supp. 2d 1109, 1118 (N.D. Cal. 2001) (requiring "an initial statistical showing that the transaction will lead to undue concentration in the market").

Plaintiffs fail to even allege in their Complaint any economic facts to support the likelihood of anticompetitive effects in a "Premium Video Distribution" market. They do not provide any way of measuring market concentration, such as the Herfindahl-Hirschman Index (or, "HHI"). Instead, they only make unverified allegations about data for limited components of the alleged market—subscriber counts and total company revenues, without any measure of the *total* market size—that do not provide any meaningful information about how the merger might affect competition within the alleged market. Mot. at 19. This is insufficient to even state a claim—much less prove likelihood of success on the merits—because "market shares must be measured in a proper relevant product and geographic market; alleging market shares in some other market is inadequate." *FTC v. Lab. Corp. of Am.*, 2011 WL 3100372, at *19 (C.D. Cal. Feb. 22, 2011); *see also Demartini*, 2023 WL 4239653, at *4 (rejecting market share allegations not tethered to the alleged market).

The Complaint also contains an unverified allegation about a single Paramount+ price increase five months after the Skydance-Paramount merger closed, which Plaintiffs rely on to speculate that a price increase will be caused by the Paramount-Warner Bros. merger at some point in the future. Mot. at 19. But Plaintiffs provide no factual allegations or evidence—just speculation—to contend that the merger could lead to an increase in streaming prices. This is clearly insufficient. *See Fry*, 2025 WL 1397163, at *5 (rejecting conclusory allegations that merged firm will have incentive to collude).

***National Television News Market.*** Similarly, the unverified Complaint does not allege any market shares or market concentration to support the likelihood of substantial lessening of competition in a

16

National TV News market, in which CNN and CBS News are claimed to be competitors. Mot. at 19–20. Instead, the Complaint makes speculative assertions about "consolidation" and references unverified data about the overall operations of businesses that are far broader than news programming, but such information bears no relation to the market Plaintiffs try to allege. Because Plaintiffs' unverified data allegations do not align with their alleged market definition (for example, the data referenced includes companies that are outside the boundaries of the alleged market, such as The New York Times Company, *id.* ¶¶ 105–08), they cannot possibly satisfy their burden to establish a likely reduction of competition in such a market. *See Lab. Corp.*, 2011 WL 3100372, at *19 (misaligned market shares are "inadequate.").

Equally barren of any support, even looking at unverified allegations, is Plaintiffs' claim that the merger will likely lead to a reduction in "viewpoint diversity." Putting aside that such a reduction, if it occurred, would be a purely ideological complaint that could not support an antitrust claim, *see supra* § I.A, Plaintiffs do not allege or prove anything about the existing level of "viewpoint diversity" in a National TV News Market or how "viewpoint diversity" could even be appropriately measured in an antitrust case. Plaintiffs' alleged National TV News market would include news services, in addition to CNN and CBS News, as diverse as MS NOW (formerly MSNBC), Fox News, NewsMax, ABC News, and NBC News, but Plaintiffs make no showing of how the merger would substantially reduce viewpoint diversity in such a market, especially given the commitment from Paramount that CNN will maintain its own independent editorial judgment about the news coverage it presents. Goldberg Decl. ¶ 35; Ex. 1, (Ellison Interview Transcript).

***Theatrical Film Production Market.*** Likewise, even considering Plaintiffs' unverified Complaint allegations, the record contains no facts that would enable the Court to determine market shares or market concentration in a "Theatrical Film Production" market. The data that the Complaint references in this regard does not correspond to Plaintiffs' proposed market definition because it includes Canada, even though the claimed market is limited to the United States. Mot. at 21. Further, even if the Court were to consider the cited data that includes Canada, Paramount's alleged post-merger market share in such a market would only be 23.6%, which falls below the threshold that would be required to support even a *plausible* inference (much less a *clear* showing) that Plaintiffs are likely to succeed in proving competitive harm from the merger in this market. *See United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1123

17

(N.D. Cal. 2004) ("A presumption of anticompetitive effects from a combined share of 35% in a differentiated products market is unwarranted."); *Fry*, 2026 WL 751422, at \*6 ("some courts hold that a plaintiff can satisfy their prima facie burden by showing that the merger will yield a combined market share of over 30%" and dismissing merger challenge with alleged combined 16.2% market share); *New York v. Kraft Gen. Foods, Inc.*, 926 F. Supp. 321, 362–63, 366 (S.D.N.Y. 1995) (similar for combined post-acquisition market share below 35%).  Nor are there any allegations in the Complaint that any increase in concentration in the Theatrical Distribution Market resulting from the merger, such as a change in HHI, would support a presumption of a lessening of competition.  *See* U.S. Dep't of Justice & FTC, Merger Guidelines § 2.1 (2023).

