Jeffrey L. Kessler (*pro hac vice*)
**WINSTON TAYLOR LLP**
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-4698
Facsimile: (212) 294-4700
jeffrey.kessler@winstontaylor.com

Conor A. Reidy (*pro hac vice*)
Kevin B. Goldstein (*pro hac vice*)
**WINSTON TAYLOR LLP**
300 N. LaSalle Drive
Chicago, IL 60654-3406
Telephone: (312) 558-7542
Facsimile: (312) 558-5700
conor.reidy@winstontaylor.com
kevin.goldstein@winstontaylor.com

Jeanifer E. Parsigian (SBN 289001)
Matthew R. DalSanto (SBN 282458)
**WINSTON TAYLOR LLP**
101 California Street, 21st Floor
San Francisco, CA 94111-5891
Telephone: (415) 591-1469
Facsimile: (415) 591-1400
jeanifer.parsigian@winstontaylor.com
matthew.dalsanto@winstontaylor.com

Matthew R. Huppert (*pro hac vice*)
**WINSTON TAYLOR LLP**
1901 L St NW
Washington, DC 20036-3506
Telephone: (202) 282-5004
Facsimile: (202) 282-5100
matthew.huppert@winstontaylor.com

*Attorneys for Defendants Paramount Skydance
Corporation and Skydance Media, LLC*

*Additional counsel on signature page*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| PAMELA FAUST, LEN MARAZZO, LISA McCARTHY, DEBORAH RUBINSOHN, and GARY TALEWSKY<br><br>Plaintiffs,<br><br>vs.<br><br>PARAMOUNT SKYDANCE CORPORATION (formerly Paramount Global), and SKYDANCE MEDIA, LLC,<br><br>Defendants. | Case No. 4:26-cv-03790-AMO<br><br>**DEFENDANTS PARAMOUNT SKYDANCE CORPORATION AND SKYDANCE MEDIA, LLC'S NOTICE OF MOTION AND MOTION TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>Hearing Date:   July 16, 2026<br>                      Jt. Stip pending requesting<br>                      hearing on July 2, 2026<br>Time:             2:00 p.m.<br>Judge:            Hon. Araceli Martínez-Olguín<br>Courtroom:     TBD |

## NOTICE OF MOTION AND MOTION

### TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE on July 16, 2026, at 2:00 p.m., or as soon thereafter as the matter may be heard, before the Honorable Araceli Martínez-Olguín, in a Courtroom to be determined of the United States District Court, Northern District of California, located at 1301 Clay Street, Oakland, CA 94612, Defendants Paramount Skydance Corporation and Skydance Media, LLC ("Defendants") will and hereby do move to dismiss with prejudice Plaintiffs Pamela Faust, Len Marazzo, Lisa McCarthy, Deborah Rubinsohn, and Gary Talewsky's ("Plaintiffs") Complaint. (ECF No. 1).[1]

This Motion is made pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) on the grounds that Plaintiffs lack standing to assert their claims and have failed to state any claim.

The Motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the pleadings and other papers on file in this action, any argument, and any other evidence that the Court may consider.

Dated: June 3, 2026

Respectfully submitted,

**WINSTON TAYLOR LLP**

By: */s/ Jeffrey L. Kessler*
    Jeffrey L. Kessler (*pro hac vice*)
    **WINSTON TAYLOR LLP**
    200 Park Avenue
    New York, NY 10166-4193
    Telephone: (212) 294-4698
    Facsimile: (212) 294-4700
    jeffrey.kessler@winstontaylor.com

    Jeanifer E. Parsigian (SBN 289001)
    Matthew R. DalSanto (SBN 282458)
    **WINSTON TAYLOR LLP**
    101 California Street, 21st Floor
    San Francisco, CA 94111-5891
    Telephone: (415) 591-1469
    Facsimile: (415) 591-1400
    jeanifer.parsigian@winstontaylor.com
    matthew.dalsanto@winstontaylor.com

    Conor A. Reidy (*pro hac vice*)

---

[1] The parties have filed a joint stipulation requesting that this Motion be heard on July 2, 2026, along with Plaintiffs' Motion for Preliminary Injunction (ECF No. 12).

Kevin B. Goldstein (*pro hac vice*)
**WINSTON TAYLOR LLP**
300 N. LaSalle Drive
Chicago, IL 60654-3406
Telephone: (312) 558-7542
Facsimile: (312) 558-5700
conor.reidy@winstontaylor.com
kevin.goldstein@winstontaylor.com

Matthew R. Huppert (*pro hac vice*)
**WINSTON TAYLOR LLP**
1901 L St NW
Washington, DC 20036-3506
Telephone: (202) 282-5004
Facsimile: (202) 282-5100
matthew.huppert@winstontaylor.com

Natalie Kaliss (SBN 353838)
**LATHAM & WATKINS LLP**
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
natalie.kaliss@lw.com

Marguerite Sullivan (*pro hac vice*)
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
marguerite.sullivan@lw.com

Shayan Ahmad (*pro hac vice*)
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
shayan.ahmad@lw.com

*Attorneys for Defendants Paramount Skydance
Corporation and Skydance Media, LLC*

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ...................................................................1

ISSUES TO BE DECIDED ...........................................................................................................2

FACTUAL ALLEGATIONS IN THE COMPLAINT ...................................................................2

    A.    The Completed Skydance-Paramount Merger ...................................................................2

    B.    The Pending Paramount-Warner Bros. Discovery Merger .................................................3

    C.    The Alleged Relevant Markets ..........................................................................................3

        1.    Premium Video Distribution Market Allegations.....................................................4

        2.    National Television News Market Allegations..........................................................4

        3.    Theatrical Distribution Market Allegations .............................................................4

    D.    Plaintiffs' Alleged Connection to and Injuries from the Challenged Mergers ...................5

    E.    Alleged Competitive Effects...............................................................................................5

        1.    Skydance-Paramount Merger Effects .......................................................................5

        2.    Paramount-Warner Bros. Merger Effects .................................................................6

LEGAL STANDARDS ..................................................................................................................7

ARGUMENT ..................................................................................................................................8

I.    PLAINTIFFS FAIL TO ALLEGE FACTS PLAUSIBLY ESTABLISHING THEIR STANDING TO CHALLENGE EITHER MERGER ...............................................................8

    A.    Plaintiffs' Allegations of Harm Are Insufficient to Confer Article III Standing.................8

        1.    Plaintiffs' Claims of Harm, Disconnected from the Skydance-Paramount Merger, Do Not Establish Standing to Challenge This Merger...............................9

        2.    Plaintiffs' Vague Allegations of Injury Do Not Establish Standing to Challenge the Paramount-Warner Bros. Merger ...................................................10

    B.    Plaintiffs' Allegations of Antitrust Standing Are Deficient ............................................12

        1.    Alleged Losses of "Viewpoint Diversity" and "Editorial Independence" Are Not Injuries the Antitrust Laws Can or Should Address ...............................13

        2.    Plaintiffs' Alleged Injuries Are Too Attenuated to Confer Antitrust Standing With Respect to a Theatrical Distribution Market in Which Plaintiffs Do Not Participate..................................................................................14

II.   PLAINTIFFS FAIL TO ALLEGE FACTS PLAUSIBLY SHOWING A VIOLATION OF SECTION 7 OF THE CLAYTON ACT.................................................................................15

A.   Plaintiffs Fail to Allege Facts Establishing a Relevant Market .......................................15

1.   Premium Video Distribution................................................................................16

2.   National Television News...................................................................................17

3.   Theatrical Distribution .......................................................................................17

B.   Plaintiffs Fail to Allege Facts Plausibly Showing that Either of the Mergers Is Likely to Substantially Lessen Competition ......................................................................18

1.   Plaintiffs Fail to Allege Facts Plausibly Showing That the Completed Skydance-Paramount Merger Has Substantially Lessened Competition..............19

a.   Skydance and Paramount were not competitors for national news or premium video distribution, making any claimed lessening of competition in these alleged markets implausible .....................................19

b.   The mere elimination of one competitor cannot plausibly state a Section 7 claim in the absence of other economic allegations..................20

c.   The Complaint fails to satisfy the pleading requirements to challenge the vertical aspects of the Skydance-Paramount merger ..........22

2.   Plaintiffs Fail to Allege Facts Plausibly Showing the Paramount-Warner Bros. Merger Will Likely Cause a Substantial Lessening of Competition............22

a.   The Complaint is devoid of any economic data to plausibly allege a lessening of competition in any of the alleged relevant markets ...........22

b.   The Complaint lacks any other facts plausibly showing a likelihood of a lessening of competition from the Paramount-Warner Bros. merger...........................................................................................24

CONCLUSION...............................................................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*,
190 F.3d 1051 (9th Cir. 1999) ..............................................................................................12

*Am. Encore v. Fontes*,
152 F.4th 1097 (9th Cir. 2025) .............................................................................................11

*In re Apple iPhone Antitrust Litig.*,
2013 WL 4425720 (N.D. Cal. Aug. 15, 2013) ........................................................................8

*In re Applications for Consent to Transfer of Control of Paramount Global*,
40 FCC Rcd 5689, 2025 FCC LEXIS 1297 (July 24, 2025) ...................................................3

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)................................................................................................................7

*Aurora Astro Prods. LLC v. Celestron Acquisition, LLC*,
691 F. Supp. 3d 1132 (N.D. Cal. 2023) ................................................................................20

*Berlyn, Inc. v. Gazette Newspapers, Inc.*,
157 F. Supp. 2d 609 (D. Md. 2001) ......................................................................................13

*Blantz v. Ca. Dept. Corr. & Rehab.*,
727 F.3d 917 (9th Cir. 2013) ................................................................................................10

*Brantley v. NBC Universal, Inc.*,
675 F.3d 1192 (9th Cir. 2012) ..............................................................................................19

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962)........................................................................................................20, 21

