Joseph M. Alioto, Esq. (SBN 42680)
Tatiana V. Wallace, Esq. (SBN 233939)
**ALIOTO LAW FIRM**
One Sansome Street, 14th Floor
San Francisco, CA 94104
Tel:  (415) 434-8900
Fax:  (415) 434-9200
Email:  jmalioto@aliotolaw.com


Ronald D. Foreman, Esq. (SBN 61148)
Ian A. Hansen, Esq. (SBN 255449)
**FOREMAN & BRASSO**
850 Montgomery Street, Suite 300
San Francisco, CA 94133
Telephone:  (415) 433-3475
Facsimile:  (415) 781-8030
Email:  foremanandbrasso@foremanandbrasso.com

Attorneys for Plaintiffs Pam Faust, Len Marazzo, Lisa McCarthy, Deborah Rubinsohn, and Gary Talewsky

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAM FAUST, LEN MARAZZO, LISA McCARTHY, DEBORAH RUBINSOHN, and GARY TALEWSKY,<br><br>    Plaintiffs,<br>vs.<br><br>PARAMOUNT SKYDANCE CORPORATION (formerly Paramount Global), and SKYDANCE MEDIA, LLC,<br><br>    Defendants. | Case No. 4:26-cv-03790-AMO<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |

**TABLE OF CONTENTS**

I.  INTRODUCTION .................................................................................................2

II.  LEGAL ARGUMENT ........................................................................................2

A.  *Pabst* Remains Binding and Controls Defendants' Attempt to
Demand Precise Market Proof at the Pleading Stage ...............................2

B.  Rule 12 Does Not Permit Defendants to Defeat the Complaint
with Factual Counter-Narratives...............................................................7

C.  Plaintiffs Plausibly Allege Article III Standing and Antitrust Injury .....8

1.   Plaintiffs plead concrete and particularized injury ..........................8

2.  Plaintiffs plead traceability and redressability.................................9

3.  Plaintiffs plead antitrust injury......................................................10

D.  The Complaint Plausibly Alleges Relevant Markets...............................12

1.   Market definition is a factual issue ................................................12

2.  The Complaint plausibly alleges a Premium Video Distribution Market........13

3.  The Complaint plausibly alleges a National Television News Market............14

4.  The Complaint plausibly alleges a Theatrical Distribution Market.................14

E.  The Complaint Plausibly Alleges That the Acquisitions
May Substantially Lessen Competition ...................................................15

1.  Section 7 requires probable threatened harm, not certainty............................15

2.  The Skydance-Paramount substantially lessened
competition and increased prices...................................................15

3.  The elimination of Paramount-Warner Bros. Discovery may
substantially lessen competition ....................................................17

F.  Defendants' Efficiencies and "Scale" Arguments Cannot
Defeat the Complaint ...............................................................................18

G.  Plaintiffs Adequately Plead Their Claims for Relief, and
Any Dismissal Should Be with Leave to Amend ....................................18

III.  CONCLUSION....................................................................................................20

# TABLE OF AUTHORITIES

Adobe Systems Inc. v. Blue Source Group, Inc.,
(N.D. Cal. 2015)125 F. Supp. 3d 945 .................................................................8

Ashcroft v. Iqbal,
(2009)556 U.S. 662 ..........................................................................................7

Aurora Astro Products LLC v. Celestron Acquisition, LLC,
(N.D. Cal. 2023) 691 F. Supp. 3d 1132 ........................................................15

Berlyn, Inc. v. Gazette Newspapers, Inc.,
(D. Md. 2001) 157 F. Supp. 2d 609 ................................................................7

Brantley v. NBC Universal, Inc.,
(9th Cir. 2012) 675 F.3d 1192 ......................................................................11

Brown Shoe Co. v. United States,
(1962) 370 U.S. 294 ..................................................................................2, 3, 6

California v. American Stores Co.,
(1990) 495 U.S. 271 ........................................................................................19

California v. Sutter Health System,
(N.D. Cal. 2001) 130 F. Supp. 2d 1109 .........................................................5

Cargill, Inc. v. Monfort of Colorado, Inc.,
(1986) 479 U.S. 104 ........................................................................................10

Coronavirus Reporter v. Apple, Inc.,
(9th Cir. 2023) 85 F.4th 948 ..........................................................................12

DeHoog v. Anheuser-Busch InBev SA/NV,
(9th Cir. 2018) 899 F.3d 758 ........................................................................15

Demartini v. Microsoft Corp.,
(N.D. Cal. 2023) 662 F. Supp. 3d 1055 ..........................................................5

DIRECTV, LLC v. Nexstar Media Group, Inc.,
(E.D. Cal. Mar. 27, 2026) 2026 U.S. Dist. LEXIS 66737 .............................6

Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.,
(5th Cir. 1984) 732 F.2d 480 ..........................................................................5

Fry v. Capital One Financial Corp.,
(N.D. Cal. May 14, 2025) 2025 U.S. Dist. LEXIS 92288 ..............................9

FTC v. Laboratory Corp. of America,
(C.D. Cal. Feb. 25, 2011) 2011 U.S. Dist. LEXIS 29144..............................6

FTC v. Microsoft Corp.,
(9th Cir. 2025) 136 F.4th 954 ..........................................................................6

FTC v. Microsoft Corp.,
    (N.D. Cal. 2023) 681 F. Supp. 3d 1069 ................................................................6

FTC v. Procter & Gamble Co.,
    (1967) 386 U.S. 568, 580.................................................................................18

FTC v. Qualcomm Inc.,
    (9th Cir. 2020) 969 F.3d 974 ..........................................................................11

hiQ Labs, Inc. v. LinkedIn Corp.,
    (N.D. Cal. 2020) 485 F. Supp. 3d 1137 ......................................................12, 20

Hicks v. PGA Tour, Inc.,
    (9th Cir. 2018) 897 F.3d 1109 .........................................................................12

