Joseph M. Alioto, Esq. (SBN 42680)
Tatiana V. Wallace, Esq. (SBN 233939)
**ALIOTO LAW FIRM**
One Sansome Street, 14th Floor
San Francisco, CA 94104
Tel:  (415) 434-8900
Fax: (415) 434-9200
Email:  jmalioto@aliotolaw.com


Ronald D. Foreman, Esq. (SBN 61148)
Ian A. Hansen, Esq. (SBN 255449)
**FOREMAN & BRASSO**
850 Montgomery Street, Suite 300
San Francisco, CA 94133
Telephone:  (415) 433-3475
Facsimile:  (415) 781-8030
Email:  foremanandbrasso@foremanandbrasso.com

Attorneys for Plaintiffs Pamela Faust, Len Marazzo, Lisa McCarthy, Deborah Rubinsohn, and Gary Talewsky

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAMELA FAUST, LEN MARAZZO, LISA McCARTHY, DEBORAH RUBINSOHN, and GARY TALEWSKY,<br><br>    Plaintiffs,<br>vs.<br><br>PARAMOUNT SKYDANCE CORPORATION (formerly Paramount Global), and SKYDANCE MEDIA, LLC,<br><br>    Defendants. | Case No. 4:26-CV-03790-AMO<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:        July 16, 2026<br>Time:       2:00 p.m.<br>Judge:      Judge Araceli Martínez-Olguín<br>Courtroom: 10 |

**TABLE OF CONTENTS**

I. INTRODUCTION ...................................................................................................2

II. ARGUMENT .........................................................................................................3

    A.  Defendants' Own Evidence Identifies the Relevant DTC Market..........................3

    B.  Plaintiffs Are Consumers in the Market Defendants Identify ...............................5

    C.   Defendants' Own Evidence Shows Imminence.......................................................6

    D.  Defendants Admit They Will Combine Paramount+ and HBO Max......................7

    E.  The Combination Threatens Reduced Choice, Reduced
        Output, and Loss of Independent Streaming Competition.....................................10

    F.  Defendants' Scale, Output, and Efficiency Arguments Do
        Not Answer Section 7 ...........................................................................................12

    G.  The Balance of Equities, Public Interest, and Bond Favor
        Preserving Streaming Competition........................................................................15

III.  CONCLUSION....................................................................................................16

# TABLE OF AUTHORITIES

Beacon Theatres, Inc. v. Westover,
    (1959) 359 U.S. 500.................................................................................6

Berlyn, Inc. v. Gazette Newspapers, Inc.,
    (D. Md. 2001) 157 F. Supp. 2d 609.......................................................3, 5

Connecticut General Life Insurance Co. v. New Images of Beverly Hills,
    (9th Cir. 2003) 321 F.3d 878. ...........................................................15, 16

FTC v. Procter & Gamble Co.,
    (1967) 386 U.S. 568...............................................................................12

Hospital Corp. of America v. FTC,
    (7th Cir. 1986) 807 F.2d 1381 ...............................................................13

*In re Nexstar-TEGNA Merger Litigation*, No. 2:26-cv-00976-TLN-CKD,
    (E.D. Cal. Apr. 17, 2026)2026 U.S. Dist. LEXIS 85526 ........................2, 3

Spokeo, Inc. v. Robins,
    (2016) 578 U.S. 330.................................................................................5

St. Alphonsus Medical Center-Nampa Inc. v. St. Luke's Health System, Ltd.,
    (9th Cir. 2015) 778 F.3d 775 ...........................................................12, 13

Times-Picayune Publishing Co. v. United States,
    (1953) 345 U.S. 594.................................................................................4

United States v. Pabst Brewing Co.,
    (1966) 384 U.S. 546.......................................................................8, 9, 10

United States v. Philadelphia National Bank,
    (1963) 374 U.S. 321.............................................................................2, 12

# OTHER AUTHORITIES

Federal Rule of Evidence 801................................................................14

15 U.S.C. § 18 .......................................................................................2

15 U.S.C. § 26 .......................................................................................6

## I.    INTRODUCTION

This case calls for immediate interim relief. Defendants ask the Court to allow two profitable, multi-billion-dollar competitors in the direct-to-consumer streaming market to combine now, before the legality of the transaction can be adjudicated on the merits. They do not claim that either company is failing. They do not claim that either company cannot continue competing absent the transaction. Their justification is instead that the combined firm will gain greater "scale" to compete against larger firms. That is not a defense to Section 7. It is the danger Section 7 was enacted to prevent.

