Joseph M. Alioto, Esq. (SBN 42680)
Tatiana V. Wallace, Esq. (SBN 233939)
**ALIOTO LAW FIRM**
One Sansome Street, 14th Floor
San Francisco, CA 94104
Tel: (415) 434-8900
Fax: (415) 434-9200
Email: jmalioto@aliotolaw.com

Ronald D. Foreman, Esq. (SBN 61148)
Ian A. Hansen, Esq. (SBN 255449)
**FOREMAN & BRASSO**
850 Montgomery Street, Suite 300
San Francisco, CA 94133
Telephone: (415) 433-3475
Facsimile: (415) 781-8030
Email: foremanandbrasso@foremanandbrasso.com

Attorneys for Plaintiffs Pamela Faust, Len Marazzo, Lisa McCarthy, Deborah Rubinsohn, and Gary Talewsky

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

PAMELA FAUST, LEN MARAZZO, LISA McCARTHY, DEBORAH RUBINSOHN, and GARY TALEWSKY,

Plaintiffs,

vs.

PARAMOUNT SKYDANCE CORPORATION (formerly Paramount Global), and SKYDANCE MEDIA, LLC,

Defendants.

Case No. 4:26-cv-03790-AMO

**FIRST AMENDED COMPLAINT FOR VIOLATION OF SECTION 7 OF THE CLAYTON ACT; DAMAGES UNDER SECTION 4; AND INJUNCTIVE RELIEF UNDER SECTION 16**

## INTRODUCTION

1. This is a private antitrust action under Section 7 of the Clayton Act, 15 U.S.C. § 18, seeking damages under Section 4, 15 U.S.C. § 15, and prospective injunctive relief under Section 16, 15 U.S.C. § 26. Plaintiffs challenge Skydance Media's completed acquisition of Paramount Global and Paramount Skydance Corporation's proposed acquisition of Warner Bros. Discovery.

2. Section 7 addresses probabilities, not certainties, and prohibits an acquisition when its effect "may be substantially to lessen competition." The proposed acquisition would eliminate Warner Bros. Discovery as an independent competitor and place formerly competing subscription services, content libraries, studios, and consumer relationships under a single owner.

3. Plaintiffs do not sue merely as viewers or observers of media consolidation. They purchase the products in the affected consumer markets, intend to continue purchasing them, and face higher prices, reduced output, lower quality-adjusted value, and fewer independently controlled purchasing alternatives.

4. Warner Bros. Discovery stockholders approved the transaction on April 23, 2026. Paramount has reported to investors that the transaction has obtained regulatory clearances across the relevant jurisdictions and that it fully expects the acquisition to close. The remaining restraint on consummation is the stipulation entered in the related antitrust actions pending before this Court, under which Paramount Skydance Corporation and Warner Bros. Discovery, Inc. agreed not to close or consummate the transaction while the stipulation remains operative. Paramount is otherwise prepared to consummate the acquisition, making the threatened combination concrete and imminent.

## LEGAL STANDARDS

5. Section 7 prohibits an acquisition where, in any line of commerce and in any

section of the country, "the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. The statute does not require proof that the market will become uncompetitive, that remaining rivals will be unable to compete effectively, or that higher prices, reduced output, or other consumer harms are certain to occur. Section 7 reaches anticompetitive tendencies in their incipiency and concerns probabilities rather than certainties. *Brown Shoe Co. v. United States*, 370 U.S. 294, 317, 323 (1962).

6. Competitive injury is not limited to a nominal price increase. Competition protects output, quality, variety, innovation, promotional terms, and consumer choice. Eliminating a competitor may leave consumers with "fewer choices, higher prices, and lower-quality products." *PLS.com, LLC v. National Association of Realtors*, 32 F.4th 824, 840 (9th Cir. 2022).

7. Section 7 also reaches a nontrivial acquisition that contributes to an industry trend toward concentration. *United States v. Pabst Brewing Co.*, 384 U.S. 546, 550–52 (1966), enjoined the combination of brewers whose combined national share was approximately 4.49 percent. *United States v. Von's Grocery Co.*, 384 U.S. 270, 272–73, 277–78 (1966), enjoined a combination with a combined share of approximately 7.5 percent because it eliminated an independent rival amid continuing consolidation.

8. The challenged transactions arise in a rapidly consolidating industry. Disney acquired 21st Century Fox, Amazon acquired MGM, and Discovery combined with WarnerMedia to form Warner Bros. Discovery. Skydance then acquired Paramount Global and now seeks to combine Paramount with Warner Bros. Discovery. Each successive transaction places additional programming, distribution, and consumer relationships under fewer independent decisionmakers.

9. Section 7 is not limited to acquisitions between firms that compete at the same level of distribution. A merger may substantially lessen competition when it combines a firm operating in a relevant market with control over a product or service rivals use to compete in that market, thereby enabling and incentivizing the firm to limit rivals' access and thereby weaken competition. *See* 2023 Merger Guidelines, Guideline 5; *United States v. E. I. du Pont de Nemours & Co.*, 353 U.S. 586, 592-95 (1957).

10. Section 16 authorizes injunctive relief against threatened loss or damage from an antitrust violation. 15 U.S.C. § 26. A plaintiff need only demonstrate a significant threat of injury from an impending violation and need not wait until the acquisition closes or the threatened consequences have fully materialized. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130 (1969).

**PARTIES**

11. Plaintiffs Pamela Faust, Len Marazzo, Lisa McCarthy, Deborah Rubinsohn, and Gary Talewsky are natural persons residing in the United States. They purchase subscription streaming services, paid video packages containing national television news, and admissions to first-run theatrical motion pictures, as alleged below.

12. Defendant Paramount Skydance Corporation is a Delaware corporation with its principal place of business in New York, New York. It operates Paramount Pictures, CBS, CBS News, Paramount+, and other film, television, streaming, news, and entertainment businesses.

13. Defendant Skydance Media, LLC, was an independent producer and financier of premium film and television programming before Skydance acquired Paramount Global. Following the closing, Skydance and Paramount operate as a single entity under David Ellison, who serves as Chairman and Chief Executive Officer.

14. Warner Bros. Discovery owns HBO Max, HBO, CNN, Warner Bros. Pictures,

New Line Cinema, and other significant streaming, news, film, television, and entertainment properties.

## JURISDICTION AND VENUE

15. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1337 because this action arises under Sections 4, 7, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 18, and 26.

16. This Court has personal jurisdiction over Defendants because they transact business throughout the United States and purposefully direct the challenged conduct toward United States consumers, including Plaintiffs.

17. Venue is proper under 28 U.S.C. § 1391 and Section 12 of the Clayton Act, 15 U.S.C. § 22, because Defendants transact business and the challenged conduct has effects in this District.

## FACTUAL BACKGROUND

### A. Skydance's Completed Acquisition of Paramount Global

18. On July 7, 2024, Skydance announced an approximately $8 billion transaction to acquire Paramount Global, including payments to National Amusements and Paramount stockholders, as well as an infusion of capital into Paramount. The transaction closed on August 7, 2025.

19. Marazzo and Rubinsohn had subscribed to Paramount+ since approximately 2021. Before August 7, 2025, each purchased Paramount+ from independently managed Paramount Global. When Skydance completed the acquisition, it obtained control over Paramount+, including its prices, tiers, discounts, promotions, free trials, programming expenditures, and distribution strategy.

20. Before Skydance acquired Paramount, Skydance independently supplied premium

programming to competing services, including Netflix, Apple TV+, and Amazon Prime Video. Its productions included Grace and Frankie, The Old Guard 2, Spellbound, Foundation, Luck, The Gorge, Reacher, Cross, and Balls Up.

21. The completed acquisition eliminated Skydance as an independent supplier and placed its development, financing, licensing, exclusivity, windowing, and platform-allocation decisions under the same corporate control as Paramount+.

22. Following the acquisition, Skydance's production assets and development pipeline were placed under the same corporate control as Paramount+. Skydance's animation operations were integrated with Paramount Animation, and Skydance's film and television productions became available for coordinated development, licensing, windowing, and distribution across Paramount's platforms.

23. Following the acquisition, the new management immediately adopted a direct-to-consumer strategy emphasizing increased average revenue per user, reduced reliance on low-margin subscriptions, retirement of free trials, and review of discounting practices.

24. In a shareholder letter filed with the Securities and Exchange Commission on November 10, 2025, Paramount Skydance announced that it would increase Paramount+ prices in the United States during the first quarter of 2026. Paramount also identified increased average revenue per user and subscriber monetization as components of its post-acquisition direct-to-consumer strategy.

25. Paramount implemented the announced increase effective January 15, 2026. The Essential monthly price increased from $7.99 to $8.99, approximately 12.5 percent, and the Premium monthly price increased from $12.99 to $13.99, approximately 7.7 percent. Marazzo and Rubinsohn paid the increased charges.

26. The price increase followed the transfer of Paramount+ pricing authority to Skydance and the adoption of the new management's post-acquisition monetization strategy. Skydance acquired Paramount, obtained control over Paramount+ pricing and consumer terms, adopted and disclosed a strategy emphasizing average revenue per user and profitability, announced the price increase, and implemented it through Paramount+. Other streaming companies did not establish the amount Paramount+ charged Marazzo and Rubinsohn.

