Jeffrey L. Kessler (*pro hac vice*)
**WINSTON TAYLOR LLP**
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-6700
Facsimile: (212) 294-4700
jeffrey.kessler@winstontaylor.com

Conor A. Reidy (*pro hac vice*)
Kevin B. Goldstein (*pro hac vice*)
**WINSTON TAYLOR LLP**
300 N. LaSalle Drive
Chicago, IL 60654-3406
Telephone: (312) 558-5600
Facsimile: (312) 558-5700
conor.reidy@winstontaylor.com
kevin.goldstein@winstontaylor.com

Jeanifer E. Parsigian (SBN 289001)
Matthew R. DalSanto (SBN 282458)
**WINSTON TAYLOR LLP**
101 California Street, 21st Floor
San Francisco, CA 94111-5891
Telephone: (415) 591-1000
Facsimile: (415) 591-1400
jeanifer.parsigian@winstontaylor.com
matthew.dalsanto@winstontaylor.com

Matthew R. Huppert (*pro hac vice*)
**WINSTON TAYLOR LLP**
1901 L Street NW
Washington, DC 20036-3506
Telephone: (202) 282-5000
Facsimile: (202) 282-5100
matt.huppert@winstontaylor.com

*Attorneys for Defendants Paramount Skydance Corporation and Skydance Media, LLC*

[Additional counsel on signature page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

PAMELA FAUST, LEN MARAZZO, LISA McCARTHY, DEBORAH RUBINSOHN, and GARY TALEWSKY

Plaintiffs,

vs.

PARAMOUNT SKYDANCE CORPORATION (formerly Paramount Global), and SKYDANCE MEDIA, LLC,

Defendants.

Case No. 4:26-cv-03790-AMO

**DEFENDANTS PARAMOUNT SKYDANCE CORPORATION AND SKYDANCE MEDIA, LLC'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**

Hearing Date: October 15, 2026
Time: 2:00 p.m.
Judge: Hon. Araceli Martínez-Olguín
Courtroom: 5

## NOTICE OF MOTION AND MOTION

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE on October 15, 2026, at 2:00 p.m., or as soon thereafter as the matter may be heard, before the Honorable Araceli Martínez-Olguín, in Courtroom 5 of the United States District Court, Northern District of California, located at 1301 Clay Street, Oakland, CA 94612, Defendants Paramount Skydance Corporation and Skydance Media, LLC ("Defendants") will and hereby do move to dismiss with prejudice Plaintiffs Pamela Faust, Len Marazzo, Lisa McCarthy, Deborah Rubinsohn, and Gary Talewsky's ("Plaintiffs") First Amended Complaint, ECF No. 81.

This Motion is made pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) on the grounds that Plaintiffs lack standing to assert their claims and have failed to state any claim. The Motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, declaration, and exhibits; the pleadings and other papers on file in this action; any argument; and any other evidence that the Court may consider.

Dated: August 28, 2026

Respectfully submitted,

By: */s/ Jeffrey L. Kessler*

Jeffrey L. Kessler (*pro hac vice*)
**WINSTON TAYLOR LLP**
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-6700
Facsimile: (212) 294-4700
jeffrey.kessler@winstontaylor.com

Jeanifer E. Parsigian (SBN 289001)
Matthew R. DalSanto (SBN 282458)
**WINSTON TAYLOR LLP**
101 California Street, 21st Floor
San Francisco, CA 94111-5891
Telephone: (415) 591-1000
Facsimile: (415) 591-1400
jeanifer.parsigian@winstontaylor.com
matthew.dalsanto@winstontaylor.com

Conor A. Reidy (*pro hac vice*)
Kevin B. Goldstein (*pro hac vice*)
**WINSTON TAYLOR LLP**
300 N. LaSalle Drive
Chicago, IL 60654-3406
Telephone: (312) 558-5600
Facsimile: (312) 558-5700
conor.reidy@winstontaylor.com
kevin.goldstein@winstontaylor.com

Matthew R. Huppert (*pro hac vice*)
**WINSTON TAYLOR LLP**
1901 L Street NW
Washington, DC 20036-3506
Telephone: (202) 282-5000
Facsimile: (202) 282-5100
matt.huppert@winstontaylor.com

Marguerite Sullivan (*pro hac vice*)
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
marguerite.sullivan@lw.com

Hanna Nunez Tse (SBN 346510)
**LATHAM & WATKINS LLP**
505 Montgomery St.,
Suite 2000
San Francisco, CA 94111-2562
Telephone: (415) 391-0600
hanna.nuneztse@lw.com

*Attorneys for Defendants Paramount Skydance Corporation and Skydance Media, LLC*

# TABLE OF CONTENTS

**Page**


ISSUES TO BE DECIDED .......... 1

BACKGROUND .......... 1

LEGAL STANDARDS .......... 3

ARGUMENT .......... 4

I. PLAINTIFFS DO NOT HAVE STANDING TO CHALLENGE EITHER MERGER .......... 4

A. Plaintiffs' Amendments Do Not Establish Article III Standing .......... 4

1. The Jan. 2026 Paramount+ Price Increase Still Does Not Establish Standing .......... 4

2. The FAC's Other Allegations Do Not Establish Article III Standing .......... 7

B. Plaintiffs' Amendments Do Not Establish Antitrust Standing .......... 9

1. Plaintiffs Do Not Have Antitrust Standing in Their Alleged Consumer Market for First-Run Theatrical Motion Pictures .......... 9

2. Plaintiffs Do Not Have Antitrust Standing in Their Alleged Paid National Television News Market .......... 10

II. PLAINTIFFS FAIL TO ALLEGE A RELEVANT ANTITRUST MARKET .......... 12

A. Direct-to-Consumer ("DTC") Subscription Streaming Market .......... 13

B. Paid National Television News Market .......... 14

C. Consumer Market for First-Run Theatrical Motion Pictures .......... 15

III. THE FAC FAILS TO ALLEGE FACTS PLAUSIBLY SHOWING A LIKELY AND SUBSTANTIAL HARM TO COMPETITION FROM EITHER MERGER .......... 16

A. The FAC Fails to Allege Any Concrete Economic Facts That Could Plausibly Support Plaintiffs' Claim That Either Merger Is Likely to Substantially Lessen Competition .......... 17

B. The FAC Alleges No Market Shares or Concentration Figures for the DTC Streaming or Paid National Television News Markets .......... 19

C. The Market Shares Plaintiffs Allege for Their Purported Consumer Market for First-Run Theatrical Motion Pictures Are Misaligned with Their Alleged Market and Insufficient to Satisfy Plaintiffs' Burden to Establish a Prima Facie Case .......... 20

CONCLUSION .......... 21

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Apple iPhone Antitrust Litig.*,
2013 WL 4425720 (N.D. Cal. Aug. 15, 2013) .......... 4

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 3, 13

*Aurora Astro Prods. LLC v. Celestron Acquisition, LLC*,
691 F. Supp. 3d 1132 (N.D. Cal. 2023) .......... 17

*Berlyn, Inc. v. Gazette Newspapers, Inc.*,
157 F. Supp. 2d 609 (D. Md. 2001) .......... 11

*Blantz v. Ca. Dep't Corr. & Rehab.*,
727 F.3d 917 (9th Cir. 2013) .......... 8

*Blue Shield of Virginia v. McCready*,
457 U.S. 465 (1982) .......... 9, 10

*Brantley v. NBC Universal, Inc.*,
675 F.3d 1192 (9th Cir. 2012) .......... 6

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962) .......... 7, 13, 18

*Brown v. Nat'l Football League, Inc.*,
825 F. Supp. 3d 265 (S.D.N.Y. 2026) .......... 11

*California v. Sutter Health Sys.*,
130 F. Supp. 2d 1109 (N.D. Cal. 2001) .......... 17, 19, 20

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) .......... 9

*Cont'l T.V., Inc. v. GTE Sylvania Inc.*,
433 U.S. 36 (1977) .......... 11

*Coronavirus Reporter v. Apple, Inc.*,
85 F.4th 948 (9th Cir. 2023) .......... 12, 13, 14

*DeHoog v. Anheuser-Busch InBev SA/NV*,
899 F.3d 758 (9th Cir. 2018) .......... 8, 17, 18

*DeHoog v. InBev, SA/NV*,
2016 WL 5853733 (D. Or. July 22, 2016) .......... 5

*Demartini v. Microsoft Corp.*,
2023 WL 4239653 (N.D. Cal. June 27, 2023) .......... 19

*Demartini v. Microsoft Corp.*,
662 F. Supp. 3d 1055 (N.D. Cal. 2023) .......... 7, 8, 17, 19

