Joseph M. Alioto, Esq. (SBN 42680)
Tatiana V. Wallace, Esq. (SBN 233939)
**ALIOTO LAW FIRM**
One Sansome Street, 14th Floor
San Francisco, CA 94104
Tel: (415) 434-8900
Fax: (415) 434-9200
Email: jmalioto@aliotolaw.com

Ronald D. Foreman, Esq. (SBN 61148)
Ian A. Hansen, Esq. (SBN 255449)
**FOREMAN & BRASSO**
850 Montgomery Street, Suite 300
San Francisco, CA 94133
Telephone: (415) 433-3475
Facsimile: (415) 781-8030
Email: foremanandbrasso@foremanandbrasso.com

Attorneys for Plaintiffs Pamela Faust, Len Marazzo, Lisa McCarthy, Deborah Rubinsohn, and Gary Talewsky

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| PAMELA FAUST, LEN MARAZZO, LISA McCARTHY, DEBORAH RUBINSOHN, and GARY TALEWSKY,<br><br>Plaintiffs,<br>vs.<br><br>PARAMOUNT SKYDANCE CORPORATION (formerly Paramount Global), and SKYDANCE MEDIA, LLC,<br><br>Defendants. | Case No. 4:26-cv-03790-AMO<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT**<br><br>Hearing Date: October 22, 2026<br>Time: 2:00 p.m.<br>Judge: Hon. Araceli Martínez-Olguín<br>Courtroom: 5 |

# TABLE OF CONTENTS

STATEMENT OF ISSUES PRESENTED.......... 5
I. INTRODUCTION.......... 5
II. FACTUAL BACKGROUND.......... 7
III. LEGAL ARGUMENT.......... 10
A. ARTICLE III DOES NOT PERMIT THE COURT TO RESOLVE DISPUTED MERITS FACTS AT RULE 12. .......... 10
B. THE FAC PLAUSIBLY ALLEGES ARTICLE III STANDING.......... 12
1. The proposed Paramount-WBD combination threatens an imminent loss of competitive choice.......... 12
2. Marazzo and Rubinsohn allege an actual monetary injury fairly traceable to the completed Skydance acquisition.......... 13
3. Other streamers' price increases do not defeat traceability.......... 14
4. The proposed Paramount-WBD acquisition threatens imminent consumer injury.......... 14
5. The FAC uses debt as evidence of incentive, not as the antitrust violation.......... 15
C. PLAINTIFFS ALLEGE ACTUAL AND THREATENED INJURIES OF THE TYPE THE ANTITRUST LAWS PROTECT.......... 15
1. Higher prices, reduced output, diminished quality, and fewer choices are antitrust injuries.......... 15
2. Defendants' direct-purchaser theory does not bar Section 16 relief.......... 17
3. The news injury is economic, not ideological, and the First Amendment authorities do not answer it.......... 18
D. EACH RELEVANT MARKET IS PLAUSIBLY ALLEGED.......... 19
1. Defendants' substitution arguments present factual disputes, not facial market defects.......... 19
2. The DTC subscription-streaming market is functionally defined, and refinement from the original Complaint is permissible.......... 20
3. The paid national television news and first-run theatrical markets are plausibly defined.......... 21
E. THE FAC PLAUSIBLY ALLEGES THAT THE CHALLENGED ACQUISITIONS MAY SUBSTANTIALLY LESSEN COMPETITION.......... 22
1. Defendants improperly convert a method of proof into a mandatory pleading rule.......... 23
2. Defendants' cases do not establish the pleading rules they attribute to them.......... 24
3. The completed Skydance transaction states a vertical theory under du Pont.......... 25
4. The proposed Paramount-WBD combination eliminates specifically alleged head-to-head streaming competition.......... 26
5. The theatrical market allegations supply competitive mechanisms beyond a single market-share estimate. .......... 27
IV. CONCLUSION.......... 27

# TABLE OF AUTHORITIES

## CASES


*Agostini v. Felton*, 521 U.S. 203 (1997) ....................23
*American Ad Management, Inc. v. General Telephone Co. of California*, 190 F.3d 1051 (9th Cir. 1999) ....................16
*Aurora Astro Products LLC v. Celestron Acquisition, LLC*, 691 F. Supp. 3d 1132 (N.D. Cal. 2023) ....................24
*Biddle v. Walt Disney Co.*, No. 5:22-cv-07317-EJD, Dkt. 51 (N.D. Cal. Sept. 30, 2023) ....................19
*Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982) ....................18
*Boardman v. Pacific Seafood Group*, 822 F.3d 1011 (9th Cir. 2016) ....................19
*Brantley v. NBC Universal, Inc.*, 675 F.3d 1192 (9th Cir. 2012) ....................14
*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ....................6, 16, 22, 23
*Brown v. Board of Education*, 347 U.S. 483 (1954) ....................5, 23
*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977) ....................16, 17
*California v. Sutter Health System*, 130 F. Supp. 2d 1109 (N.D. Cal. 2001) ....................24
*City of Oakland v. Oakland Raiders*, 20 F.4th 441 (9th Cir. 2021) ....................16, 17
*Clapper v. Amnesty International USA*, 568 U.S. 398 (2013) ....................15
*Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690 (1962) ....................12
*Coronavirus Reporter v. Apple, Inc.*, 85 F.4th 948 (9th Cir. 2023) ....................19
*DeHoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758 (9th Cir. 2018) ....................20
*Demartini v. Microsoft Corp.*, 662 F. Supp. 3d 1055 (N.D. Cal. 2023) ....................20, 24
*Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100 (2025) ....................12
*Eclectic Properties East, LLC v. Marcus & Millichap Co.*, 751 F.3d 990 (9th Cir. 2014) ....................10
*Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023) ....................22
*Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019 (N.D. Cal. 2015) ....................17
*Freeland v. Nippon Steel Corp.*, 827 F. Supp. 3d 1241 (N.D. Cal. 2026) ....................20
*Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133 (9th Cir. 2003) ....................17
*Fry v. Capital One Financial Corp.*, 2026 WL 751422 (N.D. Cal. Mar. 17, 2026) ....................15, 20
*FTC v. Indiana Federation of Dentists*, 476 U.S. 447 (1986) ....................16
*FTC v. Laboratory Corp. of America*, No. SACV 10-1873 AG (MLGx), 2011 U.S. Dist. LEXIS 20354 (C.D. Cal. Feb. 22, 2011) ....................25
*FTC v. Microsoft Corp.*, 681 F. Supp. 3d 1069 (N.D. Cal. 2023) ....................12, 24, 26
*Gideon v. Wainwright*, 372 U.S. 335 (1963) ....................23
*Gorlick Distribution Centers, LLC v. Car Sound Exhaust System, Inc.*, 723 F.3d 1019 (9th Cir. 2013) ....................16
*Hicks v. PGA Tour, Inc.*, 897 F.3d 1109 (9th Cir. 2018) ....................19
*Hogan v. Amazon.com, Inc.*, No. 24-1893, 2025 U.S. App. LEXIS 6517 (9th Cir. Mar. 20, 2025) ....................17
*Hospital Corp. of America v. FTC*, 807 F.2d 1381 (7th Cir. 1986) ....................23
*Huskey v. City of San Jose*, 204 F.3d 893 (9th Cir. 2000) ....................13
*Katzenbach v. McClung*, 379 U.S. 294 (1964) ....................23
*Khamooshi v. Politico LLC*, 786 F. Supp. 3d 1174 (N.D. Cal. 2025) ....................15
*Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988 (9th Cir. 2018) ....................10
*Loving v. Virginia*, 388 U.S. 1 (1967) ....................23
*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ....................12
*Malaney v. UAL Corp.*, 2010 WL 3790296 (N.D. Cal. Sept. 27, 2010) ....................24
*Malheur Forest Fairness Coalition v. Iron Triangle, LLC*, 164 F.4th 710 (9th Cir. 2026) ....................18
*Manzarek v. St. Paul Fire & Marine Insurance Co.*, 519 F.3d 1025 (9th Cir. 2008) ....................10
*Maya v. Centex Corp.*, 658 F.3d 1060 (9th Cir. 2011) ....................12
*McDermott v. Ampersand Publishing, LLC*, 593 F.3d 950 (9th Cir. 2010) ....................19
*Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241 (1974) ....................19
*Miranda v. Arizona*, 384 U.S. 436 (1966) ....................23
*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) ....................23
*New York v. Kraft General Foods, Inc.*, 926 F. Supp. 321 (S.D.N.Y. 1995) ....................25
*Newcal Industries, Inc. v. IKON Office Solution*, 513 F.3d 1038 (9th Cir. 2008) ....................11, 19, 21
*PLS.com, LLC v. National Association of Realtors*, 32 F.4th 824 (9th Cir. 2022) ....................6, 15
*Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421 (9th Cir. 1995) ....................27
*Reiter v. Sonotone Corp.*, 442 U.S. 330 (1979) ....................6

*Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477 (1989) ........ 23
*Ross v. Bank of America, N.A. (USA)*, 524 F.3d 217 (2d Cir. 2008) ........ 12, 13
*Safe Air for Everyone v. Meyer*, 373 F.3d 1035 (9th Cir. 2004) ........ 11
*St. Alphonsus Medical Center-Nampa, Inc. v. St. Luke's Health System, Ltd.*, 778 F.3d 775 (9th Cir. 2015) ........ 23
*Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011) ........ 10
*Sumotext Corp. v. Zoove, Inc.*, No. 16-cv-01370-BLF, Dkt. 251 (N.D. Cal. Apr. 19, 2018) ........ 19
*Tanaka v. University of Southern California*, 252 F.3d 1059 (9th Cir. 2001) ........ 21
*Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001) ........ 19
*Tundra, Inc. v. Faire Wholesale, Inc.*, No. 23-cv-02513-AMO, 2024 U.S. Dist. LEXIS 25166 (N.D. Cal. Feb. 13, 2024) 21
*United States v. Aluminum Co. of America*, 377 U.S. 271 (1964) ........ 22, 23
*United States v. Anthem, Inc.*, 855 F.3d 345 (D.C. Cir. 2017) ........ 24
*United States v. Baker Hughes Inc.*, 908 F.2d 981 (D.C. Cir. 1990) ........ 27
*United States v. Continental Can Co.*, 378 U.S. 441 (1964) ........ 22
*United States v. E. I. du Pont de Nemours & Co.*, 353 U.S. 586 (1957) ........ 13, 25
*United States v. General Dynamics Corp.*, 415 U.S. 486 (1974) ........ 24
*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) (en banc) ........ 15
*United States v. Oracle Corp.*, 331 F. Supp. 2d 1098 (N.D. Cal. 2004) ........ 25
*United States v. Pabst Brewing Co.*, 384 U.S. 546 (1966) ........ 22, 23, 26
*United States v. Philadelphia National Bank*, 374 U.S. 321 (1963) ........ 22, 23
*United States v. Topco Associates, Inc.*, 405 U.S. 596 (1972) ........ 5
*United States v. Von's Grocery Co.*, 384 U.S. 270 (1966) ........ 23, 26
*United States v. Waste Management, Inc.*, 743 F.2d 976 (2d Cir. 1984) ........ 27
*Washington Environmental Council v. Bellon*, 732 F.3d 1131 (9th Cir. 2013) ........ 13
*Whalen v. Albertsons Cos.*, 2023 WL 8812882 (N.D. Cal. Dec. 20, 2023) ........ 20
*Yoshimoto v. Alaska Airlines, Inc.*, 2026 WL 1121960 (D. Haw. Apr. 24, 2026) ........ 20
*Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100 (1969) ........ 18
*In re NFL's Sunday Ticket Antitrust Litigation*, 933 F.3d 1136 (9th Cir. 2019) ........ 16

**STATUTES**

15 U.S.C. § 15 (Clayton Act § 4) ........ 16
15 U.S.C. § 18 (Clayton Act § 7) ........ 13, 15, 16, 20, 23, 24, 25, 26, 28
15 U.S.C. § 26 (Clayton Act § 16) ........ 17, 18, 28

**RULES**

Fed. R. Civ. P. 8 ........ 21, 24
Fed. R. Civ. P. 12(b)(1) ........ 11
Fed. R. Civ. P. 12(b)(6) ........ 10

**OTHER AUTHORITIES**

U.S. Dep't of Justice & Fed. Trade Comm'n, Merger Guidelines (2023) ........ 23, 24
Joseph Farrell & Carl Shapiro, Antitrust Evaluation of Horizontal Mergers: An Economic Alternative to Market Definition, 10 B.E. J. Theoretical Econ. 1 (2010) ........ 24, 26
Adam Smith, An Inquiry into the Nature and Causes of the Wealth of Nations, Book IV, ch. 8, ¶49 (1776) ........ 5, 6
Responses of Araceli Martínez-Olguín to Questions for the Record, U.S. Senate Committee on the Judiciary (Sept. 21, 2022) ........ 23

## STATEMENT OF ISSUES PRESENTED

1. Whether the FAC plausibly alleges Article III standing where Marazzo and Rubinsohn paid a post-acquisition Paramount+ price increase, and Plaintiffs presently purchase products whose independent competition the proposed Paramount-WBD acquisition would eliminate.

2. Whether Plaintiffs allege actual and threatened antitrust injury where they purchase the affected streaming, national television news, and first-run theatrical products and allege the threat of higher prices, reduced output, diminished quality and variety, and fewer independent choices.

3. Whether the FAC plausibly alleges relevant markets where it identifies the products, participants, competitive dimensions, substitutes, and reasons the asserted substitutes are not reasonably interchangeable.

4. Whether the FAC plausibly alleges that the challenged acquisitions may substantially lessen competition through lost rivalry, integration, changed incentives, vertical control of programming, reduced output and quality, entry barriers, and increasing industry concentration.

### I. INTRODUCTION

Few Justices understood the relationship between personal liberty and economic freedom more profoundly than Justice Thurgood Marshall. When Marshall stood before the Supreme Court to argue Brown v. Board of Education, he did so as a Black lawyer in a Washington, D.C., that still segregated Black Americans by law and practice. He was arguing against legally enforced segregation while personally living under segregation himself. Years later, as a Justice, he placed the antitrust laws alongside the Nation's fundamental guarantees of liberty:

> Antitrust laws in general, and the Sherman Act in particular, are the Magna Carta of free enterprise. They are as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms.
> *United States v. Topco Associates, Inc.*, 405 U.S. 596, 610 (1972).

Marshall's point matters here because consumers are the ultimate beneficiaries of competition. Adam Smith wrote that "[c]onsumption is the sole end and purpose of all

production." Adam Smith, *An Inquiry into the Nature and Causes of the Wealth of Nations*, Book IV, ch. 8, ¶49 (1776). The Supreme Court likewise recognizes that mergers can "reduce available consumer choice," *Brown Shoe Co. v. United States*, 370 U.S. 294, 345 n.72 (1962), and that the antitrust laws were conceived principally for individuals, "especially consumers." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 343-44 (1979). The Ninth Circuit likewise recognizes "fewer choices, higher prices, and lower-quality products" as antitrust injury. *PLS.com, LLC v. National Association of Realtors*, 32 F.4th 824, 840 (9th Cir. 2022).

