Jeffrey L. Kessler (*pro hac vice*)
**WINSTON TAYLOR LLP**
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-6700
Facsimile: (212) 294-4700
jeffrey.kessler@winstontaylor.com

Conor A. Reidy (*pro hac vice*)
Kevin B. Goldstein (*pro hac vice*)
**WINSTON TAYLOR LLP**
300 N. LaSalle Drive
Chicago, IL 60654-3406
Telephone: (312) 558-5600
Facsimile: (312) 558-5700
conor.reidy@winstontaylor.com
kevin.goldstein@winstontaylor.com

Jeanifer E. Parsigian (SBN 289001)
Matthew R. DalSanto (SBN 282458)
**WINSTON TAYLOR LLP**
101 California Street, 21st Floor
San Francisco, CA 94111-5891
Telephone: (415) 591-1000
Facsimile: (415) 591-1400
jeanifer.parsigian@winstontaylor.com
matthew.dalsanto@winstontaylor.com

Matthew R. Huppert (*pro hac vice*)
**WINSTON TAYLOR LLP**
1901 L Street NW
Washington, DC 20036-3506
Telephone: (202) 282-5000
Facsimile: (202) 282-5100
matt.huppert@winstontaylor.com

*Attorneys for Defendants Paramount Skydance Corporation and Skydance Media, LLC*

[Additional counsel on signature page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

PAMELA FAUST, LEN MARAZZO, LISA McCARTHY, DEBORAH RUBINSOHN, and GARY TALEWSKY

Plaintiffs,

vs.

PARAMOUNT SKYDANCE CORPORATION (formerly Paramount Global), and SKYDANCE MEDIA, LLC,

Defendants.

Case No. 4:26-cv-03790-AMO

**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**

Hearing Date: October 22, 2026
Time: 2:00 p.m.
Judge: Hon. Araceli Martínez-Olguín
Courtroom: 5

# TABLE OF CONTENTS

Page


INTRODUCTION ........ 1

ARGUMENT ........ 2

I. PLAINTIFFS DO NOT HAVE STANDING TO CHALLENGE EITHER MERGER ........ 2

A. The FAC Does Not Establish Article III Standing ........ 2

1. The Jan. 2026 Paramount+ Price Increase Still Does Not Establish Standing ........ 2

2. The FAC's Other Allegations Do Not Establish Article III Standing ........ 4

B. The FAC Does Not Establish Antitrust Standing ........ 6

1. Plaintiffs Fail to Satisfy the Requirement That They Participate in the Same Alleged Television News and Theatrical Film Markets as Defendants ........ 6

2. Plaintiffs Do Not Allege Cognizable Antitrust Injuries in Their Alleged Paid National Television News or Video Streaming Markets ........ 7

3. Plaintiffs' Other Antitrust Standing Arguments Are Irrelevant to This Motion ........ 8

II. THE FAC FAILS TO ALLEGE A RELEVANT ANTITRUST MARKET ........ 9

A. The FAC Does Not Plausibly Allege a Direct-to-Consumer ("DTC") Subscription Streaming Market ........ 9

B. The FAC Does Not Plausibly Allege a Paid National Television News Market ........ 10

C. The FAC Does Not Plausibly Allege a Consumer Market for First-Run Theatrical Motion Pictures ........ 10

III. THE FAC FAILS TO ALLEGE ECONOMIC FACTS PLAUSIBLY SHOWING THAT EITHER MERGER IS LIKELY TO SUBSTANTIALLY LESSEN COMPETITION ........ 11

A. The FAC Again Fails to Allege Any Concrete Economic Facts Plausibly Showing That the Paramount-WBD Merger Is Likely to Substantially Lessen Competition ........ 11

1. Plaintiffs Admit That the FAC Alleges No Market Shares or Concentration Figures for the DTC Streaming or Paid National Television News Markets ........ 12

2. The Market Shares Plaintiffs Allege for Their Purported Theatrical Film Market Are Misaligned and Insufficient to Establish a Prima Facie Case ........ 13

B. The FAC Fails to Allege Economic Facts Plausibly Showing That the Paramount-Skydance Merger Is Likely to Substantially Lessen Competition ........ 15

CONCLUSION ........ 15

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ... 11

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
459 U.S. 519 (1983) ... 7

*Aurora Astro Prods. LLC v. Celestron Acquisition, LLC*,
691 F. Supp. 3d 1132 (N.D. Cal. 2023) ... 5

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ... 2, 3, 4, 5

*Blue Shield of Va. v. McCready*,
457 U.S. 465 (1982) ... 7

*Brantley v. NBC Universal, Inc.*,
675 F.3d 1192 (9th Cir. 2012) ... 4

*California v. Sutter Health Sys.*,
130 F. Supp. 2d 1109 (N.D. Cal. 2001) ... 11, 12

*Cargill, Inc. v. Monfort of Colo., Inc.*,
479 U.S. 104 (1986) ... 6

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ... 2, 3

*Datel Holdings Ltd. v. Microsoft Corp.*,
712 F. Supp. 2d 974 (N.D. Cal. 2010) ... 11

*DeHoog v. Anheuser-Busch InBev SA/NV*,
899 F.3d 758 (9th Cir. 2018) ... 12

*Demartini v. Microsoft Corp.*,
662 F. Supp. 3d 1055 (N.D. Cal. 2023) ... 4, 12, 15

*Fry v. Cap. One Fin. Corp.*,
2026 WL 751422 (N.D. Cal. Mar. 17, 2026) ... 5, 13

*FTC v. Lab'y Corp. of Am.*,
2011 WL 3100372 (C.D. Cal. Feb. 22, 2011) ... 13

*FTC v. Microsoft Corp.*,
681 F. Supp. 3d 1069 (N.D. Cal. 2023) ... 15

*Hosp. Corp. of Am. v. FTC*,
807 F.2d 1381 (7th Cir. 1986) .......... 14

*Huskey v. City of San Jose*,
204 F.3d 893 (9th Cir. 2000) .......... 3

*Ill. Brick Co. v. Illinois*,
431 U.S. 720 (1977) .......... 6

*Kaplan v. Burroughs Corp.*,
611 F.2d 286 (9th Cir. 1979) .......... 9

*Kimble v. Marvel Ent., LLC*,
576 U.S. 446 (2015) .......... 14

*Kumar v. Koester*,
131 F.4th 746 (9th Cir. 2025) .......... 5

*Lansdown v. Bayview Loan Serv., LLC*,
2023 WL 2934932 (N.D. Cal. Apr. 12, 2023) .......... 5, 9, 13