\*   \*   \*

In sum, the absence of any economic facts or data—or even allegations about such facts or data—to support Plaintiffs' *prima facie* case precludes any possibility of preliminary injunctive relief.  *See, e.g.*, *FTC v. Meta Platforms Inc.*, 654 F. Supp. 3d 892, 911, 926–27, 934–35 (N.D. Cal. 2023) (denying preliminary injunction where plaintiff failed to present non-speculative evidence establishing a "reasonable probability" of anticompetitive effects, and rejecting theories based on conclusory and "impermissibly speculative" assertions); *Microsoft*, 681 F. Supp. 3d at 1095–97 (denying preliminary injunction where theories of harm lacked sufficient evidence).

In modern antitrust law "the economic concept of competition, rather than any desire to preserve rivals as such, [became] the lodestar that shall guide the contemporary application of the antitrust laws." *Hospital Corp. of Am. v. FTC*, 807 F.2d 1381, 1386 (7th Cir. 1986).  Accordingly, courts have repeatedly rejected the type of speculative assertions of anticompetitive effects in merger challenges that Plaintiffs present here.  *See, e.g.*, *Fry*, 2025 WL 1397163, at \*4 (out-of-circuit authority "does not override binding Supreme Court and Ninth Circuit precedent"); *Demartini*, 662 F. Supp. 3d at 1064–65 (rejecting reliance on "Supreme Court merger cases from the 1960's" and relying instead on subsequent Ninth Circuit law); *Malaney*, 2010 WL 3790296, at \*6–7 (rejecting reliance on same 1960s Supreme Court cases "enjoin[ing] mergers involving companies with smaller market shares than those found here").

## III.    THE MERGER SHOULD NOT BE ENJOINED BECAUSE IT IS LIKELY TO BENEFIT COMPETITION AND CONSUMERS

In a Section 7 case, if the plaintiff establishes a *prima facie* case that the merger is likely to substantially lessen competition, Defendants may then rebut that *prima facie* case by "cast[ing] doubt on the accuracy of the [Plaintiffs'] evidence as predictive of future anticompetitive effects."  *St. Alphonsus*, 778 F.3d at 788.  "[I]f the [defendant] successfully rebuts the *prima facie* case, the burden of production shifts back to the [plaintiff] and merges with the ultimate burden of persuasion, which is incumbent on the [plaintiff] at all times."  *Id*. at 783.  Ultimately, "plaintiffs have the burden on every element of their Section 7 challenge, and a failure of proof in any respect will mean the transaction should not be enjoined." *FTC v. Arch Coal*, Inc., 329 F. Supp. 2d 109, 116 (D.D.C. 2004).

Here, Plaintiffs failed to carry their initial *prima facie* burden, so the burden does not shift to Defendants, and the preliminary injunction should be denied.  But even if Defendants bore any burden, they have carried it by presenting substantial evidence that the merger is likely to result in significant benefits to competition and consumers, rather than a substantial lessening competition.  As with every other aspect of their claims, Plaintiffs have not offered any evidence addressing these likely benefits of the merger.

### A.    THE MERGER IS LIKELY TO INCREASE COMPETITION BY MAKING PARAMOUNT A STRONGER RIVAL TO NETFLIX AND OTHER LEADING STREAMERS

The merger should not be enjoined because the evidence shows it would likely "create a more efficient combined entity and thus increase competition."  *Alphonsus*, 778 F.3d at 790.  Declarations submitted by Paramount's senior executives demonstrate that the primary objective of the merger is to achieve the scale necessary to better compete with much larger, leading streaming platforms, including Amazon Prime Video, Netflix, and Disney+ that currently dwarf Paramount+ and HBO Max in subscriber base, revenue, and content diversity and production.  Goldberg Decl. ¶ 25; Gordon Decl. ¶ 17.  Combining Paramount and Warner Bros.' streaming platforms would place Paramount closer to competitive parity with these larger platforms and enable it to greatly expand the content that it can make available to consumers through a single platform with one subscription fee.  Goldberg Decl. ¶¶ 25–26.  Specifically, the evidence shows that increased scale would enable the merged company to achieve efficiencies and