*Brown v. Nat'l Football League, Inc.*,
-- F. Supp. 3d --, 2026 WL 279599 (S.D.N.Y. Feb. 3, 2026) ..............................................12

*California v. Sutter Health Sys.*,
130 F. Supp. 2d 1109 (N.D. Cal. 2001) ................................................................................21

*Cargill, Inc. v. Monfort of Col., Inc.*,
479 U.S. 104 (1986)..............................................................................................................13

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013)......................................................................................................8, 10, 11

*Continental T.V., Inc. v. GTE Sylvania Inc.*,
433 U.S. 36 (1977)................................................................................................................13

*Coronavirus Reporter v. Apple, Inc.*,
85 F.4th 948 (9th Cir. 2023) ......................................................................................15, 16, 17

*DeHoog v. Anheuser-Busch InBev SA/NV*,
    899 F.3d 758 (9th Cir. 2018) .................................................................................................18

*DeHoog v. InBev, SA/NV*,
    2016 WL 5853733 (D. Or. July 22, 2016) .........................................................................19, 25

*Demartini v. Microsoft Corp.*,
    662 F. Supp. 3d 1055 (N.D. Cal. 2023) ....................................................................... *passim*

*Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*,
    732 F.2d 480 (5th Cir. 1984) .................................................................................................21

*E. R. R. Presidents Conf. v. Noerr Motor Freight, Inc.*,
    365 U.S. 127 (1961)................................................................................................................14

*First Nat'l Bank of Boston v. Bellotti*,
    435 U.S. 765 (1978)................................................................................................................13

*Fraser v. Team Health Holdings, Inc.*,
    2022 WL 971579 (N.D. Cal. Mar. 31, 2022)...........................................................................7

*Freeland v. Nippon Steel Corp.*,
    -- F. Supp. 3d --, 2026 WL 747417 (N.D. Cal. Mar. 17, 2026) ...........................................15

*Freeland v. Nippon Steel Corp.*,
    2025 WL 1724997 (N.D. Cal. June 20, 2025) .....................................................................1, 19

*Freeman v. ABC Legal Servs., Inc.*,
    877 F. Supp. 2d 919 (N.D. Cal. 2012) ...................................................................................11

*Fry v. Cap. One Fin. Corp.*,
    2026 WL 751422 (N.D. Cal. Mar. 17, 2026).................................................................. *passim*

*FTC v. Lab. Corp. of Am.*,
    2011 WL 3100372 (C.D. Cal. Feb. 22, 2011)........................................................................23

*FTC v. Microsoft Corp.*,
    136 F.4th 954 (9th Cir. 2025) ................................................................................................18

*FTC v. Microsoft Corp.*,
    681 F. Supp. 3d 1069 (N.D. Cal. 2023) .................................................................................22

*FTC v. Qualcomm Inc.*,
    969 F.3d 974 (9th Cir. 2020) .................................................................................................15

*Gerlinger v. Amazon.com Inc.*,
    526 F.3d 1253 (9th Cir. 2008) .................................................................................................8

*Hicks v. PGA Tour, Inc.*,
    897 F.3d 1109 (9th Cir. 2018) ..........................................................................................15, 16

*hiQ Labs, Inc. v. LinkedIn Corp.*,
    485 F. Supp. 3d 1137 (N.D. Cal. 2020) .................................................................................17

*Hogan v. Amazon.com, Inc.*,
    2025 WL 869202 (9th Cir. Mar. 20, 2025) .................................................................................14, 15

*Hospital Corp. of Am. v. FTC*,
    807 F.2d 1381 (7th Cir. 1986) ..................................................................................................21

*Huskey v. City of San Jose*,
    204 F.3d 893 (9th Cir. 2000) ......................................................................................................9

*Kendall v. Visa U.S.A., Inc.*,
    518 F.3d 1042 (9th Cir. 2008) ....................................................................................................7

*Kumar v. Koester*,
    131 F.4th 746 (9th Cir. 2025) ........................................................................................8, 10, 11

*Lake v. Fontes*,
    83 F.4th 1199 (9th Cir. 2023) .....................................................................................................8

*Lonvoaz v. Twinings N. Am., Inc.*,
    726 F. App'x 590 (9th Cir. 2018) ..............................................................................................12

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)..................................................................................................8, 9, 11, 12

*Malaney v. UAL Corp.*,
    2010 WL 3790296 (N.D. Cal. Sept. 27, 2010) ....................................................................20, 21

*Malheur Forest Fairness Coal. v. Iron Triangle, LLC*,
    164 F.4th 710 (9th Cir. 2026) ..............................................................................................13, 14

*McDermott v. Ampersand Pub., LLC*,
    593 F.3d 950 (9th Cir. 2010) ....................................................................................................13

*Miami Herald Pub. Co. v. Tornillo*,
    418 U.S. 241 (1974)..................................................................................................................14

*Missouri v. Nat'l Org. for Women, Inc.*,
    620 F.2d 1301 (8th Cir. 1980) ...................................................................................................14

*Murthy v. Missouri*,
    603 U.S. 43 (2024)....................................................................................................................12

*NAACP v. Claiborne Hardware Co.*,
    458 U.S. 886 (1982)..................................................................................................................14

*Newcal Indus., Inc. v. Ikon Off. Sol.*,
    513 F.3d 1038 (9th Cir. 2008) ..............................................................................................15, 16

*Olin Corp. v. FTC*,
    986 F.2d 1295 (9th Cir. 1993) ...................................................................................................15

*Reilly v. Apple, Inc.*,
    578 F. Supp. 3d 1098 (N.D. Cal. 2022) ......................................................................................15

*Reilly v. Hearst Corp.*,
107 F. Supp. 2d 1192 (N.D. Cal. 2000) ...............................................................................13

*Safe Air For Everyone v. Meyer*,
373 F.3d 1035 (9th Cir. 2004) ...............................................................................................7

*Sanner v. Bd. of Trade of Chi.*,
62 F.3d 918 (7th Cir. 1995) ...................................................................................................9

*Somers v. Apple, Inc.*,
729 F.3d 953 (9th Cir. 2013) .........................................................................................14, 20

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) ..............................................................................................................12

*St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*,
778 F.3d 775 (9th Cir. 2015) .........................................................................15, 16, 21, 22

*State of N.Y. v. Kraft Gen. Foods, Inc.*,
926 F. Supp. 321 (S.D.N.Y. 1995) .......................................................................................24

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021).........................................................................................................8, 10

*Tundra, Inc. v. Faire Wholesale, Inc.*,
2024 WL 589097 (N.D. Cal. Feb. 13, 2024) (Martínez-Olguín, J.) .............................16, 18

*United States v. Anthem, Inc.*,
855 F.3d 345 (D.C. Cir. 2017) .............................................................................................21

*United States v. Oracle Corp.*,
331 F. Supp. 2d 1098 (N.D. Cal. 2004) ...............................................................................24

*United States v. Pabst Brewing Co.*,
384 U.S. 546 (1966)..............................................................................................................21

*United States v. Von's Grocery Co.*,
384 U.S. 270 (1966)..............................................................................................................21

*Whalen v. Albertsons Cos. Inc.*,
2023 WL 4955141 (N.D. Cal. Aug. 2, 2023) .........................................................................1

*Whalen v. Albertsons Cos. Inc.*,
2023 WL 8812882 (N.D. Cal. Dec. 20, 2023)......................................................................10

*Winsor v. Sequoia Benefits & Ins. Servs., LLC*,
62 F.4th 517 (9th Cir. 2023) ..................................................................................................8

*Yoshimoto v. Alaska Airlines, Inc.*,
2024 WL 6990084 (D. Haw. Aug. 12, 2024) .......................................................................12

*Yoshimoto v. Alaska Airlines, Inc.*,
2026 WL 1121960 (D. Haw. Apr. 24, 2026) ........................................................................19

**Statutes**

15 U.S.C. § 18...............................................................................................................................1, 18

**Other Authorities**

Fed. R. Civ. P. 12(b)(1)..................................................................................................................7

Fed. R. Civ. P. 12(b)(6)..................................................................................................................7

U.S. Dep't of Justice & FTC, Merger Guidelines § 2.1 (2023) ....................................................24

## MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiffs are five individual consumers of entertainment and media content who seek to challenge both the already completed merger between Skydance and Paramount Global and the pending merger between Paramount Skydance Corporation and Warner Bros. Discovery. Their complaint is long on rhetoric and fearmongering, but woefully deficient because it fails to satisfy the essential requirements to state a claim to challenge a merger under the Clayton Act.

Plaintiffs do not establish standing to sue either under Article III or under the antitrust laws. They fail to allege any factually plausible relevant market. And they fail to allege any facts to support a plausible likelihood that the challenged mergers substantially reduce competition in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. Nor are these failures surprising, as Plaintiffs and their counsel have a history of filing similarly implausible merger challenges which courts in this District have repeatedly rejected. *E.g.*, *Demartini v. Microsoft Corp.*, 662 F. Supp. 3d 1055, 1060–65 (N.D. Cal. 2023); *Fry v. Cap. One Fin. Corp.*, 2026 WL 751422, at *2–7 (N.D. Cal. Mar. 17, 2026); *Freeland v. Nippon Steel Corp.*, 2025 WL 1724997, at *2–7 (N.D. Cal. June 20, 2025); *Whalen v. Albertsons Cos. Inc.*, 2023 WL 4955141, at *1–2 (N.D. Cal. Aug. 2, 2023).

Just as in those other failed cases, Plaintiffs here fail to establish standing to challenge either merger. Plaintiffs' alleged injuries are too abstract, generic, and attenuated to demonstrate that they have a sufficiently personal stake to be proper plaintiffs here. Their allegations of injury consist almost entirely of speculative, barebones assertions with no factual support. Their sole allegation of purported concrete injury (a single price increase on Paramount's streaming service, Paramount+) lacks factual allegations suggesting any causal connection between this price increase and the Skydance-Paramount merger. And their allegation that the mergers will deprive them of a "diversity" of political "viewpoints" in the news media are neither factually plausible nor the type of economic harm that can support an antitrust claim.