Hospital Corp. of America v. FTC,
    (7th Cir. 1986)807 F.2d 1381 .............................................................................4

In re Nexstar-TEGNA Merger Litigation,
    (E.D. Cal. Apr. 17, 2026) 2026 U.S. Dist. LEXIS 85526.........................................6

Malaney v. UAL Corp.,
    (N.D. Cal. Sept. 27, 2010) 2010 U.S. Dist. LEXIS 106049 ...................................5, 15

Newcal Industries, Inc. v. Ikon Office Solution,
    (9th Cir. 2008) 513 F.3d 1038 .................................................................7, 12, 20

Shaterian v. Wells Fargo Bank, N.A.,
    (N.D. Cal. June 10, 2011) 2011 U.S. Dist. LEXIS 62165 ...........................................9

Spokeo, Inc. v. Robins,
    (2016) 578 U.S. 330.........................................................................................8

St. Alphonsus Medical Center-Nampa Inc. v. St. Luke's Health System, Ltd.,
    (9th Cir. 2015) 778 F.3d 775 ..........................................................................5, 18

Tundra, Inc. v. Faire Wholesale, Inc.,
    (N.D. Cal. Feb. 13, 2024) 2024 U.S. Dist. LEXIS 25166 ....................................12, 20

United States v. Anthem, Inc.,
    (D.C. Cir. 2017) 855 F.3d 345 .................................................................4, 11, 18

United States v. Oracle Corp.,
    (N.D. Cal. 2004) 331 F. Supp. 2d 1098 .................................................................12

United States v. Pabst Brewing Co.,
    (1966) 384 U.S. 546.............................................................................2, 3, 4, 5, 6, 7

United States v. Philadelphia National Bank,
    (1963) 374 U.S. 321.......................................................................................3, 6, 7

United States v. Radio Corporation of America,
    (1959) 358 U.S. 334..........................................................................................6

# OTHER AUTHORITIES

Adam Smith, *An Inquiry into the Nature and Causes of the Wealth of Nations* (R.H. Campbell & A.S. Skinner eds., University of Chicago Press 1976) (1776) ..........................................19

Fed. R. Civ. P. 12……………………………………………………………………*passim*

15 U.S.C. § 18...........................................................................................................15, 16

15 U.S.C. § 26...........................................................................................................10, 19

15 U.S.C. § 1801............................................................................................................11

## I.    INTRODUCTION

Defendants' motion asks this Court to dismiss the case based on facts Defendants prefer, rather than on the Complaint Plaintiffs filed. That is not a Rule 12(b)(6) motion. The question is not whether Defendants can later prove broader markets, sufficient substitutes, offsetting efficiencies, or a benign account of consolidation. The question is whether the Complaint plausibly alleges that Defendants' acquisitions may substantially lessen competition. It does.

Plaintiffs allege that Defendants have eliminated one competitor in premium video production and now seek to further eliminate another independent competitor in premium video distribution, national television news, and theatrical distribution. Compl. ¶¶ 1-5, 85-118. Plaintiffs are consumers in those affected markets. They purchase and consume streaming services, live-TV packages, national television news, theatrical films, and related premium video products. Compl. ¶¶ 24-46. They allege concrete injury from higher prices, reduced output, diminished quality, fewer independent sources of premium programming, reduced content variety, reduced consumer choice, and the loss of independent platform and editorial decision-making. *Id.*

Defendants cannot defeat those allegations at this stage by contesting them. Their motion repeatedly asks the Court to credit Defendants' factual narrative about market boundaries, remaining competition, regulatory proceedings, scale, integration, and supposed consumer benefits. Those are merits disputes. At the pleading stage, the Complaint controls.

In sum, Plaintiffs plausibly allege affected markets, consumer participation, threatened injury, competing services and assets, market-structure facts, and the mechanism by which the challenged acquisitions threaten competition.

## II.    LEGAL ARGUMENT

### A. *Pabst* Remains Binding and Controls Defendants' Attempt to Demand Precise Market Proof at the Pleading Stage.

Defendants' Section 7 argument depends on demoting binding Supreme Court precedent. They ask the Court to treat *Brown Shoe*, *Von's Grocery*, and *Pabst* as relics that can be displaced

by later evidentiary merger cases and generalized references to modern economic analysis. That is not how lower courts apply Supreme Court precedent. *United States v. Pabst Brewing Co.*, 384 U.S. 546 (1966), remains binding. Under *Pabst*, Plaintiffs' allegations are more than enough to survive a Rule 12(b)(6) motion to dismiss.

Section 7 is concerned with "probabilities, not certainties." *Brown Shoe Co. v. United States*, 370 U.S. 294, 323 (1962). Its purpose is to arrest anticompetitive tendencies "in their incipiency." *United States v. Philadelphia National Bank*, 374 U.S. 321, 362 (1963). A plaintiff, therefore, need not wait until prices have increased, output has fallen, consumer choice has disappeared, or independent competition has already been eliminated. Section 7 exists to stop acquisitions before the injury to competition becomes an accomplished fact.

The Supreme Court applied that principle in *Pabst*. There, the district court dismissed the government's Section 7 case after concluding that the government had not adequately proved an economic or geographic market. The Supreme Court reversed. It held that Section 7 reaches a merger whose effect may substantially lessen competition "anywhere in the United States," and that proof of the precise section of the country is "entirely subsidiary" to the core question whether competition may be lessened. *Pabst*, 384 U.S. at 549-50. The Supreme Court also rejected dismissal based on the asserted failure to prove market boundaries through extensive expert testimony, explaining that the government's failure to prove market boundaries "by an army of expert witnesses" was not an adequate ground to dismiss a Section 7 case. *Id.* at 549.

*Pabst* also defeats Defendants' suggestion that Section 7 requires monopoly-level shares, HHI calculations, or exact market shares before the Court may act. Pabst was the tenth-largest brewer, Blatz was the eighteenth-largest brewer, and the merger gave Pabst only 4.49% of national beer sales. *Id.* at 550. The Supreme Court still held the transaction within Section 7 because it contributed to concentration and eliminated independent competition. *Id.* at 550-53. The Supreme Court explained that "a trend toward concentration in an industry, whatever its causes, is a *highly relevant factor*" under Section 7. *Id.* at 553 (emphasis supplied).