Section 7 prohibits acquisitions whose effect "may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. *United States v. Philadelphia National Bank*, 374 U.S. 321 (1963), rejected the argument that competitors may merge because larger size will make them more effective rivals to other large firms. If one set of competitors merges to gain "scale," the next competitors may do the same, and the market will move step by step toward the concentration Section 7 forbids. The Clayton Act does not require courts to wait for that process to unfold. It authorizes intervention before the anticompetitive structure is created.

The violation is imminent. The transaction is approximately $110 billion, larger than any prior media merger. Defendants seek to combine content, subscribers, revenue, and platforms to make the merged firm larger and more powerful. In other words, they seek the very scale-driven consolidation that *Philadelphia National Bank* warned would tend toward monopoly.

In *In re Nexstar-TEGNA Merger Litigation*, No. 2:26-cv-00976-TLN-CKD, 2026 U.S. Dist. LEXIS 85526 (E.D. Cal. Apr. 17, 2026), the Eastern District of California entered a preliminary injunction to preserve the status quo and prevent further integration pending adjudication on the merits. The court held that a likely substantial lessening of competition constitutes irreparable harm, and that integration itself creates immediate injury by altering the competitive structure and making later relief more difficult.

The same reasoning applies here. Defendants should not be permitted to close first, integrate next, and litigate later. Once the transaction is consummated, the market will be altered,

assets and operations will begin to combine, customers and competitors will adjust, and the Court will be left trying to restore competition after the eggs have already been scrambled. Defendants do not contend they must merge now to survive. They simply want to become larger.

At a minimum, the Court should enter a short preliminary injunction preserving the status quo, permit expedited discovery, and set a prompt merits hearing. That process can be completed within a month or two, just as *In re Nexstar-TEGNA* Merger Litigation demonstrates. A brief injunction imposes little prejudice on profitable companies that can continue competing as they do today. Denying relief, however, would allow Defendants to accomplish the very consolidation Section 7 prohibits before the Court can determine whether the merger is lawful.

## II.    ARGUMENT

### A.    Defendants' Own Evidence Identifies the Relevant DTC Market.

Defendants fault Plaintiffs' market definition; however, Defendants' own materials identify the same commercial marketplace. Paramount, Warner Bros. Discovery, and Defendants' transaction materials repeatedly describe the relevant market as "direct-to-consumer" or "DTC" streaming, and they identify Paramount+ and HBO Max as the services to be combined. Plaintiffs refer to this same relevant marketplace as "premium video distribution." The label does not matter for present purposes. The relevant economic market is the market for premium DTC streaming video services sold to consumers through subscription, advertising-supported, and hybrid models. The commercial reality is that Paramount+ and HBO Max compete for streaming consumers through price, content, quality, user experience, advertising, engagement, and retention.

That is enough at this stage. *Berlyn, Inc. v. Gazette Newspapers, Inc.*, 157 F. Supp. 2d 609 (D. Md. 2001), a case on which Defendants rely in their opposition, explains that a relevant product market identifies "the products that compete with each other," as measured by "the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Id.* at 616. *Berlyn* also recognizes that an industry's "own characterization

of the products involved" is useful in determining the scope of the relevant market. *Id.* at 617 (*quoting Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 612 n.31 (1953)).