**B. Proposed Acquisition of Warner Bros. Discovery**

27. Paramount pursued Warner Bros. Discovery through successive offers beginning in 2025. Warner Bros. Discovery accepted Paramount's proposal, and its stockholders approved the transaction on April 23, 2026.

28. Paramount's transaction materials identify the combination of the Paramount+ and HBO Max streaming businesses, consolidation of technology and operations, elimination of redundancies, increased scale, and substantial synergies as central transaction objectives.

29. The proposed financing includes substantial new debt and equity commitments. The projected leverage and stated deleveraging targets make increased cash flow, subscriber monetization, cost reductions, and achievement of synergies central to the transaction's economics.

30. On August 4, 2026, Paramount Chairman and Chief Executive Officer David Ellison publicly defended the proposed acquisition of Warner Bros. Discovery in both Paramount's second-quarter earnings materials and public statements concerning the transaction. Ellison described the transaction as creating a company with the scale to compete alongside Netflix, Amazon, Apple, and other major media platforms and stated that the combination would benefit consumers, theatrical exhibition, and creators. Paramount likewise told investors that its strategy is to scale its direct-to-consumer business, increase engagement, improve the user

experience, and invest in programming that attracts and retains audiences.

31. Ellison expressly described the merger as a response to competition for consumer attention. He stated that the combined company would compete against Netflix, Amazon, Apple, and other large platforms and argued that those companies possess resources that substantially exceed Paramount's. He admitted that Paramount and Warner Bros. Discovery together would account for nearly 20 percent of American television viewing time, or approximately 13 percent if YouTube user-generated content is included in the denominator. Ellison's own comparison therefore measures the transaction by the share of consumer viewing held by competing platforms and treats audience attention as a competitive resource.

32. Ellison further admitted that audiences ultimately determine the commercial success of the products supplied by the combined company. In defending the transaction, he stated that it is "the audience — the American people — who have the final say" in whether a movie succeeds or fails and whether a news organization thrives or withers. He explained that the purpose of building a company with greater "strength and resources" is to deliver for those audiences. Ellison thus identified consumers' choices as the key to Paramount's success in theatrical, television, streaming, and news products.

33. Paramount's own operating disclosures confirm the same relationship in subscription streaming. Paramount measures Paramount+ performance through subscriber growth, retention, viewing hours, engagement, and the ability of particular programming to attract and retain subscribers. In the second quarter of 2026, Paramount reported approximately 81.6 million Paramount+ subscribers, its best retention quarter, double-digit growth in viewing hours, and significant subscriber and engagement gains associated with specific programming. Paramount also stated that its streaming investments are intended to improve discovery,

personalization, engagement, advertising experience, and monetization. Consumers who subscribe, remain subscribed, cancel, change services, or devote viewing time to competing services therefore supply the demand that Paramount+ and HBO Max compete for.

34. Marazzo and Rubinsohn are among the consumers whose subscription payments and viewing choices Paramount and Warner Bros. Discovery compete to obtain. As alleged below, both presently purchase Paramount+ and HBO Max and independently decide whether to retain, cancel, upgrade, downgrade, or substitute those services based on price, programming, advertising load, promotional terms, quality, and overall value. Their recurring purchasing decisions are therefore part of the consumer demand that Ellison himself identifies as determining whether the combined company and its competing services succeed.

35. Ellison similarly described theatrical success as dependent upon audience choice. Paramount's August 4 disclosures state that the company applies audience insights and analytics to theatrical greenlighting, marketing, and distribution decisions, and evaluates those decisions based on resulting box-office performance. Ellison separately stated that the American audience has the final say in whether a movie succeeds or fails. The proposed acquisition would combine two studios that presently make independent decisions about which films to greenlight, produce, market, schedule, and release theatrically for consumers.

36. Plaintiffs regularly purchase admission to first-run theatrical films and choose among differentiated films based on genre, cast, director, franchise, quality, reviews, release date, theater placement, showtime, premium-format availability, and other attributes. They are therefore members of the audience whose purchasing decisions drive box-office demand, which Ellison identifies as a determinant of whether theatrical films succeed. A reduction in independently greenlit or released films, competing release windows, genre and budget variety,

or other theatrical alternatives would reduce the number of products available for Plaintiffs to purchase.

37. Ellison made the same consumer-centered point concerning national television news. In discussing CNN and CBS News, he admitted the importance of audience trust, journalistic independence, and news organizations' ability to serve the people who rely on them. He admitted that whether a news organization "thrives or withers" ultimately depends upon the audience. Those admissions recognize that independence, credibility, reporting quality, and audience trust are competitive attributes affecting consumer demand for national television news.

38. Marazzo, McCarthy, Rubinsohn, and Talewsky pay for television packages that provide national television news and regularly consume CNN, CBS News, or competing national news programming. Their payments and viewing decisions are therefore part of the audience demand that CNN and CBS News compete for. A merger-induced reduction in original reporting, investigative output, staffing, live coverage, independence, credibility, differentiation, or other competitive attributes would reduce the value of the national news programming included in the products that those Plaintiffs purchase.

39. Ellison's own defense of the transaction thus identifies consumers as the ultimate decisionmakers across the relevant consumer markets alleged here. Streaming services compete for subscribers, subscription spending, viewing time, and engagement; theatrical studios produce and release films whose success depends upon moviegoer demand; and national television news organizations compete for audiences whose viewing and trust determine whether those organizations thrive. Plaintiffs participate in those competitive processes through the recurring purchases alleged above. They do not assert injury merely as observers of media consolidation. They are consumers whose payments, viewing choices, and purchasing decisions constitute the

demand for the products that Paramount and Warner Bros. Discovery compete over.

40. Ellison's contention that the combined company would lack sufficient market power to dictate what audiences watch does not dispute that Paramount and Warner Bros. Discovery compete for those audiences. To the contrary, his defense assumes that consumer choice determines which films, streaming services, and news organizations succeed. The proposed acquisition would eliminate one independent competitor that seeks the same consumer payments and viewing choices.

**C. Industry-wide consolidation trend**

41. The proposed acquisition is part of an accelerating pattern of consolidation among firms controlling premium film, television, and streaming assets. In 2019, Disney acquired most of 21st Century Fox's entertainment assets, combining major film and television studios, programming libraries, networks, and interests in Hulu under Disney's control and eliminating Fox as an independent entertainment competitor.

42. In 2022, the WarnerMedia and Discovery transaction created Warner Bros. Discovery and placed HBO, Warner Bros., CNN, Discovery, and extensive film and television libraries under common ownership. Warner Bros. Discovery subsequently integrated substantial Discovery programming into HBO Max. It relaunched the service as HBO Max, demonstrating how a corporate combination can consolidate formerly separate content and streaming strategies under one platform and set of economic incentives.

43. On August 7, 2025, Skydance acquired Paramount Global, eliminating Paramount as an independently controlled company. As alleged above, the new owner then changed Paramount+ pricing, promotional, subscriber, and profitability policies, and implemented a price increase that Plaintiffs paid.

44. On June 15, 2026, Fox Corporation announced a definitive agreement to acquire Roku for approximately $22 billion in enterprise value. Fox stated that the acquisition would combine Fox's premium content and Tubi service with Roku's connected-television platform, The Roku Channel, first-party data, and direct relationships with more than 100 million global streaming households. Fox described the result as one of the largest streaming businesses in the United States and the third-largest player in United States television by share of viewing.

45. Fox and Roku used the same scale and monetization rationale Paramount invokes here. Fox stated that the transaction would create a scaled media and technology platform with greater reach, engagement, monetization capability, subscription opportunities, and approximately $400 million in run-rate cost synergies. The contemporaneous Fox-Roku transaction confirms that acquisition-driven consolidation is occurring across streaming content, platforms, distribution, advertising, and direct consumer relationships.

46. These transactions have progressively placed major studios, programming libraries, streaming services, distribution technology, consumer data, and direct subscriber relationships into fewer hands. The resulting trend toward concentration increases the competitive significance of eliminating the present independent rivalry between Paramount+ and HBO Max, even if Paramount disputes Plaintiffs' precise market shares or identifies other large firms that will remain after closing. *United States v. Pabst Brewing Co.*, 384 U.S. 546, 550-53 (1966).

47. The cumulative pattern also increases the risk that remaining firms will respond to consolidation with additional acquisitions rather than independent entry, output expansion, price competition, and content investment. Section 7 was enacted to stop that progression before

concentration becomes irreversible. *Brown Shoe Co. v. United States*, 370 U.S. 294, 317-23, 343-46 (1962); *United States v. Pabst Brewing Co.*, 384 U.S. 546, 552-53 (1966).

**D. Debt Load, Deleveraging, and Dependence on Streaming Cash Flow**

48. Paramount's own transaction presentation states that the combined company is expected to have approximately $79 billion in net debt at closing. Paramount initially described $54 billion in debt commitments, including approximately $39 billion of new debt, $15 billion to refinance Warner Bros. Discovery's existing bridge facility, and a bridged revolving credit facility.