*Epic Games, Inc. v. Apple, Inc.*,
67 F.4th 946 (9th Cir. 2023) .......... 16

*Freeland v. Nippon Steel Corp.*,
2025 WL 1724997 (N.D. Cal. June 20, 2025) .......... 5

*Freeland v. Nippon Steel Corp.*,
827 F. Supp. 3d 1241 (N.D. Cal. 2026) .......... 7

*Fry v. Cap. One Fin. Corp.*,
2026 WL 751422 (N.D. Cal. Mar. 17, 2026) .......... 8, 9, 20

*FTC v. Lab. Corp. of Am.*,
2011 WL 3100372 (C.D. Cal. Feb. 22, 2011) .......... 19

*FTC v. Microsoft Corp.*,
136 F.4th 954 (9th Cir. 2025) .......... 16

*FTC v. Microsoft Corp.*,
681 F. Supp. 3d 1069 (N.D. Cal. 2023) .......... 7

*FTC v. Qualcomm Inc.*,
969 F.3d 974 (9th Cir. 2020) .......... 12

*Hicks v. PGA Tour, Inc.*,
897 F.3d 1109 (9th Cir. 2018) .......... 12, 13

*hiQ Labs, Inc. v. LinkedIn Corp.*,
485 F. Supp. 3d 1137 (N.D. Cal. 2020) .......... 14

*Hospital Corp. of Am. v. FTC*,
807 F.2d 1381 (7th Cir. 1986) .......... 18

*Huskey v. City of San Jose*,
204 F.3d 893 (9th Cir. 2000) .......... 6

*Kaplan v. Burroughs Corp.*,
611 F.2d 286 (9th Cir. 1979) .......... 12

*Kendall v. Visa U.S.A., Inc.*,
518 F.3d 1042 (9th Cir. 2008) .......... 3

*Khamooshi v. Politico LLC*,
786 F. Supp. 3d 1174 (N.D. Cal. 2025) .......... 9

*Kumar v. Koester*,
131 F.4th 746 (9th Cir. 2025) ........ 8

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ........ 5, 7

*Malaney v. UAL Corp.*,
2010 WL 3790296 (N.D. Cal. Sept. 27, 2010) ........ 17

*Malheur Forest Fairness Coal. v. Iron Triangle, LLC*,
164 F.4th 710 (9th Cir. 2026) ........ 9, 10, 12

*McDermott v. Ampersand Pub., LLC*,
593 F.3d 950 (9th Cir. 2010) ........ 12

*Miami Herald Pub. Co. v. Tornillo*,
418 U.S. 241 (1974) ........ 12

*Murthy v. Missouri*,
603 U.S. 43 (2024) ........ 11

*New York v. Kraft Gen. Foods, Inc.*,
926 F. Supp. 321 (S.D.N.Y. 1995) ........ 21

*Or. Laborers-Employers Health & Welfare Trust Fund v. Philip Morris Inc.*,
185 F.3d 957 (9th Cir. 1999) ........ 10

*Rebel Oil Co. v. Atl. Richfield Co.*,
51 F.3d 1421 (9th Cir. 1995) ........ 21

*Reilly v. Apple Inc.*,
578 F. Supp. 3d 1098 (N.D. Cal. 2022) ........ 12, 14

*Reilly v. Hearst Corp.*,
107 F. Supp. 2d 1192 (N.D. Cal. 2000) ........ 11

*Safe Air for Everyone v. Meyer*,
373 F.3d 1035 (9th Cir. 2004) ........ 3

*Scaturo v. Fanatics, Inc.*,
2026 WL 810372 (S.D.N.Y. Mar. 23, 2026) ........ 15

*Somers v. Apple, Inc.*,
729 F.3d 953 (9th Cir. 2013) ........ 9, 11

*St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*,
778 F.3d 775 (9th Cir. 2015) ........ *passim*

*Tanaka v. Univ. of S. California*,
252 F.3d 1059 (9th Cir. 2001) ........ 15

*Todd v. Exxon Corp.*,
275 F.3d 191 (2d Cir. 2001) ........ 15

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ........ 4

*Tundra, Inc. v. Faire Wholesale, Inc.*,
2024 WL 589097 (N.D. Cal. Feb. 13, 2024) ........ 13

*United States v. Anthem, Inc.*,
855 F.3d 345 (D.C. Cir. 2017) ........ 17

*United States v. Baker Hughes Inc.*,
908 F.2d 981 (D.C. Cir. 1990) ........ 21

*United States v. Gen. Dynamics*,
415 U.S. 486 (1974) ........ 21

*United States v. Oracle Corp.*,
331 F. Supp. 2d 1098 (N.D. Cal. 2004) ........ 20

*United States v. Pabst Brewing Co.*,
384 U.S. 546 (1966) ........ 18

*United States v. Von's Grocery Co.*,
384 U.S. 270 (1966) ........ 18

*United States v. Waste Mgmt., Inc.*,
743 F.2d 976 (2d Cir. 1984) ........ 21

*Wash. Environmental Council v. Bellon*,
732 F.3d 1131 (9th Cir. 2013) ........ 5

*Whalen v. Albertsons Co.*,
2023 WL 8812882 (N.D. Cal. Dec. 20, 2023) ........ 7

*Yoshimoto v. Alaska Airlines, Inc.*,
2026 WL 1121960 (D. Haw. Apr. 24, 2026) ........ 5, 7

**Statutes**

15 U.S.C. § 18 ........ 16

Clayton Act ........ 17

Clayton Act § 7 ........ *passim*

**Other Authorities**

Fed. R. Civ. P. 12(b)(1) ........ 3, 6

Fed. R. Civ. P. 12(b)(6) .... 3

*Streaming Price Tracker*, https://streamingpricetracker.com (last visited Aug. 21, 2026) .... 6

U.S. Const. amend. I .... 12

U.S. Const. art. III .... *passim*

## MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiffs' First Amended Complaint fails to establish Article III or antitrust standing or to state a Section 7 claim for the same reasons the Court dismissed their original Complaint. Plaintiffs remain unable to allege any concrete and particularized injury that either challenged merger has or will imminently inflict upon them. They continue to pursue vindication of non-economic interests the antitrust laws do not protect, and they press claims in alleged markets where they are neither customers nor competitors of Defendants. Plaintiffs also continue to allege fanciful markets that do not account for commercial realities or basic economic principles. And they continue to persist in asserting that a merger with any nontrivial rival violates Section 7 despite failing to allege concrete economic facts to support a substantial lessening of competition. That dubious legal contention has long been rejected by the courts, and it cannot be saved with allegations of competitive harm that are conclusory and implausible. For all these reasons, the Court should dismiss the First Amended Complaint—this time, with prejudice.

## ISSUES TO BE DECIDED

Whether Plaintiffs have standing to assert, and have stated a claim for, violation of Section 7 of the Clayton Act with respect to the Skydance-Paramount merger and/or the Paramount-Warner Bros. Discovery ("WBD") merger.

## BACKGROUND

Plaintiffs originally filed this action on April 30, 2026. ECF No. 1 ("Compl."). Defendants moved to dismiss the original Complaint on June 3, 2026, contending that Plaintiffs lacked Article III standing and antitrust standing and had failed to state a claim upon which relief can be granted. ECF No. 36. The Court heard oral argument on the motion on July 16, 2026, and on August 5, 2026, the Court granted the motion and dismissed Plaintiffs' claims for lack of Article III and antitrust standing. ECF No. 79 ("MTD Order"). The Court found that "Plaintiffs allege only one concrete and particularized injury – a single, historical price increase on Paramount+," and that such alleged injury did not confer Article III standing because (1) Plaintiffs Faust and McCarthy do not claim to pay for Paramount+, and (2) for the other Plaintiffs, the price increase is not fairly traceable to either challenged merger. *Id.* at 4–5. The Court also held that Plaintiffs' other "boilerplate" allegations of harm from the mergers "fail[] to allege any facts to plausibly show how those claimed harms have materialized or would materialize." *Id.* at 6. Such

allegations, the Court held, "are too vague and speculative to establish standing," and the Court "must dismiss" Plaintiffs' complaint because they had not made "allegations that plausibly show how the merger has caused or would cause injury to any of the Plaintiffs 'in a personal and individual way.'" *Id.*

The Court also held that Plaintiffs lacked antitrust standing in their alleged "National Television News" and "Theatrical Distribution" markets. *See id.* at 7–9. In the alleged "National Television News" market, the Court held that Plaintiffs failed to allege antitrust injury because the alleged losses of "editorial independence" and "viewpoint diversity" are not "cognizable economic harms protected by antitrust laws." *Id.* at 8. Similarly, the Court found that concerns about loss of editorial independence and viewpoint diversity potentially diminishing news "quality, variety, and innovation" do not "give rise to antitrust injury." *Id.* In the alleged "Theatrical Distribution Market," the Court held that Plaintiffs failed to allege antitrust injury because, as moviegoers rather than movie theater owners, Plaintiffs are not participants in a market for theatrical distribution, but instead "participate in a market 'downstream'" from the allegedly harmed market. *Id.*

The Court granted Plaintiffs leave to amend, affording them an opportunity "to proffer factual allegations that support standing to prosecute these antitrust claims." *Id.* at 9. Plaintiffs filed their First Amended Complaint on August 14, 2026, ECF No. 81 (the "FAC"), but their amendments do not cure any of the fatal defects in their original Complaint.