The First Amended Complaint ("FAC") puts those consumers at the center. Plaintiffs buy Paramount+ and HBO Max subscriptions, first-run theatrical admissions, and paid television packages carrying national news. Paramount CEO David Ellison describes the same competitive relationships: Paramount competes against Netflix, Amazon, and Apple; Paramount+ and HBO Max will be combined; the American audience has the "final say" on theatrical success; and audience trust and reporting quality determine whether CNN and CBS News "thrive or wither." FAC ¶¶30-40. Plaintiffs are the subscribers, moviegoers, and viewers whose choices determine competitive success.

The two transactions present different injuries. The completed Skydance-Paramount acquisition transferred control of Paramount+ to Skydance; new management emphasized monetization, ARPU, and profitability; Paramount announced a price increase approximately three months later; and Marazzo and Rubinsohn paid it. FAC ¶¶18-26, 76-79. The proposed Paramount-WBD acquisition threatens to eliminate independent competition between Paramount+ and HBO Max, CNN and CBS News, and Paramount and Warner Bros. theatrical studios. FAC ¶¶82-97, 112-134, 151-180.

The FAC alleges subscriber overlap, integration plans, separate pricing and promotions, competing programming and theatrical slates, release-date rivalry, newsroom competition, and incentives to reduce overlapping output, investment, quality, variety, and choice. A theater cannot sell a ticket to a film a combined studio does not produce or release; a television distributor cannot restore journalists or investigations eliminated by common ownership; and a

subscriber directly pays the streaming service's price. The consumer is the object of the competition alleged here.

At Rule 12, the Court must decide whether those allegations plausibly establish traceability, threatened injury, antitrust injury, relevant markets, and a substantial lessening of competition, without resolving disputed economic facts against Plaintiffs.

## II. FACTUAL BACKGROUND

Plaintiffs challenge two related transactions in a consolidating media industry: Skydance's completed acquisition of Paramount Global, which closed August 7, 2025, and Paramount Skydance's proposed acquisition of Warner Bros. Discovery. The proposed transaction would place Paramount+, HBO Max, Paramount Pictures, Warner Bros., CBS News, CNN, and major film and television libraries under common ownership. FAC ¶¶18-29.

The completed acquisition provides a concrete example of the alleged effects. Before closing, Skydance independently supplied differentiated programming to Netflix, Apple TV+, Amazon Prime Video, and other services. The acquisition placed Skydance's development, licensing, exclusivity, windowing, and platform-allocation decisions under the same control as Paramount+. It also transferred control of Paramount+ pricing, tiers, discounts, promotions, programming expenditures, and distribution strategy. New management then adopted a DTC strategy focused on higher average revenue per user, fewer low-margin subscriptions, ending free trials, and reviewing discounting. Approximately three months after closing, Paramount announced a U.S. price increase; effective January 15, 2026, Essential rose from $7.99 to $8.99 and Premium from $12.99 to $13.99. Marazzo and Rubinsohn paid the increased charges. FAC ¶¶19-26, 68-81.

The proposed Paramount-WBD acquisition would go further. WBD owns HBO Max, HBO, CNN, Warner Bros. Pictures, and New Line Cinema; Paramount owns Paramount+, Paramount Pictures, CBS, and CBS News. WBD stockholders approved the transaction on April 23, 2026. Paramount identifies integrating Paramount+ and HBO Max, consolidating technology and operations, eliminating redundancies, increasing scale, and achieving more than $6 billion in

annual synergies as central objectives. The transaction is expected to leave the combined company with approximately $79 billion in net debt and aggressive deleveraging targets. FAC ¶¶27-29, 48-58.

Ellison's own statements are central because Paramount's Chairman and CEO describes the transaction in the same competitive terms alleged in the FAC. He says the combined company will compete against Netflix, Amazon, Apple, and other major platforms; that Paramount seeks greater "strength and resources" because those competitors' resources "dwarf ours"; and that Paramount and WBD together would account for nearly 20 percent of American television viewing time, or approximately 13 percent only if YouTube user-generated content is included in the denominator. FAC ¶¶30-31, 90-91. His description treats consumer attention as a competitive resource and the transaction as a response to rivalry for it.

Ellison repeatedly identifies consumers as the ultimate economic decision-makers. In defending the merger, he stated that "the audience - the American people - ... have the final say" on whether a movie succeeds or fails and whether a news organization thrives or withers. FAC ¶32. Paramount's operating disclosures make the same point in streaming: it measures subscriber growth, retention, viewing hours, engagement, and programming's ability to attract and retain subscribers. FAC ¶33. Marazzo and Rubinsohn currently buy both Paramount+ and HBO Max and decide whether to keep, cancel, upgrade, downgrade, or replace those services based on price, programming, advertising, promotions, quality, and value. FAC ¶34.

Ellison has also confirmed the planned streaming integration. Paramount states that DTC growth will be "essential to the success of the combined company," that it will combine the streaming portfolios "into one stronger platform," and that it plans "to put the 2 services together." FAC ¶53. Today, Paramount+ and HBO Max separately compete for recurring payments and viewing time through independently determined prices, programming, promotions, tiers, advertising loads, and quality. Common ownership would eliminate this competition. FAC ¶¶82-89.

The same consumer-centered description applies to theatrical film. Paramount uses audience insights and box-office performance to greenlight, market, and distribute films, and Ellison says the American audience has the "final say" on whether a movie succeeds. FAC ¶35. Plaintiffs regularly buy first-run theatrical admission and choose among differentiated films by genre, cast, franchise, quality, reviews, release date, placement, showtime, and premium format. FAC ¶36. Paramount and Warner Bros. presently make independent greenlight, slate, marketing, and release decisions and compete over finite release windows, screens, and audience attention. FAC ¶¶112-128. Ellison estimates the combined company would account for approximately 18 percent of domestic box office over twelve months and 22 percent over two years. FAC ¶125.

Ellison makes the same point about national television news. He identifies audience trust, journalistic independence, credibility, and reporting quality as attributes affecting whether CNN and CBS News "thrive or wither." FAC ¶37. Marazzo, McCarthy, Rubinsohn, and Talewsky pay for television packages carrying national news and regularly consume CNN, CBS News, or competing national news programming. FAC ¶38. The FAC further alleges that the completed Skydance-Paramount transaction coincided with management and editorial changes at CBS News, including the departures of Bill Owens and Wendy McMahon, additional corporate review of 60 Minutes, changes in CBS News leadership, disputes over a 60 Minutes report, departures of journalists and producers, and a decline in reported consumer trust. FAC ¶¶98-111. Plaintiffs rely on those facts not as ideological injury, but as evidence that ownership can affect reporting, staffing, investigations, live coverage, credibility, differentiation, and trust - attributes of the paid product.

The proposed transaction would place CNN and CBS News under one owner, while Paramount pursues integration and eliminates redundancies. Each maintains separate journalists, producers, editors, correspondents, bureaus, studios, management, and newsgathering operations. The FAC alleges a foreseeable risk that common ownership will treat independently maintained resources as duplicative and reduce the quantity, quality, differentiation, and value of national news supplied to consumers. FAC ¶¶151-160.