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) .......... 2

*Malaney v. UAL Corp.*,
2010 WL 3790296 (N.D. Cal. Sep. 27, 2010) .......... 5

*Malheur Forest Fairness Coal. v. Iron Triangle, LLC*,
164 F.4th 710 (9th Cir. 2026) .......... 6, 8

*Matthews v. Apple, Inc.*,
769 F. Supp. 3d 999 (N.D. Cal. 2024) .......... 9

*New York v. Kraft Gen. Foods, Inc.*,
926 F. Supp. 321 (S.D.N.Y. 1995) .......... 13

*Newcal Indus., Inc. v. Ikon Off. Sol.*,
513 F.3d 1038 (9th Cir. 2008) .......... 10

*Olin Corp. v. FTC*,
986 F.2d 1295 (9th Cir. 1993) .......... 10

*Roberts v. Bartels*,
2013 WL 6173360 (N.D. Cal. Nov. 25, 2013) .......... 5

*Ross v. Bank of Am., N.A. (USA)*,
524 F.3d 217 (2d Cir. 2008) .......... 5

*Safe Air for Everyone v. Meyer*,
373 F.3d 1035 (9th Cir. 2004) .......... 2

*Somers v. Apple, Inc.*,
729 F.3d 953 (9th Cir. 2013) .......... 6

*St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*,
778 F.3d 775 (9th Cir. 2015) .......... 11, 12, 13

*United States v. Baker Hughes Inc.*,
908 F.2d 981 (D.C. Cir. 1990) .......... 14

*United States v. Gen. Dynamics Corp.*,
415 U.S. 486 (1974) .......... 14

*United States v. Oracle Corp.*,
331 F. Supp. 2d 1098 (N.D. Cal. 2004) .......... 13

*United States v. Pabst Brewing Co.*,
384 U.S. 546 (1966) .......... 14

*United States v. Phila. Nat'l Bank*,
374 U.S. 321 (1963) .......... 11

*United States v. Von's Grocery Co.*,
384 U.S. 270 (1966) .......... 14

*Winsor v. Sequoia Benefits & Ins. Servs., LLC*,
62 F.4th 517 (9th Cir. 2023) .......... 2

**Statutes**

Clayton Antitrust Act of 1914 § 7, Pub. L. 63–212, 38 Stat. 730 .......... *passim*

**Other Authorities**

Fed. R. Civ. P. 8 .......... 11

Fed. R. Civ. P. 12(b)(1) .......... 2

U.S. Const. art. III .......... 2, 3, 4, 5

**INTRODUCTION**

Plaintiffs' opposition does not cure any of the defects previously found by this Court, which once again require dismissal. It skips across the surface of the key substantive deficiencies in the First Amended Complaint ("FAC")—deploying rhetoric in lieu of law, conclusory assertions in lieu of facts, and conjecture in lieu of plausible inferences. The opposition thus only confirms that the FAC must be dismissed—this time with prejudice.

Plaintiffs' standing arguments are a combination of implausible theories and vague generalities that continue to fall short of Article III's standards. And their clumsy attempts to sidestep the Court's prior ruling on antitrust standing—pivoting to consumer-facing markets and relabeling their political concerns as "economic" ones—likewise fall flat. Their only claim of a particularized and concrete injury remains the single price increase that two Plaintiffs claim they paid, but no factual allegation plausibly links that price increase to any lessening of competition from either merger. Contrary to Plaintiffs' insinuations, not every consumer in the world has standing to challenge every merger. As this Court previously held, the defects in Plaintiffs' constitutional and statutory standing require dismissal. ECF No. 79 ("MTD Order").

But there is also much more that dooms the FAC. It continues to lack the basic factual allegations needed to plausibly allege the elements of a Section 7 claim. All three of its newly alleged markets are riddled with factual holes that render them economically incoherent. And the FAC's only bases for alleging a likely lessening of competition are conclusory assertions without any economic support. The FAC still does not allege any market share or concentration statistics that support any presumption of harm. And the FAC still rests on the flawed legal premise that Section 7 prohibits any non-de-minimis merger between competitors. The new claim that the mergers violate Section 7 because of a profit-maximizing management philosophy at Paramount is factually unsupported, turns the antitrust laws on their head, and does not come close to stating a plausible anticompetitive effect.

In the end, the FAC suffers from the same fatal defects as the past failed efforts by these same Plaintiffs and counsel to file merger challenges. Those many prior failures have established a body of precedent, in this District and elsewhere, which catalogues why the type of speculative and implausible claims presented by Plaintiffs in the FAC cannot survive a motion to dismiss. The Court gave Plaintiffs a second chance, but that chance has now been squandered. The FAC should be dismissed with prejudice.

## ARGUMENT

## I. PLAINTIFFS DO NOT HAVE STANDING TO CHALLENGE EITHER MERGER

### A. The FAC Does Not Establish Article III Standing

Plaintiffs' opposition confirms they have failed to "'clearly . . . allege facts demonstrating' each element" of Article III standing. *Winsor v. Sequoia Benefits & Ins. Servs., LLC*, 62 F.4th 517, 523 (9th Cir. 2023). This "burden" rests solely with Plaintiffs, as the ones "invoking federal jurisdiction." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Plaintiffs' opposition gets this burden backward, claiming it is Defendants' task to "establish the counterfactual" and *disprove* Plaintiffs' standing. *See* ECF No. 90 ("Opp.") 11. Not so. *See*, *e.g.*, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 412 n.4 (2013) (it is "not the [defendant's] burden to disprove standing"). Defendants' motion demonstrated—through Plaintiffs' own allegations and additional evidence properly considered on a Rule 12(b)(1) motion—why the FAC's allegations related to standing are implausible, threadbare, and insufficient to satisfy Article III. It is therefore Plaintiffs' burden to respond with "affidavits or other evidence . . . establishing subject matter jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). But Plaintiffs failed to do so, relying only on conclusory allegations that "[t]he court need not presume" to be true. *Id.* Although Plaintiffs attempt to paper over their deficiencies by framing the issue as a choice between "competing explanations" that are "both plausible," Opp. 10, that framing is false. Plaintiffs' allegations of injury-in-fact have never crossed the "line between possibility and plausibility" that is needed to survive a motion to dismiss. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).