19

make investments that neither Paramount nor Warner Bros. could on their own. Gordon Decl. ¶¶ 5–15. Because Defendants "seek[] to merge in order to strengthen, rather than reduce, competition," that "argues strongly in favor of the planned merger's reasonableness." *United States v. Carilion Health Sys.*, 707 F. Supp. 840, 849 (W.D. Va. 1989).

### B. THE MERGER IS LIKELY TO INCREASE OUTPUT AND QUALITY IN STREAMING, FILM PRODUCTION, AND TELEVISION NETWORKS

Defendants have also come forward with evidence that the merger should not be enjoined for the additional reason that Paramount expects to increase investment in content development, which will increase the quality and quantity of content available to consumers across various entertainment mediums. Golberg Decl. ¶¶ 28–30; Gordon Decl. ¶ 16. *See Bradt v. T-Mobile US, Inc.*, 2020 WL 1809716, at *3 (N.D. Cal. Feb. 28, 2020) (declining to enjoin merger where defendants provided evidence that combining "complementary assets will result in a superior network and lower costs"); *Lab. Corp.*, 2011 WL 3100372, at *20 ("Mergers may enhance competition by combining complementary assets, eliminating duplicative assets, or achieving scale economies," which "may directly benefit consumers by . . . improving quality, increasing innovation, and lowering prices.").

***Synergies Created by the Merger***. The merger is estimated to save over $6 billion per year, and those synergies will generate significant benefits for consumers and competition. Gordon Decl. ¶¶ 5–6, 16. Given the complementary nature of Warner Bros. and Paramount's businesses, the synergies will allow the combined company to increase its film and television production. Goldberg Decl. ¶ 27. These are procompetitive benefits that rebut any *prima facie* case.

***Increased Streaming Content***. Post-merger, Paramount will be able to offer a more compelling streaming product, increase the amount of content being provided to consumers, and increase consumer choice. Gordon Decl. ¶ 17; Goldberg Decl. ¶¶ 26, 31. By combining services, the merged firm will be able to offer, for the first time, a one-stop shop to access the original content, sports, and news from both services. Goldberg Decl. ¶¶ 26, 31. The merged company will also invest more money developing its combined streaming platform content than Paramount and Warner Bros. would have spent on their standalone platforms. Gordon Decl. ¶¶ 18–19. Offering more content and a better streaming product will increase subscribers, engagement, and revenue, which will create a positive feedback loop of increasing

content, as the merged firm can spread the cost of that content across a broader and more engaged base of subscribers.  Goldberg Decl. ¶ 32; Gordon Decl. ¶¶ 18–19.

*Increased Film Investment*.  The merger will also enable Paramount to increase its investments in movies released in theaters.  Goldberg Decl. ¶¶ 27–29.  Paramount has committed to keeping both Warner Bros. Discovery Films and Paramount Pictures as separate brands and to releasing at least 30 theatrical films per year, with each studio producing roughly half of those films.  *Id.* ¶ 23.  Paramount has further committed that each of these films will be in theaters for at least 45 days before becoming available on paid video-on-demand or streaming platforms.  *Id.*  More movies in theaters will benefit consumers, talent, theater owners, and other industry stakeholders.

*Increased Television Investment*.  The savings from merger synergies will enable the combined firm to invest more in television content, leading to a more sustainable television network model in the face of current cord cutting.  *Id.* ¶¶ 26, 32.  Paramount TV has about 30 shows in different levels of production right now with the goal of producing 40 by 2030.  *Id.* ¶ 30.  When combined with Warner Bros.' television studios, that output will increase to around 170 shows, and the combined firm will invest in increasing that number even further.  *Id.*  Such increased content will also support the competitiveness of the combined firm's streaming service and provide consumers with the benefit of increased variety and choice.  *Id*.

In the face of this evidence of significant procompetitive benefits, Plaintiffs cannot meet their burden to clearly show a likelihood of a substantial lessening of competition.