Plaintiffs also fail to allege specific facts plausibly supporting any element of their claims, which require defining a relevant market and showing a likelihood that the challenged merger will substantially reduce competition in that market. Plaintiffs' three alleged markets sprawl across film, television, and news media, but none of them are plausible or consistent with governing legal and economic principles.

Plaintiffs further fail to allege facts plausibly showing that either the Skydance-Paramount merger or the Paramount-Warner Bros. merger have substantially lessened or are likely to substantially lessen competition in any market.  The thrust of Plaintiffs' Complaint is the mistaken premise that all mergers between competitors harm competition.  But courts, including this Court, have long rejected that simplistic proposition.  Many mergers between large companies, including the two mergers at issue here, add value to our economy by creating more efficient businesses, benefiting both competition and consumers.  To state a Section 7 claim challenging a merger, Plaintiffs cannot rest on bald and speculative allegations that the merger will substantially reduce competition.  They must allege economic facts—such as market shares, concentration measures, or comparable market-specific allegations—sufficient to support a plausible inference of competitive harm.  The Complaint does not do so.  It mostly omits the market-share and market-concentration statistics that must anchor a Section 7 complaint, and the statistics it does allege are, on their face, either incomplete or disconnected from the markets that Plaintiffs allege.

The Complaint does not come close to stating a viable Section 7 claim.  Like the past failed merger challenges by these Plaintiffs and their counsel, it must be dismissed.  Antitrust merger litigation is not a sport; it is a serious matter that consumes the resources of the parties and the Court.  Because this Complaint falls well short of the required pleading standards, it should be dismissed with prejudice.

<u>**ISSUES TO BE DECIDED**</u>

Whether Plaintiffs have standing to assert and have stated a claim for violation of Clayton Act Section 7 with respect to the Skydance-Paramount merger and/or the Paramount-Warner Bros. merger.

<u>**FACTUAL ALLEGATIONS IN THE COMPLAINT**</u>

**A.      The Completed Skydance-Paramount Merger**

In August 2025, Skydance Media merged with Paramount Global, combining two complementary entertainment industry businesses to form Paramount Skydance Corporation ("Paramount").  Compl. ¶¶ 47, 58.  Before the merger, Paramount Global operated various entertainment businesses, including producing and distributing movies, creating television programming, *see id*. ¶ 122, offering streaming services such as Paramount+, *id*. ¶ 28, operating the broadcast network CBS, *id*. ¶ 50, and offering a portfolio of cable television channels.  Skydance Media's pre-merger business, on the other hand, focused

on producing movies and television shows, and did not compete with Paramount Global for streaming services, television networks, or news programming. *See id*. ¶¶ 18–19.

To complete the merger, Skydance and Paramount Global needed the Federal Communications Commission ("FCC") to review and consent to the transaction, which it did. *See id.* ¶¶ 53–54. The FCC's decision concluded that the merger would "serve the public interest, convenience, and necessity" based in part on a "competitive analysis" that extended beyond the U.S. Department of Justice's authority to examine the competitive impacts of the merger. Mem. Op. and Order ¶¶ 25–26, 45–49, *In re Applications for Consent to Transfer of Control of Paramount Global*, 40 FCC Rcd 5689, 2025 FCC LEXIS 1297 (July 24, 2025). The FCC concluded that the merger posed no threat to the public interest, *id.* ¶¶ 47, 49, and the lone dissenter did not raise any antitrust concerns, *id.* at 5717; Compl. ¶¶ 55–56. After the FCC approved the transaction, the combination closed, forming Paramount Skydance Corporation.

**B.    The Pending Paramount-Warner Bros. Discovery Merger**

On February 27, 2026, Paramount and Warner Bros. Discovery ("Warner Bros.") signed a merger agreement, under which Paramount plans to acquire Warner Bros. *See* Compl. ¶¶ 66–67, 69–73. Warner Bros. produces and distributes movies and television shows, offers several cable television networks (*e.g.*, HBO, CNN, TNT, TBS), and sells two different subscription streaming services (HBO Max and discovery+). *Id.* ¶ 20. Warner Bros. does not have a broadcast network like CBS. On April 23, 2026, Warner Bros. stockholders overwhelmingly approved Paramount's acquisition of Warner Bros., subject to customary regulatory clearances. *Id.* ¶ 73.

Plaintiffs' own allegations show that the Paramount-Warner Bros. merger would combine their content into a single, more expansive entertainment portfolio. Compl. ¶ 93 ("streaming offerings, premium brands, and content libraries" of both companies will be placed "under Paramount[].");￼ *see also id.* ¶¶ 18, 20 (listing each entity's portfolio of film, entertainment, streaming, and media assets). This will increase consumers' access to the "content availability" that "matter[s] to [them]." *See id.* ¶¶ 86, 88.

**C.    The Alleged Relevant Markets**

Plaintiffs allege three markets they say the mergers would impact: (a) the "**Premium Video Distribution Market**," for "the production and distribution of premium video programming to U.S. consumers, including across broadcast, cable, and streaming channels"; (b) the "**National TV News**

**Market**," for "the production and distribution of national television news programming to U.S. consumers, including across broadcast, cable, and streaming channels"; and (c) the "**Theatrical Distribution Market**," for "the production of theatrical films for U.S. moviegoers." *Id.* ¶¶ 85, 128.

### 1.    Premium Video Distribution Market Allegations

Plaintiffs assert that the market for "Premium Video Distribution" includes "subscription streaming services, cable television," and an undefined category of "related offerings," *id*. ¶ 86, and excludes all "short-form user-generated content, social-media video, or other non-premium entertainment options," *id*. ¶ 87. The Complaint does not explain the difference between premium and non-premium entertainment, elaborate on what other "related offerings" might be included, or otherwise provide further details about this alleged market's scope. Competitors in this purported market identified in the Complaint include streaming services, such as Netflix, Amazon Prime Video, Disney+, HBO Max, Paramount+, Hulu, Peacock, and Apple TV, as well as cable companies. *Id.* ¶¶ 30, 94–97.

### 2.    National Television News Market Allegations

Plaintiffs claim that the market for "National TV News," *id.* ¶ 99, includes "national news programs" that are "offered nationwide through cable, satellite, and streaming pay-TV packages," *id.* ¶ 102, and excludes "[l]ocal television news, newspapers, digital-only outlets, social media, and radio," *id.* ¶ 101. This means that CBS News, which broadcasts daily news programming during limited intervals free to viewers, is allegedly in the same market as CNN, which offers 24-hour cable news programming for a subscriber fee. At the same time, other 24-hour news sources, like *The New York Times*, are excluded from the alleged market, although the Complaint nonetheless presents market statistics that include *The New York Times*, *id.* ¶¶ 105–08. Competitors in this purported market identified in the Complaint include Comcast, Warner Bros., Fox News Corp., and Paramount. *Id.*

### 3.    Theatrical Distribution Market Allegations

Although titled a distribution market, the Complaint identifies the competitors in the Theatrical Distribution market as "studios" that produce film and television for theatrical release.[2] The "distribution" component of the market appears to refer to the decision by studios to license certain

---

[2] *Id.* ¶ 109 ("Studios also compete . . . ."); *id.* ¶ 115 ("the four largest U.S./Canada motion-picture studios"); *id.* ¶ 116 (multiple references to "studios" and "studio competitor").

movies to theaters for distribution. The Complaint distinguishes between films produced by these studios that are watched in theaters from those watched at home, excluding from the market "home viewing via streaming or video-on-demand." *Id.* ¶ 110. The Complaint, however, does not allege that a studio that chooses to distribute a film theatrically could not choose to distribute it via streaming or video on demand. The competitors identified in the Complaint in this purported market include Disney, Universal, Warner Bros., Sony/Columbia Pictures, Paramount, and others. *See id.* ¶¶ 116–18.

### D.       Plaintiffs' Alleged Connection to and Injuries from the Challenged Mergers

Plaintiffs claim standing because they allegedly view Paramount and Warner Bros. content. The one exception is Plaintiff Faust, who does not claim to watch CNN or CBS News, subscribe to any Paramount or Warner Bros. streaming service, or purchase tickets to Paramount or Warner Bros. movies. *See id.* ¶¶ 30, 34, 38. As to news, Plaintiffs Marazzo, Rubinsohn, and McCarthy claim to watch CNN, *id.* ¶ 32, but only Plaintiffs Marazzo and McCarthy intend to continue doing so, *id.* ¶¶ 35, 36, 39. Plaintiffs Marazzo, Rubinsohn, and McCarthy do not specify how frequently they watch CNN, and no Plaintiff claims to watch CBS News. As to streaming, Plaintiffs Marazzo and Rubinsohn claim to be HBO Max subscribers, *id.* ¶¶ 35–36, and Plaintiffs Marazzo, Rubinsohn, and Talewsky claim to be Paramount+ subscribers. *Id.* ¶¶ 28, 35–37. Plaintiffs Faust and McCarthy "are not current Paramount+ subscribers," and they do not allege that they purchase any streaming service offered by Defendants. *Id.* ¶ 30. As to theatrical films, Plaintiffs collectively claim to be "routine theatrical moviegoers," *id.* ¶¶ 41, but they plead nothing about the movies they saw in theaters, when they saw those movies, the frequency of their movie theater attendance, what they paid, or whether they watched any Paramount or Warner Bros. movies.