This case presents the same Section 7 danger, with more concrete market facts. As shown

below, the Complaint alleges competing assets, affected markets, consumer injury, market-structure facts, and a concentration trend: one newly consolidated media company seeking to absorb another major independent competitor. Compl. ¶¶ 18, 20, 93-98, 103-106, 117-118. It also alleges reduced choice, reduced output, reduced quality, loss of independent decision-making, and increased leverage over consumers and market participants. Compl. ¶¶ 24-46, 85-98, 99-106, 109-118, 119-128. Under *Pabst*, that is more than enough for the Complaint to survive a motion to dismiss.

Defendants' cases do not hold otherwise. *Hospital Corp. of America v. FTC*, 807 F.2d 1381 (7th Cir. 1986), does not authorize lower courts to disregard the 1960s Supreme Court decisions. It says the opposite. Judge Posner recognized that *Brown Shoe*, *Von's Grocery*, and *Pabst* treated "the elimination of a significant rival" as implicating Section 7's incipiency standard, and then stated: "None of these decisions has been overruled." *Id.* at 1385. *Hospital Corp.* also confirms that Section 7 "does not require proof that a merger or other acquisition has caused higher prices in the affected market" and that "[a]ll that is necessary is that the merger create an appreciable danger of such consequences in the future." *Id.* at 1389.

*United States v. Anthem, Inc.*, 855 F.3d 345 (D.C. Cir. 2017), reinforces the same lower-court obligation. The D.C. Circuit rejected an effort to disregard Supreme Court merger precedent based on assertions that antitrust law had moved in a more modern direction. It explained that it is "not a lower court's role to ignore on-point precedent so as to adhere to what might someday become Supreme Court precedent." *Id.* at 354. The same rule controls here.

Nor do the 1982 Merger Guidelines displace Supreme Court precedent. Former FTC Chairman Timothy J. Muris explained the point directly: "The [Merger] Guidelines lack the force of law. They formally bind no one – not the courts, not other countries, not even the Department of Justice." Timothy J. Muris, Former Chairman of the Federal Trade Commission, "On the Occasion of the Celebration of the Twentieth Anniversary of the 1982 Merger Guidelines, United States Department of Justice" (June 10, 2002). Plaintiffs do not dispute that market shares, HHI calculations, and economic evidence may be relevant. They dispute

Defendants' premise that those tools override *Pabst* or erase Section 7's incipiency command.

Defendants' remaining authorities are distinguishable. *DeMartini v. Microsoft Corp.*, 662 F. Supp. 3d 1055, 1064-65 (N.D. Cal. 2023), rejected a bare theory that the "elimination of a rival" alone was enough. Plaintiffs do not rely on that theory alone. They allege affected markets, competing assets, consumer injury, market-structure facts, concentration trends, and concrete mechanisms of injury to competition. *Malaney v. UAL Corp.*, 2010 U.S. Dist. LEXIS 106049 (N.D. Cal. Sept. 27, 2010), is distinguishable because the court did not analyze competition among airlines generally, but instead evaluated the alleged market through demand-side substitution for particular city-pair destinations. Neither case overruled *Pabst*.

*St. Alphonsus Medical Center-Nampa Inc. v. St. Luke's Health System, Ltd.*, 778 F.3d 775 (9th Cir. 2015), supports Plaintiffs, not Defendants. It repeats that Section 7 "focuses on probabilities, not certainties," and that the statute is designed to arrest anticompetitive tendencies "in their incipiency." *Id.* at 783. It also explains that market-share and concentration statistics, while significant, "are not conclusive indicators of anticompetitive effects," and that plaintiffs may generally present "other evidence" as part of the prima facie case. *Id.* at 785. That is exactly what Plaintiffs do here.

*Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480 (5th Cir. 1984), also does not help Defendants. It was a summary-judgment case after discovery involving Holiday Inn's acquisition of a hotel where Holiday Inn owned only about 4% of downtown New Orleans hotel rooms. *Id.* at 484. The Fifth Circuit held that the plaintiff failed to show the acquisition threatened competition. *Id.* at 492-93. However, *Domed Stadium* recognized that a Section 7 plaintiff may proceed by showing either concentration statistics or "other characteristics of the market" making the acquisition injurious. *Id.* at 492. It also discussed *Pabst* favorably as an example showing that low national share does not end the Section 7 inquiry where concentration trends and market structure make the acquisition competitively significant. *Id.* at 492-93.

*California v. Sutter Health System*, 130 F. Supp. 2d 1109 (N.D. Cal. 2001), was a hospital-merger preliminary-injunction decision after an evidentiary hearing involving local

geographic market proof and a failing-company defense. It did not overrule *Pabst*. It applied Section 7's incipiency rule, explaining that "all that is necessary under § 7 is that the merger create an appreciable danger of anticompetitive consequences in the future." *Id.* at 1118. *FTC v. Laboratory Corp. of America*, 2011 U.S. Dist. LEXIS 29144 (C.D. Cal. Feb. 25, 2011), was an injunction-pending-appeal order after denial of preliminary relief. *FTC v. Microsoft Corp.*, 681 F. Supp. 3d 1069 (N.D. Cal. 2023), and *FTC v. Microsoft Corp.*, 136 F.4th 954 (9th Cir. 2025), were vertical-merger preliminary-injunction decisions after extensive evidentiary proceedings. Those cases do not permit this Court to disregard *Pabst* or dismiss a complaint that plausibly alleges the threatened loss of non-trivial independent competition.