The same reasoning applies here. Defendants' own market-facing materials do not treat Paramount+, HBO Max, DTC streaming revenue, streaming subscribers, streaming platform consolidation, or streaming technology stacks as incidental corporate labels. Paramount's May 4, 2026, shareholder letter identifies "Direct-to-Consumer" as one of Paramount's three business segments, along with Studios and TV Media. Goldberg Decl., Ex. 4 at 6. The same letter reports that "DTC revenue" grew 11% year-over-year to $2.4 billion, "led by 17% growth at Paramount+," and that Paramount continued to expect "accelerating DTC revenue and profit in 2026." *Id.* at 5. It also states that Paramount is "converging our streaming tech stack" to deliver a "more personalized, unified experience" and improve "discovery and monetization." *Id.*

Defendants' transaction materials use the same market vocabulary. They describe the transaction as creating "a premier direct-to-consumer platform" and state that "[t]he combination of Paramount+, HBO Max and Pluto creates a highly competitive DTC business." Goldberg Decl., Ex. 2 at 9; Brandon-Gordon Decl., Ex. 2 at 9. Defendants' opposition likewise states that the merger "will combine the content in Paramount's Paramount+ and Warner Bros.' HBO Max" to create a "single platform," and that both streaming services currently "lack that scale, in terms of subscriber base, revenues, and content." Opp. at 5.

Ellison made the point even more directly on Paramount Skydance's March 2, 2026, M&A call. When asked about "DTC" and whether Paramount expected "to eventually combine those 2 services into 1 service," he answered that Paramount "do[es] plan to put the 2 services together," which would give the company "a little over 200 million direct-to-consumer subscribers." Goldberg Decl., Ex. 3 at 10. He further said that Paramount would take a "similar approach" to its unified stack and that the "combined offering" would put Paramount "in a position to be able to compete with the most scaled players in DTC." *Id.*

Defendants' own characterization, therefore, supports Plaintiffs' allegation of a streaming marketplace in which Paramount+ and HBO Max compete with other streaming services.

Defendants identify the business category, the competing services, the subscriber and revenue metrics, and the transaction mechanism. Their own characterization supports Plaintiffs' market showing rather than defeating it.

*Berlyn* also confirms why the Defendants' market-definition attack is premature. "Defining the relevant market is a fact-intensive inquiry," and courts therefore "hesitate to dismiss a complaint for failure adequately to plead a relevant market." *Berlyn, Inc.*, 157 F. Supp. 2d at 617-18. The court held that "a final determination of the definition of both the product and geographic components of the relevant market must await the completion of discovery." *Id.* at 617. Here, Plaintiffs have alleged a streaming market, identified the competing services, and supported that market with Defendants' own DTC and streaming-scale materials. Defendants' "scale" argument therefore supports Plaintiffs' market showing rather than defeating it.[1]

### B.    Plaintiffs Are Consumers in the Market Defendants Identify.

Plaintiffs have standing because they are consumers in the affected streaming market and face a concrete risk of injury to their consumer interests from the threatened loss of independent streaming competition. In *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016), the Supreme Court held that Article III injury in fact requires an injury that is both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." A particularized injury must affect the plaintiff "in a personal and individual way." *Id.* While a concrete injury must not be "abstract," it need not be tangible. *Id.* at 339-40. The Court explained that "intangible injuries can nevertheless be concrete," and that "the risk of real harm can satisfy the requirement of concreteness." *Id.* at 340-41. Plaintiffs satisfy that standard. Their verifications confirm plaintiff-specific facts already pleaded in the Complaint, including subscriptions, payments, viewing habits, and threatened consumer injuries. The threatened injury includes reduced standalone choice, reduced content variety, reduced service differentiation, and diminished price and quality competition, all of

---

[1] Plaintiffs focus here on the streaming market because Defendants' own materials identify that marketplace and because a threatened antitrust violation in one affected market is sufficient to support preliminary injunctive relief preserving the status quo. Plaintiffs do not waive the other markets alleged in the Complaint.

which affect Plaintiffs as purchasers in the streaming market. Plaintiffs do not allege an abstract objection to the merger or a bare statutory violation. They face the threatened loss of an independent streaming alternative, including separate platform decision-making, content choice, service differentiation, and price and quality competition.

That threatened injury is concrete because consumers can currently choose Paramount+, HBO Max, both, or neither. The proposed transaction threatens to replace that independent choice with a single owner, a single integrated platform strategy, and a single incentive structure. That injury is antitrust injury because it flows from the very competition-reducing effect Plaintiffs challenge: the elimination of independent rivalry between two consumer-facing streaming services. An injunction would redress that injury by preserving the independent ownership and operation of the services while the merits are adjudicated. As *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506-07 (1959), explained: "[t]he basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." That injury cannot be fully repaired after the trial. Once Defendants close, combine the services, prune content, and begin implementing the integration plan they have already described, the Court will be left trying to restore competition after the eggs have already been scrambled. Damages cannot readily recreate an independent HBO Max competitor, separate platform decision-making, or the consumer choice that exists today. Section 16 likewise authorizes injunctive relief against "threatened loss or damage." 15 U.S.C. § 26. Plaintiffs need not wait for Defendants to alter the market before seeking relief.