49. Subsequent Securities and Exchange Commission disclosures described contemplated permanent acquisition financing that included approximately $39.5 billion of first-lien secured indebtedness and approximately $12.4 billion of second-lien secured indebtedness. Paramount acknowledged that the form, amount, pricing, and terms of that indebtedness remained subject to market conditions and might not be obtained on favorable terms.

50. Paramount projects a net-debt-to-adjusted-EBITDA ratio of approximately 4.3x at closing only on a fully synergized basis. The denominator therefore assumes realization of the expected annual synergies before Paramount has actually achieved them. Paramount has committed to deleverage to below 3.75x adjusted EBITDA by fiscal year 2028 and to below 3.0x by fiscal year 2029, and has stated that it and its controlling stockholder will take steps to meet those targets.

51. Paramount projects that the transaction will generate more than $6 billion in annual synergies, with approximately 30 percent of those savings expected in the first year after closing, approximately 70 percent by the second year, and the full amount by the third year.

52. Those commitments create a concrete post-closing cash-allocation constraint. The combined company must pay interest and principal, achieve rapid deleveraging, fund transaction integration, maintain ordinary operations, and finance the promised film and television slate from the same enterprise cash flows. If revenue or projected synergies fall short, the pressure to increase subscription revenue, reduce discounts and trials, increase advertising, consolidate services, eliminate overlapping expenditures, defer investment, or reduce programming becomes greater.

53. Paramount's own presentation connects that financial plan directly to direct-to-consumer streaming. David Ellison stated that "DTC growth will be essential to the success of the combined company" and that Paramount will combine the two companies' streaming portfolios "into one stronger platform." He later confirmed that Paramount plans "to put the 2 services together" and use the same unified-stack approach Paramount employed in consolidating its existing services.

54. Paramount projects that the combined company's revenue growth will be driven by its direct-to-consumer and studio businesses, that margins will depend on meaningful scaling and increased profitability of streaming, and that free cash flow conversion is a central management objective. Paramount's promise to produce at least 30 theatrical films and approximately 170 television series annually is therefore not backed by a capital pool insulated from streaming performance, debt service, or the synergy program. Under Paramount's own projections, continued content investment depends materially on the combined streaming business generating increased revenue, profitability, and cash flow.

55. The promised slate does not eliminate the threatened substantial lessening of competition should the acquisition be consummated. It is a forward-looking commitment that

depends on Paramount achieving its revenue, synergy, margin, and deleveraging assumptions. A company cannot use projected streaming cash flow to justify an acquisition while simultaneously treating the prices, terms, programming expenditures, and service quality used to generate that cash flow as unrelated to the transaction.

56. Paramount's conduct following the Skydance-Paramount acquisition demonstrates that post-acquisition integration can include programming reductions. In its filing covering the post-closing period beginning August 7, 2025, Paramount disclosed that a content portfolio review led it to abandon certain Skydance content, principally development projects, and to record programming charges. The same filing disclosed severance associated with transformation initiatives and aligning the business around post-transaction strategic priorities.

57. Paramount has similarly announced consolidation of Paramount+ and HBO Max technology stacks, cloud providers, marketing, business services, real estate, overhead, and other information-technology systems; described streaming growth and profitability as essential; committed to rapid deleveraging; and previously abandoned development projects following an acquisition-related content review.

58. Plaintiffs do not allege that debt alone establishes a Section 7 violation or makes a price increase certain. The approximately $79 billion net debt load, secured-financing structure, aggressive deleveraging timetable, synergy commitments, unified-platform plan, prior Paramount+ price increase, reduced trials and discounts, and prior content abandonment together make it plausible that common ownership will produce higher actual or quality-adjusted subscription prices and fewer or worse consumer-facing services than independent competition would produce.

## TIMELINESS

59. Plaintiffs acted after Paramount emerged as the successful bidder and the

proposed transaction became concrete and imminent. They were not required to sue upon an expression of interest, a rejected offer, a competing bid, or a preliminary proposal.

60. The April 23, 2026 stockholder approval removed a major condition to closing. The transaction remains unconsummated, and an injunction would preserve rather than disrupt the status quo. Ordinary transaction expenses and voluntary integration planning do not constitute prejudice caused by Plaintiffs.

61. On July 20, 2026, in the related action brought by twelve States challenging the same proposed acquisition, this Court entered a temporary restraining order preventing Paramount and Warner Bros. Discovery from consummating the transaction. The Court found that the States had made a strong showing that the transaction would substantially lessen competition in wide-release theatrical film distribution and had, at minimum, raised serious questions going to the merits of their Section 7 claim.

62. The Court further found that consummation would be difficult, if not impossible, to unwind due to anticipated consolidation of operations, the sharing of business-sensitive information, and the potential termination or reassignment of employees. Pre-closing relief therefore preserves the independent competitive structure while the legality of the transaction is adjudicated.

## RELEVANT MARKETS AND ANTICOMPETITIVE EFFECTS

### A. Direct-to-Consumer (“DTC”) Subscription Streaming Market

63. The relevant product market is the distribution of premium film and television programming to United States consumers through paid, direct-to-consumer subscription streaming services (the “Direct-to-Consumer Subscription Streaming Market”). Participants include Paramount+, HBO Max, Netflix, Disney+, Hulu, Apple TV+, Amazon Prime Video, and comparable paid subscription services.

64. These services compete for consumers' limited subscription budgets and viewing time through price, tiers, discounts, free trials, advertising load, bundles, library depth, exclusive programming, release cadence, genre and budget variety, interface quality, and the ability to subscribe, cancel, and rotate among services.

65. Short-form user-generated video, social-media video, free broadcast programming, physical media, and theatrical exhibition are not reasonably interchangeable substitutes for a paid, on-demand library of professionally produced premium film and television programming.

66. The relevant geographic market is the United States because services are marketed and priced nationally, content rights are negotiated subject to United States territorial restrictions, and the material competitive conditions are substantially national.

67. Consumers determine competitive success in this market through their subscription payments, retention decisions, cancellations, upgrades, downgrades, viewing time, and engagement. Streaming services therefore compete not only to acquire subscribers, but to retain their recurring payments and viewing attention over time.

**i. Effects and Threatened Effects of Skydance's Acquisition of Paramount Global in the DTC Market**

68. Before Skydance acquired Paramount, Skydance independently supplied premium programming to competing services, including Netflix, Apple TV+, and Amazon Prime Video. Its productions included *Grace and Frankie, The Old Guard 2, Spellbound, Foundation, Luck, The Gorge, Reacher, Cross,* and *Balls Up.*

69. The completed acquisition eliminated Skydance as an independent supplier and placed its development, financing, licensing, exclusivity, windowing, and platform-allocation

decisions under the same corporate control as Paramount+. Following the acquisition, Skydance's production assets and development pipeline were placed under the same corporate control as Paramount+. Skydance's animation operations were integrated with Paramount Animation, and Skydance's film and television productions became available for coordinated development and distribution across Paramount's platforms.

70. Premium film and television programming is differentiated by title, franchise, cast, creative personnel, genre, audience recognition, exclusivity, and consumer demand. A streaming service that loses timely or favorable access to a particular Skydance-produced series or film cannot obtain an identical substitute from another producer.

71. Skydance programming was competitively significant to streaming rivals because differentiated films and television series help those services attract and retain subscribers, increase viewing, and distinguish their offerings.

72. The acquisition placed control over Skydance's development, licensing, exclusivity, windowing, and platform-allocation decisions in the same firm that controls Paramount+. Paramount therefore can determine whether, when, for how long, on what terms, and with what degree of exclusivity Skydance programming is made available to streaming services that compete with Paramount+.

73. Paramount need not deny competing streaming services access to Skydance programming to weaken their ability to compete. It can reserve programming for Paramount-controlled platforms, delay or shorten rival access, alter exclusivity or licensing terms, or otherwise make rival access less timely or valuable.

74. The acquisition also changes the economic incentives governing those decisions. Before the acquisition, Skydance could benefit by supplying programming to competing

distributors according to the value of the production, licensing, or distribution opportunity. After the acquisition, the combined company may also consider whether providing programming to a competing streaming service strengthens that service's position relative to Paramount+.

75. Paramount+ competes with the streaming services for which Skydance supplied programming, including subscriptions, consumer spending, and viewing time. Paramount can therefore benefit if restricting or worsening rivals' access to differentiated Skydance programming makes those services less attractive and shifts consumer demand toward Paramount+.

76. Marazzo and Rubinsohn had subscribed to Paramount+ since approximately 2021. Before August 7, 2025, each purchased Paramount+ from independently managed Paramount Global. When Skydance completed the acquisition, it obtained control over Paramount+, including its prices, tiers, discounts, promotions, free trials, programming expenditures, and distribution strategy.

77. Following the acquisition, the new management adopted a direct-to-consumer strategy emphasizing increased average revenue per user, reduced reliance on low-margin subscriptions, retirement of free trials, and review of discounting practices.