The FAC modifies the definitions of the alleged markets. First, instead of a "premium video distribution" market, Plaintiffs now allege a narrower market that includes only "direct-to-consumer subscription streaming services." *Id.* ¶ 63. Without explanation, the FAC no longer includes "cable television and related offerings" as competitors in that market. *Compare id.*, *with* Compl. ¶ 86. Second, instead of a "national television news programming" market, Plaintiffs now allege a narrower market for "paid national television news," which includes only news "supplied to consumers through paid cable, satellite, and live-TV streaming packages." FAC ¶ 92. Likewise, without explanation, this new market definition no longer includes national news distributed via broadcast television. *Compare id.*, *with* Compl. ¶ 99. Finally, instead of a "theatrical distribution" market in which theaters were the licensees of films, Plaintiffs now allege a "Consumer Market for First-Run Theatrical Motion Pictures," which consists of

"the sale of admission to differentiated first-run theatrical motion pictures to consumers in the United States." FAC ¶ 112.

In addition, Plaintiffs have made two other changes in the FAC allegations to which they give emphasis. First, in an apparent effort to connect the Skydance-Paramount merger to the January 2026 Paramount+ price increase, the FAC alleges that Paramount's "new management" adopted a "post-acquisition change in pricing and monetization policy" which "emphasiz[ed] average revenue per user and profitability." *See id.* ¶¶ 23–24, 26, 136–137, 139. Second, Plaintiffs allege that "editorial independence," "credibility," and "audience trust" are "competitive attributes of national television news," rather than "abstract political concepts." *Id.* ¶ 98; *see also id.* ¶ 155 (alleging these "attributes have economic value to consumers").

**<u>LEGAL STANDARDS</u>**

A court must dismiss a complaint for lack of subject matter jurisdiction under Article III of the Constitution if plaintiffs lack standing. *See* Fed. R. Civ. P. 12(b)(1). "A Rule 12(b)(1) jurisdictional attack may be facial or factual." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). In a factual attack, such as here, "the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Id.* "In resolving a factual attack on jurisdiction, the district court may review evidence beyond the complaint," and "need not presume the truthfulness of the plaintiff's allegations." *Id*. Here, Defendants make both a facial and a factual attack on Plaintiffs' allegation that they have Article III standing to bring their antitrust claims.

A court must dismiss a complaint that fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To survive dismissal, plaintiffs must plead "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). The plausibility requirement "asks for more than a sheer possibility that a defendant has acted unlawfully"; the well-pleaded facts must show that plaintiffs are entitled to relief. *Id.* Allegations that are merely "labels and conclusions" or "'naked assertion[s]' devoid of 'further factual enhancement'" are not well-pleaded facts entitled to be credited. *Id.* Rather, the complaint must include sufficient "evidentiary facts," *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008), to permit a "reasonable inference that the defendant is liable for the misconduct alleged," *Iqbal*, 556 U.S. at 678.

## ARGUMENT

## I. PLAINTIFFS DO NOT HAVE STANDING TO CHALLENGE EITHER MERGER

The FAC, like the original Complaint, fails to establish Article III standing for either of Plaintiffs' claims in any of the three alleged antitrust markets. The Court can and should dismiss the FAC on that basis alone. *See* MTD Order at 3 (plaintiffs must demonstrate standing "for each claim," "for each form of relief they seek," and "in each alleged market" (citing *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) and *In re Apple iPhone Antitrust Litig.*, 2013 WL 4425720, at *6 (N.D. Cal. Aug. 15, 2013)). Plaintiffs also fail to establish antitrust standing in their alleged national television news and first-run theatrical motion pictures markets, which continues to provide an independent basis for dismissing Plaintiffs' claims based on either of these revised markets.

### A. Plaintiffs' Amendments Do Not Establish Article III Standing

#### 1. The Jan. 2026 Paramount+ Price Increase Still Does Not Establish Standing

As in the original Complaint, Plaintiffs continue to allege only one concrete and particularized harm, which is the Paramount+ price increase that occurred in January 2026, five months after the Skydance-Paramount merger. FAC ¶¶ 137–38. None of Plaintiffs' amendments cure the problems that made the Paramount+ price increase an insufficient basis to establish Article III standing in the original Complaint. Plaintiffs have withdrawn their claim that Plaintiffs Faust, McCarthy, and Talewsky were injured by the alleged price increase, leaving only Plaintiffs Marazzo and Rubinsohn. *See, e.g.*, FAC ¶¶ 19, 25, 76, 79, 135, 138–39, 171–73, 183 (alleging only Marazzo and Rubinsohn subscribe to Paramount+ or have paid a price increase). But the single alleged price increase remains incapable of providing Marazzo and Rubinsohn with Article III standing because there is still no plausible basis to connect this alleged price increase with any lessening of competition purportedly caused by either merger.

Specifically, the January 2026 Paramount+ price increase does not establish Plaintiffs' standing to bring a Section 7 claim against either merger because it is not fairly traceable to any lessening of competition purportedly caused by the Skydance-Paramount merger (or the Paramount-WBD merger).[1]

[1] Plaintiffs appear to concede that the pending Paramount-WBD merger has nothing to do with the alleged Paramount+ price increase. As the FAC acknowledges, the price increase in question was announced in November 2025 and implemented in January 2026, *see* FAC ¶¶ 24–25, before Paramount and WBD signed their merger agreement in February 2026, *see* Compl. ¶¶ 69–70.

To begin with, the Skydance-Paramount merger could not have plausibly eliminated any competition or increased concentration in the alleged direct-to-consumer subscription streaming services market because Skydance operated no streaming service pre-merger. It is implausible to trace a consumer price increase to a purported lessening of competition by a merger that resulted in no change in market shares or concentration. *See, e.g.*, *Yoshimoto v. Alaska Airlines, Inc.*, 2026 WL 1121960, at *8–9 (D. Haw. Apr. 24, 2026) (dismissing merger challenge where one party was not a competitor pre-merger); *Freeland v. Nippon Steel Corp.*, 2025 WL 1724997, at *6 (N.D. Cal. June 20, 2025) (same); *see also DeHoog v. InBev, SA/NV*, 2016 WL 5853733, at *3 (D. Or. July 22, 2016) (recommending dismissal of Section 7 claim where post-acquisition world would not cause change in market share percentage), *adopted by*, 2016 WL 5858663 (D. Or. Oct. 3, 2016) (dismissing with prejudice).

Further, Plaintiffs cannot supply the missing Article III causal connection by claiming a "post-acquisition monetization strategy" allegedly adopted by management following the Paramount-Skydance merger, *see* FAC ¶¶ 26, 173, because such a purported management strategy would have nothing to do with any alleged lessening of competition caused by the merger. Instead, insofar as any such "strategy" existed, there are no facts to connect it to any purported reduction in competition, or even to the merger itself. The "causal connection" needed for Article III standing is "between the injury and *the conduct complained of*," not separate alleged conduct of the defendant. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (emphasis added); *see also Wash. Environmental Council v. Bellon*, 732 F.3d 1131, 1142–43 (9th Cir. 2013) (plaintiffs established "a litany of adverse environmental effects" from climate change but failed to connect them to "the conduct complained of," *i.e.*, agencies' failure to set emission limits). Here, the conduct complained of is an alleged violation of Section 7 of the Clayton Act, which requires that there be an Article III causal connection between Plaintiffs' alleged injury and the merger's claimed substantial lessening of competition. No such connection is alleged in the FAC.