The transactions also occur amid broader media consolidation, including Disney's acquisition of most of 21st Century Fox's entertainment assets, the WarnerMedia-Discovery combination, and Skydance's acquisition of Paramount. FAC ¶¶41-47. Ellison's own defense of the Paramount-WBD transaction thus reinforces the FAC: he identifies the competitors, acknowledges the scale the combination would obtain, confirms integration, and repeatedly recognizes that consumers and audiences determine success. Plaintiffs are those consumers. The proposed acquisition would replace independently controlled firms competing for their purchases and attention with common ownership. FAC ¶¶30-40.

## III. LEGAL ARGUMENT

### A. ARTICLE III DOES NOT PERMIT THE COURT TO RESOLVE DISPUTED MERITS FACTS AT RULE 12.

Rule 12 tests the complaint, not which side's factual account is more persuasive. On Rule 12(b)(6), the Court generally considers the pleadings, properly incorporated exhibits, and matters subject to judicial notice; it accepts well-pleaded facts as true and construes them in Plaintiffs' favor. *Manzarek v. St. Paul Fire & Marine Insurance Co.*, 519 F.3d 1025, 1030-31 (9th Cir. 2008). The Ninth Circuit likewise cautions against using outside materials to resolve factual disputes. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998-1003 (9th Cir. 2018), holds that judicial notice and incorporation are limited exceptions and may not be used to dispute well-pleaded allegations or "short-circuit the resolution of a well-pleaded claim." *Id.* at 1003. Nor may Defendants prevail merely by offering another plausible inference. Where competing explanations are both plausible, the complaint survives. *Starr v. Baca*, 652 F.3d 1202, 1216-17 (9th Cir. 2011). As the Ninth Circuit later put it, "a tie goes to the plaintiffs" at the pleading stage. *Eclectic Props. E., Ltd. Liab. Co. v. Marcus & Millichap Co.*, 751 F.3d 990, 999 n.8 (9th Cir. 2014).

That rule answers much of the motion. Whether Paramount would have raised prices anyway, whether subscribers would substitute YouTube or linear television, whether news consumers would substitute newspapers or social media, whether moviegoers would substitute

later home streaming, and whether common ownership will reduce overlapping output are disputed factual propositions, not grounds to select Defendants' inference at Rule 12. The question is whether the FAC's allegations, taken as true with reasonable inferences drawn for Plaintiffs, plausibly state the claims. *See Newcal Industries, Inc. v. IKON Office Solution*, 513 F.3d 1038, 1043 n.2, 1045 (9th Cir. 2008).

Defendants invoke *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039-40 (9th Cir. 2004), because a factual Rule 12(b)(1) attack may look beyond the complaint. However, *Safe Air* also holds that a "jurisdictional finding of genuinely disputed facts is inappropriate" when jurisdiction and the merits intertwine and that the court may not "weigh the evidence or determine the truth of the matter." The FAC alleges a straightforward sequence: Skydance acquired Paramount; control and incentives changed; new management adopted a monetization strategy emphasizing ARPU and profitability; Paramount announced the increase about three months later; and Marazzo and Rubinsohn paid it. FAC ¶¶18-26, 76-79. It also alleges that the acquisition placed Skydance programming previously supplied to Paramount+ rivals under Paramount's control. FAC ¶¶67-81.

Defendants' assertion that Paramount would have raised prices anyway because it previously discussed ARPU growth asks the Court to choose a disputed counterfactual. A pre-acquisition business objective does not establish that the same increase, at the same time and amount, would have occurred under independent ownership, or that the acquisition did not alter incentives or contribute to the decision.

Defendants' reliance on Paramount's statement that the increase would support "ongoing investments in Paramount+" fares no better. Mot. at 5. A company may use increased revenue for investment and still adopt the increase because a transaction altered its competitive incentives. The statement does not establish the counterfactual fact Defendants need: that independently owned Paramount would have imposed the same increase, at the same time and in the same amount, absent Skydance's acquisition. At most, it supplies another factual inference that cannot be resolved against the FAC at this stage.

*FTC v. Microsoft Corp.*, 681 F. Supp. 3d 1069, 1091, 1096-98 (N.D. Cal. 2023), illustrates why that inquiry is factual. After extensive discovery and a five-day evidentiary hearing, the court evaluated testimony, documents, business practices, and incentives concerning what *Microsoft* and Activision would do absent and after the merger. For preliminary-injunction purposes, it accepted that Call of Duty likely would be offered exclusively on Game Pass, then assessed the competitive consequences. Defendants ask this Court to resolve the same kind of counterfactual against Plaintiffs before discovery. *Microsoft* therefore supports treating post-merger incentives as an evidentiary question, not an assumption. Defendants cannot invoke that case while asking the Court to decide on a truncated record that Paramount's pricing would have been identical absent the acquisition.

**B. THE FAC PLAUSIBLY ALLEGES ARTICLE III STANDING.**

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992), requires an injury in fact that is fairly traceable to the challenged conduct and likely redressable by a favorable decision. At the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice." *Id.* at 561. Article III does not impose a heightened injury requirement merely because the claim arises under the antitrust laws. *See Ross v. Bank of America, N.A. (USA)*, 524 F.3d 217, 224–25 (2d Cir. 2008). Article III requires fair traceability, not proximate causation. *Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011); *see Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100, 116-17 (2025) (permitting commonsense economic inferences). The FAC alleges more than chronology: transfer of control, changed incentives, a post-acquisition monetization strategy, the announced increase, implementation, and payment. The same principle forecloses choosing Defendants' causal inference now. *See Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 696-701 (1962) (requiring evidence to be viewed in the plaintiff's favor where competing causal inferences existed).

**1. The proposed Paramount-WBD combination threatens an imminent loss of competitive choice.**

*Ross* is directly on point. Credit-card consumers alleged that collusion removed non-arbitration cards from the market; the Second Circuit held that "reduction in choice and diminished quality" constituted Article III injury and rejected the contention that lost choice was merely a "subjective preference." 524 F.3d at 223-25. Here, Plaintiffs are consumers of the very independently controlled products and services that the proposed merger would place under common ownership: Paramount+ and HBO Max in streaming, CNN and CBS News in national television news, and Warner Bros. and Paramount theatrical films. As Ellison repeatedly states, consumers are the persons who ultimately determine the competitive value of these offerings through what they choose to watch, subscribe to, trust, and purchase. Reducing the number of independent firms competing for that consumer response therefore threatens precisely the harms Plaintiffs allege: fewer choices, diminished quality and variety, and reduced output.

**2. Marazzo and Rubinsohn allege an actual monetary injury fairly traceable to the completed Skydance acquisition.**

Defendants argue that the January 2026 Paramount+ increase cannot be traced to the Skydance acquisition because Skydance did not operate a streaming service. Mot. at 5. That attacks a horizontal theory the FAC does not plead. Before the transaction, Skydance supplied differentiated programming to Paramount+ rivals; after the acquisition, Paramount+ controlled decisions on development, licensing, exclusivity, windowing, and platform allocation. FAC ¶¶20-22, 68-81. Section 7 reaches such vertical acquisitions. *du Pont*, 353 U.S. at 592-95 (holding Section 7 reaches a stock acquisition where the relationship created a reasonable probability of foreclosing competitors from a substantial share of the relevant market).

Defendants' reliance on *Huskey v. City of San Jose*, 204 F.3d 893, 899 (9th Cir. 2000), and *Washington Environmental Council v. Bellon*, 732 F.3d 1131, 1142–43 (9th Cir. 2013), does not justify resolving causation against the FAC. *Huskey* involved chronology without evidence tying the decision-maker to the alleged retaliatory cause; *Bellon* involved broad climate injuries not connected to the particular agencies' failure to regulate. Here the FAC alleges the missing connection: changed control and incentives, transferred control over rival-supplied content, a

post-acquisition monetization strategy, the ensuing price increase, and Plaintiffs' payment of it. FAC ¶¶18–26, 67–81.