#### 1. The Jan. 2026 Paramount+ Price Increase Still Does Not Establish Standing

Plaintiffs' opposition presents no reason to conclude that the January 2026 Paramount+ price increase—the "only . . . concrete and particularized injury" they allege, MTD Order 4—is "fairly traceable" to the Skydance-Paramount merger. *See Lujan*, 504 U.S. at 560.

*First*, Plaintiffs repeat their claim that the merger resulted in "a post-acquisition monetization strategy" that led to the price increase, *see* Opp. 11–14, but that claim cannot establish a plausible "causal connection" between such a strategy (assuming it existed) and any lessening of competition caused by the merger—which did not eliminate any streaming competition. *See Lujan*, 504 U.S. at 560 (connection must be "between the injury and the conduct complained of"). Companies adopt and refine business strategies

all the time, usually to become more vigorous competitors. The existence of such a strategy thus raises no plausible inference of reduced competition. Plaintiffs' opposition does not attempt to explain why the alleged "monetization strategy" reflects a lessening of competition. Therefore, there is no basis to conclude that the January 2026 price increase was "fairly traceable" to a lessening of competition resulting from the merger, and thus no basis to find Article III standing. *See* ECF No. 87 ("Mot.") 4–7.

*Second*, Plaintiffs' contention that the merger *changed* the company's pricing incentives or strategy is unsupported by any facts. *See id.* 5–7. This matters because, if the merger did not plausibly change the firm's incentive or ability to increase the Paramount+ price, then the merger cannot be a plausible cause of Plaintiffs' alleged monetary injury. Plaintiffs now concede that what the FAC alleges was a new "post-acquisition . . . strategy" "emphasizing average revenue per user and profitability," ECF No. 81 ("FAC") ¶¶ 23–24, 26, 77–78, was, instead, "[a] *pre-acquisition* business objective" not attributable to the merger, Opp. 11 (emphasis added).[1] Plaintiffs also fail to allege any plausible connection between the "transfer of control" effected by the merger and the Paramount+ price increase. *See id.* 12–13. Indeed, Plaintiffs admit that the "incentive" they allege the merger changed related to licensing Skydance content to rival streaming services, not to raising prices on streaming customers. *See id.* 25. Thus, even assuming such an incentive existed, it would not be a basis to find any connection between the merger and the Paramount+ price increase. At bottom, the only variable identified by the FAC that changed alongside the January 2026 price increase was the passage of time. As this Court has recognized, a mere temporal sequence is insufficient to plausibly establish Article III causation. *Huskey v. City of San Jose*, 204 F.3d 893, 899 (9th Cir. 2000) (post hoc reasoning is a "logical fallacy"); MTD Order 6.

*Third*, Plaintiffs' Article III injury arguments confuse possibility with plausibility. They rely on FAC allegations that are, at best, "merely consistent with" an injury traceable to a lessening of competition caused by the merger, and fail to grapple with the "obvious alternative explanation[s]" for the January 2026 price increase. *See Twombly*, 550 U.S. at 557, 567. This defect is fatal because, when allegations only suggest a price increase *might* be a result of reduced competition, "further factual enhancement" is needed to make that connection plausible. *Id.* at 557. The FAC lacks any such enhancement. Alleging such

[1] Because it is Plaintiffs' burden to establish standing, Defendants need not prove an alternative explanation for Plaintiffs' injury. *See, e.g.*, *Clapper*, 568 U.S. at 412 n.4. Rather Plaintiffs must allege facts that overcome "obvious alternative explanation[s]" for their injury. *Twombly*, 550 U.S. at 567.

facts is especially important where, as here, there are "obvious alternative explanation[s]" for the price increase, *id.* at 567, namely an industry-wide trend of price increases and Paramount's contemporaneous explanation that the price increase was attributable to "ongoing investments in Paramount+," Mot. 5.

To "enter the realm of plausible," a complaint's allegations must cross "the line between the conclusory and the factual," and "between the factually neutral and the factually suggestive," *Twombly*, 550 U.S. at 557 n.5, but the FAC does neither. The mere existence of a price increase "stays in neutral territory," *id.* at 557, because it is "fully consistent with a free, competitive market," rather than any lessening of competition caused by the merger. *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1202 (9th Cir. 2012); *see also* Opp. 14 (conceding alleged price increase is merely "consistent with weakened competitive constraints"). If anything, Plaintiffs' opposition muddies the waters of their causation argument even further by suggesting that the January 2026 Paramount+ price increase may have been attributable to *other* mergers they do not challenge. *See* Opp. 14 (suggesting "repeated consolidation" from other media industry mergers "may itself contribute to higher prices across firms").

In all events, the January 2026 price increase cannot provide Article III standing to the three Plaintiffs—Faust, McCarthy, and Talewsky—who do not allege they paid it. Nor can it provide Article III standing as to the Paramount-WBD merger (which has not yet taken place) or as to any claim directed at alleged markets other than the alleged streaming market. *See* MTD Order 3 (plaintiffs must demonstrate standing "for each claim," "each form of relief," and "in each alleged market").