## IV.   PLAINTIFFS HAVE MADE NO SHOWING OF IMMINENT OR ACTUAL IRREPARABLE INJURY

To meet the stringent preliminary injunction standard, Plaintiffs must also establish that they are "likely to suffer irreparable harm in the absence of preliminary relief."  *Beaty v. Brewer*, 649 F.3d 1071, 1072 (9th Cir. 2011).  To meet this burden, Plaintiffs must demonstrate an "immediate" threatened injury.  *Demartini*, 2023 WL 3569993, at *3.  They must do more than "merely allege" an irreparable injury; they must "demonstrate" it.  *Id*. at *2; *Delco LLC v. Giant of Maryland*, 2007 WL 3307018, at *19 (D.N.J. Nov. 8, 2007) (denying injunction against merger because claimed injuries of higher prices and longer drive times were not irreparable).  Additionally, "[i]n evaluating plaintiffs' purported irreparable harm . . .

21

the Court must only consider those injuries plaintiffs advance that are personal to them were defendants to merge, and cannot consider any injuries that plaintiffs allege would be suffered by the . . . public as a whole." *Malaney*, 2010 WL 3790296, at \*13; *see also Demartini*, 2023 WL 3569993, at \*2 (to obtain preliminary injunction, "the threatened loss or damage must be personal to the private plaintiff"); *Bradt*, 2020 WL 1233939, at \*4 (rejecting argument that "irreparable injury is established by the merger itself").

Plaintiffs make no effort to meet this heavy burden. They spend only two sentences in their Motion repeating unverified conclusory allegations of "irreparable harm," proclaiming that the merger somehow "threaten[s] . . . higher prices, reduced output, reduced quality, diminished consumer choice, reduced promotional availability, fewer independent sources of premium programming, fewer independent editorial decision-makers, reduced theatrical output, narrowed release slates, and fewer meaningful alternatives at local theaters." Mot. at 21–22. Plaintiffs offer no evidence to back up any of these sprawling allegations nor do they even try to explain why these claimed generic harms are imminent or how they will cause irreparable and personal damage to Plaintiffs. The failure to offer any evidence to support their claim of irreparable harm to individual Plaintiffs, by itself, requires that the injunction be denied. *See Demartini*, 662 F. Supp. 3d at 1062 (dismissing as "insufficient" Plaintiffs' counsel's "general allegation that the merger may cause 'higher prices, less innovation, less creativity, less consumer choice, decreased output, and other potential anticompetitive effects'"); *Ginsberg v. INBEV SA/NV*, 2008 WL 4965859, at \*5 (E.D. Mo. Nov. 18, 2008) (denying a preliminary injunction motion by Plaintiffs' counsel because "bare allegations . . . are insufficient to establish irreparable injury.").[2]

Moreover, to the extent Plaintiffs allege "threatened" "higher prices" for streaming services, such an economic harm would not be irreparable as it could be fully compensated through monetary damages. *Nat'l Ass'n of Chain Drug Stores v. Express Scripts, Inc.*, 2012 WL 3655459, at \*5 (W.D. Pa. Aug. 27, 2012) (rejecting plaintiffs' attempt to block a pharmaceutical merger because claimed injury of higher

---

[2] Plaintiffs cite *In re Nexstar-Tegna Merger Litigation*, 2026 WL 1049295 (E.D. Cal. Apr. 17, 2026), multiple times in their brief, including for the proposition that interim relief can preserve the ability to obtain a divestiture. Mot. at 13, 23, 25. However, *In re Nexstar-Tegna* is a very different case because plaintiffs there presented evidence in support of their motion for preliminary injunction, including multiple declarations from fact witnesses and an expert economist (who provided an analysis of highly concentrated markets, with some having combined market shares exceeding 50%). *In re Nexstar-Tegna*, 2026 WL 1049295, at \*7, 15, 17, 23. That alone makes *In re Nexstar-Tegna* inapposite to the present case.

22

prices was not irreparable). *Taleff v. Sw. Airlines Co.*, 828 F. Supp. 2d 1118, 1123 (N.D. Cal. 2011) (similar); *Malaney*, 2010 WL 3790296, at *12–13 (similar); *Delco*, 2007 WL 3307018, at *19 (similar).