### E.       Alleged Competitive Effects

#### 1.       Skydance-Paramount Merger Effects

The Complaint alleges that the Skydance-Paramount merger led to a price increase for Paramount+ five months after the merger. *Id.* ¶¶ 43, 91, 98, 124. But it also alleges that Skydance did not have any streaming service and thus did not compete in the proposed Premium Video Distribution market prior to the merger. *See id.* ¶¶ 19, 90. Plaintiffs allege that the "elimination of an independent *producer*"—rather than a *distributor*—"increased Paramount's ability and incentive to raise consumer

prices," but they do not allege any facts to explain why. *Id.* ¶ 43 (emphasis added). The Complaint contains no allegations about Skydance's or Paramount's market share in any alleged relevant market before or after their merger. Nor does it set forth any allegations that plausibly explain why the merger of a film and television producer into Paramount would cause the combined company to implement a price increase in subscription streaming services or otherwise reduce competition in any relevant market.

With respect to the alleged National TV News market, Plaintiffs claim that the Skydance-Paramount merger reduced "non-price competition" in this market "by centralizing and constraining editorial decision-making and increasing the risk of political influence over programming and newsroom judgment." *Id.* ¶ 104; *see also id.* ¶¶ 43, 123 (same). But the Complaint acknowledges that Skydance never produced or distributed national news programming prior to the merger, and it contains no facts that indicate how the merger could have "centralized" editorial decisions when Skydance had no news editorial decision making before the transaction. *Id.* ¶¶ 19, 90. Moreover, the Complaint alleges that the FCC imposed conditions on its approval of the broadcast license transfer, suggesting that those conditions were the cause of any alleged "constrained" editorial decision-making. *Id.* ¶¶ 57, 104.

Although the Theatrical Distribution market is the only alleged market in which Paramount and Skydance purportedly competed prior to their merger, the Complaint does not identify any way in which the merger caused anticompetitive effects in this market. The Complaint makes the conclusory assertion that the merger allegedly weakened "the competitive pressure that would otherwise discipline output, variety, and consumer-facing value," but it does not include any factual allegations that any reduction in output or variety or "consumer-facing value" actually took place or will imminently occur. *Id.* ¶ 113.

### 2. Paramount-Warner Bros. Merger Effects

The Complaint similarly contains numerous conclusory allegations and significant omissions regarding the Paramount-Warner Bros. merger's effects. In the Premium Video Distribution market, the Complaint alleges that the Paramount-Warner Bros. merger will "increase Paramount's ability and incentive" to increase prices and worsen undefined "consumer-facing terms." *Id.* ¶ 44. But it does not contain any supporting allegations about market shares or increases in concentration. Plaintiffs do not allege any facts regarding a reduction in competition in this market given the large number of content producers who will remain after the merger to distribute content. *E.g.*, *id.* ¶¶ 34, 94–97.

Regarding the National TV News market, the Complaint asserts that the Paramount-Warner Bros. merger will lead to "degradation of non-price dimensions of competition in national news, including credibility, editorial independence, investigative vigor, output, and viewpoint diversity." *Id.* ¶ 27. But the Complaint does not identify any facts for this alleged degradation, a significant omission in light of the large number of other national news outlets that will continue to be available, including ABC News, NBC News, Fox News, MS NOW, *The New York Times*, *The Washington Post*, NewsMax, and many others, as well as local news outlets, and social media, through which individuals consume their news.

In the Theatrical Distribution Market, the Complaint makes the conclusory allegation that the Paramount-Warner Bros. merger will result in "fewer theatrical titles" and "less genre and budget variety, and fewer meaningful alternatives at local theaters." *Id.* ¶ 114. But it does not allege any supporting facts, such as market shares or market concentration statistics for the alleged market. *See id.* ¶¶ 115–18.

## LEGAL STANDARDS

A court must dismiss a complaint that fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To survive dismissal, plaintiffs must plead "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). The plausibility requirement "asks for more than a sheer possibility that a defendant has acted unlawfully"; the well-pleaded facts must show that plaintiffs are entitled to relief. *Id.* Allegations that are merely "labels and conclusions" or "'naked assertion[s]' devoid of further factual enhancement" are not well-pleaded facts entitled to be credited. *Id.* Rather, the complaint must include sufficient "evidentiary facts," *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008), to permit a "reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

A court must dismiss a complaint for lack of subject matter jurisdiction under Article III of the Constitution if plaintiffs lack standing. *See* Fed. R. Civ. P. 12(b)(1). "A Rule 12(b)(1) jurisdictional attack may be facial or factual." *Safe Air For Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). A facial attack, such as here, accepts the truth of plaintiffs' allegations but asserts they are "insufficient on their face to invoke federal jurisdiction." *Id.* A district court resolves a facial attack as it would a Rule 12(b)(6) motion. *Fraser v. Team Health Holdings, Inc.*, 2022 WL 971579, at *6 (N.D. Cal. Mar. 31, 2022).

**ARGUMENT**

**I.    PLAINTIFFS FAIL TO ALLEGE FACTS PLAUSIBLY ESTABLISHING THEIR STANDING TO CHALLENGE EITHER MERGER**

The Complaint fails at the threshold because it does not allege facts sufficient to establish constitutional or antitrust standing by any of the individual Plaintiffs to challenge either merger.

**A.    Plaintiffs' Allegations of Harm Are Insufficient to Confer Article III Standing**

Plaintiffs fail to establish constitutional standing under Article III, which "is required to establish a justiciable case or controversy within the jurisdiction of the federal courts," *Gerlinger v. Amazon.com Inc.*, 526 F.3d 1253, 1256 (9th Cir. 2008).  Article III standing has three elements: (1) injury-in-fact, (2) traceability, *i.e.*, "a causal connection between the injury and the conduct complained of," and (3) redressability, *i.e.*, a likelihood "that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).  "The party invoking federal jurisdiction"—here, Plaintiffs—"bears the burden of establishing these elements." *Id*. at 561.  "At the pleadings stage," this means the plaintiff "must clearly . . . allege facts demonstrating each element." *Winsor v. Sequoia Benefits & Ins. Servs., LLC*, 62 F.4th 517, 523 (9th Cir. 2023).  And because "standing is not dispensed in gross, . . . plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).  In an antitrust case, that requires demonstrating standing in each alleged market. *See In re Apple iPhone Antitrust Litig.*, 2013 WL 4425720, at *6 (N.D. Cal. Aug. 15, 2013) (purchasing iPhone insufficient to establish standing for claimed overcharges in a separate "aftermarket").

An injury-in-fact must be (1) "concrete" (2) "particularized," and (3) "actual or imminent." *Lujan*, 504 U.S. at 560.  An injury is not "actual or imminent" if it is "conjectural or hypothetical," *id*., and it is not "concrete" if it is "abstract," *TransUnion*, 594 U.S. at 424.  To be "particularized," an injury cannot be "generalized" and must "affect[] the plaintiff in a personal and individual way." *Kumar v. Koester*, 131 F.4th 746, 751–52 (9th Cir. 2025).  Where, as here, plaintiffs seek to remedy future harm, "allegations of possible future injury are not sufficient" to allege harm that is "imminent." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).  Rather, a future injury must be "certainly impending," or "at the very least" have "a substantial risk" of occurring. *Lake v. Fontes*, 83 F.4th 1199, 1204 (9th Cir. 2023).

**1.    Plaintiffs' Claims of Harm, Disconnected from the Skydance-Paramount Merger, Do Not Establish Standing to Challenge This Merger**

The Complaint fails to allege facts establishing Article III standing by any Plaintiff to challenge the Skydance-Paramount merger because the only allegation of concrete and particularized harm to Plaintiffs—a single price increase that occurred five months after the merger—does not apply to two Plaintiffs and is not plausibly traceable to the merger for the three other Plaintiffs.

*First*, Plaintiffs' allegations of "direct out-of-pocket harm in the form of" higher subscription charges for Paramount+, Compl. ¶ 28, do not satisfy Article III as to Plaintiffs Faust and McCarthy because they do not claim to be Paramount+ subscribers and thus do not claim to have paid any price for Paramount+, let alone an increased price. *Id.* ¶¶ 29–30. Their allegation that the 2026 price increase has "deterred" them from subscribing to Paramount+, *id.* ¶ 30, is insufficient to satisfy Article III. *See Sanner v. Bd. of Trade of Chi.*, 62 F.3d 918, 923–24 (7th Cir. 1995) (farmers "refraining from selling soybeans" lacked Article III standing to allege antitrust claims based on "depressed price" of soybeans).

*Second*, the other three Plaintiffs—Marazzo, Rubinsohn, and Talewsky[3]—allege they paid an "increased amount" for Paramount+ beginning on January 15, 2026, Compl. ¶ 28, but they fail to allege any facts to show that this increased price was "fairly traceable to the challenged action of the defendant," *i.e.*, the Skydance-Paramount merger. *See Lujan*, 504 U.S. at 560. Any "causal connection," *id.*, is lacking because Skydance did not have any streaming service prior to the merger, *see* Compl. ¶¶ 18–19, so there is no plausible claim that the merger increased concentration, eliminated head-to-head competition, or otherwise increased Paramount's power in the alleged Premium Video Distribution market. Plaintiffs ask the Court to infer causation from a mere temporal sequence, *i.e.*, suggesting that the price increase was caused by the merger because it occurred five months after the merger. *See, e.g.*, Compl. ¶¶ 91, 98. That is a "logical fallacy" that fails to raise any plausible inference of causation, *see Huskey v. City of San Jose*, 204 F.3d 893, 899 (9th Cir. 2000), especially because Plaintiffs allege that prices for all "leading streaming services . . . have increased materially over time," independent of the merger, Compl. ¶ 98.

---

[3] Defendants reserve the right to move to compel arbitration as to any Plaintiffs who subscribed to Paramount+, pursuant to the mandatory arbitration provision that Paramount+ subscribers agree to.