Recent media-merger decisions confirm the point. In *DIRECTV, LLC v. Nexstar Media Group, Inc.*, 2026 U.S. Dist. LEXIS 66737 (E.D. Cal. Mar. 27, 2026), and *In re Nexstar-TEGNA Merger Litigation*, 2026 U.S. Dist. LEXIS 85526 (E.D. Cal. Apr. 17, 2026), the district court applied modern Section 7 doctrine while relying on *Brown Shoe* and *Philadelphia National Bank*'s incipiency principles. The district court credited evidence that common ownership of competing media assets would increase bargaining leverage, raise consumer prices, reduce output, reduce quality, and make later relief difficult. *DIRECTV*, 2026 U.S. Dist. LEXIS 66737, at *13-*24; *In re Nexstar-TEGNA Merger Litigation*, 2026 U.S. Dist. LEXIS 85526, at *22-*66. The district court also rejected the argument that regulatory clearance displaced antitrust review, relying on *United States v. Radio Corporation of America*, 358 U.S. 334, 346 (1959), for the rule that FCC action does not decide antitrust issues or prevent federal-court enforcement. *In re Nexstar-TEGNA Merger Litigation*, 2026 U.S. Dist. LEXIS 85526, at *65-*77.

The same principle matters here. Defendants rely on FCC clearance, arguing that the FCC conducted a "competitive analysis," found the Skydance-Paramount merger would "serve the public interest, convenience, and necessity," and "concluded that the merger posed no threat to the public interest." Mot. at 3. That argument does not support dismissal. Federal clearance is not a judgment on Plaintiffs' Clayton Act claim, not a Rule 12 defense, and not a substitute for the Court's independent application of Section 7.

A recent Wall Street Journal report underscores the limited point that DOJ non-enforcement is not a judicial determination of Section 7 compliance. The article reported that career Antitrust Division staff investigating Paramount's acquisition of Warner Bros. Discovery were leaning toward recommending a challenge before senior leadership closed the investigation, and that the investigative staff did not participate in drafting the DOJ's public statement supporting the deal. Dave Michaels, Dana Mattioli, Sadie Gurman & Jessica Toonkel, *Justice Department Decision to Allow Paramount Deal Surprised Staff Investigators*, Wall Street Journal (June 15, 2026). Plaintiffs do not ask the Court to decide this motion based on that article. The point is narrower: Defendants cannot convert an executive-branch non-enforcement decision into an adjudication of Plaintiffs' statutory claim.

In sum, Defendants ask the Court to disregard binding precedent and now dismiss based on agency clearance, preferred factual inferences, and extra-complaint assurances about the transaction's competitive effects. Section 7 does not permit that shortcut. *Brown Shoe*, *Philadelphia National Bank*, *Von's Grocery*, and *Pabst* all point in the same direction: courts apply Section 7 independently and evaluate threatened anticompetitive consolidation before the market has already been reshaped. The motion should therefore be denied.

## B. Rule 12 Does Not Permit Defendants to Defeat the Complaint with Factual Counter-Narratives.

A motion to dismiss tests the sufficiency of the Complaint, not the ultimate truth of the allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court must accept well-pleaded factual allegations as true and draw reasonable inferences in Plaintiffs' favor. *Newcal Industries, Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1043 n.2, 1045 (9th Cir. 2008). That limitation is especially important in antitrust cases because market definition, competitive effects, entry, repositioning, efficiencies, and substitution are fact-intensive issues. *Id.* at 1045; *see also Berlyn, Inc. v. Gazette Newspapers, Inc.*, 157 F. Supp. 2d 609, 624-25 (D. Md. 2001) (market allegations sufficient at pleading stage because market definition is fact-intensive and should await discovery).

Defendants cannot rely on materials outside the Complaint to disprove the pleaded markets, injuries, or competitive effects. Rule 12(d) requires exclusion, or conversion into a Rule 56 motion with discovery, when matters outside the pleadings are considered, and conversion is discretionary, not automatic. Fed. R. Civ. P. 12(d); *Adobe Systems Inc. v. Blue Source Group, Inc.*, 125 F. Supp. 3d 945, 968 (N.D. Cal. 2015). Nor may Defendants obtain dismissal by substituting their own factual version of the marketplace for the allegations pleaded.

Defendants' motion repeatedly asks the Court to cross that line. It asks the Court to accept that the Warner Bros. Discovery acquisition will "increase consumers' access" to content, that remaining content producers or news outlets will discipline Defendants, that FCC proceedings negate antitrust injury, and that asserted integration benefits outweigh the loss of independent competition. Those arguments depend on extra-complaint factual assertions and should not be considered on a Rule 12(b)(6) motion. If Defendants believe discovery will show broader markets, adequate remaining competition, offsetting efficiencies, or no threatened consumer injury, those arguments can be developed later. They are not grounds for dismissal.

### C. Plaintiffs Plausibly Allege Article III Standing and Antitrust Injury.

1. Plaintiffs plead concrete and particularized injury.

Plaintiffs allege direct consumer participation in the affected markets. They purchase and consume filmed entertainment and news programming through streaming subscriptions, cable or live TV packages, per-title digital rentals, premium rentals, and theatrical exhibition. Compl. ¶ 24. They are not asserting a generalized grievance but are purchasers and consumers who personally receive less value when competition is reduced through higher prices, reduced output, narrowed content choice, reduced promotional availability, diminished news quality, and fewer independent sources of premium programming. Compl. ¶ 25.

That is concrete and particularized injury. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339-41 (2016), requires injury that affects plaintiffs in a personal and individual way and is concrete, but an injury need not be tangible or already fully realized to confer standing. Plaintiffs allege monetary injury as to Paramount+ subscribers and threatened injury as to ongoing and future

purchases. Compl. ¶¶ 26-46. Defendants' standing authorities do not require Plaintiffs to prove their injury at the pleading stage. *Fry v. Capital One Financial Corp.*, 2025 U.S. Dist. LEXIS 92288 (N.D. Cal. May 14, 2025), does not address the Complaint now before the Court; *Fry* denied preliminary relief where plaintiffs relied on general allegations rather than a developed showing. *Shaterian v. Wells Fargo Bank*, N.A., 2011 U.S. Dist. LEXIS 62165 (N.D. Cal. June 10, 2011), was a real property foreclosure case involving unsupported allegations of loan modification, not a Section 7 merger challenge by consumers alleging overcharges and a threatened loss of competition.