### C.   Defendants' Own Evidence Shows Imminence.

The record does not describe a distant or speculative transaction. The Merger Agreement has been signed, Warner Bros. Discovery shareholders have approved it, and it provides that Warner Bros. Discovery will become a wholly owned subsidiary of Paramount at closing. Brandon-Gordon Decl., Ex. 5 § 1.1. Defendants' own filed materials confirm that closing can occur on short notice. In Exhibit 1 to the Goldberg Declaration, Ellison stated that "our HSR waiting period has expired in the United States, which means if we were cleared everywhere else

in the world, we could close in the U.S. tomorrow." Goldberg Decl., Ex. 1 at 7. He then reiterated: "As I said, we could technically close tomorrow." *Id.* Defendants made the same point during Paramount Skydance's March 2, 2026, M&A call. They stated that "[i]n the United States, the waiting period under the Hart-Scott-Rodino Antitrust Improvements Act has expired, and there is no statutory impediments [sic] to close in the United States." Goldberg Decl., Ex. 3 at 7. Defendants also represented that they were "absolutely confident" they could meet the closing timeline they had outlined. *Id.* at 14.

The Merger Agreement confirms the same urgency. Section 1.2 provides that closing "shall take place at 10:00 a.m. Eastern Time, remotely via electronic exchange of documents and signatures, no later than the second Business Day . . . following the satisfaction or, to the extent permitted by applicable Law, waiver of the conditions set forth in Article VII." Brandon-Gordon Decl., Ex. 5 at 9. Article VII likewise provides that the parties' obligation to consummate the merger is subject to the "satisfaction or waiver at or prior to the Closing" of the listed conditions. *Id.* at 78. The agreement further provides that Buyer's obligations, "including to consummate the Closing," are "not conditioned in any manner upon Buyer obtaining the Financing." *Id.* at 77.

Paramount's May 4, 2026, shareholder letter reinforces the point. Paramount stated that it had made "significant progress toward closing," including WBD shareholder approval, regulatory progress, and debt and bridge financing arrangements, and that the "WBD transaction" was "on track for a Q3 close." Goldberg Decl., Ex. 4 at 5, 14. Defendants, therefore, cannot characterize the threatened injury as remote. Their own public statements, transaction materials, and Merger Agreement show that the parties have cleared U.S. HSR review, obtained shareholder approval, made financing arrangements, preserved waiver rights, and structured closing to occur within two business days after satisfaction or waiver of the listed conditions.

### D.    Defendants Admit They Will Combine Paramount+ and HBO Max.

The relevant competitive injury is not abstract common ownership. It is the planned integration of two competing streaming services. Brandon-Gordon states that Paramount expects savings from consolidating the technology infrastructure required to deliver Paramount's and

Warner Bros. Discovery's streaming services into a "single tech stack." Brandon-Gordon Decl. ¶ 8. He also states that Paramount expects content savings, including "pruning content that is unpopular or overpriced relative to its viewership." *Id.* ¶ 12. And he states that a central thesis of the transaction is combining Paramount+ and HBO Max on a single platform. *Id.* ¶ 17.

Ellison's public statements confirm the same integration plan. In his March 5, 2026, CNBC interview, Ellison stated that the transaction "immediately gets us to scale in streaming" because "[w]hen you put Paramount Plus and HBO Max together," the combined service reaches "over 200 million" gross subscribers. Goldberg Decl., Ex. 1 at 3. He later explained that Paramount is "going to bring HBO Max and Paramount Plus together," which "will rationalize the tech stacks" and create "incredible savings" through "cloud rationalization." *Id.* at 5. When asked directly whether Paramount would combine HBO Max and Paramount+, Ellison answered: "we're absolutely going to put the services together." *Id.* at 8-9.