78. In a shareholder letter filed with the Securities and Exchange Commission on November 10, 2025, Paramount Skydance announced that it would increase Paramount+ prices in the United States during the first quarter of 2026 and identified increased average revenue per user and subscriber monetization as components of its post-acquisition direct-to-consumer strategy.

79. The post-acquisition price increase provides a concrete example of the change in economic incentives that follows an acquisition. Skydance acquired control over Paramount+

pricing and consumer terms; the new management adopted a monetization strategy emphasizing increased average revenue per user; Paramount announced and implemented the price increase; and Marazzo and Rubinsohn paid the resulting higher charges.

80. The acquisition may substantially lessen competition in the Direct-to-Consumer Subscription Streaming Market even though Skydance did not itself operate a competing subscription-streaming service before the acquisition. The transaction gives Paramount+ control over differentiated programming that its streaming rivals use to compete, permitting the combined firm to limit or worsen rivals' access to that programming and thereby reduce the competitive constraints those rivals impose on Paramount+.

81. Weakening those rivals reduces the competitive constraints they impose on Paramount+, which in turn permits Paramount to charge higher subscription prices, reduce discounts or promotional terms, and increase advertising, or otherwise reduce the economic value offered to consumers. *See* 2023 Merger Guidelines, Guideline 5 (explaining that a merger may substantially lessen competition when it gives a market participant control over a product or service its rivals use to compete and creates the ability and incentive to limit rivals' access); *United States v. E. I. du Pont de Nemours & Co.*, 353 U.S. 586, 592-95 (1957) (Section 7 reaches a vertical acquisition that places control over a competitively significant input or source of supply in a firm positioned to restrict competition in the market in which that input is used).

**ii. Threatened Effects of Paramount's Proposed Acquisition of Warner Bros. Discovery in the DTC Market**

82. Paramount Skydance owns and operates Paramount+, and Warner Bros. Discovery owns and operates HBO Max. Both are nationwide, paid, direct-to-consumer subscription streaming services that offer consumers on-demand access to professionally

produced films and television programming through recurring subscription plans, including ad-supported and higher-priced premium tiers. Paramount+ distributes programming from Paramount, CBS, Showtime, and related libraries and franchises, while HBO Max distributes programming from HBO, Warner Bros., DC, and other Warner Bros. Discovery properties. The two services compete for consumers who decide whether to subscribe, remain subscribed, cancel, upgrade, downgrade, or allocate their subscription spending and viewing time to competing streaming services.

83. Paramount+ and HBO Max presently operate under separate ownership and must each maintain a programming slate capable of attracting and retaining subscribers and independently justifying the price of that service. Separate ownership therefore creates ongoing competitive pressure on each company to invest in original series, films, library content, release cadence, programming variety, promotional terms, and other features that enhance the service's value to consumers.

84. That competition occurs directly at the consumer level. Paramount+ and HBO Max compete for recurring subscription payments, viewing time, and retention by offering differentiated programming at independently determined prices and terms. A consumer dissatisfied with the price, programming, advertising load, or overall value of one service may cancel it, reduce spending on it, or allocate that spending and viewing time to the other or to another competing subscription service.

85. The proposed acquisition would eliminate that independent rivalry and may substantially lessen competition by placing Paramount+ and HBO Max under common ownership. The combined firm would no longer face the same economic consequence when a consumer shifts subscription spending or viewing time between Paramount+ and HBO Max

because the same company would own both services. Common ownership therefore reduces the incentive for each service to improve independently on price, programming, promotional terms, quality, and other attributes to win or retain consumers from the other.

86. Before the proposed transaction, Warner Bros. Discovery's United States streaming revenue was approximately $10.3 billion, and Paramount's was approximately $7.6 billion. Combining them would place approximately $17.9 billion in streaming revenue under common control.



87. HBO Max had approximately 128 million subscribers and Paramount+ approximately 79.1 million subscribers. Their combination would place approximately 207.1 million gross subscriptions under a single owner, subject to adjustment for overlapping subscribers.




88. The admitted subscriber overlap identifies consumers who currently purchase both services and whose two recurring purchases will be combined under a single seller. That overlap is evidence of direct competition, not a reason to disregard the loss of rivalry.

89. The proposed acquisition would permit Paramount to replace independently priced services with an integrated or bundled product, increase the aggregate price of accessing both libraries, eliminate overlapping discounts and free trials, increase advertising, and move

desired programming into higher-priced tiers. It would also place Paramount+'s and HBO Max's programming decisions under common control, allowing the combined company to reduce programming that previously existed to make each service independently competitive, eliminate projects regarded as duplicative across the two services, and reduce aggregate content expenditures without risking the loss of subscribers from one independently owned service to the other.

90. Ellison's own description of the transaction demonstrates its extraordinary scale. He acknowledged that Paramount and Warner Bros. Discovery together would account for nearly 20 percent of all American television viewing time. Even under Ellison's broader measure, which includes forms of viewing outside the Direct-to-Consumer Subscription Streaming Market alleged here, his admission places nearly one-fifth of American television viewing under common ownership and control. Section 7 has prohibited acquisitions involving combined shares far below that level. *See United States v. Pabst Brewing Co.*, 384 U.S. 546, 550-52 (1966) (holding that the merger of two competing brewers violated Section 7 where their combined national sales accounted for only approximately 4.49 percent of the market, in light of the continuing concentration of the brewing industry and the elimination of an independent competitor); *United States v. Von's Grocery Co.*, 384 U.S. 270, 272-78 (1966) (holding that the merger of two competing Los Angeles grocery chains violated Section 7 where their combined share was approximately 7.5 percent, against a background of declining independent competitors and increasing concentration).

91. Ellison's assertion that Paramount requires greater "scale" and "resources" to compete with Netflix, Amazon, and Apple does not justify eliminating Warner Bros. Discovery as an independent competitor. The Supreme Court rejected the same type of defense in *United*

*States v. Philadelphia National Bank*, 374 U.S. 321, 370-71 (1963), where the merging banks argued that the combination would create a larger institution with greater lending capacity and prestige that could compete more effectively against much larger out-of-state banks. The Court held that the proposed consolidation could not be justified on that basis. *Id.* (rejecting the argument that a merger creating a larger local bank was justified because the combined firm would be better able to compete with large New York banks for major customers and loans). Section 7 protects the existing competition between independent firms; a defendant cannot justify eliminating that competition merely by asserting that the resulting larger company will compete more effectively against still larger rivals.

**B. Paid National Television News Market**

92. A relevant product market is nationally distributed television news programming supplied to consumers through paid cable, satellite, and live-TV streaming packages in the United States (the "Paid National Television News Market"). CNN and CBS News compete for viewers, advertising, journalists, sources, reputation, and consumer trust.

93. National television news is distinguished by nationwide newsgathering capacity, correspondents and bureaus, institutional credibility, original reporting, and nationally distributed programming.

94. National television news programming supplied through paid television packages is not reasonably interchangeable with local television news, newspapers, radio, podcasts, social-media posts, or digital written journalism. Those products may provide information about some of the same events; however, they do not provide the same combination of nationwide audiovisual newsgathering, correspondents and bureaus, immediate live coverage of national and international events, studio programming, interviews, continuous or regularly scheduled national television presentation, and institutional television-news production.

95. Consumers may obtain national television news alongside newspapers, websites, radio, podcasts, or social media sources without treating those products as substitutes. The simultaneous use of multiple sources reflects differentiation among news products rather than interchangeability. A consumer seeking live, nationally distributed television coverage of a breaking national or international event cannot obtain the same product merely by substituting a newspaper, local newscast, radio program, or social media feed.

96. CNN and CBS News compete notwithstanding differences in the precise schedules and distribution methods of particular programs. They compete for national audiences, journalists, sources, exclusive reporting, reputation, distribution, and investment in newsgathering and programming. Those competitive decisions determine the quantity, quality, differentiation, and value of the national television news programming ultimately supplied to consumers through paid television services.

97. The relevant geographic market is the United States because distribution, branding, carriage, advertising, and competitive effects are national in scope.

98. The completed Skydance-Paramount acquisition provides a concrete example of how changes in corporate control can affect the competitive attributes of national television news, including editorial independence, reporting decisions, staffing, credibility, and audience trust. Those attributes are not abstract political interests. They affect the quality and value of the news product supplied to viewers, as well as consumers' willingness to choose, watch, and continue relying on a particular news organization.

99. During the regulatory review of the Skydance-Paramount transaction, CBS's flagship news program, 60 Minutes, experienced an unusual conflict with Paramount management over editorial independence. In April 2025, 60 Minutes Executive Producer Bill

Owens resigned after concluding that he no longer had the independence necessary to run the program as he believed journalism required. Paramount had imposed additional review of 60 Minutes stories before broadcast while Paramount was simultaneously seeking regulatory approval of the Skydance transaction and defending litigation brought by President Trump concerning a 60 Minutes interview with then-Vice President Kamala Harris.

100. The conflict was sufficiently serious that longtime *60 Minutes* correspondent Scott Pelley addressed viewers on the program itself. Pelley explained that Paramount had begun supervising *60 Minutes* stories in new ways and stated that Owens believed he had lost the independence that honest journalism required. Pelley told the audience that “none of us is happy” about the additional corporate supervision.