The shareholder letter Plaintiffs rely on attributed the price increase not to the merger, but rather to "ongoing investments in Paramount+." Ex. A at 5 (cited in FAC ¶¶ 24, 78).[2] Similarly, the FAC does not allege any facts to plausibly suggest that the purportedly new monetization strategy was merger-specific, as opposed to a strategy that was being adopted by management of streaming services throughout

[2] "Ex." refers to the exhibits to the concurrently filed Declaration of Jeffrey L. Kessler.

the industry. The FAC alleges that the "new" strategy "emphasiz[ed] average revenue per user and profitability." FAC ¶ 26. But such a strategy is indistinguishable from every streaming service's profit-maximizing business strategy, including legacy Paramount before it was acquired by Skydance. Legacy Paramount management regularly and prominently discussed average revenue per user (or "ARPU") as an important measure of streaming performance and profitability prior to the merger with Skydance. *See*, *e.g.*, Ex. B (Paramount Global Q4 2023 Earnings Call) (Feb. 28, 2024) (Paramount CFO: "[T]he ability to drive deeper engagement and ARPU growth . . . is the path to profitability in streaming."); Ex. C (Paramount Global Q3 2023 Earnings Call) (Nov. 2, 2023) (Paramount CFO citing "Paramount+ global ARPU growth" as part of company's "execution of our streaming strategy"). At bottom, Plaintiffs continue to ask the Court to infer Article III causation from a mere temporal sequence, which is legally insufficient. *Huskey v. City of San Jose*, 204 F.3d 893, 899 (9th Cir. 2000) (post hoc reasoning is a "logical fallacy"); MTD Order at 5.

Other facts Plaintiffs omitted from the FAC only underscore the conclusion that the price increase was a manifestation of ongoing commercial dynamics in the streaming industry and "fully consistent with a free, competitive market," rather than any alleged lessening of competition caused by the merger. *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1202 (9th Cir. 2012). As before, any alleged connection between the merger and the price increase is "severely undermined," MTD Order at 5, by the prevalence of incremental price increases across the streaming industry. For example, Netflix implemented four incremental price increases in its streaming service between January 2022 and March 2026, Disney+ implemented five incremental price increases between March 2021 and October 2025, and Peacock implemented four incremental price increases between July 2023 and August 2026.[3] The FAC acknowledges the reality of these "[o]ther streaming companies' price increases," FAC ¶ 140, but alleges no facts that plausibly distinguish the January 2026 Paramount+ price increase or suggest it was caused by the Skydance merger as opposed to industry dynamics. Plaintiffs cannot avoid these fatal facts on a Rule 12(b)(1) motion for lack of Article III standing by simply removing their prior allegation that "prices for all 'leading streaming services . . . have increased materially over time,' independent of the merger."

[3] *Streaming Price Tracker*, https://streamingpricetracker.com (last visited Aug. 21, 2026).

MTD Order at 5 (quoting Compl. ¶ 98). As this Court held, these facts cause Plaintiffs to "fail *Lujan*'s traceability requirement." *Id*.

Finally, Plaintiffs fare no better with their FAC allegations about a possible vertical impact of the Skydance-Paramount merger causing the alleged price increase. Plaintiffs allege a theoretical possibility of Paramount withholding Skydance content from streaming rivals that would somehow lead to a price increase, *see* FAC ¶¶ 70–75, 80–81, but they allege no facts to suggest such a foreclosure occurred and resulted in the alleged price increase. This renders Plaintiffs' theoretical claim implausible. *See*, *e.g.*, *FTC v. Microsoft Corp.*, 681 F. Supp. 3d 1069, 1089–100 (N.D. Cal. 2023) (discussing standard for evaluating vertical mergers). Absent plausible allegations of a substantial foreclosure and a linkage of that foreclosure to the alleged price increase, Plaintiffs' vertical claims cannot supply any basis for finding that the single alleged price increase is plausibly traceable to any alleged lessening of competition purportedly caused by the merger. *Id.*; *see also Brown Shoe Co. v. United States*, 370 U.S. 294, 328–29 (1962) ("size of the share of the market foreclosed" is "an important consideration," but "foreclosure of a de minimis share of the market will not tend 'substantially to lessen competition'"). Indeed, independent of the January 2026 price increase, the FAC does not allege any facts that (1) identify any specific Skydance content at risk of foreclosure, (2) explain why such content is significant enough to downstream competitors (streaming services) that its withholding would "probably substantially lessen competition" or harm Plaintiffs in any way, *Microsoft*, 681 F. Supp. 3d at 1090, or (3) explain why Paramount would have the incentive to forgo revenue it would earn from licensing Skydance content to competing streaming services, *see id*. at 1090–97 (no incentive to foreclose because, *inter alia*, licensing content to downstream rivals was "critical to [defendant's] financial success"). Plaintiffs' vertical theory is thus entirely "conjectural or hypothetical" and not a basis for finding Article III standing. *Lujan*, 504 U.S. at 560.

**2. The FAC's Other Allegations Do Not Establish Article III Standing**

As with the original Complaint, the FAC's "other allegations of harm from the mergers" continue to be "too vague and speculative to establish standing." MTD Order at 6. Plaintiffs continue to make boilerplate and conclusory allegations of competitive harm, such as higher prices, reduced output, and lower quality, *see*, *e.g.*, FAC ¶¶ 3, 146, 155, 166, and they also continue to "fail[] to allege any facts to

plausibly show how those claimed harms have materialized or would materialize," *see* MTD Order at 6.[4] This combination cannot establish Article III standing for either of their claims. *See Demartini*, 662 F. Supp. 3d at 1062 ("Plaintiffs' general allegation that the merger may cause 'higher prices, less innovation, less creativity, less consumer choice, decreased output, and other potential anticompetitive effects' is insufficient." (citation omitted)). For example, the FAC makes the conclusory assertion that acquiring Warner Bros. would "give Paramount the ability and incentive to increase the aggregate price of" Paramount+ and HBO Max, FAC ¶ 171, but it alleges no facts to suggest why any such price increase is likely to occur or that any of the Plaintiffs would pay it. Such "naked assertions devoid of further factual enhancement" are insufficient to establish Article III standing. *Blantz v. Ca. Dep't Corr. & Rehab.*, 727 F.3d 917, 927 (9th Cir. 2013); MTD Order at 6. There are simply no allegations that plausibly show how the mergers have caused or would cause injury to any of the Plaintiffs "in a personal and individual way." *Kumar v. Koester*, 131 F.4th 746, 751 (9th Cir. 2025).

Further, the FAC cannot establish Article III standing by speculating that debt obligations of the merged firm might generate "pressure to increase subscription revenue, reduce discounts and trials, increase advertising, consolidate services, eliminate overlapping expenditures, defer investment, or reduce programming." FAC ¶ 52. Once again, such a claim is not traceable to any alleged lessening of competition purportedly caused by the merger because a company's debt load is not a competitive effect. And, in any event, these allegations of negative effects caused by the debt load are guesswork and not tied to any facts plausibly alleged in the FAC. Indeed, the FAC acknowledges that its debt-related speculation is premised on company projections about "revenue or projected synergies fall[ing] short," *id.*, even

[4] Courts in this Circuit have dismissed Section 7 merger challenges brought by Plaintiffs' counsel for the same deficiencies as the FAC's. *See DeHoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758, 765 (9th Cir. 2018) (plaintiffs' assertion that post-merger entity "will adopt the distribution practices of" the acquiring firm was "a classic speculative conclusion" that "stops short of the line between possibility and plausibility"); *Fry v. Cap. One Fin. Corp.*, 2026 WL 751422, at *2–3 (N.D. Cal. Mar. 17, 2026) (no Article III standing because plaintiffs' "theory of harm is attenuated and conclusory" and lacks "individualized allegations"); *Whalen v. Albertsons Co.*, 2023 WL 8812882, at *1 (N.D. Cal. Dec. 20, 2023) (no Article III standing because plaintiffs "barely say anything" to demonstrate particularized and imminent injuries); *Freeland v. Nippon Steel Corp.*, 827 F. Supp. 3d 1241, 1249 (N.D. Cal. 2026) (no antitrust standing because "no Plaintiff participates in this relevant market, directly or indirectly, either as a consumer or a competitor" (cleaned up)); *Demartini v. Microsoft Corp.*, 662 F. Supp. 3d 1055, 1062–63 (N.D. Cal. 2023) (dismissing complaint where plaintiffs made only "general allegation[s] that the merger may cause 'higher prices, less innovation, . . . and other potential anticompetitive effects'"); *Yoshimoto*, 2026 WL 1121960, at *8–9 (dismissing merger challenge where one party was not a competitor pre-merger).

though the FAC alleges no facts that make such a shortfall likely. Instead, the FAC's allegations about the adverse impact of the merged entity's debt load depend upon "a highly attenuated chain of possibilities," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013), which cannot provide a basis for finding Article III standing. *See Fry*, 2026 WL 751422, at *3 (dismissing similar complaint on standing grounds because its "theory of harm is attenuated and conclusory"). Forced to concede that the precise mechanism of their injury "cannot be known," FAC ¶ 149, Plaintiffs are not able to show Article III standing in any of the markets that they have alleged. *See Khamooshi v. Politico LLC*, 786 F. Supp. 3d 1174, 1183 (N.D. Cal. 2025) ("[A]n unmaterialized risk of future harm does not qualify as a concrete injury.").