**3. Other streamers' price increases do not defeat traceability.**

Other streamers' price increases do not defeat traceability. They did not set Paramount+'s price or compel its increase. *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1202 (9th Cir. 2012), does not make an industry trend conclusive proof of Paramount's reason for acting. Defendants instead offer a competing inference that Paramount would have increased its price anyway, which the FAC cannot resolve at Rule 12. Defendants' assertion that Plaintiffs previously alleged streaming prices increased "independent of the merger" is simply false. Those words appear nowhere in the Complaint, which instead alleged that Paramount+'s post-acquisition increase was "consistent with weakened competitive constraints and worsened consumer-facing terms." Compl. ¶ 98; Mot. at 7.

Nor does an industry-wide pattern of streaming price increases establish that Paramount+'s increase was independent of the acquisition. The opposite inference is at least equally plausible: the industry has undergone repeated consolidation, and reduced competition resulting from that consolidation may itself contribute to higher prices across firms. Warner Bros. combined with Discovery; Disney acquired most of Twenty-First Century Fox's entertainment assets; and Amazon acquired MGM, including the historic United Artists library and assets. An industry in which multiple major competitors have been absorbed through consolidation may experience price increases across multiple services precisely because competitive alternatives have been reduced. Defendants therefore cannot convert evidence of similar price increases by other consolidated firms into proof that Paramount's own post-acquisition increase would have occurred anyway. At most, they offer a competing explanation for the same facts, which cannot be resolved against Plaintiffs at the pleading stage.

**4. The proposed Paramount-WBD acquisition threatens imminent consumer injury.**

The FAC alleges subscriber overlap, announced integration, bundling and tier changes, increased advertising, reduced discounts, reduced expenditures on overlapping programming,

and corresponding theatrical and news mechanisms. FAC ¶¶82–97, 151–180. These allegations identify an imminent threat to consumers who presently buy the affected products.

Neither *Clapper v. Amnesty International USA*, 568 U.S. 398, 410–14 (2013), nor *Khamooshi v. Politico LLC*, 786 F. Supp. 3d 1174, 1179–81 (N.D. Cal. 2025), involved a transaction that, if it closes, necessarily places presently independent competitors under common ownership. The uncertainty here concerns which alleged consumer consequence will materialize, not whether independent ownership disappears upon closing. *Fry v. Capital One Financial Corp.*, 2026 WL 751422, at *2–3 (N.D. Cal. Mar. 17, 2026), is likewise different because the FAC identifies the affected consumers, the rivalry eliminated, the announced integration, and the specific mechanisms of threatened injury.

**5. The FAC uses debt as evidence of incentive, not as the antitrust violation.**

Debt is pleaded only as evidence of post-closing incentives to monetize, integrate, and reduce overlapping expenditures, not as the antitrust violation itself. FAC ¶58.

**C. PLAINTIFFS ALLEGE ACTUAL AND THREATENED INJURIES OF THE TYPE THE ANTITRUST LAWS PROTECT.**

**1. Higher prices, reduced output, diminished quality, and fewer choices are antitrust injuries.**

Antitrust causation also does not demand certainty about a hypothetical competitive world. *See United States v. Microsoft Corp.*, 253 F.3d 34, 78-80 (D.C. Cir. 2001) (en banc). Section 7 is predictive: it asks whether an acquisition's effect "may be substantially to lessen competition."

The completed and proposed acquisitions present different injuries. Marazzo and Rubinsohn allege an actual higher Paramount+ price caused by the completed Skydance-Paramount acquisition; Plaintiffs allege threatened higher prices, reduced output, diminished quality and variety, and fewer independent choices from Paramount-WBD. Defendants previously conceded that "the injury of a price increase from a merger would be an antitrust injury." Tr. 6:19-22; FAC ¶172 n.2. Those harms are classic antitrust injuries. *See PLS.com*, 32

F.4th at 840 (recognizing "fewer choices, higher prices, and lower-quality products" as competitive injuries); *FTC v. Indiana Federation of Dentists*, 476 U.S. 447, 459, 461–62 (1986) (competition extends beyond price to the package of services and consumer choice); *In re NFL's Sunday Ticket Antitrust Litigation*, 933 F.3d 1136, 1150–52 (9th Cir. 2019) (recognizing antitrust injury where consumers alleged that restraints reduced output and increased the price of the viewing product they purchased); *Brown Shoe Co. v. United States*, 370 U.S. 294, 345 n.72 (1962) (explaining that expansion through merger is "more likely to reduce available consumer choice" and that Section 7 was enacted to prevent even small mergers contributing to industry concentration).

The modern concept of antitrust injury originates with *Brunswick*: injury must be "of the type the antitrust laws were intended to prevent and ... flow[] from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). *Brunswick* itself involved Section 7 acquisitions, but the plaintiffs sought treble damages because the acquisitions kept failing bowling centers in business. Their loss flowed from preserved competition, not reduced competition. *Id.* at 487-89. Here the alleged injury is the opposite: consumer harm flowing from elimination of independent rivalry.

The Ninth Circuit later incorporated *Brunswick* into the five-factor antitrust-standing framework in *American Ad Management, Inc. v. General Telephone Co. of California*, 190 F.3d 1051, 1054-57 (9th Cir. 1999), a Sherman Act § 1 case involving Yellow Pages commissions and discounting. Its framework includes damages-oriented concerns such as duplicative recovery and apportionment. *Id.* at 1054. Those concerns do not alter *Brunswick*'s core inquiry whether Plaintiffs' threatened injury is of the type antitrust law protects and flows from reduced competition. *City of Oakland v. Oakland Raiders*, 20 F.4th 441, 455-57 (9th Cir. 2021), likewise applied that framework to a Section 4 damages claim arising from the Raiders' relocation, expressly noting that "[a]ctions for damages, like this one, are authorized by § 4 of the Clayton Act." *Id.* at 455. Here consumers seek prospective relief before the predicted loss of competition fully occurs. *Gorlick Distribution Centers, LLC v. Car Sound Exhaust System, Inc.*, 723 F.3d

1019, 1024-27 (9th Cir. 2013), was also not a merger or Section 16 case; it concerned pricing claims resolved on summary judgment. Its requirement of harm to competition, not merely to an individual competitor, is satisfied because Plaintiffs allege market-wide consumer harms from lost rivalry.

*Hogan v. Amazon.Com, Inc., No. 24-1893,* 2025 U.S. App. LEXIS 6517, at *4 (9th Cir. Mar. 20, 2025), is different. There, consumers alleged injury in online retail from restraints in a separate logistics-services market and depended on sellers passing higher costs downstream. *Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019, 1026-28 (N.D. Cal. 2015), likewise involved alleged search restraints but injury through Android-phone prices. Here, Plaintiffs buy the products whose competitive output and attributes are threatened. A theater cannot exhibit a film that is never greenlit or released, and a television distributor cannot restore reporting or staffing eliminated by common ownership.

In sum, the "modern" cases do not undermine Plaintiffs' antitrust-injury allegations or require mechanical application of a damages-oriented balancing test to prospective relief. They confirm *Brunswick*'s familiar principle that injury must flow from the anticompetitive feature of the challenged conduct. In equity, the question is whether the conduct threatens such injury. *See City of Oakland*, 20 F.4th at 455-56. Plaintiffs allege exactly that: an actual higher price from the completed acquisition and threatened higher prices, reduced output, diminished quality and variety, and fewer independent choices from Paramount-WBD. A threat is necessarily prospective; it need not already have come to pass to be real.