**2. The FAC's Other Allegations Do Not Establish Article III Standing**

Other than the January 2026 Paramount+ price increase, the FAC alleges no facts to suggest any injury sufficiently concrete, particularized, or imminent to satisfy Article III with respect to either merger. *See* Mot. 7–9. Plaintiffs' opposition reinforces this conclusion by supporting all of their other purported injuries with conclusory assertions that consumers are always injured by horizontal mergers. Their primary argument is that any time a merger "places presently independent competitors under common ownership," injury to consumers is inevitable, though the nature of that injury is "uncertain[]." Opp. 15; *see also id.* 16 ("the alleged injury is . . . consumer harm flowing from elimination of independent rivalry"). However, "[m]erely alleging the elimination of a rival does not plausibly support an inference of an appreciable danger of anticompetitive effects." *Demartini v. Microsoft Corp.*, 662 F. Supp. 3d 1055, 1065 (N.D. Cal.

2023); *see also Aurora Astro Prods. LLC v. Celestron Acquisition, LLC*, 691 F. Supp. 3d 1132, 1149–50 (N.D. Cal. 2023) (similar); *Malaney v. UAL Corp.*, 2010 WL 3790296, at *7 (N.D. Cal. Sep. 27, 2010) (it is "wrong" that "any non-trivial acquisition of a significant rival is per se violative of the Clayton Act"). Plaintiffs insinuate that, because the antitrust laws are designed to protect against consumer harm, consumers always have standing to challenge any merger. *See* Opp. 5–6, 8–10, 13–15. But that is not the law. Consumers bringing antitrust claims—like every plaintiff "across the myriad areas of law that arise in federal courts"—must establish Article III standing. *Fry v. Cap. One Fin. Corp.*, 2026 WL 751422, at *3 n.5 (N.D. Cal. Mar. 17, 2026). And Article III requires more than platitudes and speculation to establish standing.[2]

Plaintiffs claim that "[t]he FAC alleges much more" than the elimination of a rival, Opp. 24, with a mass citation to nearly 100 paragraphs of the FAC. *See id.* (citing FAC ¶¶ 67–134, 151–180); *see also id.* 14–15 (similar, citing FAC ¶¶ 82–97, 151–180). But those paragraphs reflect no concrete and particularized injury to any Plaintiff. Plaintiffs have failed to identify any specific facts to support their Article III injury claims other than conclusory assertions, and "[i]t is not the role of the Court to make the parties' arguments for them." *See*, *e.g.*, *Roberts v. Bartels*, 2013 WL 6173360, at *4 (N.D. Cal. Nov. 25, 2013). Merely alleging, without factual support, that the mergers threaten to cause some generalized injury, Opp. 5, 15, 17, 28 (alleging that the mergers "threaten[] higher prices, reduced output, diminished quality and variety, and fewer independent choices") does not satisfy the pleading test. *See Twombly*, 550 U.S. at 557. Plaintiffs continue to "fail[] to allege any facts to plausibly show how those claimed harms have materialized or would materialize." MTD Order 6.

Plaintiffs also fail to respond to Defendants' arguments that the FAC's debt-related injury allegations are speculation. *See* Mot. 8–9. By not responding, Plaintiffs "concede[] the argument." *See*, *e.g.*, *Lansdown v. Bayview Loan Serv., LLC*, 2023 WL 2934932, at *4 (N.D. Cal. Apr. 12, 2023). Plaintiffs

---

[2] Plaintiffs' invocation of *Ross v. Bank of America, N.A. (USA)*, 524 F.3d 217 (2d Cir. 2008), *see* Opp. 13, is inapposite. The plaintiffs there alleged a conspiracy among credit card issuing banks to impose arbitration provisions on customers, which "limit[ed] the choice of terms offered to cardholders," thereby making credit cards "less valuable." *Ross*, 524 F.3d at 224. Plaintiffs allege nothing like those concrete facts here. Rather, the FAC speculates about "fewer choices" being available to Plaintiffs in the abstract, Opp. 13, without alleging any facts suggesting which choices will be eliminated, how either merger is likely to bring about that reduction in choices, or how such a specific reduction in choices will harm Plaintiffs "in a personal and individual way." *Kumar v. Koester*, 131 F.4th 746, 751 (9th Cir. 2025).

claim that their debt-related allegations are "evidence of post-closing incentives to monetize, integrate, and reduce overlapping expenditures," Opp. 15, but the FAC alleges no facts to support this assertion, and none of these purported incentives would plausibly result from a lessening of competition from the mergers in any event.

**B. The FAC Does Not Establish Antitrust Standing**

As Defendants have previously shown, for a private plaintiff to have antitrust standing, it must establish, among other things, "antitrust injury," ECF No. 36 at 13, and it must do so to seek either damages or injunctive relief, *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 111–13 (1986). Antitrust injury requires, among other things, that the plaintiff's injury be "of the type the antitrust laws were intended to prevent," and "that the injured party be a participant in the same market as the alleged malefactors." *Malheur Forest Fairness Coal. v. Iron Triangle, LLC*, 164 F.4th 710, 733 (9th Cir. 2026). Plaintiffs do not dispute these binding legal requirements, but they attempt to evade them. *See* Opp. 15–19. As shown below, the FAC still fails to establish any claim of antitrust injury for Plaintiffs with respect to their alleged television news or theatrical film markets. *See* MTD Order 7–9. Nor do Plaintiffs establish antitrust injury in their putative streaming market by claiming that management philosophy or debt load caused or might cause a price increase, as that would not "flow[] from that which makes the conduct unlawful," *i.e.*, a reduction in competition. *Malheur Forest*, 164 F.4th at 733.