The *Malaney* case is instructive. There, Plaintiffs' counsel at least went through the exercise of submitting affidavits from the plaintiffs in which they set forth their allegedly threatened harm from a merger. But since these injury claims from the challenged merger were both "speculative" and a "*de minim[i]s* injury," the court found them to be "insufficient to establish irreparable harm." *See Malaney*, 2010 WL 3790296, at *14.

Here, like in *Malaney*, the claimed injuries are speculative, not personal to Plaintiffs, de minimis in amount, and not shown to be immediate. These many failings show that Plaintiffs have not met their burden to show the personal and immediate irreparable harm that is necessary to grant the extraordinary remedy of a preliminary injunction. *See Malaney*, 2010 WL 3790296, at *14 ("Although plaintiffs allege, in their briefing, that this merger will adversely affect consumer choice and purchasing power by resulting in increased [prices], decreased capacity, poorer service, and a constraint on the ability of [rival companies] to compete . . . they still must establish that these alleged effects will be personal to them."); *Fry*, 2025 WL 1397163, at *6 ("general allegations cannot establish that the threat of [alleged] harms is so immediate as to warrant the drastic remedy of preliminary injunctive relief").

## V.    THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST WEIGH HEAVILY IN FAVOR OF DEFENDANTS

The Court need not reach the balance of equities because of Plaintiffs' failures of proof on standing, the merits of their claims, and irreparable harm. *See, e.g.*, *Malaney*, 2010 WL 3790296, at *14 ("Indeed, in the face of such an insufficient showing of harm to the plaintiffs, the Court need not address what defendants argue will be substantial injury to them were the merger preliminarily enjoined."). Nonetheless, the harm an injunction would inflict on Defendants from a delayed closing of the merger would significantly outweigh any alleged harm to Plaintiffs if their requested relief is denied.

Plaintiffs claim the requested injunction would simply "preserve the status quo until trial," Mot. at 23, but that framing ignores the real-world costs of delaying the multi-billion-dollar merger. *See Fry*, 2025 WL 1397163, at *7 ("delaying this multi-billion-dollar merger" would not "simply maintain the status quo"). Here, if a preliminary injunction delays the merger's closing past September 30, 2026,

23

Paramount would have to pay nearly $7 million per day to Warner Bros. through closing. Gordon Decl. ¶ 22. Any delay in closing would also result in continued carrying costs to Paramount on committed financing, potential expiration or renegotiation of financing commitments, and ongoing uncertainty in the capital markets in which Paramount obtains financing. *Id.* ¶ 23. And if the delay is long enough, it could scuttle the merger, Goldberg Decl. ¶ 36, requiring Paramount to pay a $7 billion termination fee, Ex. 5 (Merger Agreement) § 8.3(b). "The cost of enjoining this huge undertaking [shortly] before its long awaited consummation is simply staggering in its magnitude, in the number of lives touched and dollars lost. To assume that enjoining the merger would do no more than preserve the status quo, in the face of this upheaval, would be to blink at reality." *W. Airlines, Inc. v. Int'l Bhd. of Teamsters*, 480 U.S. 1301, 1309 (1987).

Furthermore, Paramount has prepared to quickly create cost synergies between the two combined companies that will benefit consumers, and it estimates that 70% of those synergies will be realized within two years of closing, with the balance within the following year. Gordon Decl. ¶ 21. But a delay in closing through trial would also delay the realization of these synergies, causing harm to consumers and Paramount's business. *Id.*

Because Plaintiffs have failed to present any evidence that they would suffer any concrete harm from the merger, there is no equity on Plaintiffs' side of the ledger for the Court to balance. *See Malaney*, 2010 WL 3790296, at *13. Further, even if the Court were to credit Plaintiffs' claims of a possible price increase on a streaming service they purchase, such a *de minimis* personal injury cannot possibly outweigh the massive harm and disruption that will be caused to Paramount if the merger is enjoined, let alone "tip[] *sharply* toward the plaintiff." *Bennett*, 118 F.4th at 1126 (emphasis in original).