*Third*, Plaintiffs' other allegations of harm from the Skydance-Paramount merger are too vague and speculative to establish standing.  The Complaint contains a boilerplate assertion of competitive harms, such as "lower quality and variety" and "decreased consumer choice," Compl. ¶¶ 2, 90; *see also id.* ¶¶ 26, 43, 113, but it fails to allege any facts to plausibly show how those claimed harms have materialized or would materialize.  Such "naked assertions devoid of further factual enhancement" are insufficient.  *Blantz v. Ca. Dept. Corr. & Rehab.*, 727 F.3d 917, 927 (9th Cir. 2013).  There are simply no allegations that plausibly show how the merger has caused or would cause injury to any of the Plaintiffs "in a personal and individual way."  *Kumar*, 131 F.4th at 751.  Courts addressing similarly speculative allegations of harm from Plaintiffs' counsel have rejected them as insufficient to confer standing.  *See, e.g.*, *Fry*, 2026 WL 751422, at *3 (dismissing complaint because the "theory of harm is attenuated and conclusory"); *Whalen v. Albertsons Cos. Inc.*, 2023 WL 8812882, at *1 (N.D. Cal. Dec. 20, 2023) (standing allegations "barely say anything").

### 2.    Plaintiffs' Vague Allegations of Injury Do Not Establish Standing to Challenge the Paramount-Warner Bros. Merger

The Complaint independently does not establish Article III standing for Plaintiffs to challenge the proposed Paramount-Warner Bros. merger for many of the same reasons it fails to do so for the completed Skydance-Paramount merger.  *See TransUnion*, 594 U.S. at 431 ("plaintiffs must demonstrate standing for each claim").  The Complaint lacks any allegations of concrete and particularized harm to Plaintiffs from the pending merger, and instead makes only naked, speculative assertions of future increased prices, reduced output, reduced quality, and reduced consumer choice.  *See*, *e.g.*, Compl. ¶ 1 ("increased prices, reduced production, reduced quality, and reduced consumer choice"); *id*. ¶ 27 ("degradation of non-price dimensions of competition"); *id*. ¶ 40 (similar).  Plaintiffs' conclusory assertions of a generalized future injury do not satisfy Article III.  *See Blantz*, 727 F.3d at 927 ("naked assertions devoid of further factual enhancement" are insufficient); *Kumar*, 131 F.4th at 751 (injury must affect plaintiffs "in a personal and individual way").  Many courts in this District have dismissed merger challenges brought by the same Plaintiffs' counsel for lack of Article III standing on these grounds.  *E.g.*, *Fry*, 2026 WL 751422, at *2–3 ("theory of harm is attenuated and conclusory" and lacks "individualized allegations"); *Whalen*, 2023 WL 8812882, at *1 (plaintiffs "barely say anything" to demonstrate particularized and imminent injuries).

The Complaint additionally fails to allege facts to establish standing to challenge the Paramount-Warner Bros. merger because it does not allege facts to plausibly show that any of these alleged future injuries specific to Plaintiffs, such as a future price increase, are "certainly impending." *See Clapper*, 568 U.S. at 409. Instead, Plaintiffs posit "a highly attenuated chain of possibilities," *id*. at 410, detached from commercial realities and economic principles, to conclude that this merger will usher in a parade of horribles, which in turn lack any plausible factual connection to Plaintiffs. *See*, *e.g.*, Compl. ¶¶ 27, 40. The only concrete fact pled in the Complaint about the imminence of any actions regarding the merger is the April 2026 approval of the merger by Warner Bros. shareholders, *see id*. ¶¶ 45, 74, but that merely relates to the imminence of the transaction closing, not to any imminent alleged harm to Plaintiffs. Absent specific allegations of imminent harm traceable to Plaintiffs from the challenged merger, Article III standing does not exist. *Clapper*, 568 U.S. at 411; *see also Fry*, 2026 WL 751422, at *3 (dismissing similar complaint on standing grounds because its "theory of harm is attenuated and conclusory").

In the Premium Video Distribution market, the allegation of a single Paramount+ price increase in January 2026 does not cure Plaintiffs' lack of standing because that price increase occurred prior to the merger and thus is not "fairly traceable" to it. *See Lujan*, 504 U.S. at 560. And a single historical price increase prior to the merger does not show that it is likely to cause future price increases. *See*, *e.g.*, *Am. Encore v. Fontes*, 152 F.4th 1097, 1112 (9th Cir. 2025) (single "isolated case" of historical harm "cannot by itself support standing for injunctive relief"); *Freeman v. ABC Legal Servs., Inc.*, 877 F. Supp. 2d 919, 926 (N.D. Cal. 2012) ("a single incident is insufficient to establish a likelihood of future injury").

In the Theatrical Distribution market, Plaintiffs speculate about the possibility of "fewer theatrical titles, less genre and budget variety, and fewer meaningful alternatives at local theaters," Compl. ¶ 114, but they allege no facts that would plausibly show an imminent prospect of such harm taking place in a manner that will be "personal and individual" to any of the Plaintiffs. *See Kumar*, 131 F.4th at 751. The Complaint lacks any allegations of an imminent reduction in theatrical film output, much less any plans by the merged firm to reduce output. *See also infra* §§ II.A(3), II.B(2).

In addition, the Complaint fails to allege any particularized harm Plaintiffs are likely to experience if their posited output reduction came to pass. It does not allege any concrete, imminent plans by any Plaintiff to attend any movie in a theater, let alone plans to watch a specific Paramount or Warner Bros.

movie at a theater that might be negatively impacted by the merger. The Complaint alleges only that Plaintiffs are "routine theatrical moviegoers" and "intend[] to continue attending theatrical movies." Compl. ¶¶ 35–39, 41. Such vague allegations are insufficient to establish Article III standing, both as to particularity and imminence. *See*, *e.g.*, *Lonvoaz v. Twinings N. Am., Inc.*, 726 F. App'x 590, 591 (9th Cir. 2018) ("A 'profession of an inten[t] . . . is simply not enough' to satisfy Article III." (quoting *Lujan*, 504 U.S. at 564)); *Yoshimoto v. Alaska Airlines, Inc.*, 2024 WL 6990084, at *3 (D. Haw. Aug. 12, 2024) (no injury where plaintiffs alleged that they hoped to fly in the future, rather than concrete plans to do so); *Fry*, 2026 WL 751422, at *2 (no standing because "it is unclear what [debit or credit] cards [plaintiffs] have or how they use them," and thus "it is also unclear . . . what if any harm the Plaintiffs face").

In the National TV News market, the Complaint similarly fails to allege any concrete injury-in-fact to any of the Plaintiffs. An alleged intangible harm, such as a reduction of diversity in viewpoints, cannot confer Article III jurisdiction unless it "has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016). The Complaint's allegations that the Paramount-Warner Bros. merger will lead to a loss of "viewpoint diversity," "credibility," "editorial independence," or similar abstract concepts do not satisfy this standard. *See* Compl. ¶¶ 27, 81, 130. Even crediting the claim in the Complaint that Plaintiffs "value" these concepts when consuming news,[4] *id.* ¶ 103, their "ideological discomfort" with Paramount's perceived editorial viewpoint "does not implicate any legally protected interest." *Brown v. Nat'l Football League, Inc.*, -- F. Supp. 3d --, 2026 WL 279599, at *7 (S.D.N.Y. Feb. 3, 2026); *see also Murthy v. Missouri*, 603 U.S. 43, 75 (2024) (rejecting, as "startingly broad," standing theory based on right to "hear[] unfettered speech on social media").

### B.    Plaintiffs' Allegations of Antitrust Standing Are Deficient

The Complaint further fails to satisfy the separate and more demanding requirements of antitrust standing for their claims in the Theatrical Distribution and National TV News markets. "Antitrust standing is distinct from Article III standing," such that "[a] plaintiff who satisfies the constitutional requirement

---

[4] Plaintiffs Faust and Talewsky do not allege that they have ever watched or intend to watch CNN, *see* Compl. ¶¶ 32, 37–38, and Plaintiff Rubinsohn does not allege any intention to continue doing so, *id.* ¶¶ 32, 36. Thus, none of these three Plaintiffs has standing to assert a claim against the Paramount-Warner Bros. merger based on any alleged future degradation of CNN.

of injury in fact is not necessarily a proper party to bring a private antitrust action." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1054 n.3 (9th Cir. 1999). An essential component of antitrust standing is antitrust injury, which has five elements: (1) "unlawful conduct," (2) "causing an injury to the plaintiff," (3) "that flows from that which makes the conduct unlawful," (4) "that is of the type the antitrust laws were intended to prevent," and (5) "that the injured party be a participant in the same market as the alleged malefactors." *Malheur Forest Fairness Coal. v. Iron Triangle, LLC*, 164 F.4th 710, 733 (9th Cir. 2026). Antitrust injury is required for a private party to seek damages or injunctive relief under the Clayton Act. *Cargill, Inc. v. Monfort of Col., Inc.*, 479 U.S. 104, 111–13 (1986).

### 1.     Alleged Losses of "Viewpoint Diversity" and "Editorial Independence" Are Not Injuries the Antitrust Laws Can or Should Address

Plaintiffs fail to allege any cognizable antitrust injury in their National TV News market. Just as alleged losses of "viewpoint diversity," "credibility," "editorial independence," and the like are too abstract to satisfy Article III, *see supra* § I.A(2), they are also not "the type [of injury] the antitrust laws were intended to prevent," *Malheur Forest*, 164 F.4th at 733. Antitrust laws "exclusively confine their scope to matters of economic consequence," *Reilly v. Hearst Corp.*, 107 F. Supp. 2d 1192, 1195 (N.D. Cal. 2000), and although "[c]ompetitive economies have social and political as well as economic advantages . . . an antitrust policy divorced from market considerations would lack any objective benchmark," *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 53 n.21 (1977). Thus, a loss of "viewpoint diversity" or "editorial independence" is insufficient to establish antitrust injury. *See Berlyn, Inc. v. Gazette Newspapers, Inc.*, 157 F. Supp. 2d 609, 619 (D. Md. 2001) ("stilled independent editorial voices and reduced . . . presentation and discussion of diverse viewpoints" are not antitrust injuries).