For the completed Skydance-Paramount transaction, Plaintiffs Marazzo, Rubinsohn, and Talewsky allege that they are current Paramount+ subscribers, that Paramount implemented a price increase effective January 15, 2026, after the acquisition was consummated, and that each paid the increased amount. Compl. ¶¶ 28-29. That out-of-pocket overcharge is a concrete economic injury. Plaintiffs Faust and McCarthy allege that they purchased streaming services, would consider Paramount+ at competitive prices and terms, and were deterred by the post-acquisition price increase and reduction in consumer-friendly promotional mechanisms. Compl. ¶¶ 30-31, 38-39. Defendants' argument that Faust and McCarthy are not current Paramount+ subscribers misses the point. They allege injury as streaming consumers who would consider purchasing Paramount+ at competitive prices and terms, and who were dissuaded from doing so by Paramount's price increase.

For the pending Paramount-Warner Bros. Discovery transaction, Plaintiffs allege imminent threatened injury because the transaction would eliminate Warner Bros. Discovery as an independent competitor and further concentrate control over premium programming and nationally significant news assets, diminishing consumer choice and increasing the combined firm's ability and incentive to worsen consumer-facing terms, reduce output and variety, and degrade non-price competition. Compl. ¶¶ 40, 44-46, 93-98, 105-106, 117-118.

    2. <u>Plaintiffs plead traceability and redressability</u>.

Plaintiffs allege that their injuries are fairly traceable to the challenged transactions.

Compl. ¶¶ 43-45. For the completed transaction, the Complaint alleges that Skydance's acquisition of Paramount eliminated an independent producer and increased Paramount's ability and incentive to raise consumer prices and worsen consumer-facing terms, as evidenced by the post-acquisition Paramount+ price increases. Compl. ¶¶ 28-31, 43, 90-91, 124-126. For the pending transaction, the Complaint alleges that Paramount's acquisition of Warner Bros. Discovery would consolidate ownership and control over premium video programming assets and nationally significant news properties, increasing the ability and incentive to raise prices, reduce output, eliminate consumer choice, and diminish independent editorial rivalry. Compl. ¶¶ 40, 44-46, 93-98, 103-106, 117-118, 127-128.

Plaintiffs also allege redressability. Treble damages would compensate Marazzo, Rubinsohn, and Talewsky for overcharges paid after the Paramount+ price increase. Compl. ¶ 46. Divestiture would restore independent competitive decision-making between Skydance and Paramount and reduce the continuing effects of the completed acquisition. *Id.* An injunction prohibiting Paramount's acquisition of Warner Bros. Discovery would prevent further consolidation before it occurs and preserve Warner Bros. Discovery as an independent competitor. *Id.*; *see also* 15 U.S.C. § 26.

> 3. Plaintiffs plead antitrust injury.

Antitrust injury is injury of the type the antitrust laws were intended to prevent and that flows from that which makes the challenged conduct unlawful. *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 113 (1986). Plaintiffs allege exactly that: consumer overcharges, reduced output, reduced quality, reduced content variety, diminished promotional availability, fewer independent sources of premium programming, the elimination of choice, and loss of independent rivalry in markets where Plaintiffs purchase or consume products. Compl. ¶¶ 24-46, 85-98, 99-106, 109-118.

Defendants argue that injuries involving breadth of coverage, editorial independence, and news quality are not antitrust injuries. That argument is too broad. Congress has recognized that competition in media markets is not limited to commercial pricing or output. The Newspaper

Preservation Act declares that, "[i]n the public interest of maintaining a newspaper press editorially and reportorially independent and competitive in all parts of the United States," federal policy preserves newspaper publication where joint operating arrangements are necessary because of economic distress. 15 U.S.C. § 1801. Congress thus treated editorial and reportorial independence as interests distinct from, and protected alongside, commercial competition. The same point is relevant here: injuries to the independence, quality, and variety of news coverage are cognizable competitive injuries, not merely abstract editorial preferences. The Complaint does not ask the Court to regulate editorial viewpoint or prefer one viewpoint over another. It alleges reduced quality, output, editorial independence, investigative investment, and breadth of competing news products as non-price dimensions of competition. Compl. ¶¶ 8, 15-16, 32-33, 99-106. Antitrust law protects non-price competition, including quality, variety, and innovation. *Brown Shoe*, 370 U.S. at 320-23; *Anthem*, 855 F.3d at 366-67. In media markets, the quality and independence of news programming are competitive dimensions that consumers purchase and value. Compl. ¶¶ 32-33, 99-104.

Defendants' cited antitrust injury cases do not require dismissal. *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192 (9th Cir. 2012), was a rule-of-reason Sherman Act challenge to vertical channel bundling and was dismissed because the plaintiffs alleged consumer dissatisfaction with bundles but did not plead injury to competition. Plaintiffs here allege structural injury arising from acquisitions that eliminate independent rivalry and threaten competition in price, output, quality, variety, and platform competition. *FTC v. Qualcomm Inc.*, 969 F.3d 974 (9th Cir. 2020), involved unilateral patent-licensing and modem-chip practices, not a Section 7 merger; Plaintiffs' alleged injury occurs in the same consumer-facing markets where competition is alleged to be restrained. *Anthem* confirms that consumer welfare includes product variety, quality, innovation, and competitive choice, not price alone. *Anthem*, 855 F.3d at 366-67.