Defendants repeated the same point on Paramount Skydance's March 2, 2026, M&A call. Ellison stated that "when you put these 2 services together," the combined company will have approximately 200 million subscribers and will have "economic incentives" to grow the business. Goldberg Decl., Ex. 3 at 15. When asked about "coupling the services" and whether Paramount expected "to eventually combine those 2 services into 1 service," Ellison responded: "we do plan to put the 2 services together," and tied that plan to more than 200 million direct-to-consumer subscribers, a "similar approach" to Paramount's unified stack, and the ability to compete with "the most scaled players in DTC." *Id.* at 10. Defendants also identified efficiencies from "consolidating our streaming technology stacks and cloud providers, including P+ and HBO Max," as well as migrating the combined company to a single ERP system and combining other IT systems. *Id.* at 8.

Those admissions matter under Section 7. In *United States v. Pabst Brewing Co.*, 384 U.S. 546, 549 (1966), the Supreme Court explained that Section 7 asks whether "the effect of the merger may be substantially to lessen competition or tend to create a monopoly in any line of commerce 'in any section of the country.'" The Court emphasized that "[p]roof of the section of

the country where the anticompetitive effect exists is entirely subsidiary to the crucial question in this and every § 7 case which is whether a merger may substantially lessen competition anywhere in the United States." *Id.* at 549-50. It also rejected dismissal based on an asserted failure to prove market boundaries through expert testimony, explaining that "the failure of the Government to prove by an army of expert witnesses what constitutes a relevant 'economic' or 'geographic' market is not an adequate ground on which to dismiss a § 7 case." *Id.* at 549.

*Pabst* also confirms why Defendants' integration admissions are probative of threatened competitive injury. The Court treated the loss of separate competitors as central to the Section 7 inquiry, noting that "[t]he merger of Pabst and Blatz brought together two very large brewers competing against each other in 40 States." *Id.* at 551. It held that the evidence was sufficient where the transaction combined competing firms in an industry moving toward concentration and where the merged firm increased its competitive position. *Id.* at 550-52. The Court explained that Section 7 reflects Congress's concern with "arresting concentration in the American economy, whatever its cause, in its incipiency," and held that "a trend toward concentration in an industry, whatever its causes, is a highly relevant factor in deciding how substantial the anticompetitive effect of a merger may be." *Id.* at 552-53.

The record shows that trend in real time. Defendants state that Skydance Media merged with Paramount Global in August 2025 to form Paramount Skydance Corporation. Opp. at 2. Within weeks, Paramount began diligence for the Warner Bros. Discovery transaction. *Id*. at 6. Defendants describe a bidding process that ran "from September 2025 to February 2026," during which Paramount's offer price rose "from $19 to $31 per share." *Id.* They also admit that Paramount's final bid included a commitment to pay the breakup fee Warner Bros. Discovery owed "Netflix, the other leading bidder," bringing Paramount's effective financial commitment to approximately $32 per share. *Id.*; *see also* Brandon-Gordon Decl., Ex. 5 at 8, 83. Ellison likewise described the contest as one in which Warner Bros. Discovery "was going to be sold to Netflix, or it was going to be sold to us." Goldberg Decl., Ex. 1 at 7. That record is evidence of the concentration trend in an industry *Pabst* treats as "highly relevant."

The same principle applies here. Defendants' own evidence does not merely show that a corporate acquisition will occur. It shows the mechanism by which competition will be reduced: Paramount+ and HBO Max will be combined, their streaming technology consolidated into a single stack, content pruned, and two independent streaming strategies replaced by a single Paramount-controlled platform strategy. Under *Pabst*, that evidence is probative because Section 7 concerns whether the acquisition may lessen competition in the affected market before the injury to competition becomes irreversible. Plaintiffs thus do not rely on the elimination of a rival in the abstract. Defendants themselves identify the streaming marketplace, the trend to consolidation, the competing services to be combined, the subscriber scale to be gained, the technology rationalization, the content pruning, and the planned single-platform strategy.