101. The dispute extended beyond *60 Minutes*. In May 2025, CBS News Chief Executive Officer Wendy McMahon resigned, stating that she and the company no longer agreed on the path forward. McMahon, like Owens, had opposed settling President Trump’s lawsuit concerning the *60 Minutes* interview. Paramount subsequently agreed to pay $16 million to resolve that litigation while the Skydance acquisition remained subject to federal regulatory approval.

102. Skydance’s acquisition of Paramount Global occurred amid substantial political and regulatory pressure related to Paramount’s news and entertainment properties. During the regulatory review period, President Trump maintained litigation against CBS arising from a 60 Minutes interview, while Paramount required Federal Communications Commission approval for broadcast license transfers necessary to complete the acquisition. Paramount ultimately paid $16 million to settle President Trump’s lawsuit during that approval period. On information and belief, Paramount’s decision to resolve that litigation was influenced by its need to secure

governmental approval of the Skydance transaction. The alleged use of media and editorial interests to obtain political or regulatory support resembles the political "horse trading" described in *Reilly v. Hearst Corp.*, 107 F. Supp. 2d 1192, 1209 (N.D. Cal. 2000), where evidence showed that favorable editorial treatment was offered in exchange for political support for an acquisition and that the transaction was pursued in the form selected because it was believed necessary to obtain political and regulatory approval. On information and belief, Paramount's $16 million settlement of President Trump's lawsuit was a quid pro quo intended to secure federal regulatory approval of Skydance's acquisition of Paramount Global.

103. The political pressure surrounding the transaction also extended to The Late Show with Stephen Colbert. After Paramount settled President Trump's lawsuit, CBS announced that it would not renew The Late Show. Colbert was a prominent critic of the Trump Administration and had publicly criticized Paramount's settlement of President Trump's lawsuit, including referring to the settlement on air as a "big fat bribe." On information and belief, CBS's decision to cancel or terminate The Late Show with Stephen Colbert was influenced by Colbert's criticism of President Trump and Paramount's settlement while Paramount was seeking regulatory approval of the Skydance acquisition. Plaintiffs allege these circumstances as further evidence that control over Paramount's media properties was subject to political pressure connected to the transaction rather than solely ordinary competitive and editorial considerations.

104. The FCC thereafter approved the broadcast-license transfers associated with Skydance's acquisition by a 2-1 vote. The dissenting commissioner characterized the agency's involvement and the conditions associated with approval as "unprecedented" and identified requirements affecting CBS News governance and newsroom decision-making. CBS also agreed to appoint an ombudsperson to receive and evaluate complaints concerning bias and related

matters. The acquisition closed on August 7, 2025, after Paramount settled President Trump's lawsuit; CBS announced the end of Colbert's program following his criticism of that settlement; and the FCC approved the license transfers, subject to conditions affecting CBS News governance and corporate policy. Plaintiffs allege that these events reflect the same type of transaction-related political influence identified in *Reilly v. Hearst Corp.*, 107 F. Supp. 2d 1192, 1209 (N.D. Cal. 2000), and demonstrate how common ownership can expose national news operations to centralized political and regulatory pressure.

105. After Skydance acquired Paramount, the new ownership materially changed CBS News management, acquired The Free Press, and appointed its founder, Bari Weiss, editor-in-chief of CBS News.

106. The acquisition of The Free Press was negligible in scale compared with the CBS News operation over which its founder was immediately given authority. The Free Press had approximately 170,000 paid subscribers when Paramount acquired it and lacked CBS News's national broadcast infrastructure, newsgathering operations, bureaus, correspondents, and institutional reach. The commercial significance of the transaction therefore cannot be understood merely as Paramount adding another substantial national news competitor to its portfolio. Paramount used the acquisition of a comparatively small digital publication to install its founder as editor-in-chief of CBS News and transfer substantial editorial authority over an established national television-news organization to the new owner's chosen editor. Weiss was given authority over CBS News and *60 Minutes*, and Paramount publicly stated that she had the support of Paramount and David Ellison as the editorial leader overseeing both.

107. The consequences were not limited to changes in titles or reporting lines. In December 2025, CBS News withheld a scheduled *60 Minutes* investigative report concerning

allegations of abuse suffered by men deported by the Trump Administration to a prison in El Salvador. Weiss stated that the report required additional administration comment before broadcast. The decision sparked an internal and public dispute over 60 Minutes' editorial independence.

108. The conflict continued in 2026. CBS removed or declined to retain several prominent *60 Minutes* journalists and producers, including Scott Pelley, Sharyn Alfonsi, Cecilia Vega, and senior production personnel. Alfonsi publicly alleged that CBS had penalized her for resisting efforts to alter factually accurate reporting. At the same time, the remaining correspondents, Lesley Stahl, Bill Whitaker, and Jon Wertheim, stated that they were "deeply upset" by the dismissals and would remain with the program to protect its independence and integrity.

109. During the same period, reported consumer trust in CBS News declined sharply. Data from the 2026 Reuters Institute Digital News Report, based on its United States brand-trust results, showed that trust in CBS News fell from approximately 48 percent in 2025 to 38 percent in 2026, while the share reporting that they did not trust CBS News increased from approximately 30 percent to 39 percent.

110. The experience at CBS News therefore provides evidence of the competitive significance of preserving independent ownership of national news organizations. Corporate control can affect which investigations are pursued, what stories are broadcast, who makes editorial decisions, how much is invested in reporting and staffing, and whether viewers continue to trust the resulting product. The proposed acquisition would now place CNN and CBS News under the same corporate owner, eliminating an independent newsroom owner and allowing a single management structure to influence the competitive attributes of both organizations.

111. Plaintiffs who pay for television packages containing CNN, CBS News, and competing national television news programming purchase a product whose value depends in part on original reporting, journalistic independence, credibility, staffing, live coverage, and consumer trust. The deterioration of those attributes reduces the quality and economic value of the programming included in the packages Plaintiffs pay for. The threatened injury is therefore not disagreement with editorial viewpoint. It is the loss of competitive attributes of a product Plaintiffs themselves purchase.

**C. Consumer Market for First-Run Theatrical Motion Pictures**

112. A relevant product market is the sale of admission to differentiated first-run theatrical motion pictures to consumers in the United States (the "Consumer Market for First-Run Theatrical Motion Pictures"). Studio-distributors compete through the films they greenlight, finance, produce, market, license, and release for purchase through theatrical exhibitors.

113. Home streaming is not a reasonable substitute for first-run theatrical admission for consumers seeking the initial theatrical release of a film. The theatrical product provides time-sensitive access during the theatrical window, along with large-screen presentation, premium sound, premium formats, communal viewing, and an event experience that later home viewing cannot reproduce. Consumers who value those attributes may later stream the same film without treating later home viewing as a substitute for the initial theatrical experience.

114. A deterioration in the price, availability, variety, or quality of first-run theatrical offerings would not lead to sufficient substitution into later home streaming to eliminate competition for first-run theatrical attendance. The temporary nature of the theatrical window itself prevents later streaming from replacing contemporaneous access to a film during its first-run theatrical release.

115. The market contains finite screens, premium-format auditoriums, release dates,

and peak-period showtimes. Separate studios compete through output, slates, genre and budget diversity, release timing, marketing, windowing, and placement.

116. Theatrical competition also occurs on a finite annual release calendar. Paramount and Warner Bros. Discovery presently make independent decisions concerning which films to release, when to release them, and whether to compete directly for the same audiences during valuable theatrical windows. That rivalry creates incentives to improve films, marketing, release strategies, and audience appeal because each studio can take sales from the other.

117. Common ownership changes that incentive. A single owner has less reason to release two of its own films against one another during the same theatrical window because the films may cannibalize the combined company's own box-office receipts. The acquisition therefore creates an incentive to separate formerly competing releases, eliminate overlapping projects, and reduce the number of release weekends contested by independently owned studios.

118. The relevant geographic market is the United States because wide-release calendars, marketing campaigns, licensing, and exhibitor negotiations are planned nationally.

119. The Disney acquisition of 21st Century Fox illustrates the effect of placing competing theatrical slates under common ownership. Before that acquisition, Disney and Fox together released an average of approximately 25.6 wide-release films per year. After the acquisition, that figure fell to approximately 12.6 wide releases per year, excluding the pandemic years.

120. The reduction was particularly pronounced at the acquired studio. During the decade preceding the acquisition, 20th Century Fox released approximately 15 films annually, with the majority of them original. After the acquisition, Disney released approximately 5 films annually under the 20th Century Studios label, most of which were franchise films or legacy Fox

properties.

121. Disney also eliminated entire sources of differentiated theatrical output. It closed Fox 2000, which had specialized in mid-budget original adult dramas and literary adaptations, and shuttered Blue Sky Studios, Fox's animation studio, while absorbing its intellectual property into Disney's existing operations. The transaction therefore reduced not only aggregate output but also independent sources of original, mid-budget, and differentiated films.

122. The Disney-Fox experience therefore provides a factual example of how common ownership reduces independently determined theatrical output and eliminates differentiated sources of film production.