### B. Plaintiffs' Amendments Do Not Establish Antitrust Standing

Plaintiffs' amendments also do not cure the defects in antitrust standing that the Court previously held were fatal to Plaintiffs' claims in their television news and theatrical film markets. And, to the extent that Plaintiffs are now alleging injuries caused by a change in management philosophy or debt load impacting the streaming market, they do not have antitrust standing to assert a claim in that market either.

#### 1. Plaintiffs Do Not Have Antitrust Standing in Their Alleged Consumer Market for First-Run Theatrical Motion Pictures

In their newly alleged Consumer Market for First-Run Theatrical Motion Pictures, Plaintiffs' amendments do not fix their lack of antitrust injury. Plaintiffs changed their market definition to be consumer-facing ("sale of admission to differentiated first-run theatrical motion pictures to consumers," FAC ¶ 112), to try to get around the Court's holding that one must be a participant in the market one alleges is harmed to have antitrust injury. *See* MTD Order at 8. However, this amendment still does not establish antitrust injury because Defendants do not participate in a consumer-facing theatrical market, and antitrust injury requires that "the injured party be a participant in the same market as the alleged malefactors." *Malheur Forest Fairness Coal. v. Iron Triangle, LLC*, 164 F.4th 710, 733 (9th Cir. 2026). As the FAC acknowledges, Plaintiffs are allegedly customers of exhibitors, not movie distributors, and movie distributors compete only in an upstream market to license films to exhibitors. *See* FAC ¶¶ 112, 128, 177. Therefore, in an alleged downstream, consumer-facing theatrical film market, Plaintiffs are still neither "consumer[s] of [Paramount's] goods or services" nor "competitor[s] of [Paramount]." *Somers v. Apple, Inc.*, 729 F.3d 953, 963 (9th Cir. 2013).

Plaintiffs' new reliance on *Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982), *see* FAC ¶¶ 161, 179, does not establish antitrust injury. That case held, in relevant part, that an alleged antitrust violation must be the "proximate cause" of a plaintiff's alleged injury for that plaintiff to have antitrust standing. *See id*. at 477. That holding is consistent with *Malheur Forest* and other post-*McCready* Ninth Circuit precedent that requires private antitrust plaintiffs to participate "in the same market" as the defendants. *See Malheur Forest*, 164 F.4th at 733; *see*, *e.g.*, *Or. Laborers-Employers Health & Welfare Trust Fund v. Philip Morris Inc.*, 185 F.3d 957, 967 (9th Cir. 1999) (*McCready* "did *not* hold that there is no 'consumer' or 'market participant' requirement" for antitrust injury (emphasis in original)).

Moreover, Plaintiffs do not allege facts that plausibly show their alleged injuries are "inextricably intertwined with the injury" the mergers would allegedly cause in an upstream market in the same way the plaintiff's injuries in *McCready* were. *See* 457 U.S. at 479, 483–84. That case involved a "purposefully anticompetitive scheme" by a health insurer targeting psychologists, and the plaintiff, "a consumer of psychotherapy services," paid more for those services because the defendant reimbursed physicians and psychiatrists, but not psychologists, for those services. *See id*. at 480, 483. Thus, the harm to the plaintiff was an "integral . . . aspect" and "necessary step in effecting the ends of the alleged illegal conspiracy." *Id*. at 479. Here, by contrast, there are no allegations to plausibly suggest that any harm to Plaintiffs in an alleged downstream market would be "necessary" or "integral" to "effecting" the challenged mergers.

**2. Plaintiffs Do Not Have Antitrust Standing in Their Alleged Paid National Television News Market**

In the revised Paid National Television News Market, Plaintiffs continue to lack antitrust standing because (1) they are neither customers nor competitors of Defendants in that alleged market, and (2) the harms they claim in that alleged market are non-economic and therefore not "of the type the antitrust laws were intended to prevent." *Malheur Forest*, 164 F.4th at 733.

*First*, Plaintiffs narrowed their alleged news market to a consumer-facing one, *i.e.*, a market for news programming "supplied to consumers through paid cable, satellite, and live-TV streaming packages," FAC ¶ 92, and they acknowledge that they "purchase and consume the affected national news product through paid distribution channels," *id.* ¶ 174. In other words, Plaintiffs are customers of television programming distributors that sell linear "cable, satellite, and live-TV streaming packages," *id.*

¶ 92, but Plaintiffs do not allege Paramount or Warner Bros. sell those packages. Thus, as in Plaintiffs' alleged theatrical film market, Plaintiffs are neither "consumer[s] of [Paramount's] goods or services" in the alleged Paid National Television News Market nor "competitor[s] of [Paramount] in" that market. *Somers*, 729 F.3d at 963; *see also supra* p. 9.

*Second*, although Plaintiffs have tried to reformulate their alleged injury in this market to sound more economic, their amended allegations just repackage the same "viewpoint diversity" arguments the Court previously rejected. Specifically, the FAC alleges that the "economic value" of news programming depends on characteristics like "journalistic independence," "credibility," and "consumer trust." FAC ¶ 111; *see also id.* ¶¶ 154–55. But alleged decreases in abstract, non-economic concepts like "independence," "credibility," and "trust" are not injuries the antitrust laws are designed to protect. *Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 53 n.21 (1977) ("Competitive economies have social and political as well as economic advantages," but "an antitrust policy divorced from market considerations would lack any objective benchmark"); *Reilly v. Hearst Corp.*, 107 F. Supp. 2d 1192, 1195 (N.D. Cal. 2000) (antitrust laws "exclusively confine their scope to matters of economic consequence"); *Berlyn, Inc. v. Gazette Newspapers, Inc.*, 157 F. Supp. 2d 609, 619 (D. Md. 2001) ("stilled independent editorial voices and reduced . . . presentation and discussion of diverse viewpoints" are not antitrust injuries). Crediting the claim in the FAC that Plaintiffs "value" these non-economic factors when consuming news, FAC ¶ 111, their "ideological discomfort" with Paramount's perceived editorial viewpoint "does not implicate any legally protected interest." *Brown v. Nat'l Football League, Inc.*, 825 F. Supp. 3d 265, 277 (S.D.N.Y. 2026); *see also Murthy v. Missouri*, 603 U.S. 43, 75 (2024) (rejecting, as "startlingly broad," standing theory based on right to "hear[] unfettered speech on social media"). The FAC also alleges no facts plausibly to suggest that Paramount's and Warner Bros.' actual customers for television news—television distributors—place "economic value" on concepts like "independence" or "trust" when making their licensing decisions. But in any event, Plaintiffs would not have antitrust standing to assert any claim for purported injuries suffered by such distributors.

In addition, the FAC does not allege any facts plausibly suggesting that the combined firm is likely to reduce "original reporting," "investigative output," or "live coverage." *See* FAC ¶¶ 111, 154–55. Rather, Plaintiffs' amended allegations center on editorial decisions that Paramount has allegedly made—

prior to any merger with Warner Bros.—regarding *which* stories to cover and *who* within the company makes those editorial decisions. *See id.* ¶¶ 98–109. But claims evidencing Plaintiffs' alleged concern about the political implications of Paramount controlling the editorial viewpoint of CNN, *see id.*, do not constitute a cognizable antitrust injury. Indeed, a firm's "exercise of editorial control over its content" is protected by the First Amendment. *See McDermott v. Ampersand Pub., LLC*, 593 F.3d 950, 959 (9th Cir. 2010); *see also Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974) ("governmental regulation of [editorial decisions]" cannot occur "consistent with First Amendment guarantees of a free press").

Lastly, for the reasons discussed *supra* pp. 5–9, the new claims by Plaintiffs about suffering an injury from an alleged change in management philosophy or debt load do not establish antitrust injury because neither type of conduct would be the result of any alleged lessening of competition. Changes in management philosophy or debt load can be and often are put in place without any reduction in competition, and thus any price increase resulting from these changes does not plausibly "flow[] from" a lessening of competition. *See Malheur Forest*, 164 F.4th at 733.