**2. Defendants' direct-purchaser theory does not bar Section 16 relief.**

Defendants' intermediary argument cannot convert Section 16 into a direct-purchaser statute. The Ninth Circuit states the rule directly: "Illinois Brick doesn't apply to equitable relief." *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1145 (9th Cir. 2003). Plaintiffs seek an injunction against threatened loss of competition, not duplicative damages apportioned through a distribution chain. An exhibitor or television distributor is a channel through which the product reaches consumers; it does not restore a film never produced, reporting eliminated by

common ownership, or competition between independently controlled products. *McCready* confirms that antitrust standing is not defeated merely because an intermediary participates in the chain where the plaintiff's injury is economically intertwined with the breakdown of competition. *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 478, 480–84 (1982). *Malheur Forest Fairness Coalition v. Iron Triangle, LLC*, 164 F.4th 710, 733-35 (9th Cir. 2026), does not help Defendants. It requires participation as a consumer or competitor and rejected bidders whose injuries did not plausibly show consumer harm. Plaintiffs here are recurring consumers of the products whose competitive price, output, quality, variety, and alternatives are threatened

Section 16 independently confirms the prospective nature of the remedy. It authorizes "[a]ny person" to seek injunctive relief "against threatened loss or damage by a violation of the antitrust laws." 15 U.S.C. § 26. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130 (1969), holds that § 16 authorizes relief for threatened injury and does not require that actual injury already have occurred; a plaintiff need only show a significant threat from an impending violation or a contemporary violation likely to continue or recur. Plaintiffs therefore need not wait for the proposed Paramount-WBD acquisition to close and inflict the very harm they seek to prevent.

**3. The news injury is economic, not ideological, and the First Amendment authorities do not answer it.**

The news injury is economic, not ideological. The FAC expressly disclaims ideological injury and alleges a threatened degradation of a paid product through reduced reporting, staffing, live coverage, investigations, differentiation, and reliability. FAC ¶154. Ellison himself identifies audience trust, journalistic independence, and reporting quality as factors determining whether CNN and CBS News "thrive or wither." FAC ¶¶37–40. In other words, consumers decide whether better reporting, more reliable coverage, greater differentiation, and stronger journalism succeed in the marketplace. The threatened loss of competition over those product attributes is therefore a threatened consumer injury, not an abstract political or ideological grievance.

Plaintiffs seek no order directing CNN or CBS what to publish. Defendants' First Amendment authorities therefore address a different problem: governmental control of editorial content or ideological interests. *See McDermott v. Ampersand Publishing, LLC*, 593 F.3d 950, 959 (9th Cir. 2010); *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 258 (1974). An injunction preserving separate ownership leaves each newsroom free to exercise its own editorial judgment. *Boardman v. Pacific Seafood Group*, 822 F.3d 1011, 1023 (9th Cir. 2016), supports prospective relief before independent competitive capabilities are lost.

**D. EACH RELEVANT MARKET IS PLAUSIBLY ALLEGED.**

**1. Defendants' substitution arguments present factual disputes, not facial market defects.**

Market definition ordinarily is factual and need not be pleaded with evidentiary specificity. *Newcal*, 513 F.3d at 1045. Unlike the facially artificial or undefined markets in *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120-22 (9th Cir. 2018), and *Coronavirus Reporter v. Apple, Inc.*, 85 F.4th 948, 956-57 (9th Cir. 2023), the FAC identifies products, sellers, competitive dimensions, proposed substitutes, and why those substitutes are not reasonably interchangeable. Whether consumers actually substitute among those products is a factual question.

Paramount's own statements corroborate the pleaded markets. Ellison identifies Netflix, Amazon, and Apple as competitors; promises extensive theatrical and television output; and says audiences have the "final say" on movies and news organizations. FAC ¶¶30-40, 53-60, 90-91. Those statements reinforce that the markets are facially plausible, although discovery may refine their contours. *See Todd v. Exxon Corp.*, 275 F.3d 191, 199-202, 205 (2d Cir. 2001) (market definition "deeply fact-intensive"); *Biddle v. Walt Disney Co.*, No. 5:22-cv-07317-EJD, Dkt. 51 at 18-19 (N.D. Cal. Sept. 30, 2023) (market "adequate at this stage"; substitute question better resolved at summary judgment); *Sumotext Corp. v. Zoove, Inc.*, No. 16-cv-01370-BLF, Dkt. 251 at 11 (N.D. Cal. Apr. 19, 2018) (whether market "ultimately will stand" not decided on motion to dismiss).

Defendants attempt to divert attention from the allegations here by citing a handful of prior merger actions brought by Plaintiffs' counsel as though those cases establish a recurring pleading defect. They do not. In *Demartini v. Microsoft Corp.*, 662 F. Supp. 3d 1055 (N.D. Cal. 2023), the court dismissed the original complaint with leave to amend; after amendment, the court denied dismissal of the vertical Section 7 claim. *See Demartini v. Microsoft Corp.*, No. 22-cv-08991-JSC, Dkt. 228 (N.D. Cal. June 27, 2023). *Fry v. Capital One Financial Corp.*, 2026 WL 751422 (N.D. Cal. Mar. 17, 2026), likewise dismissed with leave to amend, after which plaintiffs filed a Second Amended Complaint. In *Whalen v. Albertsons Cos.*, 2023 WL 8812882 (N.D. Cal. Dec. 20, 2023), the court granted leave to amend; the transaction was later abandoned following governmental litigation, and the private action became moot. In *Yoshimoto v. Alaska Airlines, Inc.*, 2026 WL 1121960 (D. Haw. Apr. 24, 2026), the court left open further amendment; plaintiffs elected to stand on their pleading and appeal. *Freeland v. Nippon Steel Corp.*, 827 F. Supp. 3d 1241, 1247–48 (N.D. Cal. 2026), actually cuts against Defendants' Article III argument: although those consumers were several steps downstream from the allegedly restrained steel market, the court held that they plausibly alleged traceability and redressability because Article III does not require proximate causation and permits commonsense economic inferences concerning downstream injury. The court dismissed on separate grounds. *Id.* at 1249–54. That judgment is on appeal. *DeHoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758 (9th Cir. 2018), involved a materially different transaction because the acquired company's United States business was divested, leaving concentration in the alleged United States market unchanged. Defendants' collection of a handful of prior cases therefore does not establish a recurring pleading defect or show that the markets alleged here are facially implausible.

**2. The DTC subscription-streaming market is functionally defined, and refinement from the original Complaint is permissible.**

Vague adjectives do not define the DTC market. "Professionally produced" distinguishes studio film and television programming from user-generated content, while the FAC identifies paid recurring services, dimensions of competition, and excluded substitutes. FAC ¶¶63–67.

*Tundra, Inc. v. Faire Wholesale, Inc.*, No. 23-cv-02513-AMO, 2024 U.S. Dist. LEXIS 25166, at *2 (N.D. Cal. Feb. 13, 2024) involved adjectives that themselves artificially narrowed the market; this FAC does not. Nor does competition for finite "viewing time" collapse all entertainment into one market. Products may compete for discretionary time or spending without being reasonably interchangeable after a price increase. Ellison's own comparison of Paramount with Netflix, Amazon, and Apple, while discussing YouTube separately, corroborates the alleged competitive set. The original Complaint's broader premium-video allegation does not bind the FAC. Rule 8 permits the presentation of alternative and inconsistent theories. Under *Newcal*, the operative question at Rule 12 is not whether Defendants can posit a different market, but whether the market alleged in the FAC is facially unsustainable as a matter of law. 513 F.3d at 1045.