**1. Plaintiffs Fail to Satisfy the Requirement That They Participate in the Same Alleged Television News and Theatrical Film Markets as Defendants**

Plaintiffs do not dispute that antitrust injury requires that "the injured party be a participant in the same market as the alleged malefactors," *id.*, or that this means that "the party alleging the injury must be either a consumer of the alleged violator's goods or services or a competitor of the alleged violator in the restrained market," *Somers v. Apple, Inc.*, 729 F.3d 953, 963 (9th Cir. 2013). This requirement is not directed to concerns about the "complexity" caused by trying to "apportion" damages across "all potential plaintiffs that could have absorbed part of [an] overcharge." *Ill. Brick Co. v. Illinois*, 431 U.S. 720, 737 (1977); *see* Opp. 17 (arguing inapplicability of *Illinois Brick* because Plaintiffs do not seek "duplicative damages apportioned through a distribution chain"). Rather, the requirement that a plaintiff participate in the same market as the alleged violator determines which private plaintiffs are "part of the class the

[antitrust laws] w[ere] designed to protect." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 538–40 (1983) (discussing "central interest in protecting the economic freedom of participants in the relevant market" and finding no antitrust injury where plaintiff "was neither a consumer nor competitor in the market in which trade was restrained").

Plaintiffs fail to satisfy this requirement as to their claims in both the alleged television news market and the alleged theatrical film market because Plaintiffs are neither customers nor competitors of Defendants in either alleged market. *See* Mot. 9–12. Again, Plaintiffs do not dispute this point, *see* Opp. 18; FAC ¶¶ 152, 177, nor could they because Paramount does not sell movie tickets or television cable packages to consumers. Rather, it licenses films to theater owners and licenses news programming to television distributors. *See* FAC ¶¶ 112, 159. Plaintiffs argue they should be excused from being in the same markets as Defendants because the firms they are customers of—theater owners and television distributors—"cannot restore" to Plaintiffs films that were never produced or news stories that were never reported. Opp. 17–18; *see also id.* 6–7 (similar). Whatever these allegations mean, they do not provide an exception from the antitrust injury requirement. Nor do Plaintiffs offer any substantive response to Defendants' argument explaining why *Blue Shield of Va. v. McCready*, 457 U.S. 465 (1982) does not help Plaintiffs establish antitrust injury. As Defendants have demonstrated, the FAC does not allege facts that plausibly show that Plaintiffs' alleged injuries are "inextricably intertwined with the injury" the mergers allegedly cause in upstream markets. *See* Mot. 10.

### 2. Plaintiffs Do Not Allege Cognizable Antitrust Injuries in Their Alleged Paid National Television News or Video Streaming Markets

Defendants previously demonstrated that Plaintiffs' complaints about editorial decisions and political influence in newscasts are not antitrust injuries. ECF No. 36 at 13–14. Plaintiffs attempt to relitigate this point by labelling these political complaints as "economic" injuries. Opp. 18. But labels do not trump substance, and the FAC's allegations show that Plaintiffs are still claiming non-economic injuries based on editorial decisions Paramount allegedly made at CBS News that Plaintiffs find distasteful or politically unacceptable. *See id.* ¶¶ 98–109. Plaintiffs' concern that Paramount might make similar editorial decisions after merging with WBD is not the type of economic harm that the antitrust laws are intended to prevent. *See* MTD Order 7–8.

Similarly, to the extent Plaintiffs allege injury in a streaming market from changes in Paramount's profit maximizing management philosophy, *see* Opp. 9–11, that is no basis for antitrust injury because such a change would not "flow[] from" any alleged reduction in competition. *Malheur Forest*, 164 F.4th at 733. A strategy to pursue cost-saving synergies is procompetitive, not anticompetitive, and it could be adopted without any reduction of competition. Thus, even if such a philosophy resulted in a price increase (something Plaintiffs fail to factually support), it would not be an antitrust injury.

Plaintiffs also find no support for their antitrust injury claims in the guest essay published by Paramount's CEO, David Ellison, in *The New York Times*. *See* Opp. 18. Far from "describ[ing] the transaction in the same competitive terms alleged in the FAC," *id.* 8, Mr. Ellison's essay explains why the Paramount-WBD Merger will *enhance* competition and *increase* output "because making more is the whole point of the company we are building." ECF No. 80-2 at 3. Most egregiously, Plaintiffs graft two separate portions of the essay together to argue (inaccurately) that Mr. Ellison would agree with their contention that any claimed harm to "audience trust" or "journalistic independence" would be economic injuries. *See* Opp. 9, 18. In the essay, Mr. Ellison identified these social and political values of journalism as ones he personally supports and intends to preserve. *See*, *e.g.*, ECF No. 80-2 at 3 ("I believe that news should be based on facts and truth."); *id.* (identifying independence and factual reporting as "founding principles for both CNN and CBS"). Nothing in his essay provides any support for Plaintiffs' contention that their misguided political complaints are antitrust injuries.

**3. Plaintiffs' Other Antitrust Standing Arguments Are Irrelevant to This Motion**

Plaintiffs raise other points about antitrust standing, but they are all non-responsive to Defendants' arguments for dismissal. For example, Plaintiffs contend that an antitrust injury may be prospective, *see* Opp. 17–19; that higher prices, reduced output, and diminished quality are generally considered injuries the antitrust laws were intended to prevent, *id.* 15; and that the holding of *Illinois Brick* barring treble damages claims by "indirect purchasers" does not apply to claims for equitable relief, *see* Opp. 17–18. All of these points have nothing to do with the arguments that Defendants have advanced above (and in their opening brief) demonstrating that the FAC does not establish an antitrust injury to Plaintiffs.

## II. THE FAC FAILS TO ALLEGE A RELEVANT ANTITRUST MARKET

The FAC's alleged markets are implausible on their face for a variety of independent reasons, and Plaintiffs' opposition fails to overcome these defects. *See* Mot. 12–16. As with Defendants' first motion to dismiss, Plaintiffs once again do not contest Defendants' argument that all three of Plaintiffs' alleged markets fail to satisfy the threshold legal requirement of alleging cross-elasticity of demand, *see id.* 12–13, *i.e.*, the "principle most fundamental to product market definition." *Kaplan v. Burroughs Corp.*, 611 F.2d 286, 291 (9th Cir. 1979). Instead, the opposition only claims in passing that the FAC "identifies . . . why [certain proposed] substitutes are not reasonably interchangeable," Opp. 19, while failing to provide any citation to the FAC to support this contention. This failure is not surprising, as the FAC is devoid of any specific facts to plausibly demonstrate cross-elasticity of demand in any of the three alleged markets. Without such allegations, there is no "factual dispute[]" to resolve. *Id.*

Equally baffling is Plaintiffs' citation to Mr. Ellison's essay as somehow "corroborat[ing] the pleaded markets." *Id.* Nothing could be further from the truth. Mr. Ellison's essay underscores the flaws in Plaintiffs' gerrymandered market definitions by observing that "television" competes against platforms like Netflix, Amazon, Apple, and YouTube for "watch time," and that the combined firm would account for only about 13% of that time. ECF No. 80-2 at 2.