Finally, the public interest does not support granting the injunction. Courts should not grant preliminary injunctions "unless those public interests [favoring an injunction] outweigh other public interests that cut in favor of *not* issuing the injunction." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1138 (9th Cir. 2011) (emphasis in original). Plaintiffs provide no evidentiary support for their conclusory assertion that "[t]he public interest favors preliminary relief." Mot. at 24. To the contrary, the public interest favors consummation of the merger because it will provide "pro-competitive advantages for consumers," including increased access to content. *Supra* § III; *see Microsoft*, 681 F. Supp. 3d at 1100

24

(holding that public interest did not outweigh private interest where merger would increase access to the product). The public interest also will be furthered by not granting a preliminary injunction to delay a multi-billion dollar merger that will positively impact the lives of thousands at the behest of five consumers who have not submitted any evidence to support their challenge and who have a history of filing serial meritless challenges to any prominent merger that catches their attention. This behavior is an abuse of the legal process, not an action in furtherance of the public interest. Courts have "a strong interest in preserving free operation of the nation's markets and insuring that it does not unduly restrain free enterprise." *Ginsberg*, 2008 WL 4965859, at *6.

## VI.    PLAINTIFFS SHOULD BE REQUIRED TO POST A BOND

Given the significant costs Paramount would incur if a preliminary injunction were issued, Plaintiffs should be required to post a significant bond to cover those costs. If an injunction issues, a bond should account for "the costs and damages sustained by [Defendants]" if they are "found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Thus, Plaintiffs should be required to post a bond in the amount of at least $50 million to account for the likely costs and damages that would be inflicted on Defendants from ticking fees and other harm they will suffer if the merger were delayed until trial. *See, e.g.*, *Illumina, Inc. v. Qiagen, N.V.*, 207 F. Supp. 3d 1081, 1095 (N.D. Cal. 2016) ("[Plaintiff] must post a bond of twenty million dollars as security for the injunction."); *Hoosier Energy Rural Elec. Co-op., Inc. v. John Hancock Life Ins. Co.*, 2008 WL 5216027, at *5 (S.D. Ind. Dec. 11, 2008) ($132 million bond required to protect defendant against damages "by improper issuance of the preliminary injunction").

## CONCLUSION

For all the reasons set forth above, Plaintiffs' extraordinary request for a preliminary injunction against the Paramount-Warner Bros. merger—without any evidence filed in support—should be denied.

Dated:  June 3, 2026                              Respectfully submitted,

                                                  **WINSTON TAYLOR LLP**

                                                  By: _/s/ Jeffrey L. Kessler_
                                                      Jeffrey L. Kessler (*pro hac vice*)
                                                      **WINSTON TAYLOR LLP**
                                                      200 Park Avenue
                                                      New York, NY 10166-4193
                                                      Telephone: (212) 294-4698
                                                      Facsimile: (212) 294-4700
                                                      jeffrey.kessler@winstontaylor.com

                                                      Jeanifer E. Parsigian (SBN 289001)
                                                      Matthew R. DalSanto (SBN 282458)
                                                      **WINSTON TAYLOR LLP**
                                                      101 California Street, 21st Floor
                                                      San Francisco, CA 94111-5891
                                                      Telephone: (415) 591-1469
                                                      Facsimile: (415) 591-1400
                                                      jeanifer.parsigian@winstontaylor.com
                                                      matthew.dalsanto@winstontaylor.com

                                                      Conor A. Reidy (*pro hac vice*)
                                                      Kevin B. Goldstein (*pro hac vice*)
                                                      **WINSTON TAYLOR LLP**
                                                      300 N. LaSalle Drive
                                                      Chicago, IL 60654-3406
                                                      Telephone: (312) 558-7542
                                                      Facsimile: (312) 558-5700
                                                      conor.reidy@winstontaylor.com
                                                      kevin.goldstein@winstontaylor.com

                                                      Matthew R. Huppert (*pro hac vice*)
                                                      **WINSTON TAYLOR LLP**
                                                      1901 L St NW
                                                      Washington, DC 20036-3506
                                                      Telephone: (202) 282-5004
                                                      Facsimile: (202) 282-5100
                                                      matthew.huppert@winstontaylor.com

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 4:26-CV-03790-AMO

Natalie Kaliss (SBN 353838)
**LATHAM & WATKINS LLP**
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
natalie.kaliss@lw.com

Marguerite Sullivan (*pro hac vice*)
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
marguerite.sullivan@lw.com

Shayan Ahmad (*pro hac vice*)
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
shayan.ahmad@lw.com

*Attorneys for Defendants Paramount Skydance
Corporation and Skydance Media, LLC*

27