It would vastly expand the antitrust laws and trample on companies' First Amendment freedoms for courts to consider in a Clayton Act challenge whether a merger adequately preserves certain viewpoints and to treat alleged changes in viewpoint, editorial judgment, or political perspective as cognizable antitrust harms. A firm's "exercise of editorial control over its content" is protected by the First Amendment. *McDermott v. Ampersand Pub., LLC*, 593 F.3d 950, 959 (9th Cir. 2010); *see also First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 778 (1978) (recognizing First Amendment rights of corporations). "The choice of material to go into a newspaper" or similar journalistic outlet, including the

"treatment of public issues and public officials—whether fair or unfair—constitute the exercise of editorial control and judgment," and "governmental regulation of this crucial process" cannot occur "consistent with First Amendment guarantees of a free press." *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974). Thus, a court applying the antitrust laws to prohibit a merger based on alleged impacts on editorial content would regulate particular editorial outcomes in violation of the First Amendment—underscoring why such impacts are not cognizable antitrust injuries.

Simply put, Plaintiffs' allegations of "political" harm in the National TV News Market are not only speculative, but also not the type of antitrust injuries that can support a Clayton Act claim. Allegations of political activity are not a basis for stating an antitrust cause of action. *See*, *e.g.*, *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 914 (1982) (political boycotts do not violate the antitrust laws); *E. R. R. Presidents Conf. v. Noerr Motor Freight*, *Inc.*, 365 U.S. 127, 136 (1961) (petitioning the legislature is not an antitrust violation); *Missouri v. Nat'l Org. for Women*, *Inc.*, 620 F.2d 1301, 1315 (8th Cir. 1980) (boycotting "for the purpose of influencing legislation is not proscribed by the Sherman Act").

> **2.    Plaintiffs' Alleged Injuries Are Too Attenuated to Confer Antitrust Standing With Respect to a Theatrical Distribution Market in Which Plaintiffs Do Not Participate**

Plaintiffs also fail to allege any injuries supporting antitrust standing in the Theatrical Distribution market because they are not "participant[s] in" that market, *Malheur Forest*, 164 F.4th at 733, meaning they are neither "consumer[s] of [Paramount's] goods or services" in that market nor "competitor[s] of [Paramount] in" that market, *Somers v. Apple, Inc.*, 729 F.3d 953, 963 (9th Cir. 2013). Plaintiffs allege that the Theatrical Distribution market involves competition among "major studio-distributors" to sell their content to "exhibitors," *i.e.*, movie theaters. Compl. ¶ 109. This market definition is fatally flawed for the reasons explained below, *see infra* § II.A, but as alleged, it is apparent that Plaintiffs are neither "major studio-distributors" nor "exhibitors." Indeed, Plaintiffs' allegations of harm in this market relate solely to bargaining dynamics between movie studios and exhibitors about "screen access," "large-format placements," "marketing commitments," and other terms of exhibition, *see* Compl. ¶ 109, but Plaintiffs are not parties to such negotiations. Instead, Plaintiffs only allege that they are "moviegoers," *id.* ¶¶ 41–42, *i.e.*, consumers of theatrical films, which the Complaint recognizes "is a distinct product market," *id.* ¶ 110. "Because these markets are distinct, Plaintiffs have not alleged antitrust injury," as any injuries

Plaintiffs allege they might suffer would occur in a downstream market different from the one allegedly restrained. *Hogan v. Amazon.com, Inc.*, 2025 WL 869202, at * 1 (9th Cir. Mar. 20, 2025); *accord Freeland v. Nippon Steel Corp.*, -- F. Supp. 3d --, 2026 WL 747417, at *3 (N.D. Cal. Mar. 17, 2026) (following *Hogan* and dismissing claims brought by Plaintiffs' counsel).

## II.   PLAINTIFFS FAIL TO ALLEGE FACTS PLAUSIBLY SHOWING A VIOLATION OF SECTION 7 OF THE CLAYTON ACT

Separately from whether Plaintiffs can establish standing, their claims must be dismissed for the independent reason that the Complaint fails to plausibly state a Section 7 violation. To state a violation of Section 7 of the Clayton Act, a plaintiff must allege facts plausibly showing: (1) a relevant product market, (2) a relevant geographic market, and (3) "that the merger will probably lead to anticompetitive effects in that market." *St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 783–85 (9th Cir. 2015).

### A.   Plaintiffs Fail to Allege Facts Establishing a Relevant Market

"A threshold step in any antitrust case is to accurately define the relevant market, which refers to the area of effective competition." *FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020). "Failing to define a relevant market alone is fatal to an antitrust claim." *Coronavirus Reporter v. Apple, Inc.*, 85 F.4th 948, 957 (9th Cir. 2023). "[A] complaint may be dismissed . . . if the complaint's 'relevant market' definition is facially unsustainable." *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1121 (9th Cir. 2018).

To begin with, "the market must encompass . . . all economic substitutes," the boundaries of which are "determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008). Cross-elasticity of demand is an economic concept that is "[t]he principle most fundamental to product market definition." *Coronavirus Reporter*, 85 F.4th at 955.[5] A complaint is "legally insufficient" if it "fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand." *Reilly v. Apple, Inc.*, 578 F. Supp. 3d 1098, 1109 (N.D. Cal. 2022); *accord Coronavirus Reporter*, 85 F.4th at 955 (cross-elasticity of demand is "required to define a

---

[5] Cross-elasticity of demand exists when "an increase in the price of one product leads to an increase in demand for another," and when that is so, "both products should be included in the relevant product market." *Olin Corp. v. FTC*, 986 F.2d 1295, 1298 (9th Cir. 1993).

market"). A market also cannot be "artificial" or "contorted to meet [plaintiffs'] needs." *Hicks*, 897 F.3d at 1121. Thus, a complaint must "define . . . [any] adjectives that facially pare down the relevant market" and thereby artificially "attribute a greater share to" a defendant. *Tundra, Inc. v. Faire Wholesale, Inc.*, 2024 WL 589097, at *1 (N.D. Cal. Feb. 13, 2024) (Martínez-Olguín, J.).

All three of Plaintiffs' alleged markets fail as a matter of law. For all three, Plaintiffs fail to allege facts that "show the cross-elasticity required to define a market." *Coronavirus Reporter*, 85 F.4th at 955. Instead, while Plaintiffs formulaically invoke the concept of "reasonable interchangeability," *see* Compl. ¶¶ 87, 101, 110, they do not allege any facts to plausibly apply this principle to any of their alleged markets. The principle of cross-elasticity of demand focuses on whether some products could "deprive" other products "of significant levels of business," *Hicks*, 897 F.3d at 1120, if those other products increased price materially. *See also St. Alphonsus*, 778 F.3d at 784 (explaining the "hypothetical monopolist" test). The Complaint here alleges no facts to plausibly suggest that any one of the three alleged markets satisfies the cross-elasticity of demand test. *Coronavirus Reporter*, 85 F.4th at 956.

### 1.    Premium Video Distribution

Plaintiffs' "Premium Video Distribution" market is facially deficient. *First*, the Complaint fails to allege facts specifying the contours of this market with "sufficient clarity" to be plausible, *Coronavirus Reporter*, 85 F.4th at 956, because it leaves open-ended which forms of distribution it does and does not include. For example, Plaintiffs allege the market includes "subscription streaming services, cable television, and *related offerings*," without identifying what products would be included within the category of "related offerings." Compl. ¶ 86 (emphasis added). That ambiguity makes it impossible to determine if the alleged market "encompass[es] . . . all economic substitutes." *Newcal*, 513 F.3d at 1045.

*Second*, the Complaint fails to meaningfully define "premium" video content and instead relies on conclusory allegations to exclude "non-premium" content. *See* Compl. ¶ 87. The modifiers the Complaint uses to define this market are completely opaque and not capable of identifying which types of video content are excluded or included. *See id.* ("professionally produced," "high-budget," "recognized talent," "prestige"). These vague adjectives are both over and under inclusive, as not all content on subscription streaming services and cable television is plausibly "high-budget," "prestig[ious]," etc., and major video distributors like YouTube, which have inexplicably been excluded from the alleged relevant market,

compete vigorously to distribute "premium" content. Such vague pleading is insufficient to define a relevant market. *See, e.g.*, *Tundra*, 2024 WL 589097, at \*1 (markets modified by undefined adjectives are insufficient); *hiQ Labs, Inc. v. LinkedIn Corp.*, 485 F. Supp. 3d 1137, 1148 (N.D. Cal. 2020) (granting motion to dismiss where "parameters" of alleged market were "vague").

### 2.    National Television News

Plaintiffs' "National TV News" market is facially deficient in at least two ways. *First*, the Complaint excludes various news products from the alleged market on the ground that they lack "continuous live coverage," Compl. ¶ 101, yet it inexplicably includes broadcast news in the market, despite that it too does not offer "continuous live coverage." Nor does it explain why free products (broadcast networks) are in the same market as products that involve subscription fees (cable networks). The Complaint alleges no facts indicating whether there is cross-elasticity of demand among the news products it includes in the proposed market and those that it excludes. *Second*, the Complaint fails to allege any facts that would explain why other forms of news media are not reasonable substitutes, with cross-elasticity of demand, for "national television news programming." *See Coronavirus Reporter*, 85 F.4th at 955. Specifically, the Complaint does not address why major national news outlets and their constantly updated websites and apps that include video content (*e.g.*, *USA Today*, *New York Times*, *Washington Post*, *Wall Street Journal*), wire services (*e.g.*, AP, Reuters), or other online news publications (*e.g.*, Axios, The Atlantic), are not reasonably interchangeable with the attributes that the Complaint claims define the "National TV News" market (*i.e.*, "national scope, continuous live coverage, and branded, nationally distributed programming formats"). *See* Compl. ¶ 101. Indeed, the Complaint identifies the corporate owners of some of these major news outlets as "competitor[s] in U.S. news and media markets," *id.* ¶ 105 (identifying News Corp. and The New York Times Company), but nonetheless excludes them from the alleged relevant market.