Defendants also mischaracterize the Plaintiffs' theatrical-distribution injury. Plaintiffs need not be movie theaters or theatrical distributors to have standing. They are downstream consumers of theatrical films. The Complaint alleges that they routinely attend theatrical motion

pictures, intend to continue doing so, and will face fewer independent theatrical-distribution decision-makers, fewer competing release slates, reduced genre and budget variety, and fewer meaningful theatrical choices if Paramount acquires Warner Bros. Discovery. Compl. ¶¶ 41-42. Plaintiffs need not identify the next specific Paramount or Warner Bros. film they will attend; they allege regular participation in the market and threatened loss of competitive choice in the theatrical films available to them. Defendants' argument conflates the level at which competition is restrained with the level at which consumer injury is felt.

### D. The Complaint Plausibly Alleges Relevant Markets.

#### 1. Market definition is a factual issue.

A relevant market must include products reasonably interchangeable by consumers for the same purposes. *Brown Shoe*, 370 U.S. at 325. However, *Newcal* confirms that there is no requirement that market definition be pleaded with evidentiary specificity and that a complaint survives unless the market definition is facially defective. *Newcal*, 513 F.3d at 1045. Market definition is typically a factual issue subject to discovery and factual testing. *Id.*

Defendants' market-definition cases involved markets that were facially defective or were rejected after evidentiary development. *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109 (9th Cir. 2018), rejected advertising markets limited to professional-golf endorsements and "in-play" golf advertising because the Complaint excluded obvious substitute ways to reach golf audiences. *Tundra, Inc. v. Faire Wholesale, Inc.*, 2024 U.S. Dist. LEXIS 25166 (N.D. Cal. Feb. 13, 2024), dismissed a market narrowed by undefined terms such as "local," "new," and "emerging." *hiQ Labs, Inc. v. LinkedIn Corp.*, 485 F. Supp. 3d 1137 (N.D. Cal. 2020), involved a vague "people analytics" market and unilateral refusal-to-deal theories. *Coronavirus Reporter v. Apple, Inc.*, 85 F.4th 948 (9th Cir. 2023), involved an app-distribution challenge, not a Section 7 merger between competing media assets. *Oracle* was a post-trial decision rejecting a government software market after extensive evidence; it did not impose a trial burden on a Rule 12(b)(6) motion. *United States v. Oracle Corp.*, 331 F. Supp. 2d 1098 (N.D. Cal. 2004).

Accordingly, Defendants' argument that the markets should be broader, narrower, or

differently labeled is not enough for dismissal under 12(b)(6). They must show that the markets alleged are facially unsustainable as a matter of law based on the Complaint itself. They cannot do so.

2.  The Complaint plausibly alleges a Premium Video Distribution Market.

The Complaint plausibly alleges a Premium Video Distribution Market. It identifies the products in the market: subscription streaming services, cable television, and related offerings that provide professionally produced, high-budget, long-form entertainment. Compl. ¶¶ 85-86. It explains why short-form user-generated content, social-media video, and other non-premium entertainment are not reasonably interchangeable substitutes for marquee releases, franchise installments, premium series, and comparable long-form programming. Compl. ¶ 87. It alleges the dimensions on which firms compete, including subscription prices, tiers, consumer-facing terms, content libraries, release cadence, and availability windows. Compl. ¶ 88. And it alleges a national market because the services are marketed, priced, licensed, and offered on a U.S. basis. Compl. ¶ 89.

Unlike the artificial markets rejected in Defendants' cases, the Complaint does not rely on vague adjectives alone or omit obvious substitutes without explanation. Defendants can argue for a broader market after discovery. They cannot obtain dismissal by insisting that their preferred market is the only permissible one.

The Complaint also pleads market facts showing why the Paramount-Warner Bros. Discovery transaction matters. Warner Bros. Discovery and Paramount are meaningful independent competitors in premium video distribution. Compl. ¶ 94. Their pre-transaction U.S. streaming revenues were approximately $10.3 billion and $7.6 billion, respectively. *Id.*

Combining Paramount+ and Warner Bros. Discovery's streaming businesses would create a service with approximately $17.9 billion in U.S. streaming revenue and eliminate direct rivalry between previously independent services. Compl. ¶ 95. Subscriber data likewise shows both firms are substantial competitors: HBO Max had approximately 128 million subscribers, and Paramount+ had approximately 79.1 million subscribers. Compl. ¶ 96. The combined service

would have approximately 207.1 million subscribers, leaving consumers with fewer independent premium-video alternatives at scale. Compl. ¶ 97.

### 3. The Complaint plausibly alleges a National Television News Market.

The Complaint alleges a National TV News Market for the production and distribution of national television news programming to U.S. consumers across broadcast, cable, and streaming channels. Compl. ¶¶ 99-102. It alleges that consumers choose among major national news brands based on credibility and editorial independence, and that those brands impose competitive and reputational constraints on one another on non-price dimensions, including investigative investment, breadth of coverage, editorial independence, and quality. Compl. ¶ 101. It alleges a national geographic market because distribution, branding, advertising, and competitive effects are nationwide. Compl. ¶ 102.

Defendants' argument that consumers can obtain news from newspapers, social media, radio, or local outlets is a factual substitution argument. The Complaint alleges why the market is national television news and why other sources are not reasonably interchangeable substitutes for the product consumers purchase in cable, satellite, and streaming pay-TV packages. Compl. ¶¶ 99-102. Defendants may test that allegation in discovery.

### 4. The Complaint plausibly alleges a Theatrical Distribution Market.

The Complaint alleges a Theatrical Distribution Market for the production and distribution of theatrical films for U.S. moviegoers. Compl. ¶¶ 109-112. It alleges that theatrical distribution is distinct from home viewing because theatrical films involve different release windows, consumer experiences, exhibition channels, and competitive constraints. Compl. ¶¶ 109-112. Plaintiffs allege they are routine theatrical moviegoers, intend to continue attending theatrical motion pictures, and will face fewer independent theatrical distribution decision-makers, fewer competing release slates, reduced genre and budget variety, and fewer meaningful alternatives at local theaters if Paramount acquires Warner Bros. Discovery. Compl. ¶¶ 41-42.