**E.      The Combination Threatens Reduced Choice, Reduced Output, and Loss of Independent Streaming Competition.**

Paramount+ and HBO Max are differentiated products. That does not make them noncompetitive. It is why their independent rivalry matters. Defendants' own materials describe Paramount as a company with Direct-to-Consumer, Studios, and TV Media segments, and identify Paramount's portfolio as including CBS, CBS Sports, Nickelodeon, MTV, BET, Comedy Central, Showtime, and Paramount+. Goldberg Decl., Ex. 2 at 11. Defendants likewise describe Warner Bros. Discovery as offering "the world's most differentiated and complete portfolio of branded content" across television, film, streaming, and gaming, including HBO Max, discovery+, HBO, CNN, DC, TNT Sports, HGTV, Food Network, Cartoon Network, Adult Swim, Warner Bros. Pictures, and other brands. *Id.* That is differentiation by Defendants' own description.

Defendants' opposition makes the same point. Defendants argue that the combined service would offer consumers "a broad range of complementary content—from prestige dramas to popular children's programming—on a single platform." Opp. at 5. That admission confirms that Paramount+ and HBO Max are not identical products. They offer different content, brands,

and consumer value propositions. Consumers currently can choose Paramount+, HBO Max, both, or neither. That menu of independent options is competition.

The proposed acquisition threatens to eliminate that independent choice. Defendants do not merely propose passive common ownership. They plan to combine the services into a "premier direct-to-consumer platform" and generate synergies through "technology integration," including "consolidating streaming technology stacks." Goldberg Decl., Ex. 2 at 8-10.

As shown above, Defendants have repeatedly stated that they plan to combine Paramount+ and HBO Max, rationalize the streaming technology, and operate the services through a unified platform strategy. That plan matters because Paramount+ and HBO Max are differentiated streaming products that consumers can currently purchase separately. When two differentiated products are independent, each disciplines the other. A consumer who wants HBO Max's programming can subscribe to HBO Max without subscribing to Paramount+. A consumer who wants Paramount+ programming can subscribe to Paramount+ without subscribing to HBO Max. A consumer who wants both can buy both. Combining those products allows the merged firm to replace independent consumer choice with a package, bundle, or integrated platform strategy. Even if Defendants retain separate branding or tiers, the pricing, content mix, quality, user experience, promotions, and product design will be controlled by a single owner rather than by two independent competitors.

Defendants' own recent conduct reinforces that risk. Paramount's May 4, 2026, shareholder letter states that in January, it "implemented price increases across our Essential and Premium tiers in the U.S., Canada, Australia, and Latin America." Goldberg Decl., Ex. 4 at 6. The same letter states that Paramount made "meaningful progress on platform consolidation," including the "successful transition of BET+ content onto Paramount+ ahead of the full service integration expected in early summer," bringing more than 1,000 hours of content "to audiences in one unified experience." *Id.* Paramount also reported strategic exits from hard-bundle subscribers while seeking DTC revenue growth and profitability. *Id.* at 13. Plaintiffs do not rely on the prior Paramount+ price increase as the completed injury from the Warner Bros. Discovery

acquisition. They rely on it as evidence that Plaintiffs participate in the affected streaming market and that changes in streaming pricing impose concrete consumer injury. The traceable threatened injury from the Warner Bros. Discovery acquisition is the proposed integration of HBO Max, which threatens higher prices, reduced standalone choice, reduced content variety, and diminished independent service competition.

### F.    Defendants' Scale, Output, and Efficiency Arguments Do Not Answer Section 7.

Defendants argue that the combined service will have greater scale and compete more effectively against larger streaming firms. That does not answer Section 7. *United States v. Philadelphia National Bank*, 374 U.S. 321, 370 (1963), rejected the argument that anticompetitive effects in one market may be justified by claimed procompetitive consequences elsewhere, explaining that "[i]f anticompetitive effects in one market could be justified by procompetitive consequences in another," then "every firm in an industry could, without violating § 7, embark on a series of mergers that would make it in the end as large as the industry leader." The Court further held that "a merger the effect of which 'may be substantially to lessen competition' is not saved because, on some ultimate reckoning of social or economic debits and credits, it may be deemed beneficial." *Id.* at 371. The Supreme Court said the same thing in *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 580 (1967): "Possible economies cannot be used as a defense to illegality" because "Congress was aware that some mergers which lessen competition may also result in economies but it struck the balance in favor of protecting competition."