123. Increased concentration among major studios also creates incentives to concentrate investment in lower-risk, franchise-driven films at the expense of original, mid-budget, and creatively differentiated films. The loss of an independent studio, therefore, threatens more than just the aggregate title count. It eliminates the need for a separate set of greenlight criteria, development priorities, and creative strategies that govern which films reach consumers. Maintaining separate studio labels after an acquisition does not preserve that competition.

124. If Paramount acquires Warner Bros. Discovery, Paramount and Warner Bros. would combine into a single firm with approximately 23.6% market share, making the combined Paramount/Warner Bros. entity the largest studio shown in the chart. The post-merger top four studios would be Paramount/Warner Bros. at approximately 23.6%, Disney at approximately 21.4%, Universal at approximately 20.2%, and Sony/Columbia at approximately 11.1%, for a combined top-four share of approximately 76.3%. The proposed transaction, therefore, would not merely combine two studios; it would increase top-four concentration by approximately 10.2 percentage points and eliminate Paramount as an independent studio competitor.[1]




[1] The presently available market-share data report theatrical box-office performance for the United States and Canada together. Plaintiffs rely on those publicly available figures because the more granular transaction-specific data necessary to calculate precise United States shares are principally within Defendants' possession. The publicly available figures nevertheless plausibly demonstrate the substantial scale of the combination and the elimination of Paramount and Warner Bros. Discovery as independent theatrical competitors.

125. Ellison admits that the combined company would account for approximately 18 percent of domestic box office over the preceding twelve months and approximately 22 percent over two years. Those admissions confirm a substantial existing share under Paramount's own measure.

126. Ellison has stated that the combined company intends to release at least 30 theatrical films annually. That 30-film projection is extremely unrealistic. In 2025, Warner Bros. released approximately 11 theatrical films, and Paramount released approximately 9. No single studio has produced and distributed more than approximately 20 theatrical films in a single recent calendar year. Since 2022, Paramount has released approximately eight to nine major theatrical films per year, while Warner Bros. has released approximately ten to twelve. Their recent combined output therefore has generally been approximately 18 to 21 major theatrical releases annually, well below the 30 releases Ellison projects after the acquisition. Reaching 30 annual releases would therefore require the combined company not merely to preserve the studios' existing output, but also to materially expand it, despite the reduced incentive to release films that compete with other titles owned by the same company.

127. Current release plans provide another concrete example of head-to-head competition that common ownership could diminish. Paramount is scheduled to release *Street Fighter* on October 16, 2026, just one week before Warner Bros. Discovery releases DC Studios' *Clayface* on October 23. Both are major franchise-based films aimed at overlapping action and genre audiences during the same theatrical period. While Paramount and Warner Bros. remain independent, each has an incentive to compete for those moviegoers through film quality, marketing expenditures, release placement, premium-format screens, and audience appeal. Common ownership would reduce the incentive to position two films seeking substantially the

same audience in directly competing release windows.

128. Paramount and Warner Bros. Discovery also compete independently over the terms and placement through which their films reach moviegoers. They negotiate with exhibitors concerning box-office revenue splits, minimum ticket prices, discounting, complimentary tickets, exclusivity periods, release dates, screen allocation, and premium-format placement. Separate ownership gives exhibitors alternatives and incentivizes each studio to secure superior placement for its own films.

129. Entry or expansion by smaller studios would not be timely enough to replace the competition eliminated by the acquisition. Wide theatrical release at scale requires established relationships with theater chains, coordinated nationwide screen allocation and release planning, substantial marketing infrastructure, and sufficient capital to absorb large production and marketing expenditures when a film underperforms.

130. Those barriers are greater for anticipated top-grossing films. Sustaining a slate of such films commonly requires valuable franchise intellectual property, large-scale production and visual effects resources, established marketing capabilities, international distribution relationships, and an ancillary revenue infrastructure involving licensing and merchandising. Those capabilities have been developed over many years and cannot be replicated quickly in response to Warner Bros. Discovery's elimination as an independent studio competitor.

131. Streaming-focused firms do not provide a complete substitute for the theatrical competition eliminated by the transaction. Netflix generally distributes films through its subscription platform rather than through sustained wide theatrical release. Apple lacks a proprietary theatrical distribution operation and produces a materially smaller theatrical slate. Amazon has historically emphasized streaming or limited theatrical releases and has relied on

third parties for portions of theatrical distribution. Those firms therefore do not replicate the nationwide theatrical production and distribution capabilities of Paramount and Warner Bros. Discovery.

132. The acquisition would also increase the likelihood of coordination among the remaining major studio-distributors. Major theatrical release schedules are unusually transparent because studios publicly announce release dates months or years in advance. A studio's decision to move a major release into or out of another studio's release window is therefore readily observable to competitors.

133. Reducing the number of independent major studios makes it easier for the remaining firms to avoid competing release windows, detect deviations from established release patterns, and accommodate one another's major releases. With four studios accounting for approximately 93 percent of the box-office revenue generated by films released in more than 3,000 theaters, reduced rivalry may diminish the competitive pressure to increase output, develop differentiated films, and compete aggressively during desirable release windows.

134. For the reasons alleged above, the transaction threatens Plaintiffs with reduced theatrical output, variety, independently developed slates, contested release windows, and meaningful ticket-purchasing alternatives.

## ARTICLE III STANDING

### A. Completed Skydance-Paramount Acquisition

135. Marazzo and Rubinsohn have subscribed to Paramount+ since approximately 2021. Before August 7, 2025, each purchased Paramount+ from independently managed Paramount Global. On August 7, 2025, Skydance acquired Paramount Global, ending Paramount Global's independent control of Paramount+ and placing the service's prices, tiers, discounts, promotions, free trials, programming expenditures, and distribution strategy under Skydance's

control.

136. The new management announced a coordinated direct-to-consumer strategy emphasizing profitability, free cash flow generation, increased average revenue per user, reduced reliance on low-margin subscriptions, the retirement of free trials, and a review of discounting practices.

137. On November 10, 2025, only about three months after Skydance acquired Paramount Global, Paramount Skydance announced that it would increase Paramount+ prices in the United States in the first quarter of 2026. The short interval between the acquisition, the new management's adoption of its monetization strategy, and the announced price increase supports the inference that the increase was part of the post-acquisition change in pricing and monetization policy.

138. Paramount implemented the announced increase effective January 15, 2026. The Essential monthly price increased from $7.99 to $8.99, approximately 12.5 percent, and the Premium monthly price increased from $12.99 to $13.99, approximately 7.7 percent. Marazzo and Rubinsohn paid the increased charges.

139. The causal chain is direct and plausible: Skydance acquired Paramount; Skydance obtained control over Paramount+ pricing and consumer terms; the new management adopted and disclosed a strategy emphasizing average revenue per user, profitability, reduced discounts, and retired trials; the new management announced the increase; Paramount implemented it; and Marazzo and Rubinsohn paid it directly. The post-acquisition price increase is a concrete manifestation of the lessening of competition resulting from the acquisition. By placing Paramount+ and Skydance's programming assets under common control, the transaction altered the combined firm's incentives for pricing, monetization, licensing, and distribution of

Paramount+ and Skydance programming.

140. Other streaming companies' price increases did not set Paramount+'s prices or compel Paramount to raise its prices. General industry pricing pressure does not sever the fairly traceable connection between the acquisition-related transfer of control, the post-acquisition monetization strategy, and the increased Paramount+ charges paid by Plaintiffs.

141. Paramount's disclosures later reported increased average revenue per user on Paramount+ and confirmed that subscriber monetization was an intended component of the post-acquisition strategy. Marazzo's and Rubinsohn's monetary injuries are concrete, particularized, fairly traceable to the completed acquisition, and redressable by damages and appropriate structural relief.

**B. Proposed Paramount-Warner Bros. Discovery Acquisition**

142. Marazzo and Rubinsohn presently subscribe to both Paramount+ and HBO Max and intend to continue subscribing to paid subscription-streaming services, including Paramount+ and HBO Max. Each makes recurring payments for both products, whose independent competition the proposed acquisition would eliminate. Each separately evaluates the price, programming, advertising load, promotional terms, quality, and overall value of Paramount+ and HBO Max in deciding whether to retain, cancel, downgrade, upgrade, or substitute one service for another.

143. Paramount+ and HBO Max presently operate under separate ownership and independently compete for Marazzo's and Rubinsohn's recurring subscription payments and viewing time.

144. The proposed acquisition will eliminate that independent rivalry by placing Paramount+ and HBO Max under common ownership and control.

145. The threatened injuries do not depend upon the discretionary conduct of an

independent third party. Paramount itself will obtain authority to change the terms on which Marazzo and Rubinsohn purchase Paramount+ and HBO Max and will no longer face the competitive constraint created by independent ownership.

146. The threatened injuries are concrete economic injuries to the products Marazzo and Rubinsohn regularly purchase. Paying more for the same subscription product, paying the same amount for less programming or lower quality, losing discounts or promotional terms, receiving more advertising, receiving fewer new programs, or receiving a narrower or less differentiated library each reduces the economic value received in exchange for their subscription payments.