## II. PLAINTIFFS FAIL TO ALLEGE A RELEVANT ANTITRUST MARKET

Plaintiffs' claims must also be dismissed for the independent reason that the FAC fails to plausibly allege a relevant market, which is a "necessary predicate" to a Section 7 claim. *See St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 783–85 (9th Cir. 2015). "A threshold step in any antitrust case is to accurately define the relevant market, which refers to the area of effective competition." *FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020). "Failing to define a relevant market alone is fatal to an antitrust claim." *Coronavirus Reporter v. Apple, Inc.*, 85 F.4th 948, 957 (9th Cir. 2023). "[A] complaint may be dismissed . . . if the complaint's 'relevant market' definition is facially unsustainable." *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018).

Plaintiffs' three revised alleged markets are variations of the three markets they previously alleged. *See* Compl. ¶¶ 85–118. Each of them is "facially unsustainable," *Hicks*, 897 F.3d at 1120, for many of the same reasons discussed in Defendants' original motion to dismiss. *See* ECF No. 36 at 15–18.

As to all three, Plaintiffs fail to allege a cognizable market because they still fail to address cross-elasticity of demand, *Reilly v. Apple Inc.*, 578 F. Supp. 3d 1098, 1108–09 (N.D. Cal. 2022), which is "[t]he principle most fundamental to product market definition," *Kaplan v. Burroughs Corp.*, 611 F.2d 286, 291

(9th Cir. 1979). Instead, while Plaintiffs make conclusory assertions about the concepts of "reasonabl[e] interchangeab[ility]," *see* FAC ¶¶ 65, 94–95, and "reasonable substitut[ion]," *see id.* ¶ 113, they do not allege any facts to plausibly apply these principles to any of their alleged markets. The principle of cross-elasticity of demand focuses on whether some products could "deprive" other products "of significant levels of business," *Hicks*, 897 F.3d at 1120, if those other products increased price materially. *See also St. Alphonsus*, 778 F.3d at 784 (explaining the "hypothetical monopolist" test). The FAC alleges no facts to plausibly suggest that any one of the three alleged markets satisfies the cross-elasticity of demand test. *Coronavirus Reporter*, 85 F.4th at 956. For this reason alone, all three alleged markets are facially deficient. There are also no FAC allegations that could plausibly satisfy any of the "practical indicia" for defining antitrust markets, such as "industry or public recognition" of the boundaries Plaintiffs allege. *See*, *e.g.*, *Hicks*, 897 F.3d at 1121 (citing *Brown Shoe*, 370 U.S. at 325).[5]

### A. Direct-to-Consumer ("DTC") Subscription Streaming Market

Plaintiffs' alleged subscription streaming services market is also legally deficient because the FAC fails to allege facts that would explain why other forms of video entertainment (*e.g.*, user-generated content or television programs available without a subscription) are not reasonably interchangeable with programming available on subscription streaming services. Their only discussion of this topic in the FAC is one conclusory sentence alleging that these alternative forms of video entertainment "are not reasonably interchangeable substitutes for a paid, on-demand library of professionally produced premium film and television programming." FAC ¶ 65. That is legally insufficient. *See*, *e.g.*, *Iqbal*, 556 U.S. at 678.

Additionally, the FAC fails to define the contours of "professionally produced" or "premium" video content, *see* FAC ¶¶ 63, 65, which are vague adjectives that do not supply any reasoned basis to differentiate films and television programs that fall under those categories from those that do not. *See*, *e.g.*, *Tundra, Inc. v. Faire Wholesale, Inc.*, 2024 WL 589097, at *1 (N.D. Cal. Feb. 13, 2024) (Martínez-Olguín, J.) (holding that a "fatal defect" in an antitrust complaint was plaintiff's "fail[ure] to define terms

---

[5] In the litigation filed by the Writers Guild of America, all the markets are labor markets for writers, none of which are alleged in the FAC here. *See Writers Guild of Am. W., Inc., et al. v. Paramount Skydance Corp. et al.*, No. 3:26-cv-07212, ECF No. 1 ¶¶ 107–32 (N.D. Cal.). In the litigation by the State of California and eleven other states, the alleged markets are for theatrical distribution (not customer-facing) and basic cable channel licensing, none of which are alleged in the FAC. *See California et al. v. Paramount Skydance Corp. et al.*, No. 4:26-cv-07116, ECF No. 1 ¶¶ 36–66 (N.D. Cal.).

like 'local,' 'new,' or 'emerging,' adjectives that facially pare down the relevant market to attribute a greater share to [defendant]"); *hiQ Labs, Inc. v. LinkedIn Corp.*, 485 F. Supp. 3d 1137, 1148 (N.D. Cal. 2020) (granting motion to dismiss where "parameters" of alleged market were "vague").

The FAC also fails to explain why "premium film and television programming" distributed through linear television, theatrical exhibition, or other methods is not reasonably interchangeable for consumers with the same content distributed through subscription streaming services. Indeed, the original Complaint alleged that a "Premium Video Distribution Market" included "cable television, and related offerings" as competitive products within the same market as streaming services, Compl. ¶ 86, yet the FAC excludes such programs from the relevant market without alleging any facts that could justify this exclusion. FAC ¶¶ 63–65. Underscoring this deficiency, the FAC acknowledges that streaming services compete for "viewing attention" and "viewing time" with competing platforms. *Id.* ¶¶ 33, 39, 67, 75; *see also id.* ¶ 31 (discussing "share of consumer viewing"); *id.* ¶ 44 (measuring market presence by "share of viewing"). The FAC offers no explanation as to why viewers in the alleged subscription streaming market would not reallocate their "viewing attention" or "viewing time" to other distribution channels if prices in the alleged market were raised. Because the FAC allegations fail to address this commercial reality or explain why only one subset of these viewing options is distinct from the others, their relevant market allegations fail. *See Reilly*, 578 F. Supp. 3d at 1107 ("A plaintiff cannot ignore economic reality and arbitrarily choose the product market relevant to its claims." (cleaned up)).

### B. Paid National Television News Market

Plaintiffs' "Paid National Television News Market" is also facially unsustainable. Even assuming that end-consumers like Plaintiffs were customers of Defendants in an alleged "Paid National Television News" market (they are not, *see supra* pp. 10–11), the FAC, like the original Complaint, does not allege facts that would explain why, from the perspective of an end-consumer, other forms of news media are not reasonable substitutes for "Paid National Television News."[6] *See Coronavirus Reporter*, 85 F.4th at 955. The FAC's only allegation in this regard is that other forms of newsgathering or journalism, such as

[6] Because Plaintiffs allege a consumer-facing television news market, they do not even attempt to allege facts that would explain why television distributors—Defendants' actual customers—would have distinct demand for paid national news channels as opposed to other news channels.

"newspapers" and "digital written journalism," "do not provide the same combination of" characteristics, such as "nationwide audiovisual newsgathering," "interviews," "correspondents and bureaus," and "immediate live coverage of national and international events." FAC ¶ 94. Not only are these allegations hopelessly vague, but they are also implausible. Plaintiffs continue to fail to explain why major national newspapers (*e.g.*, *New York Times*, *Washington Post*, *Wall Street Journal*, *USA Today*), wire services (*e.g.*, AP, Reuters), or other prominent online news publications (*e.g.*, Axios, The Atlantic) lack all of the identified attributes and otherwise do not compete against "Paid National Television News."

Moreover, while Plaintiffs have now excluded from their alleged relevant market any television news sources that are not "paid" (*e.g.*, broadcast news), they do not offer any facts to explain why such news programs are not reasonable substitutes for "Paid National Television News." A market cannot be gerrymandered in this manner without supporting factual allegations to make the alleged market plausible. *See Tanaka v. Univ. of S. California*, 252 F.3d 1059, 1063 (9th Cir. 2001) ("[Plaintiff's] conclusory assertion that the 'UCLA women's soccer program' is 'unique' and hence 'not interchangeable with any other program in Los Angeles' is insufficient."); *Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001) (dismissal on the pleadings is appropriate when a plaintiff fails "even to attempt a plausible explanation as to why a market should be limited in a particular way").

Finally, the FAC does not allege any facts to plausibly explain how "immediate live coverage," FAC ¶ 94, is an attribute unique to television news. In today's digital era, social media feeds and news alerts accessible at all times by smartphone (even when television news is not available) provide consumers with instantaneous access to breaking news coverage, including related video content, by major newspapers, wire services, and online news publications.