**3. The paid national television news and first-run theatrical markets are plausibly defined.**

Paid national television news combines national audiovisual newsgathering, bureaus, live coverage, studio programming, interviews, and original reporting. FAC ¶¶92-96. The fact that newspapers, websites, or social media reproduce some attributes does not establish reasonable interchangeability; that is a question of factual substitution which should not be resolved on a motion to dismiss. *Tanaka v. University of Southern California*, 252 F.3d 1059, 1063 (9th Cir. 2001), involved a bare assertion that a single university women's soccer program was "unique" and therefore constituted its own market. The FAC does not rely on such a label; it identifies concrete functional characteristics of paid national television news and alleges why newspapers, social media, and other forms of journalism do not provide the same competitive package.

Defendants' argument mistakes alternative distribution for absence from the market. CBS News does not cease competing with CNN merely because some CBS programming can also be received free over the air. The FAC alleges that both are distributed to consumers through paid television packages and compete for the same audience demand, attention, programming investment, and viewing choices. That some CBS programming is also available over the air without an additional charge does not eliminate competition between CBS News and CNN. A

product can constrain another product competitively even when consumers do not pay a separate charge for each distribution channel.

The theatrical market likewise refers to the sale of admission to differentiated first-run films, not to "watching a movie" generally. FAC ¶112. The FAC alleges facts supporting the inference that first-run theatrical exhibition is not reasonably interchangeable with streaming generally. Theatrical exhibition provides time-sensitive access to films during their initial release window, before later home availability; premium large-format presentation and theatrical sound unavailable in ordinary home viewing; and a communal, location-based viewing experience that streaming does not replicate. FAC ¶¶113–116. The products also compete under materially different commercial conditions. Theatrical films compete for a finite number of screens, premium-format auditoriums, opening weekends, release dates, and moviegoer attendance, and studios make separate decisions concerning theatrical slates, release timing, marketing expenditures, and placement. *Id.* ¶¶115–116. A consumer who wants to see a particular first-run film during its theatrical window cannot obtain that same product by subscribing to a streaming service on that date if the film is not yet available there. Finally, *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 975 (9th Cir. 2023), identifies the economic question of whether sufficient consumer substitution would discipline a price increase, but it arose after a full bench trial on a developed evidentiary record concerning consumer behavior and substitution. Here, whether moviegoers would substitute later home streaming for first-run theatrical attendance in sufficient numbers to defeat the pleaded market is a factual question that cannot be resolved against Plaintiffs at Rule 12.

**E. THE FAC PLAUSIBLY ALLEGES THAT THE CHALLENGED ACQUISITIONS MAY SUBSTANTIALLY LESSEN COMPETITION.**

At the prior hearing, the Court asked whether Plaintiffs have authority other than *United States v. Pabst Brewing Co.*, 384 U.S. 546 (1966). The answer is yes. *Pabst* is part of a Supreme Court line including *Brown Shoe*, 370 U.S. 294; *United States v. Philadelphia National Bank*, 374 U.S. 321 (1963); *United States v. Continental Can Co.*, 378 U.S. 441 (1964); *United States*

*v. Aluminum Co. of America*, 377 U.S. 271 (1964); and *United States v. Von's Grocery Co.*, 384 U.S. 270 (1966). Judge Posner later stated expressly: "None of these decisions has been overruled." *Hospital Corp. of America v. FTC*, 807 F.2d 1381, 1385 (7th Cir. 1986). The current DOJ and FTC Merger Guidelines likewise recognize that Supreme Court statutory holdings remain controlling unless modified and continue to rely on *Brown Shoe*, *Philadelphia National Bank*, and *Pabst*. U.S. Dep't of Justice & Fed. Trade Comm'n, Merger Guidelines 2 (2023).

Defendants nevertheless invoke "modern Section 7 jurisprudence" and say Plaintiffs' position has been "long . . . rejected." Mot. at 1, 17. Supreme Court precedent does not lose force with age. When directly applicable, lower courts must follow it and leave to the Supreme Court "the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989); *accord Agostini v. Felton*, 521 U.S. 203, 237 (1997).[1]

**1. Defendants improperly convert a method of proof into a mandatory pleading rule.**

Section 7 contains no HHI or minimum-share pleading requirement. The structural presumption is a method of proving likely competitive harm in sufficiently concentrated markets, not an element of every Section 7 claim and not a safe harbor below a numerical threshold. *See Philadelphia National Bank*, 374 U.S. at 363; *St. Alphonsus Medical Center-Nampa, Inc. v. St. Luke's Health System, Ltd.*, 778 F.3d 775, 785–86 (9th Cir. 2015). Defendants turn the absence of a presumption into a presumption of legality. The statute does not.

*St. Alphonsus* itself followed a nineteen-day bench trial and said a prima facie case "can" be established through sufficiently high market share; it did not say such a showing must be pleaded in every case. 778 F.3d at 785. It also emphasized that shares and concentration statistics

[1] Like federal judicial nominees generally, this Court affirmed during the Senate confirmation process that it would faithfully apply binding precedent of the United States Supreme Court and the Ninth Circuit. *See* Responses of Araceli Martínez-Olguín to Questions for the Record, U.S. Senate Committee on the Judiciary (Sept. 21, 2022) (stating that, if confirmed, she would "fully, faithfully, and impartially apply all binding Supreme Court and Ninth Circuit precedent"). Binding precedent does not lose force with age. *See, e.g.*, *Brown v. Board of Education*, 347 U.S. 483 (1954); *Gideon v. Wainwright*, 372 U.S. 335 (1963); *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964); *Katzenbach v. McClung*, 379 U.S. 294 (1964); *Miranda v. Arizona*, 384 U.S. 436 (1966); *Loving v. Virginia*, 388 U.S. 1 (1967).

are "not conclusive indicators" because Section 7 examines the market's "structure, history and probable future." *Id.* at 786. Defendants turn "can" into "must." *General Dynamics* likewise warns against treating a current share as dispositive. 415 U.S. at 498.

Modern merger economics points the same way. Farrell and Shapiro explain that concentration can be an imperfect proxy in differentiated-product markets and focus on direct rivalry and changes in incentives caused by common ownership. Joseph Farrell & Carl Shapiro, Antitrust Evaluation of Horizontal Mergers: An Economic Alternative to Market Definition, 10 B.E. J. Theoretical Econ. 1, 2-6 (2010). The 2023 Merger Guidelines likewise recognize competition between merging firms as evidence of threatened harm apart from market shares. Merger Guidelines §§ 2.2, 4.2.E, 4.3.B.

**2. Defendants' cases do not establish the pleading rules they attribute to them.**

Defendants' principal merger cases do not create the pleading rules they attribute to them. *Demartini v. Microsoft Corp.*, 662 F. Supp. 3d 1055, 1062-65 (N.D. Cal. 2023), *Malaney v. UAL Corp.*, 2010 WL 3790296, at *7 (N.D. Cal. Sept. 27, 2010), and *Aurora Astro Products LLC v. Celestron Acquisition, LLC*, 691 F. Supp. 3d 1132, 1149-50 (N.D. Cal. 2023), rejected theories resting merely on a rival's disappearance. The FAC alleges much more: subscriber overlap, independent pricing and promotion, separate slates, internalized cannibalization, integration plans, content-control and newsroom-redundancy incentives, entry barriers, and specific threats to price, output, quality, variety, and choice. FAC ¶¶67-134, 151-180.