### A. The FAC Does Not Plausibly Allege a Direct-to-Consumer ("DTC") Subscription Streaming Market

Plaintiffs do not respond to most of Defendants' arguments about the facial implausibility of their alleged streaming market, including by: (1) not explaining why other forms of video entertainment are not reasonably interchangeable with streaming services; (2) not defining "premium" services; and (3) not explaining why "premium film and television programming" distributed through other methods (*e.g.*, linear television) is not reasonably interchangeable with the same content distributed through a subscription streaming service. *See* Mot. 13–14. Plaintiffs' silence concedes all these points, *Lansdown*, 2023 WL 2934932, at *4, which are sufficient to reject Plaintiffs' alleged streaming market on its face.

The arguments Plaintiffs do make are unavailing. Plaintiffs try to explain the meaning of the modifier "professionally produced" in their brief, Opp. 20, but "the complaint may not be amended by briefs in opposition to a motion to dismiss." *Matthews v. Apple, Inc.*, 769 F. Supp. 3d 999, 1015 (N.D. Cal.

2024). And, though Plaintiffs concede the existence of "competition for . . . 'viewing time,'" they contend, without explanation, that the platforms competing against each other for that time are not "reasonably interchangeable." Opp. 21. This conclusory assertion, like Plaintiffs' alleged market, is implausible on its face, and in any event is not supported by any factual allegations in the FAC.

**B. The FAC Does Not Plausibly Allege a Paid National Television News Market**

Plaintiffs' responses regarding their alleged television news market are likewise unavailing. They concede that other forms of newsgathering "reproduce some attributes" of cable television news, but they nevertheless claim that reasonable interchangeability is "a question of factual substitution" because other forms of news are not identical to cable television news (*i.e.*, "provide the same competitive package"). Opp. 21. Such rhetoric cannot stand in for factual allegations. To survive dismissal, Plaintiffs must allege facts that plausibly suggest their alleged market "encompass[es] . . . all economic substitutes," *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008), which includes not just products that have all the same attributes as the candidate product market but also any products for which demand would plausibly increase if the price of the candidate product increased, *see Olin Corp. v. FTC*, 986 F.2d 1295, 1298 (9th Cir. 1993). In other words, if the price of cable television news increased, the complaint must allege facts suggesting why customers would not respond by substituting other forms of newsgathering. The FAC fails to do so.

Plaintiffs make a similarly misguided contention in trying to defend their choice to exclude unpaid sources of news, such as broadcast news, from their alleged market. The relevant question is not whether the existence of free news sources "eliminate[s] competition between CBS News and CNN," Opp. 21, but whether the free, over-the-air version of CBS News (and other broadcast news channels) should be included in the relevant news market because they are reasonably interchangeable from the standpoint of consumers. Neither the FAC nor the opposition provides any facts to answer this critical question.

**C. The FAC Does Not Plausibly Allege a Consumer Market for First-Run Theatrical Motion Pictures**

Plaintiffs again misrepresent the governing legal standard in attempting to defend their alleged theatrical film market. They describe various alleged differences between watching a movie in a theater and doing so via a streaming service, *see* Opp. 22, but "[r]easonable interchangeability means all products

which could be used for the same general purpose, despite functional or price differences among them." *Datel Holdings Ltd. v. Microsoft Corp.*, 712 F. Supp. 2d 974, 996 (N.D. Cal. 2010). There is no dispute that films shown in theaters and films distributed via streaming "could be used for the same general purpose," *id.*, and the FAC contains no allegations to suggest that customers in the alleged theatrical market would not substitute to streaming in response to a price increase for theatrical exhibition. Plaintiffs do not dispute that this substitution issue is the governing "economic question" in defining an antitrust market. Opp. 22.[3] But, once again, the FAC does not address this critical issue at all. Simply alleging a conclusion of non-substitutability, without supporting facts, does not satisfy Rule 8. *See*, *e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009) ("conclusory" allegations are "not entitled to be assumed true").

## III. THE FAC FAILS TO ALLEGE ECONOMIC FACTS PLAUSIBLY SHOWING THAT EITHER MERGER IS LIKELY TO SUBSTANTIALLY LESSEN COMPETITION

Finally, Plaintiffs' opposition does not meaningfully respond to Defendants' argument showing that the FAC lacks the concrete economic facts required to be pled to plausibly support a Section 7 claim. *See* Mot. 16–21. Instead, Plaintiffs continue to recycle bankrupt legal arguments about Section 7 blocking any non de minimis merger among competitors that this Court and other courts have repeatedly rejected. Rhetoric aside, Plaintiffs cannot escape the FAC's failure to allege market shares, concentration levels, or other economic facts required to state a Section 7 claim.

### A. The FAC Again Fails to Allege Any Concrete Economic Facts Plausibly Showing That the Paramount-WBD Merger Is Likely to Substantially Lessen Competition

The FAC does not allege facts showing "undue" market concentration resulting from the Paramount-WBD merger. *See United States v. Phila. Nat'l Bank*, 374 U.S. 321, 363 (1963); *California v. Sutter Health Sys.*, 130 F. Supp. 2d 1109, 1118 (N.D. Cal. 2001). Modern Section 7 jurisprudence requires an initial showing, through economic facts, that "the merger will probably lead to anticompetitive effects." *St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 783–85 (9th Cir. 2015). The FAC alleges no economic facts capable of satisfying this burden. Their opposition tries to distract from these deficiencies by pointing to a hodgepodge of FAC paragraphs setting forth various revenue,

[3] Plaintiffs also continue to conflate substitutability between theatrical exhibition and streaming generally and substitutability of "see[ing] a particular first-run film during its theatrical window" and watching that same film on a streaming service. Opp. 22; *see* Mot. 16.

sales, market capitalization, and subscriber figures. Opp. 24, 26–27. But none of these data points show any alleged market shares, concentration levels, or barriers to entry to establish "undue" concentration in any of the three alleged markets. *See* Mot. 19–21.