### 3.    Theatrical Distribution

Plaintiffs' "Theatrical Distribution" market is facially deficient for at least two reasons. *First*, it conflates three distinct stages of the movie supply chain—production, distribution, and exhibition—and does not specify which of these functions is allegedly inside or outside the alleged market. *See* Compl. ¶¶ 109–11. *Second*, insofar as Plaintiffs allege a market for *producing* movies *distributed in theaters*, *see*

ECF No. 12 at 21 (calling this market "theatrical film production"), the Complaint does not allege any facts explaining why feature films produced for theatrical release are not reasonably interchangeable with feature films produced for release through other forms of distribution, such as subscription streaming services or streaming video on-demand—especially because, in many cases, the same films may be distributed through both theatrical and streaming channels.  Nor does the Complaint allege that *producing* a feature film for theatrical release is meaningfully distinct from producing a film for release through other forms of distribution, and that omission is fatal to determining what products are reasonably interchangeable with each other to form the boundaries of the relevant market. Because the Complaint's market definition "facially pare[s] down the relevant market" by ignoring or marginalizing major movie production companies that indisputably compete with Paramount and Warner Bros., such as Amazon MGM, Netflix, and Apple, it simply is not plausible.  *See Tundra*, 2024 WL 589097, at *1.

**B.**     **Plaintiffs Fail to Allege Facts Plausibly Showing That Either of the Mergers Is Likely to Substantially Lessen Competition**

Section 7 prohibits only those acquisitions whose effect "may be substantially to lessen competition."  15 U.S.C. § 18.  To survive dismissal, Plaintiffs must allege facts showing a "reasonable probability" that a merger will substantially lessen competition in a relevant market.  *FTC v. Microsoft Corp.*, 136 F.4th 954, 964 (9th Cir. 2025).  In applying this standard, courts apply a burden-shifting framework that requires the plaintiff to first "establish a prima facie case that a merger is anticompetitive." *DeHoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758, 763 (9th Cir. 2018).  Because Plaintiffs fail to allege facts plausibly establishing a *prima facie* case, the complaint must be dismissed.  *E.g., Demartini*, 662 F. Supp. 3d at 1062–63 (dismissing complaint where plaintiffs made only "general allegation that the merger may cause 'higher prices, less innovation, . . . and other potential anticompetitive effects'" while omitting "factual allegations as to market share, other competitors, or even what anticompetitive conduct is at risk of occurring in these markets . . . and why it is reasonably probable to happen").

**1.      Plaintiffs Fail to Allege Facts Plausibly Showing That the Completed Skydance-Paramount Merger Has Substantially Lessened Competition**

**a.      Skydance and Paramount were not competitors for national news or premium video distribution, making any claimed lessening of competition in these alleged markets implausible**

Plaintiffs' challenge to the Skydance-Paramount merger fails, on its face, with respect to the Premium Video Distribution market and the National TV News market.  For both alleged markets, the Complaint fails to plead any pre-merger competition between Skydance and Paramount—and thus no competition that could be lost as a result of the merger.  Specifically, Plaintiffs do not allege that Skydance operated any streaming service or cable network in the Premium Video Distribution market or that it operated a national news outlet in the National TV News market.  *See* Compl. ¶¶ 19, 90.

To the contrary, the Complaint makes clear that Skydance was an upstream "production company" that produced film and television programming for "multiple competing distributors and platforms," not a downstream distributor to consumers.  *Id.* ¶ 19.  Because Skydance never participated in either alleged market, the transaction could not, and did not, result in any increase in market share or concentration in these markets.  Courts routinely dismiss merger challenges with these deficiencies.  *E.g.*, *Yoshimoto v. Alaska Airlines, Inc.*, 2026 WL 1121960, at *8–9 (D. Haw. Apr. 24, 2026) (dismissing merger challenge where one party was not a competitor pre-merger); *Freeland*, 2025 WL 1724997, at *6 (same); *see also DeHoog v. InBev, SA/NV*, 2016 WL 5853733, at *3 (D. Or. July 22, 2016) (dismissing Section 7 claim where the post-acquisition world would not cause a change in market share percentage).

Nor have Plaintiffs sufficiently pled a likelihood of a substantial lessening of competition in the Premium Video Distribution market by citing a single post-merger Paramount+ price increase.  *See* Compl. ¶¶ 91, 98.  Because Skydance was not a participant in the Premium Video Distribution market before the merger, it is implausible to trace a consumer price increase to a merger that resulted in no change in market shares or concentration.  Further, a price increase by itself "does not sufficiently allege an injury to competition" and may be "fully consistent with a free, competitive market."  *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1202 (9th Cir. 2012).  Because Plaintiffs themselves acknowledge that prices were already "increasing materially over time" across streaming services before the merger, Compl. ¶ 98, there are "obvious alternative explanation[s]" for the one price increase alleged in the Complaint.  *Somers*, 729

F.3d at 965. Thus, any anticompetitive inference "stops short of the line between possibility and plausibility" that must be crossed to survive a motion to dismiss. *Id.*

Additionally, Plaintiffs' claim that Skydance's acquisition of Paramount "lessened non-price competition in national news programming by consolidating and constraining editorial governance at CBS News," Compl. ¶ 123, is similarly implausible. The Complaint offers no plausible basis for that theory. As there was no pre-merger competition in the National TV News market between Skydance and Paramount Global (Skydance did not have any national news service), the merger could not have reduced competition between participants in that alleged market—whether through price or non-price competition. To the extent that Plaintiffs suggest that alleged editorial or viewpoint changes at CBS News constitute an antitrust harm, they are wrong. *See supra* § I.B(1).

### b. The mere elimination of one competitor cannot plausibly state a Section 7 claim in the absence of other economic allegations

Plaintiffs' claim that the Skydance-Paramount merger reduced the number of production competitors in the alleged Theatrical Distribution market by one is insufficient to plead a substantial lessening of competition caused by the merger. Courts in this district recognize that "[m]erely alleging the elimination of a rival does not plausibly support an inference of an appreciable danger of anticompetitive effects in a relevant market," *Demartini*, 662 F. Supp. 3d at 1065, and have rejected the idea that "any non-trivial acquisition of a significant rival is per se violative of the Clayton Act," *Malaney v. UAL Corp.*, 2010 WL 3790296, at \*7 (N.D. Cal. Sept. 27, 2010); *see also Aurora Astro Prods. LLC v. Celestron Acquisition, LLC*, 691 F. Supp. 3d 1132, 1149–50 (N.D. Cal. 2023) (dismissing Section 7 claim where plaintiffs did not plead anything more than the elimination of a rival). But that is all the Complaint here has alleged. There are no allegations about market shares, increased concentration, or other economic facts that might plausibly establish a likelihood that competition will be substantially lessened.

Plaintiffs' pleading failure is not an accident. The Complaint cites various 1960s Supreme Court decisions for the premise that stating a Section 7 claim requires only allegations of the elimination of a single competitor, regardless of other market conditions. Compl. ¶¶ 7–10 (citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 345 n.72 (1962); *United States v. Von's Grocery Co.*, 384 U.S. 270 (1966); *United States v. Pabst Brewing Co.*, 384 U.S. 546 (1966)). But "the Supreme Court, echoed by the lower courts,

has said repeatedly that the economic concept of competition, rather than any desire to preserve rivals as such, is the lodestar that shall guide the contemporary application of the antitrust laws." *Hospital Corp. of Am. v. FTC*, 807 F.2d 1381, 1386 (7th Cir. 1986).  Indeed, courts in this district have recognized that antitrust law has substantially evolved since the 1960s, and subsequent binding Ninth Circuit authority requires plausible economic facts to support a Section 7 claim.  *Demartini*, 662 F. Supp. 3d at 1065 (rejecting reliance on 1960s Supreme Court merger cases as conflicting with intervening Ninth Circuit law); *Malaney*, 2010 WL 3790296, at *6–7 (rejecting claim that *Brown Shoe*, *Von's*, and *Pabst* require finding that any non-trivial acquisition of a significant competitor violates Section 7).

It is widely recognized that modern Section 7 analysis requires a plaintiff to put forward economic facts, such as market shares, market concentration, or other market characteristics, showing "that the merger will probably lead to anticompetitive effects." *St. Alphonsus*, 778 F.3d at 783–85 (describing plaintiff's burden as "establishment of a prima facie case on statistical evidence"); *United States v. Anthem, Inc.*, 855 F.3d 345, 349 (D.C. Cir. 2017) (*prima facie* case requires "showing that the transaction will lead to undue concentration"); *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 492 (5th Cir. 1984) (Section 7 plaintiff "may make a prima facie showing . . . in one of two ways," *i.e.*, "market share and market concentration statistics" or "other characteristics of the market"); *California v. Sutter Health Sys.*, 130 F. Supp. 2d 1109, 1118 (N.D. Cal. 2001) (requiring "an initial statistical showing that the transaction will lead to undue concentration in the market").

The Complaint here fails this test.  It does not offer any allegations of economic facts to establish Plaintiffs' *prima facie* case.  Instead, it offers only conclusory allegations of anticompetitive effects, recycled from other failed merger-challenge complaints filed by this same Plaintiffs' counsel, that have been ruled to be inadequate.  *See Demartini*, 662 F. Supp. 3d at 1062–63 ("Plaintiffs' general allegation that the merger may cause higher prices, less innovation, less creativity, less consumer choice, decreased output, and other potential anticompetitive effects is insufficient." (cleaned up)).