The Complaint also alleges market-structure facts. Warner Bros. and Paramount generated approximately $25.54 billion and $19.32 billion in total domestic box-office revenue,

**PLAINTIFFS' OPP TO DEFENDANTS' MOT TO DISMISS**         **CASE NO. 4:26-cv-03790-AMO**

respectively, over the measured period from 1997 to 2026. Compl. ¶ 117. Combining them would yield approximately $44.86 billion in domestic box-office revenues, making the combined firm the leading theatrical studio and increasing leverage over release slates, premium screens, and exhibition terms. Compl. ¶ 118.

### E. The Complaint Plausibly Alleges That the Acquisitions May Substantially Lessen Competition.

1. Section 7 requires probable threatened injury, not certainty.

As explained above, Section 7 prohibits acquisitions where the effect "may be substantially to lessen competition." 15 U.S.C. § 18. Defendants' "mere elimination of a rival" argument fails because Plaintiffs do not rely on a bare elimination theory. Defendants' authorities on the elimination of a rival and Section 7 plausibility are distinguishable. *Aurora Astro Products LLC v. Celestron Acquisition, LLC*, 691 F. Supp. 3d 1132 (N.D. Cal. 2023), dismissed only one Section 7 theory directed at a 2005 acquisition where the plaintiffs failed to connect that acquisition to an appreciable danger of anticompetitive effects; Plaintiffs here plead markets, consumer injury, competing services, revenue, subscriber facts, and the mechanism of injury to competition. *Malaney v. UAL Corp.*, 2010 U.S. Dist. LEXIS 106049 (N.D. Cal. Sept. 27, 2010), was a preliminary injunction decision following an evidentiary record concerning demand-side substitution for particular airline routes and airport-pair destinations, not a Rule 12 dismissal. *DeHoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758 (9th Cir. 2018), turned on a complete divestiture that preserved the relevant U.S. beer-market competitor; Plaintiffs allege no comparable divestiture preserving HBO Max, CNN, Warner Bros., or Warner Bros. Discovery's media assets as independent competitors.

In sum, the Complaint plausibly alleges relevant markets, consumer participation, direct and threatened injury, competing services, revenue and subscriber figures, market-structure facts, transaction timing, and the mechanism of injury to competition through the elimination of consumer choice. Compl. ¶¶ 24-46, 85-98, 99-106, 109-118, 119-128.

2. The Skydance-Paramount merger substantially lessened competition and

increased prices.

The Complaint alleges that Skydance was, before the Paramount acquisition, an independent production company producing high-budget, prestige film and television programming to multiple competing distributors and platforms. Compl. ¶¶ 19, 90. It alleges Skydance produced or financed *Top Gun: Maverick*, *Reacher* for Amazon Prime Video, and *Grace and Frankie* for Netflix. Compl. ¶ 90. Following the acquisition, Skydance Television became part of Paramount Television Studios, and Skydance's film and animation divisions were integrated into Paramount's broader studio portfolio. *Id.*

That matters because Section 7 is not limited to distributors with identical business models. The Complaint alleges that the acquisition eliminated Skydance as an independent rival in packaging, financing, producing, and allocating premium projects, reducing separate greenlight and allocation decisions and diminishing independent sources of premium programming available across competing platforms. Compl. ¶¶ 90-92. Plaintiffs also allege direct consumer injury: after consummation, Paramount announced and implemented price increases for Paramount+ effective January 15, 2026. Compl. ¶¶ 28-31, 91.

Defendants' argument that Skydance did not operate a streaming service before the merger is not dispositive. Section 7 is not limited to acquisitions between firms with identical business models, nor is it defeated by characterizing the transaction as an extension into a new or adjacent area. The statute reaches acquisitions whose effect may be substantially to lessen competition "in any line of commerce." 15 U.S.C. § 18. In *United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 589, 607 (1957), the Supreme Court held that Section 7 reached an acquisition that unlawfully extended du Pont's power into General Motors' requirements for automotive finishes and fabrics, even though du Pont and General Motors were not identical competitors selling the same finished product. The same principle applies here. The Complaint alleges injury from eliminating Skydance as an independent premium-content producer and integrating that producer into Paramount's studio structure. Compl. ¶¶ 19, 43, 90-92. To the extent Defendants characterize the Skydance-Paramount transaction as an extension into a new

area, that label does not defeat the claim. Plaintiffs allege that the transaction reduced independent programming supply, internalized content-allocation decisions that previously occurred outside Paramount, and diminished consumer-facing competitive pressure. Defendants may test those allegations in discovery, not by contradicting them on Rule 12.

3. The elimination of Paramount-Warner Bros. Discovery may substantially lessen competition.

The Complaint's allegations concerning the pending transaction demonstrate that it involves the acquisition of a substantial competitor, leading to increased concentration and the loss of competition. Warner Bros. Discovery owns HBO Max, discovery+, CNN, HBO, TNT, TBS, Warner Bros. Motion Picture Group, Warner Bros. Television Group, New Line Cinema, Cartoon Network, Adult Swim, and related assets. Compl. ¶ 20. Paramount owns Paramount+, CBS, CBS News, CBS Sports, Nickelodeon, MTV, BET, Comedy Central, Showtime, Paramount Pictures, and related assets. Compl. ¶ 18.

The Complaint alleges that Paramount's acquisition of Warner Bros. Discovery would place Warner Bros. Discovery's streaming offerings, premium brands, and content libraries under Paramount's common ownership and control, reducing meaningful alternatives and increasing the combined firm's ability and incentive to raise prices and worsen consumer-facing terms. Compl. ¶ 93. It alleges that Paramount and Warner Bros. Discovery are independent competitors in premium video distribution, with significant U.S. streaming revenue and subscriber bases. Compl. ¶¶ 94-97. It alleges the transaction would further concentrate nationally significant news and entertainment assets. Compl. ¶¶ 103-106. It alleges the transaction would make the combined company the leading theatrical studio by domestic box-office revenue over the measured period, increasing leverage over release slates, premium screens, and exhibition terms. Compl. ¶¶ 117-118.