The Ninth Circuit's treatment of efficiencies is no broader. *St. Alphonsus Medical Center-Nampa Inc. v. St. Luke's Health System, Ltd.*, 778 F.3d 775, 790 (9th Cir. 2015), stated that "[t]he Supreme Court has never expressly approved an efficiencies defense to a § 7 claim" and that "[t]he status of the defense in this circuit remains uncertain." Even assuming such a defense exists, *St. Alphonsus* requires the claimed efficiencies to answer the competition problem. Because "[t]he Act focuses on 'competition,'" any efficiency defense "must demonstrate that the prima facie case 'portray[s] inaccurately the merger's probable effects on

competition.'" *Id.* at 791. Put differently, "a successful efficiencies defense requires proof that a merger is not, despite the existence of a prima facie case, anticompetitive." *Id.* The defendant must "clearly demonstrate" that the merger "enhances rather than hinders competition because of the increased efficiencies." *Id.* The claimed efficiencies also must be "merger-specific," meaning they cannot "be achieved without the concomitant loss of a competitor," and they must be "verifiable, not merely speculative." *Id.* at 791-92.

Defendants have not made that showing. As explained above, their asserted efficiencies are the integration plan Plaintiffs challenge: one tech stack, content pruning, and one combined Paramount-controlled platform. Brandon-Gordon Decl. ¶¶ 8, 12, 17. Those are private cost reductions and integration steps. They do not preserve HBO Max as an independent competitor, preserve separate streaming technology, or preserve separate pricing, content, output, or platform incentives.

Defendants' output arguments have the same defect. They promise more theatrical films, a 45-day theatrical window, more television shows, more streaming content, and a better combined platform. Goldberg Decl. ¶¶ 22-35; Brandon-Gordon Decl. ¶¶ 16-19. Those are unilateral post-merger business plans, not structural remedies. *St. Alphonsus* rejected that kind of answer. "It is not enough to show that the merger would allow St. Luke's to better serve patients." *St. Alphonsus*, 778 F.3d at 791. "The Clayton Act focuses on competition," and the claimed efficiencies must show that the predicted anticompetitive effects are inaccurate. *Id.* The Ninth Circuit held that even if a merger may produce better service, "the Clayton Act does not excuse mergers that lessen competition or create monopolies simply because the merged entity can improve its operations." *Id.* at 792.

*Hospital Corp.* confirms that courts need not give weight to post-acquisition conduct or representations that are susceptible to manipulation by the merging party. Judge Posner explained that "[p]ost-acquisition evidence that is subject to manipulation by the party seeking to use it is entitled to little or no weight." *Hospital Corp. of America v. FTC*, 807 F.2d 1381, 1384 (7th Cir. 1986). The same principle applies here. Defendants' promises about future output,

future windows, future investment, and future consumer benefits are not structural safeguards. They are litigation-position business plans by the party seeking to complete the challenged acquisition. They should be given little weight, especially where the financing record and public reporting raise serious doubts about whether those promises can be kept.

Defendants' own financing record makes those unilateral output promises still less credible. Paramount has petitioned the FCC for approval of a financing structure that depends on massive new outside capital, including foreign sovereign wealth funds. In that Petition, Paramount states that the transaction-related equity syndication includes subscription agreements for private-placement Class B shares in amounts of up to $46.72 billion from the Ellison Trust and $250 million from RedBird Fund IV, with rights assigned to institutional investors including Saudi Arabia's Public Investment Fund, Abu Dhabi's L'Imad investment vehicle, and the Qatar Investment Authority. *See* Plaintiffs' Request for Judicial Notice in Support of Reply, Ex. A, Paramount Global, Petition for Declaratory Ruling Under Section 310(b)(4), at 5-6.[2] Paramount further asks the FCC to approve indirect foreign ownership above 25%, up to 100% in the aggregate, and identifies expected foreign equity ownership of approximately 49.5% after the proposed investment. *Id.* at 1-2, 14-17. This is not a conventional, ordinary-course operating plan. It is a highly leveraged, highly financed consolidation strategy that depends on extraordinary new capital.