147. Those threatened injuries are imminent rather than conjectural. The transaction has received stockholder approval, is financed, and is being pursued with stated objectives that include integration, monetization, cost reductions, synergies, and deleveraging. Marazzo and Rubinsohn presently purchase both affected services and intend to continue those purchases.

148. The completed Skydance-Paramount acquisition, as alleged above, provides additional factual support for the threatened injury from placing HBO Max under the same management.

149. Plaintiffs' threatened injuries do not depend on Paramount announcing before consummation a particular future subscription increase, program cancellation, newsroom reduction, or the elimination of a theatrical project. The transaction itself transfers presently independent pricing, programming, investment, greenlight, and release decisions to a common owner and eliminates the competitive constraint created by independent ownership. The precise consumer-facing decisions through which that reduction in competition will manifest cannot be known before the firms combine their operations; however, the elimination of the independent

competitive incentives alleged above follows directly from consummation.

150. An injunction preventing consummation would prevent the ownership consolidation that threatens these injuries. Paramount+ and HBO Max would remain separate, independently owned competitors, each with its own pricing, programming, promotional, investment, and consumer-retention incentives. The requested relief therefore directly redresses the threatened injuries to Marazzo and Rubinsohn.

**C. Paid National Television News Market**

151. Marazzo purchases DirecTV and Hulu + Live TV; McCarthy purchases DirecTV's Ultimate package; Rubinsohn purchases Verizon FiOS, Hulu + Live TV, and Philo; and Talewsky receives Hulu + Live TV through a T-Mobile package and purchases traditional cable service. Each pays for access to nationally distributed television programming, regularly watches national television news provided through those paid services, and intends to continue purchasing paid packages that include CNN, CBS News, and competing national television news programming.

152. These Plaintiffs are consumers of the national television news product whose competitive attributes the challenged acquisition threatens to diminish. Cable, satellite, and live-TV streaming providers are the distribution channels through which that programming is delivered to paying consumers. Plaintiffs' injury therefore concerns the competitive attributes of the national news programming they purchase, not an injury occurring only in an unrelated market.

153. The acquisition will transfer CNN to Paramount and place CNN and CBS News under a single corporate owner, giving Paramount direct authority over the competitive inputs of both organizations.

154. Plaintiffs' threatened injury is not ideological disagreement with the viewpoint or

editorial content of a news organization and is not a claim for a carriage-fee overcharge passed through an intermediary. Their injury is economic: they will continue paying for packages that contain a less competitive national news product if common ownership reduces original reporting, investigative output, staffing, live coverage, independence, credibility, differentiation, or other attributes for which they pay. The threatened reduction of those attributes will diminish the value of programming included in Plaintiffs' paid packages.

155. An injunction preventing the acquisition will preserve CNN and CBS News as separately owned organizations with independent budgets, personnel, programming, editorial structures, investment incentives, and incentives to compete for viewers. The threatened injury includes degradation of product attributes such as original reporting, investigative capacity, staffing, live coverage, independence, credibility, differentiation, and consumer trust. Those attributes have economic value to consumers who pay for packages containing national television news, even though the precise dollar value of a lost investigative unit, fewer correspondents, reduced newsroom staffing, diminished independence, or declining consumer trust cannot readily be isolated and calculated after the harm occurs. Preserving independent ownership before consummation therefore prevents an injury that would be difficult to reconstruct or adequately compensate after separate newsrooms, personnel, budgets, and reporting capabilities have been consolidated. *See Boardman v. Pacific Seafood Group*, 822 F.3d 1011, 1023 (9th Cir. 2016) (affirming preliminary injunctive relief against a proposed acquisition and holding that "[a] lessening of competition constitutes an irreparable injury" where the merger threatened to reduce competition in the relevant markets).

156. The threatened loss is heightened by the transaction's stated objective of achieving substantial synergies through integration and elimination of redundancies. Paramount

has told investors that it is preparing to integrate Warner Bros. Discovery and expects significant benefits from operating the combined company more efficiently. At the same time, its SEC disclosures expressly identify the realization of merger synergies and successful integration of Warner Bros. Discovery as central transaction objectives. Those objectives create a foreseeable incentive to identify overlapping personnel, functions, facilities, programming, and operations for consolidation or elimination.

157. CNN and CBS News are precisely the type of separately operated organizations in which common ownership creates overlapping functions. Each maintains journalists, producers, editors, correspondents, bureaus, management, technical personnel, newsgathering operations, studios, and national programming. A transaction premised in part on integration, efficiency, and the elimination of redundancies creates a substantial risk that some of those independently maintained resources will be treated as duplicative after closing. The resulting consolidation could reduce the number of independently employed journalists, producers, editors, correspondents, bureaus, and investigative resources available to produce competing national-news products.

158. Once those independently maintained resources are eliminated, the competitive loss cannot necessarily be repaired by a later monetary award. A terminated investigative team cannot simply be recreated, departed journalists and sources cannot necessarily be reassembled, lost institutional knowledge cannot readily be restored, and diminished audience trust cannot be purchased back at a readily measurable price. Prospective relief preserving CNN and CBS News as independent competitors therefore directly prevents the threatened degradation of the product Plaintiffs purchase before those competitive attributes are lost.

159. Plaintiffs' injury does not depend on a cable, satellite, or live-TV distributor

passing through an increased carriage fee. Those distributors are the channels through which Plaintiffs receive and pay for national television news programming; they do not independently determine the amount of original reporting CNN or CBS News produces, the number of journalists or bureaus each maintains, whether investigative programs are funded or eliminated, or whether the two organizations remain independently controlled competitors. If common ownership reduces those competitive attributes, Plaintiffs receive a diminished product through the same distribution channel for which they continue to pay.

160. The threatened injury therefore reaches Plaintiffs without any necessary discretionary decision by the distributor. A cable or live-TV provider cannot restore an investigative report that the combined company does not fund, replace journalists or bureaus that the combined company eliminates, recreate competing newsroom judgment that common ownership removes, or restore independently produced programming that the combined company treats as duplicative. The loss occurs when the common owner reduces the competitive attributes of the national-news product, and that diminished product is then delivered to Plaintiffs.

161. Alternatively, even if the Court characterizes competition among national-news organizations as occurring at an upstream level from Plaintiffs' purchases of television packages, Plaintiffs' injury is inextricably intertwined with the threatened reduction in that competition. CNN and CBS News produce national news programming to attract and retain audiences, increase viewership, and generate economic returns driven by consumer demand. Plaintiffs are members of the audience Ellison himself identifies as the ultimate decisionmakers in the success of national news organizations. In defending the proposed acquisition, Ellison stated that "the audience, the American people, have the final say" in whether a news organization thrives or

withers. A reduction in the quantity, quality, differentiation, independence, or credibility of the programming available to Plaintiffs is therefore a direct and foreseeable consequence of eliminating independent competition between CNN and CBS News. See *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 479-84 (1982) (allowing recovery by an insurance subscriber whose injury was inextricably intertwined with the alleged restraint against psychologists, although she was not herself a competitor in the restrained professional-services market).

**D. Consumer Market for First-Run Theatrical Motion Pictures**

162. Each Plaintiff regularly purchases admission to first-run theatrical motion pictures in the United States and intends to make additional purchases following the proposed transaction. Plaintiffs select among differentiated films based on genre, cast, director, franchise, quality, reviews, release date, theater placement, showtime, premium-format availability, and other attributes of individual films.

163. Plaintiffs therefore participate as purchasers in the Consumer Market for First-Run Theatrical Motion Pictures alleged in this Complaint. They are not seeking relief for injury suffered by a film studio, writer, exhibitor, distributor, or other third party. Their threatened injury concerns the number, variety, quality, timing, and availability of the first-run theatrical films for which Plaintiffs themselves purchase admission.

164. The proposed acquisition will place Paramount's and Warner Bros. Discovery's independently made theatrical greenlight, production, slate, and release decisions under common ownership.

165. The injury from those decisions reaches Plaintiffs without any necessary intervening decision by an independent exhibitor. A theater cannot sell Plaintiffs admission to a film that Paramount or Warner Bros. does not greenlight, cancels, does not produce, removes from the theatrical slate, delays to avoid another release, or redirects to streaming. Once the

combined studio eliminates the film or its theatrical release, the corresponding purchasing opportunity ceases to exist.

166. Plaintiffs therefore face threatened injury in the form of fewer purchasable films, fewer independently developed slates, reduced genre and budget variety, fewer competing releases directed toward the same audiences, reduced premium-format and showtime alternatives, and fewer meaningful choices among differentiated first-run theatrical products. Those injuries reduce the quantity, variety, quality, and economic value of products Plaintiffs regularly purchase.

167. The threatened injury is imminent because Plaintiffs regularly purchase first-run theatrical admission and intend to continue doing so. The transaction will combine the relevant studio decision-making authority upon consummation. Their injury does not depend on speculation about whether Plaintiffs will enter the market in the future; they already participate in it and have an established pattern of purchases.

168. An injunction preventing consummation will preserve Paramount and Warner Bros. Discovery as independent studio decisionmakers with independent incentives to greenlight, finance, produce, market, schedule, and theatrically release films. The requested relief therefore directly prevents and redresses Plaintiffs' threatened loss of output, variety, quality, and purchasing alternatives.