### C. Consumer Market for First-Run Theatrical Motion Pictures

Plaintiffs' "Consumer Market for First-Run Theatrical Motion Pictures" is likewise deficient on its face. The FAC fails to allege any facts to plausibly explain why—from a consumer's perspective—other forms of film distribution, *e.g.*, streaming services, are not reasonable substitutes for the theatrical exhibition of films. Such alternatives make it implausible that theater owners could profitably increase prices within a consumer market limited to theatrical films. *See*, *e.g.*, *Scaturo v. Fanatics, Inc.*, 2026 WL 810372, at *9 (S.D.N.Y. Mar. 23, 2026) (allegation that defendants "engaged in anticompetitive conduct

towards third-party distributors, causing prices to increase" did not support claims "expressly limited to purchasing cards 'directly' from Defendants"). The FAC simply ignores these economic realities of the film viewing industry, in which the boundaries between theatrical exhibition and other forms of distribution have been erased, and movie theaters increasingly compete for audience "viewing time" against streaming services—and other platforms like YouTube—that show films. FAC ¶¶ 31, 90.

The FAC alleges that watching any given film in a theater is not reasonably interchangeable with watching that "same film" through "later home streaming," FAC ¶¶ 113–114, but that is not the relevant question for market definition. The relevant question is whether, at any given time, streaming services—or other video entertainment services like YouTube—as a whole, are reasonable substitutes for theatrical films as a whole, such that a significant increase in price for theatrical film would shift enough viewing time to these other services to make the price increase unprofitable. *See*, *e.g.*, *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 975 (9th Cir. 2023). The FAC contains only a single paragraph addressing this issue through the conclusory assertion that "[a] deterioration in the price, availability, variety, or quality of first-run theatrical offerings would not lead to sufficient substitution into later home streaming to eliminate competition for first-run theatrical attendance." FAC ¶ 114. That is insufficient. To make this narrow market viable in light of obvious commercial realities, the FAC would need to include factual allegations plausibly showing why consumers of theatrical films would not be expected to switch in sufficient numbers to streaming services if prices for theatrical films materially increased. Indeed, the FAC acknowledges the commercial reality that consumers are constantly deciding between watching a film in the theaters and "later stream[ing] the same film," *Id.* ¶ 113, but it fails to allege any facts explaining why such reasonable interchangeability does not make its alleged relevant market definition implausible.

## III. THE FAC FAILS TO ALLEGE FACTS PLAUSIBLY SHOWING A LIKELY AND SUBSTANTIAL HARM TO COMPETITION FROM EITHER MERGER

Section 7 prohibits only those acquisitions whose effect "may be substantially to lessen competition." 15 U.S.C. § 18. Thus, to survive dismissal, Plaintiffs must allege facts plausibly showing a "reasonable probability" that a merger will substantially lessen competition in a relevant market. *FTC v. Microsoft Corp.*, 136 F.4th 954, 964 (9th Cir. 2025). In applying this standard, courts apply a burden-shifting framework that requires plaintiffs to first "establish a prima facie case that a merger is

anticompetitive." *DeHoog*, 899 F.3d at 763. The FAC fails to meet this initial burden with respect to either merger, thereby providing yet another reason why it should be dismissed with prejudice. *See*, *e.g.*, *Demartini*, 662 F. Supp. 3d at 1062–63.

### A. The FAC Fails to Allege Any Concrete Economic Facts That Could Plausibly Support Plaintiffs' Claim That Either Merger Is Likely to Substantially Lessen Competition

The FAC—like the original Complaint—is devoid of any concrete allegations of economic facts that could plausibly support Plaintiffs' claims. Section 7 does not condemn every horizontal acquisition that increases market concentration to any degree. Rather, to state a *prima facie* Section 7 claim, Plaintiffs must allege facts showing that a merger will likely result in "undue" market concentration. *See United States v. Anthem, Inc.*, 855 F.3d 345, 349 (D.C. Cir. 2017) (*prima facie* case requires "showing that the transaction will lead to undue concentration"); *California v. Sutter Health Sys.*, 130 F. Supp. 2d 1109, 1118 (N.D. Cal. 2001) (requiring "an initial statistical showing that the transaction will lead to undue concentration in the market"). To make that showing, modern Section 7 jurisprudence requires a plaintiff to put forward economic facts—such as market shares, market concentration, barriers to entry, or other alleged market characteristics—showing "that the merger will probably lead to anticompetitive effects." *St. Alphonsus*, 778 F.3d at 783–85 (requiring "statistical evidence" to establish *prima facie* case). The inquiry is not whether the merger eliminates a competitor. It is whether the pleaded facts make a substantial lessening of competition in the alleged relevant markets reasonably probable. The FAC fails this test because it is devoid of the allegations of market shares or market concentration that are ordinarily required to support a Section 7 claim.

Plaintiffs once again seek to shortcut this required showing by alleging the mere elimination of a rival, but courts, including in this District, reject that approach. "Merely alleging the elimination of a rival does not plausibly support an inference of an appreciable danger of anticompetitive effects in a relevant market." *Demartini*, 662 F. Supp. 3d at 1065. Courts likewise reject the proposition that "any non-trivial acquisition of a significant rival is per se violative of the Clayton Act." *Malaney v. UAL Corp.*, 2010 WL 3790296, at *7 (N.D. Cal. Sept. 27, 2010); *see also Aurora Astro Prods. LLC v. Celestron Acquisition, LLC*, 691 F. Supp. 3d 1132, 1149–50 (N.D. Cal. 2023) (dismissing Section 7 claim where allegations showed no more than elimination of rival). The governing rule is that the "economic concept of

competition, rather than any desire to preserve rivals as such, is the lodestar that shall guide the contemporary application of the antitrust laws." *Hospital Corp. of Am. v. FTC*, 807 F.2d 1381, 1386 (7th Cir. 1986). The FAC simply ignores these fundamental legal requirements.

Instead, Plaintiffs continue to press the legally incorrect premise that any "nontrivial" combination of competitors violates Section 7 because, in Plaintiffs' view, "the elimination of . . . independent competitive incentives . . . follows directly from consummation" of the merger. *See* FAC ¶¶ 7, 149. Rather than allege economic facts to support their claims, Plaintiffs allege that the Paramount-WBD merger "may substantially lessen competition by placing Paramount+ and HBO Max under common ownership," *id.* ¶ 85, that it will harm news competition by "eliminating an independent newsroom owner and allowing a single management structure to influence the competitive attributes of both organizations," *id.* ¶ 110, and that it will, through common ownership, change the incentive to "improve films, marketing, release strategies, and audience appeal," *id.* ¶¶ 116–17. Such conclusory assertions of competitive harm, based solely on the allegation that the merging parties were competitors to some degree, are not a legally sufficient substitute for allegations of economic facts capable of stating a *prima facie* Section 7 claim.

Plaintiffs' recycled reliance on an "incipiency" theory drawn from 1960s Supreme Court decisions such as *Brown Shoe*, *United States v. Von's Grocery Co.*, 384 U.S. 270 (1966), and *United States v. Pabst Brewing Co.*, 384 U.S. 546 (1966) is a bankrupt effort to avoid satisfying modern pleading requirements for a Section 7 claim. FAC ¶¶ 5, 7. The Ninth Circuit expressly rejected such an incipiency argument in *DeHoog*, 899 F.3d at 764–65 (holding that plaintiffs' assertion that a post-merger entity "will adopt the distribution practices of" the acquiring firm was "a classic speculative conclusion" that "stops short of the line between possibility and plausibility"). "Merely stating that" a post-merger entity "is likely to have incentives to change its practices," "without more, is insufficient." *Id.* at 762, 765. Incipiency permits courts to act before harm is certain, but it does not dispense with the requirement that a complaint plead facts making substantial competitive harm reasonably probable.

The FAC is devoid of any allegations of economic facts that might plausibly establish a likelihood that competition will be substantially lessened in any market, *i.e.*, that there exists a "monopolistic tendenc[y]" worthy of being curbed "in [its] incipiency." *Brown Shoe*, 370 U.S. at 317 n.32. Instead, the FAC treats as sufficient the merger of two firms with some allegedly overlapping assets, the alleged loss

of one independent owner through the merger, and conclusory assertions about post-merger incentives. These allegations, however, are *ipse dixit*, not a plausible factual basis to connect the challenged transactions to undue concentration or other market conditions that would likely harm competition.