Procedural posture matters. *Malaney* denied a preliminary injunction after evidence; it did not define Rule 8. *Microsoft*, 681 F. Supp. 3d at 1097-98, followed extensive discovery and a five-day hearing; its result turned on evidence that Activision historically had not materially supplied rival subscription libraries. The FAC alleges the opposite as to Skydance.

Defendants' concentration authorities also do not create a numerical pleading floor. *See United States v. Anthem, Inc.*, 855 F.3d 345, 349, 354 (D.C. Cir. 2017) (applying the structural presumption based on proof that the transaction would produce undue concentration in a defined market, including HHI evidence); *California v. Sutter Health System*, 130 F. Supp. 2d 1109,

1118 (N.D. Cal. 2001) (describing the government's prima facie burden in terms of an "initial statistical showing" that a transaction would lead to undue concentration, in a case resolved on an evidentiary record rather than at the pleading stage); *FTC v. Lab. Corp. of Am.*, No. SACV 10-1873 AG (MLGx), 2011 U.S. Dist. LEXIS 20354, at *35 (C.D. Cal. Feb. 22, 2011) ("[T]his analytical structure does not exhaust the possible ways to prove a § 7 violation on the merits, much less the ways to demonstrate a likelihood of success on the merits in a preliminary proceeding."); *United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1123 (N.D. Cal. 2004) (holding after trial that a 35% combined share in the differentiated-products market proven there did not warrant a presumption of anticompetitive effects); *New York v. Kraft General Foods, Inc.*, 926 F. Supp. 321, 366 (S.D.N.Y. 1995) (concluding after evaluating market-share, concentration, and competitive-effects evidence that absence of a structural presumption did not end the inquiry because the acquisition still raised competitive concerns requiring consideration of other evidence).

**3. The completed Skydance transaction states a vertical theory under *du Pont*.**

Defendants' assertion that Skydance was not a streaming competitor attacks a horizontal theory the FAC does not plead. Skydance independently supplied differentiated programming to Paramount+ rivals; the acquisition transferred control over its pipeline, licensing, exclusivity, windowing, duration, and platform allocation. FAC ¶¶20–22, 68–81. Section 7 reaches vertical acquisitions. *du Pont*, 353 U.S. at 592-95. The FAC further alleges that common ownership changes the incentive to balance licensing revenue from a rival against the competitive benefit to Paramount+ from making that rival's access later, shorter, narrower, or less attractive.

Nor must the FAC allege that Paramount has already completely foreclosed a particular Skydance title. Section 7 is preventive. The FAC identifies the differentiated Skydance programming historically supplied to Paramount+ rivals, explains why differentiated programming attracts and retains subscribers, and alleges the means by which common ownership can make rival access later, shorter, narrower, more expensive, or exclusive. FAC ¶¶68–81. Complete withholding is only one possible mechanism. Defendants' contention that

licensing revenue will necessarily outweigh Paramount+'s competitive interest presents the same post-merger incentive question that *Microsoft* resolved only after an evidentiary hearing.

The absence of an immediate horizontal share increase therefore does not defeat the claim. *Microsoft*, 681 F. Supp. 3d at 1084, recognizes that vertical mergers ordinarily produce "no immediate change in the relevant market share." The competitive concern is the change in control and incentives, which is why the FAC pleads Skydance's historical supply to rival streamers and the post-acquisition ability and incentive to alter their access.

**4. The proposed Paramount-WBD combination eliminates specifically alleged head-to-head streaming competition.**

Paramount+ and HBO Max independently compete for the same subscribers' payments and viewing, set prices and promotions, invest in programming and retention, maintain separate slates, and acknowledge subscriber overlap. FAC ¶¶82–89. After closing, diversion between them becomes an internal transfer rather than a lost sale to an independent rival. Common ownership changes the optimization problem by weakening each service's incentive to compete with the other.

Ellison's statement that the combined company would account for "nearly one-fifth of American television viewing" corroborates the significance of that lost rivalry. Plaintiffs do not plead the figure as DTC market share or as a structural presumption. Defendants nevertheless argue that even 20% would be too small. Mot. at 20. Section 7 contains no such numerical safe harbor, and Supreme Court decisions including *Pabst* and *Von's Grocery* confirm that smaller shares can matter in a consolidating market. 384 U.S. at 550–52; 384 U.S. at 272–78.

Nor must the FAC inventory the market share of every streaming service. The continued presence of Amazon, Apple, Hulu, or other platforms does not restore the rivalry eliminated by placing Paramount+ and HBO Max under common ownership. Where differentiated products compete for the same customers, that common ownership internalizes diversion that previously disciplined pricing and other competitive decisions. Farrell & Shapiro, *supra*, at 2.

**5. The theatrical market allegations supply competitive mechanisms beyond a single market-share estimate.**

The theatrical theory likewise does not depend on one 23.6% U.S./Canada estimate. The FAC alleges Paramount's domestic estimates of approximately 18% over twelve months and 22% over two years, independent greenlight and slate decisions, head-to-head release competition, internalized cannibalization, an overlapping-release example, and historical evidence that combined Disney-Fox wide releases fell materially after that merger. FAC ¶¶115–128. Those allegations identify mechanisms of reduced output and rivalry, not merely a percentage.

Defendants misunderstand the Disney-Fox allegations. Plaintiffs do not allege that a different merger seven years ago mechanically predicts the precise output of Paramount-WBD. The allegations provide real-world evidence supporting the pleaded economic mechanism: when independently controlled theatrical slates come under common ownership, output and differentiated sources of production can be consolidated rather than maintained as independent rivals. Whether Paramount-WBD will produce the same magnitude of reduction is a factual question; the prior transaction makes the alleged mechanism more, not less, plausible.

The FAC also alleges entry barriers involving theater relationships, nationwide screen allocation, capital, production and marketing infrastructure, franchise IP, VFX resources, and distribution. FAC ¶¶129–134. *Baker Hughes*, *Rebel Oil*, and *Waste Management* assessed evidentiary records showing actual or readily available entry or expansion; they do not permit the Court to assume timely and sufficient entry against pleaded barriers. *See United States v. Baker Hughes Inc.*, 908 F.2d 981, 984–85, 987–89 (D.C. Cir. 1990); *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1441 (9th Cir. 1995); *United States v. Waste Management, Inc.*, 743 F.2d 976, 982–83 (2d Cir. 1984).

**IV. CONCLUSION**

The FAC alleges what Sections 7 and 16 require. The completed Skydance acquisition is alleged to have contributed to a price increase Marazzo and Rubinsohn actually paid. The

proposed Paramount-WBD acquisition threatens consumers with higher prices, reduced output and quality, and fewer independent choices if presently competing businesses are placed under common ownership. Section 7 asks whether the effect of an acquisition "may be substantially to lessen competition"; Section 16 authorizes consumers threatened by that violation to obtain prospective relief. The FAC plausibly alleges Article III standing, antitrust injury, relevant markets, and concrete mechanisms of competitive harm. The motion should be denied.

DATED: September 11, 2026

ALIOTO LAW FIRM

/s/ Joseph M. Alioto
Joseph M. Alioto, Esq.
Tatiana V. Wallace, Esq.
Attorneys for Plaintiffs

FOREMAN & BRASSO

/s/ Ronald D. Foreman
Ronald D. Foreman, Esq.
Ian A. Hansen, Esq.
Attorneys for Plaintiffs