Plaintiffs also misread *St. Alphonsus*. They contend it held that a *prima facie* case "can" be established through high market shares, but that such a showing need not "be pleaded in every case." Opp. 23. What it actually holds is that a *prima facie* case "can" be established through "statistical evidence," but that this is a bare minimum showing, which can be rebutted, because "statistics concerning market share and concentration . . . are not conclusive indicators of anticompetitive effects." *St. Alphonsus*, 778 F.3d at 783, 785 (cleaned up). For that reason, the court noted that "plaintiffs in § 7 cases generally present other evidence," in addition to market share and concentration figures, "as part of the prima facie case." *Id.* at 786. Here, Plaintiffs have done neither.[4]

**1. Plaintiffs Admit That the FAC Alleges No Market Shares or Concentration Figures for the DTC Streaming or Paid National Television News Markets**

Plaintiffs do not—and cannot—dispute that the FAC alleges no market shares or concentration figures for either the alleged streaming market or the alleged television news market. *See* Opp. 23–27. This is a fatal flaw, given the absence of any other economic facts in the FAC that could plausibly support a *prima facie* case. *See* Mot. 16–21; *Demartini*, 662 F. Supp. 3d at 1062–63 (dismissing Section 7 claims where complaint alleged no market shares or concentration data). A Section 7 plaintiff must plead relevant economic facts to permit the Court to assess the merging firms' competitive positions and the transaction's alleged competitive effect within the relevant market. *See*, *e.g.*, *St. Alphonsus*, 778 F.3d at 783–85 (describing plaintiff's burden as "establishment of a *prima facie* case on statistical evidence"); *Sutter Health*, 130 F. Supp. 2d at 1118 (requiring "an initial statistical showing that the transaction will lead to undue concentration in the market").

In both the alleged streaming and television news markets, the FAC is an empty shell: it alleges neither market shares nor any method of measuring market concentration, such as an HHI. Mot. 19. The FAC only offers bits and pieces of information—subscriber counts and streaming revenue for some

[4] As discussed *supra* p. 6, Plaintiffs' claim that "[t]he FAC alleges much more" than the bare elimination of a rival, Opp. 24, is unsupported by citations to any factual allegations contained in the FAC. Labels are not economic facts. *See DeHoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758, 764–65 (9th Cir. 2018); Mot. 17–18.

companies—without any market-wide allegations. *See* FAC ¶¶ 86–87. These data points are incomplete, misaligned with the alleged markets, and otherwise incapable of plausibly establishing "the merger will probably lead to anticompetitive effects." *St. Alphonsus*, 778 F.3d at 785; *see* Mot. 19–21. Plaintiffs' only response to these points is to contend that they need not "inventory the market share of every streaming service" because the "presence" of competitors "does not restore" the purported "rivalry" between Paramount+ and HBO Max. Opp. 26. But this just rehashes Plaintiffs' oft-repeated but inaccurate contention that any elimination of rivalry violates Section 7. *See supra* pp. 5–6 (explaining why this contention is wrong). Plaintiffs otherwise fail to respond to Defendants' points, thereby conceding them. *See Lansdown*, 2023 WL 2934932, at *4.

### 2. The Market Shares Plaintiffs Allege for Their Purported Theatrical Film Market Are Misaligned and Insufficient to Establish a *Prima Facie* Case

Plaintiffs do not deny that the only market share figures alleged in the FAC—for their purported theatrical film market—are misaligned with their alleged market and, in any event, too low to support a *prima facie* case. The FAC alleges a market limited to the United States, FAC ¶ 118, yet it alleges market shares that include Canada, *id.* ¶ 124. Plaintiffs concede this error, *id.* n.1, but they gloss over it in their opposition, Opp. 27. This misalignment renders Plaintiffs' sole market-share allegation invalid. *FTC v. Lab'y Corp. of Am.*, 2011 WL 3100372, at *19 (C.D. Cal. Feb. 22, 2011) ("Market shares must be measured in a proper relevant product and geographic market . . . .").

Moreover, even if it were correct to use market share data that includes Canada (it is not), the FAC's allegation that the Paramount-WBD merger will result in a combined 23.6% market share, FAC ¶ 124, falls well below the levels necessary to support a *prima facie* Section 7 case. *See, e.g.*, *United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1123 (N.D. Cal. 2004) ("A presumption of anticompetitive effects from a combined share of 35% in a differentiated products market is unwarranted."); *Fry*, 2026 WL 751422, at *6 ("some courts hold that a plaintiff can satisfy their *prima facie* burden by showing that the merger will yield a combined market share of over 30%"); *New York v. Kraft Gen. Foods, Inc.*, 926 F. Supp. 321, 366 (S.D.N.Y. 1995) (rejecting challenge to merger resulting in combined share below 35%). Regardless of whether the foregoing cases "create a numerical pleading floor," Opp. 24, they represent a body of consistent precedent, unrebutted by Plaintiffs, that precludes any inference of a *prima facie* case

where the alleged market share is significantly below 30 percent and no other economic facts are pled to plausibly allege a likely substantial lessening of competition.