Skydance is not even mentioned in Plaintiffs' incomplete studio market share and box-office revenue allegations, and Plaintiffs do not allege the amount of any increase in concentration purportedly attributable to the merger.  Compl. ¶¶ 115–18.  The Complaint also does not identify which outputs were allegedly reduced, how quality or consumer choice have purportedly been diminished, which prices for

theatrical distribution were allegedly increased, or how any price changes resulted from the merger. This is exactly the type of conclusory pleading with respect to alleged anticompetitive effects caused by a merger that requires dismissal. *See Demartini*, 662 F. Supp. 3d at 1062–63.

### c. The Complaint fails to satisfy the pleading requirements to challenge the vertical aspects of the Skydance-Paramount merger

Plaintiffs' conclusory claims concerning the vertical impact of the Skydance-Paramount merger, *i.e.*, the combination of different levels of the supply chain, fare no better. The Complaint claims that adding Skydance to Paramount would "internalize Skydance's content pipeline" within Paramount, increasing Paramount's ability and incentive to foreclose rival theaters, broadcasters, cable companies, and streamers from accessing Skydance content. Compl. ¶¶ 90, 122. But Plaintiffs do not allege any facts that would be necessary to support a vertical foreclosure claim: that Defendants (1) have the ability to foreclose content, (2) have the incentive to foreclose content, and (3) such foreclosure would substantially lessen competition. *FTC v. Microsoft Corp.*, 681 F. Supp. 3d 1069, 1090 (N.D. Cal. 2023).

Here, the Complaint does not allege any actual foreclosure of Skydance content, let alone an incentive or ability to do so, or why Skydance content would be viewed as competitively necessary, such that its denial to other competitors would substantially lessen competition. Instead, the Complaint just resorts to conclusory assertions of competitive impact, which are insufficient. *See Fry*, 2026 WL 751422, at \*6; *Demartini*, 662 F. Supp. 3d at 1062. Plaintiffs plead no facts plausibly suggesting that integrating Skydance's production operations with Paramount's streaming service foreclosed any rivals, restricted access to content, altered competitive incentives, or otherwise substantially lessened competition.

### 2. Plaintiffs Fail to Allege Facts Plausibly Showing the Paramount-Warner Bros. Merger Will Likely Cause a Substantial Lessening of Competition

### a. The Complaint is devoid of any economic data to plausibly allege a lessening of competition in any of the alleged relevant markets

Although market-share statistics may sometimes be used to establish a *prima facie* case, *St. Alphonsus*, 778 F.3d at 786, the fatal defect here is that the Complaint does not allege any market shares, market concentration, or other economic facts, that align with Plaintiffs' alleged relevant markets. *See supra* § II(B)(1)(b). Specifically, for the putative Premium Video Distribution and National TV News

markets, Plaintiffs do not allege any market shares or any way of measuring market concentration, such as the Herfindahl-Hirschman Index ("HHI").  Instead, they cite data for limited components of the putative markets—such as subscriber counts, total company revenue, or market capitalization—that do not measure competition within the alleged markets.  *See* Compl. ¶¶ 94–97, 105–108.  Such allegations are insufficient as a matter of law, because "[m]arket shares must be measured in a proper relevant product and geographic market; alleging market shares in some other market is inadequate."  *FTC v. Lab. Corp. of Am.*, 2011 WL 3100372, at *19 (C.D. Cal. Feb. 22, 2011); *see also Demartini*, 2023 WL 4239653, at *4 (rejecting market share allegations not "tethered to . . . the alleged relevant market").

For example, in the putative Premium Video Distribution market, Plaintiffs show rankings of U.S. video streaming services by revenue and the number of subscribers, but they do not provide any market share data at all for two of the components of the Premium Video Distribution market which the Complaint defines: cable television and "related offerings."  Compl. ¶¶ 86, 94–97.  Plaintiffs' data also inexplicably omits streaming competitors.  Amazon Prime Video, one of the largest streaming competitors, is excluded from the streaming revenue data, *id.* ¶¶ 94–95, even though it has the second-highest number of streaming subscribers, *id.* ¶¶ 96–97, and Plaintiff McCarthy subscribes to it, *id.* ¶ 30.  Similarly, Apple TV is excluded from both the revenue and subscriber data, even though Plaintiff Faust subscribes to it.  *Id.* ¶¶ 30, 34, 38.  Such incomplete and misaligned data is insufficient to support a Section 7 claim.  *See Fry*, 2026 WL 751422, at *6 (rejecting "gerrymander[ed]" and incomplete market share calculations).

Similarly, the Complaint does not contain any market share or concentration data for the National TV News market.  Instead, it alleges total revenue for diversified companies that offer far more than national news, including the revenues of all businesses of these companies, Compl. ¶ 105, or their total value, *id.* ¶ 108.  Plaintiffs' data also does not align with the Complaint's market definition because it includes companies that are outside the boundaries of the alleged market, such as The New York Times Company, *id.* ¶¶ 105–08, which is expressly excluded from the market definition as a newspaper or digital-only outlet, *id.* ¶ 101.  Such misaligned data cannot support a Section 7 claim.  *See Lab. Corp. of Am.*, 2011 WL 3100372, at *19 ("[A]lleging market shares in some other market is inadequate.").

The data alleged for the Theatrical Distribution market suffers from a similar fatal defect.  While it purports to show market shares, they include Canada, even though the market alleged is limited to the

United States. Compl. ¶¶ 112, 115–16. The Court should not credit a market share figure that is, by Plaintiffs' own admission, calculated on the wrong geographic basis. Further, even if the Court were to credit these market share allegations, Paramount's alleged post-merger market share of only 23.6% falls well below that capable of supporting a plausible inference of competitive harm. *See United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1123 (N.D. Cal. 2004) ("A presumption of anticompetitive effects from a combined share of 35% in a differentiated products market is unwarranted."); *Fry*, 2026 WL 751422, at *6 (noting that "some courts hold that a plaintiff can satisfy their *prima facie* burden by showing that the merger will yield a combined market share of over 30%" and dismissing a complaint alleging a combined 16.2% market share); *State of N.Y. v. Kraft Gen. Foods, Inc.*, 926 F. Supp. 321, 366 (S.D.N.Y. 1995) (similar for proposed merger resulting in a combined market share below 35%). Nor does the Complaint allege any increase in concentration in the Theatrical Distribution market, such as a change in HHI, that might suggest a lessening of competition. *See* U.S. Dep't of Justice & FTC, Merger Guidelines § 2.1 (2023).

### b.      The Complaint lacks any other facts plausibly showing a likelihood of a lessening of competition from the Paramount-Warner Bros. merger

Plaintiffs' only other allegations of anticompetitive effects from the Paramount-Warner Bros. merger are precisely the type of formulaic, conclusory allegations that courts routinely reject in merger challenges. For example, the Complaint makes the unsupported assertion that the acquisition will "reduce theatrical film output and narrow release slates, leaving moviegoers with fewer theatrical titles, less genre and budget variety, and fewer meaningful alternatives," thereby "diminishing the value of the theatrical experience." Compl. ¶¶ 41–42. Such conclusory allegations, without factual support, cannot support a Section 7 claim. *Demartini*, 662 F. Supp. 3d at 1062–63 (dismissing complaint based on allegations of "higher prices, less innovation, less creativity, less consumer choice, [and] decreased output").

Plaintiffs also rely on the bare assertion that the merger will increase the combined firm's "ability and incentive" to harm competition. *E.g.*, Compl. ¶¶ 40, 44, 93, 114, 129; *see also id.* ¶¶ 43, 122. But such conclusory allegations, without any fact-specific allegations of market power, foreclosure, or other anticompetitive effects, are simply not enough to support a merger challenge. *See DeHoog*, 2016 WL

5853733, at *3–4 (rejecting plaintiffs' allegations that defendants were "likely to have incentives to change distribution and pricing practices" as "purely speculative and not supported by any specific facts").

## CONCLUSION

For all the reasons set forth above, the Complaint should be dismissed with prejudice. Plaintiffs have not shown that they have standing, and the Complaint does not come close to meeting the pleading standards to state a claim under Section 7. This lawsuit is the latest example of a meritless merger challenge by these Plaintiffs and their counsel, which courts have previously rejected. A dismissal with prejudice is therefore warranted to bring this baseless litigation to an end.

Dated:  June 3, 2026

Respectfully submitted,

**WINSTON TAYLOR LLP**

By: */s/ Jeffrey L. Kessler*
Jeffrey L. Kessler (*pro hac vice*)
**WINSTON TAYLOR LLP**
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-4698
Facsimile: (212) 294-4700
jeffrey.kessler@winstontaylor.com

Jeanifer E. Parsigian (SBN 289001)
Matthew R. DalSanto (SBN 282458)
**WINSTON TAYLOR LLP**
101 California Street, 21st Floor
San Francisco, CA 94111-5891
Telephone: (415) 591-1469
Facsimile: (415) 591-1400
jeanifer.parsigian@winstontaylor.com
matthew.dalsanto@winstontaylor.com

Conor A. Reidy (*pro hac vice*)
Kevin B. Goldstein (*pro hac vice*)
**WINSTON TAYLOR LLP**
300 N. LaSalle Drive
Chicago, IL 60654-3406
Telephone: (312) 558-7542
Facsimile: (312) 558-5700
conor.reidy@winstontaylor.com
kevin.goldstein@winstontaylor.com

Matthew R. Huppert (*pro hac vice*)
**WINSTON TAYLOR LLP**
1901 L St NW
Washington, DC 20036-3506
Telephone: (202) 282-5004
Facsimile: (202) 282-5100
matthew.huppert@winstontaylor.com

Natalie Kaliss (SBN 353838)
**LATHAM & WATKINS LLP**
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
natalie.kaliss@lw.com

Marguerite Sullivan (*pro hac vice*)
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW
Suite 1000

Washington, D.C. 20004
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
marguerite.sullivan@lw.com

Shayan Ahmad (*pro hac vice*)
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
shayan.ahmad@lw.com

*Attorneys for Defendants Paramount Skydance
Corporation and Skydance Media, LLC*