Defendants' "no economic data" argument ignores those allegations. The Complaint pleads subscriber scale, streaming revenue, asset control, national news concentration, and domestic box-office concentration. Compl. ¶¶ 94-98, 103-106, 117-118. Defendants' Canada

point, complaints about additional competitors, objections to diversified-company metrics, and disputes about the precise treatment of particular services do not create pleading defects. They concern the weight and refinement of market evidence, not whether the Complaint plausibly alleges substantial competitors and increased concentration. The Complaint alleges a U.S. market, and the cited figures plausibly show substantial competing firms and increased concentration at the pleading stage. Compl. ¶¶ 89, 94-98.

### F.  Defendants' Efficiencies and "Scale" Arguments Cannot Defeat the Complaint.

Defendants' claimed scale, efficiencies, and greater content availability are factual defenses. Under Rule 12, the Court cannot credit Defendants' asserted consumer benefits over the Complaint's plausible allegations that consolidation will eliminate independent rivalry, reduce consumer choice, reduce content variety, reduce output, and diminish quality. Compl. ¶¶ 24-46, 85-98, 99-106, 109-118.

Moreover, Defendants' "scale" authorities do not support dismissal. *Anthem*, 855 F.3d at 356-357, affirmed an injunction against a horizontal merger and rejected efficiencies that were not sufficiently merger-specific, verifiable, or likely to offset competitive injury. *St. Alphonsus*, 778 F.3d at 790-92, likewise explains that claimed efficiencies must show that the merger enhances, rather than hinders, competition. *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 580 (1967), held that "possible economies" do not excuse an otherwise unlawful merger. Defendants' claimed scale and integration benefits cannot defeat the Complaint's allegations on a Rule 12 motion.

### G.  Plaintiffs Adequately Plead Their Claims for Relief, and Any Dismissal Should Be with Leave to Amend.

Count I alleges that Skydance's acquisition of Paramount Global is an acquisition within Section 7 and that its effect may be substantially to lessen competition. Compl. ¶¶ 119-126. Plaintiffs allege damages under Section 4 and injunctive relief under Section 16. Compl. ¶¶ 119-126, Prayer ¶¶ A-D.

Count II alleges that Paramount's proposed acquisition of Warner Bros. Discovery is an

acquisition within Section 7 and that its effect may be substantially to lessen competition. Compl. ¶¶ 127-128. Plaintiffs seek an injunction preserving Warner Bros. Discovery as an independent competitor before the transaction closes. Compl. ¶ 46, Prayer ¶¶ E-F.

Those allegations state claims for relief. Defendants' reference to Plaintiffs' and their counsel's participation in other, unrelated cases is not a legal argument and does not establish futility. Each antitrust case turns on its own pleaded facts, markets, alleged injuries, threatened damage, competitive effects, and procedural posture. Congress expressly authorized private parties to seek injunctive relief against threatened antitrust injury, 15 U.S.C. § 26, and the Supreme Court has confirmed that private plaintiffs may seek divestiture where appropriate under Section 16. *California v. American Stores Co.*, 495 U.S. 271, 284-85 (1990). Plaintiffs' and counsel's history of challenging mergers, therefore, does not disqualify them; it reflects the private enforcement role Congress provided and the Supreme Court recognized. Defendants call that "serial" litigation, but the more accurate point is that there have been serial mega-mergers. Adam Smith warned long ago that those who oppose monopolists may face the same kind of personal attack Defendants make here: "neither the most acknowledged probity, nor the highest rank, nor the greatest public services, can protect them from the most infamous abuse and detraction, from personal insults, nor sometimes from real danger, arising from the insolent outrage of furious and disappointed monopolists." Adam Smith, *An Inquiry into the Nature and Causes of the Wealth of Nations*, Book IV, Chapter II, at 494 (R.H. Campbell & A.S. Skinner eds., University of Chicago Press 1976) (1776).

The question here is not whether Plaintiffs and their counsel have challenged other mergers. Plaintiffs have opposed, and will continue to oppose, mega-mergers that threaten competition and injure consumers. The question is whether this Complaint plausibly alleges that these acquisitions may substantially lessen competition in the markets alleged.

At a minimum, if the Court concludes that any allegation requires clarification, leave to amend should be granted. Dismissal with prejudice would be improper where any defect could be cured by amendment, particularly in a complex antitrust case involving fact-intensive market

allegations. *Newcal*, 513 F.3d at 1055. Defendants have not shown that amendment would be futile. Several of the market-definition cases on which Defendants rely were dismissed with leave to amend or involved alleged defects that could be cured by more precise allegations. *See, e.g.*, *Tundra, Inc. v. Faire Wholesale, Inc.*, 2024 U.S. Dist. LEXIS 25166 (N.D. Cal. Feb. 13, 2024); *hiQ Labs, Inc. v. LinkedIn Corp.*, 485 F. Supp. 3d 1137 (N.D. Cal. 2020). If the Court concludes that any alleged market or injury theory requires clarification, the proper remedy is leave to amend, not dismissal with prejudice. *Newcal*, 513 F.3d at 1055.

## III.   CONCLUSION

Defendants' motion should be denied. The Complaint alleges consumer injury, affected markets, independent competitors, increased concentration, and transactions that may substantially lessen competition. Rule 12(b)(6), Section 7, and the controlling Supreme Court precedent require nothing more. At a minimum, Plaintiffs should be granted leave to amend.

DATED: June 17, 2026                    ALIOTO LAW FIRM


                                        __/s/ Joseph M. Alioto_____
                                        Joseph M. Alioto, Esq.
                                        Tatiana V. Wallace, Esq.
                                        Attorneys for Plaintiffs



                                        FOREMAN & BRASSO


                                        _/s/ Ian A. Hansen_____
                                        Ronald D. Foreman, Esq.
                                        Ian A. Hansen, Esq.
                                        Attorneys for Plaintiffs