The debt load matters. Defendants ask the Court to credit promises that the combined company will increase theatrical output, maintain a 45-day theatrical window, and invest in more programming. However, a company assuming a massive financing burden has strong incentives to cut costs, consolidate operations, reduce duplication, rationalize content spend, and prioritize debt service and investor returns over incremental theatrical output or consumer-facing variety.

---

[2] The Court may take judicial notice of the filing as a public FCC record, and Paramount's statements in that filing are independently admissible against it as opposing-party statements under Federal Rule of Evidence 801(d)(2).

**PLS' REPLY ISO MOTION FOR PRELIMINARY INJUNCTION**     CASE NO. 4:26-CV-03790-AMO

The merged company's incentive will be to integrate, rationalize, prune, and monetize the combined assets, not to preserve the competitive rivalry Section 7 protects or produce greater content for consumers.

### G.    The Balance of Equities, Public Interest, and Bond Favor Preserving Streaming Competition.

The requested injunction preserves the status quo in streaming. Defendants remain free to operate Paramount+, invest in content, improve technology, and compete. What they should not be permitted to do before a merits determination is close the transaction and eliminate HBO Max as an independent streaming competitor.

Defendants' asserted delay harms are overstated by their own agreement. Section 8.1(b)(i) provides an End Date of March 4, 2027, and further provides for automatic extension to June 4, 2027, if specified antitrust or foreign regulatory-law conditions have not been satisfied or waived. Brandon-Gordon Decl., Ex. 5 § 8.1(b)(i). Defendants, therefore, cannot credibly argue that temporary preliminary relief would scuttle a transaction whose own terms contemplate delay into 2027.

Nor do Defendants' ticking-cost arguments outweigh the public interest. The Ticking Consideration is a private deal term to which Defendants agreed. The Merger Agreement defines Ticking Consideration as an additional amount if closing occurs after September 30, 2026. Brandon-Gordon Decl., Ex. 5, Annex A. It is not a market injury and thus not an equitable basis to deny Section 16 relief. Defendants cannot convert their own timing bargain into a basis for denying consumers the statutory protection Congress provided against threatened antitrust injury. Defendants negotiated both the Ticking Consideration and the outside date in the same agreement; the Court should not treat one private term as dispositive while ignoring the other.

For the same reasons, the bond should be zero or nominal. Rule 65(c) requires security only "in such sum as the court deems proper." *Connecticut General Life Insurance Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003). The Ninth Circuit holds that the district court has "wide discretion in setting the amount of the bond," and that "the bond amount

may be zero if there is no evidence the party will suffer damages from the injunction." *Id.* *Connecticut General Life Insurance Co.* further explains that Rule 65(c) does not relieve the enjoined party of its "obligation of presenting evidence that a bond is needed." *Id.* at 882-83.

Defendants have not shown compensable damages from being required to preserve the status quo while the Court adjudicates Plaintiffs' Section 7 claim. Their asserted Ticking Consideration damages are private timing costs allocated in their own transaction documents, not market injury, consumer injury, or damages caused by a wrongful restraint. On this record, a zero or nominal bond is therefore appropriate.

## III.    CONCLUSION

Defendants' own evidence confirms the need for preliminary relief. Plaintiffs are consumers in the streaming marketplace Defendants call DTC and Plaintiffs call "premium video distribution." The transaction is signed and approved, and can close rapidly upon satisfaction or waiver of closing conditions. Defendants admit that the deal is designed to combine Paramount+ and HBO Max, prune content, and create scale in streaming. Plaintiffs have shown serious questions going to the merits, likely irreparable injury, and a balance of hardships sharply favoring preservation of the status quo. The Court should preliminarily enjoin Defendants from consummating, closing, integrating, or otherwise implementing Paramount's proposed acquisition of Warner Bros. Discovery pending trial.

DATED: June 17, 2026                    ALIOTO LAW FIRM

 /s/ Joseph M. Alioto_____
Joseph M. Alioto, Esq.
Tatiana V. Wallace, Esq.
Attorneys for Plaintiffs

DATED: June 17, 2026                    FOREMAN & BRASSO

 /s/ Ronald D. Foreman_____
Ronald D. Foreman, Esq.
Ian A. Hansen, Esq.
Attorneys for Plaintiffs