## ANTITRUST STANDING AND ANTITRUST INJURY

169. Article III injury and antitrust injury are distinct requirements, and Plaintiffs satisfy both. The injuries alleged above are concrete economic injuries to products Plaintiffs purchase. They also constitute antitrust injury because they are the types of losses that reduced competition is likely to cause and flow from the feature that makes the proposed acquisition unlawful: the elimination of an independent competitor and the resulting reduction in

independent price, output, quality, investment, variety, and consumer-choice incentives. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

170. As alleged above, Plaintiffs purchase the products in each market in which they allege competition will be restrained and therefore suffer the threatened injuries as market participants rather than participants in collateral markets. *American Ad Management, Inc. v. General Telephone Co. of California*, 190 F.3d 1051, 1057 (9th Cir. 1999).

**A. Direct-to-Consumer Subscription Streaming Market**

171. As alleged above, Marazzo and Rubinsohn purchase Paramount+ and HBO Max. They have already suffered economic injury from the post-acquisition Paramount+ price increase, which is fairly traceable to Skydance's acquisition of Paramount Global and the resulting transfer of control over Paramount+ pricing and monetization. They also face threatened economic injury from Paramount's proposed acquisition of Warner Bros. Discovery, which would eliminate the independent competition between Paramount+ and HBO Max for their recurring subscription payments, viewing time, and retention. Paramount and HBO Max presently compete for their recurring subscription payments through independently determined prices, programming, promotions, advertising loads, and other terms. Common ownership would eliminate that independent pricing constraint, place both recurring purchases under one seller, and give Paramount the ability and incentive to increase the aggregate price of accessing both libraries, eliminate overlapping discounts, alter tiers, or otherwise reduce the economic value of the services. The threatened price injury is therefore tied to a transaction that would directly transfer control over the prices Plaintiffs pay to the acquiring firm.

172. Those injuries are of the type the antitrust laws protect against. Competition constrains subscription prices and creates incentives to improve quality, increase programming output, offer discounts and promotional terms, and provide consumers greater value. As alleged

above, the completed Skydance acquisition changed the economic incentives governing Paramount+ and was followed by the price increase paid by Marazzo and Rubinsohn. The proposed acquisition would further reduce competition by eliminating the independent constraint that Paramount+ and HBO Max currently impose on each other.[2]

173. The causal relationships are direct. With respect to the completed acquisition, Skydance obtained control over Paramount+ pricing, adopted the post-acquisition monetization strategy alleged above, announced and implemented the price increase, and Marazzo and Rubinsohn paid the increased charges directly to Paramount. With respect to the proposed acquisition, consummation itself would place Paramount+ and HBO Max under common ownership and eliminate their independent incentives to compete for Plaintiffs' subscription payments and viewing choices. Neither theory depends upon a passed-through overcharge or the discretionary act of an unrelated market participant.

**B. Paid National Television News Market**

174. As alleged above, Marazzo, McCarthy, Rubinsohn, and Talewsky purchase and consume the affected national news product through paid distribution channels. Their alleged injury is to the competitive attributes of that product rather than to a passed-through overcharge.

175. Plaintiffs seek prospective relief preserving independent competition, not damages calculated by tracing a carriage fee or other upstream charge through a distribution chain. There is therefore no need to determine whether or to what extent a distributor passed an upstream charge to Plaintiffs, and no risk that Plaintiffs and a distributor would recover the same alleged overcharge.

---

[2] At the July 16, 2026 hearing on the dismissal of the original Complaint, Defendants expressly acknowledged that "the injury of a price increase from a merger would be an antitrust injury." Tr. 6:19-22.

### C. Consumer Market for First-Run Theatrical Motion Pictures

176. As alleged above, Plaintiffs repeatedly purchase admission to differentiated first-run films and face threatened loss of output, variety, and purchasing opportunities in that consumer market.

177. The presence of theatrical exhibitors does not convert Plaintiffs' output-and-choice injury into an injury belonging to another market. Exhibitors are the distribution channel through which consumers purchase theatrical admission. Plaintiffs do not seek damages for an overcharge first imposed upon exhibitors, and no calculation of pass-through is necessary to establish their threatened loss of theatrical output, variety, or purchasing opportunities.

178. The threatened output injury is directly linked to the challenged consolidation for the reasons alleged above; an exhibitor cannot restore a film that the combined studio does not greenlight, produce, or theatrically release.

179. Alternatively, if the Court characterizes studio distribution to exhibitors as a separate upstream market, Plaintiffs' injury is inextricably intertwined with the threatened reduction in theatrical output. Studios greenlight, finance, market, and distribute theatrical films for the purpose of generating moviegoer demand and box-office receipts, and Plaintiffs' purchases constitute the consumer demand those decisions seek to capture. The loss of films available for Plaintiffs to purchase is therefore a necessary and foreseeable consequence of the alleged reduction in independent studio output. As consumers of first-run theatrical motion pictures, Plaintiffs are within the area of the economy endangered by the breakdown in competitive conditions resulting from the elimination of Paramount and Warner Bros. Discovery as independent studio competitors. *See Blue Shield of Virginia v. McCready*, 457 U.S. 465, 480-81, 484 (1982) (holding that a consumer of psychotherapy services was within the area of the economy endangered by the alleged restraint even though the challenged conduct operated

through an insurance reimbursement arrangement).

180. Plaintiffs are appropriate private enforcers of the requested prospective relief. They are identifiable, recurring consumers of the products at issue; their threatened injuries are direct and non-speculative; the requested relief avoids duplicative damages and complex apportionment; and no more immediate consumer exists whose purchasing injury better corresponds to the threatened reduction in price, output, quality, variety, and choice alleged in these consumer markets.

## CLAIMS FOR RELIEF

### COUNT I

**Violation of Section 7 of the Clayton Act, 15 U.S.C. § 18; Damages Under Section 4, 15 U.S.C. § 15; and Injunctive Relief Under Section 16, 15 U.S.C. § 26 (Completed Skydance-Paramount Acquisition)**

181. Plaintiffs reallege and incorporate the preceding allegations.

182. Skydance's acquisition of Paramount Global was an acquisition within the meaning of Section 7 that substantially lessened competition in the Direct-to-Consumer Subscription Streaming Market. The transaction combined Paramount+, a participant in that market, with an independent supplier of differentiated premium programming used by competing streaming services, placed Skydance's licensing, exclusivity, windowing, and platform-allocation decisions under Paramount's control, and created the ability and incentive to limit rivals' access to that programming while benefiting from any resulting weakening of competition with Paramount+.

183. Marazzo and Rubinsohn sustained economic injury by paying the post-acquisition Paramount+ increase. They are entitled to recover damages, costs, and reasonable attorneys' fees under Section 4. Plaintiffs are also entitled to appropriate structural relief under Section 16.

### COUNT II

**Violation of Section 7 of the Clayton Act, 15 U.S.C. § 18; Injunctive Relief Under Section 16, 15 U.S.C. § 26 (Proposed Paramount-Warner Bros. Discovery**

**Acquisition)**

184. Plaintiffs reallege and incorporate the preceding allegations.

185. Paramount's proposed acquisition of Warner Bros. Discovery is an acquisition within the meaning of Section 7 whose effect may be substantially to lessen competition in the Direct-to-Consumer Subscription Streaming Market, Paid National Television News Market, and Consumer Market for First-Run Theatrical Motion Pictures.

186. For the reasons alleged above, the transaction would eliminate Warner Bros. Discovery as an independent competitor and may substantially lessen competition in each of the alleged relevant markets.

187. As alleged above, Plaintiffs presently purchase the products in the relevant consumer markets and intend to continue those purchases.

188. Plaintiffs therefore face the imminent, threatened losses alleged above, which will be prevented and redressed by an injunction that preserves Paramount and Warner Bros. Discovery as separately owned competitors.

## JURY TRIAL DEMAND

189. Plaintiffs demand a jury trial on all claims and issues for which a jury trial is available.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request judgment and the following relief:

190. Declaring that Skydance's acquisition of Paramount Global violated Section 7 of the Clayton Act;

191. Awarding Marazzo and Rubinsohn damages, costs, and reasonable attorneys' fees under Section 4;

192. Ordering appropriate structural relief sufficient to restore competition affected by

the completed acquisition;

193. Declaring that Paramount's proposed acquisition of Warner Bros. Discovery violates Section 7;

194. Preliminarily and permanently enjoining Paramount from consummating the proposed acquisition;

195. Awarding all costs and attorneys' fees recoverable by law; and

196. Granting such other relief as the Court deems just and proper.

DATED: August 14, 2026

ALIOTO LAW FIRM

/s/ *Joseph M. Alioto*
Joseph M. Alioto, Esq.
Tatiana V. Wallace, Esq.
Attorneys for Plaintiffs

**FOREMAN & BRASSO**

/s/ *Ronald D. Foreman*
Ronald D. Foreman, Esq.
Ian A. Hansen, Esq.
Attorneys for Plaintiffs