**B. The FAC Alleges No Market Shares or Concentration Figures for the DTC Streaming or Paid National Television News Markets**

In both the alleged streaming services and television news markets, the FAC is an empty shell: it alleges neither market shares nor any method of measuring market concentration, such as the Herfindahl-Hirschman Index ("HHI"). This is fatal to Plaintiffs' Section 7 claims. *See Demartini*, 662 F. Supp. 3d at 1062–63. A Section 7 plaintiff must plead economic facts that permit the Court to assess the merging firms' competitive positions and the alleged anticompetitive effect of the transaction within the alleged relevant market. *See*, *e.g.*, *St. Alphonsus*, 778 F.3d at 783–85 (describing plaintiff's burden as "establishment of a prima facie case on statistical evidence"); *Sutter Health*, 130 F. Supp. 2d at 1118 (requiring "initial statistical showing"). The FAC offers no such allegations for either market.

***The Alleged Streaming Market.*** As with the original Complaint, Plaintiffs' amended allegations offer only bits and pieces of information about their alleged subscription streaming services market—subscriber counts and streaming revenue for some companies—without any market-wide allegations. *See* FAC ¶¶ 86–87. Plaintiffs allege no market shares, market concentration figures, or even the total volume of commerce allegedly involved. As before, Plaintiffs' subscriber and revenue allegations continue to inexplicably omit major streaming competitors, including Amazon (*id.* ¶ 86), Hulu (*id.* ¶ 86), and Apple (*id.* ¶¶ 86–87). None of this is sufficient to state a Section 7 claim against either merger.

Plaintiffs' inclusion of a statement from Paramount's CEO that the combined company after the merger with Warner Bros. would account for "nearly one-fifth of American television viewing," FAC ¶ 90, cannot plausibly cure the problem because it measures the share of a broader market than the one Plaintiffs allege in the FAC and because a 20% market share would not be large enough to state a plausible Section 7 claim in any event. *See*, *e.g.*, *FTC v. Lab. Corp. of Am.*, 2011 WL 3100372, at *19 (C.D. Cal. Feb. 22, 2011) ("Market shares must be measured in a proper relevant product and geographic market; alleging market shares in some other market is inadequate."); *Demartini v. Microsoft Corp.*, 2023 WL 4239653, at *4 (N.D. Cal. June 27, 2023) (rejecting market share allegations not "tethered to . . . the

alleged relevant market"); *see infra* pp. 20–21. And, as discussed *supra* pp. 7–8, Plaintiffs do not allege any facts to support a vertical foreclosure claim in the alleged streaming market with respect to the Skydance-Paramount merger or otherwise.

***The Alleged Paid Television News Market.*** In the alleged Paid Television News market, the absence of any alleged economic facts is glaring. The FAC says nothing at all about the size or competitive significance of any competitor in the alleged market. It identifies no revenues, viewership information, market shares, market concentration figures, or other economic facts that could potentially form the basis of a Section 7 claim. Instead, Plaintiffs make extensive allegations about pre-merger conduct, some of which does not even relate to television news, that they claim threatens "deterioration" of "journalistic independence," "credibility," and "consumer trust." *See* FAC ¶¶ 98–111. These types of allegations are not "cognizable economic harms protected by antitrust laws," MTD Order at 8; *see supra* pp. 11–12, and they are far afield from the allegations of economic facts that are required to support a plausible Section 7 theory. *See*, *e.g.*, *St. Alphonsus*, 778 F.3d at 783–85; *Sutter Health*, 130 F. Supp. 2d at 1118. Indeed, because over-the-air news networks like CBS News are available for free, without subscribing to "paid cable, satellite, and live-TV streaming packages," FAC ¶ 92, CBS News is not even in Plaintiffs' alleged television news market.

### C. The Market Shares Plaintiffs Allege for Their Purported Consumer Market for First-Run Theatrical Motion Pictures Are Misaligned with Their Alleged Market and Insufficient to Satisfy Plaintiffs' Burden to Establish a *Prima Facie* Case

The FAC alleges market shares for the alleged Consumer Market for First-Run Theatrical Motion Pictures, but these shares are misaligned with the alleged relevant market and are far too low to raise a plausible inference of competitive harm. As in the original Complaint, Plaintiffs allege the market is limited to the United States, FAC ¶ 118, yet they allege market shares that include Canada, *id.* ¶ 124. Plaintiffs concede this shortcoming. *See id.* n.1. Moreover, Plaintiffs' allegation that the merger of Warner Bros. and Paramount will result in a 23.6% market share, *id.* ¶ 124, falls well below the levels courts have identified as necessary to support a *prima facie* Section 7 case.[7] *See United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1123 (N.D. Cal. 2004) ("A presumption of anticompetitive effects from a combined share of 35% in a differentiated products market is unwarranted."); *Fry*, 2026 WL 751422, at *6 ("some courts

[7] The FAC alleges no market shares or other economic facts relating to the Skydance-Paramount merger.

hold that a plaintiff can satisfy their prima facie burden by showing that the merger will yield a combined market share of over 30%" and dismissing a complaint alleging a combined 16.2% share); *New York v. Kraft Gen. Foods, Inc.*, 926 F. Supp. 321, 366 (S.D.N.Y. 1995) (rejecting a challenge to a proposed merger resulting in a combined share below 35%). Nor does the FAC allege any increase in concentration in this alleged market, such as a change in HHI, that might support a likely substantial lessening of competition. *See* U.S. Dep't of Justice & FTC, Merger Guidelines § 2.1 (2023).

Plaintiffs' new allegations about the Disney-Fox merger, FAC ¶¶ 119–122, do not cure its pleading deficiencies about either of the mergers it challenges. The FAC alleges no facts to plausibly suggest that the alleged impact of the Disney-Fox merger is in any way predictive of the future competitive effect of the Paramount-WBD merger. The allegations about Fox-Disney concern a different transaction that occurred seven years ago involving different parties, different assets, and different market conditions. Plaintiffs do not allege any facts supporting the assertion that the Paramount-WBD merger would have comparable competitive effects in the alleged theatrical market.

Moreover, the FAC does not allege facts suggesting any barriers exist that would hinder competitors in the alleged theatrical market from expanding their output of films to counteract any actions by the merged firm to raise prices or restrict output. Given the low market share alleged for the merged company, the combination of no allegations of high barriers to entry or expansion makes any claim of competitive harm implausible. *See United States v. Baker Hughes Inc.*, 908 F.2d 981, 984–85, 987–89 (D.C. Cir. 1990) (finding ease of entry "would likely avert anticompetitive effects"); *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1441 (9th Cir. 1995) (no market power as a matter of law where "competitors have expanded output in the recent past, or have the ability to expand output in the future"); *United States v. Waste Mgmt., Inc.*, 743 F.2d 976, 982–83 (2d Cir. 1984) (current market shares "are not an accurate proxy for market power" when "potential competition [can] respond quickly to price increases" (citing *United States v. Gen. Dynamics*, 415 U.S. 486, 486 (1974)).

## CONCLUSION

For all the reasons set forth above, and because this is now Plaintiffs' second failed chance to state a viable Section 7 claim on multiple grounds, including a lack of Article III standing, the First Amended Complaint should be dismissed with prejudice.

Dated: August 28, 2026

Respectfully submitted,

By: */s/ Jeffrey L. Kessler*

Jeffrey L. Kessler (*pro hac vice*)
**WINSTON TAYLOR LLP**
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-6700
Facsimile: (212) 294-4700
jeffrey.kessler@winstontaylor.com

Jeanifer E. Parsigian (SBN 289001)
Matthew R. DalSanto (SBN 282458)
**WINSTON TAYLOR LLP**
101 California Street, 21st Floor
San Francisco, CA 94111-5891
Telephone: (415) 591-1000
Facsimile: (415) 591-1400
jeanifer.parsigian@winstontaylor.com
matthew.dalsanto@winstontaylor.com

Conor A. Reidy (*pro hac vice*)
Kevin B. Goldstein (*pro hac vice*)
**WINSTON TAYLOR LLP**
300 N. LaSalle Drive
Chicago, IL 60654-3406
Telephone: (312) 558-5600
Facsimile: (312) 558-5700
conor.reidy@winstontaylor.com
kevin.goldstein@winstontaylor.com

Matthew R. Huppert (*pro hac vice*)
**WINSTON TAYLOR LLP**
1901 L Street NW
Washington, DC 20036-3506
Telephone: (202) 282-5000
Facsimile: (202) 282-5100
matt.huppert@winstontaylor.com

Marguerite Sullivan (*pro hac vice*)
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
marguerite.sullivan@lw.com

Hanna Nunez Tse (SBN 346510)
**LATHAM & WATKINS LLP**
505 Montgomery St.,
Suite 2000
San Francisco, CA 94111-2562
Telephone: (415) 391-0600
hanna.nuneztse@lw.com

*Attorneys for Defendants Paramount Skydance Corporation and Skydance Media, LLC*