Plaintiffs cannot escape these deficiencies by invoking *United States v. Pabst Brewing Co.*, 384 U.S. 546 (1966) and *United States v. Von's Grocery Co.*, 384 U.S. 270 (1966) for the proposition that Section 7 contains no numerical safe harbor. Opp. 26. Defendants have not advocated such a safe harbor. Rather, Defendants have shown that modern precedent establishes threshold levels of concentration that must be pled before a plaintiff may rely on market statistics to state a *prima facie* Section 7 claim. Mot. 20–21. The 23.6% allegation is well below those thresholds, and Plaintiffs' alternative estimates of 18% and 22% are even lower. Opp. 27. As for *Pabst* and *Von's Grocery* themselves, those decisions have been "cut . . . back sharply," *United States v. Baker Hughes Inc.*, 908 F.2d 981, 990–91 (D.C. Cir. 1990) (Thomas, J.).[5] Modern merger case law requires much more than what the FAC alleges—higher levels of concentration and a valid economic theory of how undue concentration is likely to harm competition. *Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381, 1386 (7th Cir. 1986) (Posner, J.); Mot. 20–21.

Nor do Plaintiffs' new allegations about the Disney-Fox merger cure any pleading deficiency. *See* Opp. 27. The FAC alleges no facts plausibly suggesting that the Disney-Fox merger—a different transaction that occurred seven years ago, involving different parties, different assets, and different market conditions—has any predictive value as to the future competitive effect of the Paramount-WBD merger. Mot. 20–21. The possibility that output "can be consolidated," Opp. 27, does not mean any lessening of competition is likely here, and although Plaintiffs claim the likelihood of an output reduction is "a factual question," *id.*, they once again allege no facts in the FAC that would make such an allegation plausible.

Finally, the FAC's allegations about barriers to entry in the putative theatrical market are not plausibly pleaded. The FAC recites a list of alleged barriers—theater relationships, nationwide screen allocation, capital, production and marketing infrastructure, franchise IP, VFX resources, and distribution (Opp. 27 (citing FAC ¶¶ 129–134))—but these are just conclusory labels, not facts. Given the low market

[5] Plaintiffs argue that "Supreme Court precedent does not lose force with age," Opp. 23, but the Supreme Court pares back its statutory precedents when their "doctrinal underpinnings have . . . eroded over time" through "growth of judicial doctrine" or otherwise. *See Kimble v. Marvel Ent., LLC*, 576 U.S. 446, 458 (2015). More recent Supreme Court case law clarified that market realities have to be considered in assessing the competitive effects of a merger, notwithstanding its earlier precedents supporting a less economically oriented approach. *See United States v. Gen. Dynamics Corp.*, 415 U.S. 486, 498 (1974).

share alleged for the merged company, the absence of plausible allegations of high barriers to entry or expansion makes competitive harm implausible. *See* Mot. 21 (collecting cases).

### B. The FAC Fails to Allege Economic Facts Plausibly Showing That the Paramount-Skydance Merger Is Likely to Substantially Lessen Competition

Plaintiffs make almost no attempt to defend their threadbare allegations concerning the completed Paramount-Skydance merger. Plaintiffs do not—and cannot—dispute that the FAC alleges no market shares or other economic facts relating to the Paramount-Skydance merger as a stand-alone transaction. *See* Opp. 25–26. This alone is fatal. *See* Mot. 7, 16–19.

Moreover, the FAC's scattered allegations about the purported vertical impact of the Paramount-Skydance merger amount to nothing more than speculation that Paramount might withhold or limit access to Skydance content, thereby causing a price increase. FAC ¶¶ 70–75, 80–81. Tellingly, the FAC alleges no facts suggesting that such a foreclosure has occurred or resulted in a price increase. *See FTC v. Microsoft Corp.*, 681 F. Supp. 3d 1069, 1089–100 (N.D. Cal. 2023) (discussing standard for evaluating vertical mergers); Mot. 7. This is a purely speculative claim, not a plausible one. Critically, the FAC also does not allege any of the facts that might make an inference of foreclosure likely, such as identifying specific Skydance content significant enough to cause competitive harm if withheld from downstream competitors or facts explaining why Paramount would have an incentive to forgo the revenue it would earn by licensing Skydance content to competing streaming services. *See Microsoft*, 681 F. Supp. 3d at 1090–97 (finding no incentive to foreclose because, *inter alia*, licensing content to downstream rivals was "critical to [defendant's] financial success"). While Plaintiffs make the theoretical claim that the merger might have caused a "change[]" of "incentive" regarding how content is licensed, Opp. 25, they point to no factual allegations in the FAC that would support such a change.

## CONCLUSION

For all the reasons set forth above and in the moving brief, the First Amended Complaint should be dismissed with prejudice.

Dated: September 18, 2026

Respectfully submitted,

By: _/s/ Jeffrey L. Kessler_

Jeffrey L. Kessler (*pro hac vice*)
**WINSTON TAYLOR LLP**
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-6700
Facsimile: (212) 294-4700
jeffrey.kessler@winstontaylor.com

Jeanifer E. Parsigian (SBN 289001)
Matthew R. DalSanto (SBN 282458)
**WINSTON TAYLOR LLP**
101 California Street, 21st Floor
San Francisco, CA 94111-5891
Telephone: (415) 591-1000
Facsimile: (415) 591-1400
jeanifer.parsigian@winstontaylor.com
matthew.dalsanto@winstontaylor.com

Conor A. Reidy (*pro hac vice*)
Kevin B. Goldstein (*pro hac vice*)
**WINSTON TAYLOR LLP**
300 N. LaSalle Drive
Chicago, IL 60654-3406
Telephone: (312) 558-5600
Facsimile: (312) 558-5700
conor.reidy@winstontaylor.com
kevin.goldstein@winstontaylor.com

Matthew R. Huppert (*pro hac vice*)
**WINSTON TAYLOR LLP**
1901 L Street NW
Washington, DC 20036-3506
Telephone: (202) 282-5000
Facsimile: (202) 282-5100
matt.huppert@winstontaylor.com

*Attorneys for Defendants Paramount Skydance Corporation and Skydance Media, LLC*

Marguerite Sullivan (*pro hac vice*)
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
marguerite.sullivan@lw.com

Hanna Nunez Tse (SBN 346510)
**LATHAM & WATKINS LLP**
505 Montgomery St.
Suite 2000
San Francisco, CA 94111-2562
Telephone: (415) 391-0600
hanna.nuneztse@lw.com