Joseph M. Alioto, Esq. (SBN 42680)
**ALIOTO LAW FIRM**
One Sansome Street, 14th Floor
San Francisco, CA 94104
Tel: (415) 434–8900
Fax: (415) 434–9200
Email: jmalioto@aliotolaw.com

Ronald D. Foreman, Esq. (SBN 61148)
Ian A. Hansen, Esq. (SBN 255449)
**FOREMAN & BRASSO**
850 Montgomery Street, Suite 300
San Francisco, CA 94133
Telephone: (415) 433–3475
Facsimile: (415) 781–8030
Email: foremanandbrasso@foremanandbrasso.com

Attorneys for Plaintiffs Pamela Faust, Len Marazzo, Lisa McCarthy, Deborah Rubinsohn, and Gary Talewsky

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| PAMELA FAUST, LEN MARAZZO, LISA McCARTHY, DEBORAH RUBINSOHN, and GARY TALEWSKY,<br><br>Plaintiffs,<br>vs.<br><br>PARAMOUNT SKYDANCE CORPORATION (formerly Paramount Global), and SKYDANCE MEDIA, LLC,<br><br>Defendants. | Case No. 4:26-cv-03790-AMO<br><br>**SECOND AMENDED COMPLAINT FOR VIOLATION OF SECTION 7 OF THE CLAYTON ACT; DAMAGES UNDER SECTION 4; AND DIVESTITURE UNDER SECTION 16** |

## INTRODUCTION

1. This is a private antitrust action seeking divestiture of two completed acquisitions under Section 16 of the Clayton Act, 15 U.S.C. § 26, and damages under Section 4, 15 U.S.C. § 15, for violations of Section 7, 15 U.S.C. § 18. Plaintiffs challenge Skydance Media's August 7, 2025 acquisition of Paramount Global and Paramount Skydance Corporation's October 6, 2026 acquisition of Warner Bros. Discovery. The central threatened injury is the elimination of independently competing choices for the products Plaintiffs purchase: two streaming services, two sources of national television news, and two theatrical studios that formerly had separate incentives to offer better prices, more programming, and higher quality. Plaintiffs also seek interim relief to preserve that lost competition, including relief against the announced Paramount+/HBO Max integration, pending adjudication.

2. On November 9, 2026, after acquiring Warner Bros. Discovery, Skydance announced in an SEC-furnished shareholder letter that it plans to offer Paramount+ and HBO Max together in a bundle beginning in early 2027, align their technology systems, and move toward a unified streaming product. Before the acquisition, a consumer dissatisfied with the price or programming of Paramount+ could direct that consumer's subscription payment to HBO Max, an independently owned competitor, and vice versa. That choice between independent sellers has been eliminated. The two services may retain distinct names and interfaces, but both now answer to one owner and its combined financial interests. The announced bundle is a concrete step toward implementing that change in competitive incentives. Skydance Corp., Third Quarter 2026 Shareholder Letter, Ex. 99 to Form 8-K (Nov. 9, 2026), at 3, 6–7.

3. In the accompanying earnings call, Skydance Chairman and Chief Executive Officer David Ellison described bundling as the first step toward unifying the services and said it would permit the company to capture consumer monetization benefits before completing that

unification. He also discussed phasing in pricing arrangements. Under separate ownership, each service had an incentive to win subscribers and revenue from the other by offering a better price, discount, or selection of programming. Under common ownership, a subscriber who switches between the two services may no longer take revenue away from the corporate parent. The planned bundle permits that parent to manage the combined revenue stream rather than preserve price competition between two independent sellers. Plaintiffs allege a substantial threat of increased aggregate subscription costs, fewer independent offers, and diminished programming value. Skydance Corp., Q3 2026 Earnings Call (Nov. 9, 2026).

4. Section 7 reaches acquisitions whose effect may substantially lessen competition. Plaintiffs allege six relevant product markets in three principal and alternative pairs. The principal markets are (1) the Direct-to-Consumer Subscription Streaming Market; (2) the Paid National Television News Market; and (3) the Consumer Market for First-Run Theatrical Motion Pictures. In the alternative, Plaintiffs allege (4) the broader United States Television and Video Viewing Market; (5) the United States National Television News Programming and Viewing Market, encompassing paid and free distribution; and (6) the United States Wide-Release Theatrical Production and Distribution Market. The pairs reflect different product boundaries and, in the case of theatrical distribution, different levels of commerce. The August 2025 acquisition is challenged principally for vertical effects on subscription streaming and, additionally, for eliminating potential independent entry. The October 2026 acquisition is challenged for the loss of independent competition in streaming, national television news, and theatrical production and distribution. Plaintiffs do not allege a per se violation from common ownership alone.

5. Plaintiffs sue as purchasers or sufficiently concrete prospective purchasers, not

merely as viewers concerned about consolidation. Marazzo and Rubinsohn paid the Paramount+ overcharges alleged to result from the 2025 acquisition. They also pay for Paramount+ and HBO Max, two services that previously offered them a choice between independent competitors but now are controlled by a single seller. Other Plaintiffs purchase television packages containing national news or regularly buy theatrical admissions, and allege threatened losses of competing programming choices, output, or quality in those purchased products.

6. The two acquisitions present distinct injuries. Marazzo and Rubinsohn seek Section 4 damages for the merger-related portion of the January 2026 Paramount+ overcharges following the 2025 acquisition. The October 2026 WBD transaction did not cause that earlier increase. It independently supports Section 16 relief, including divestiture, against threatened higher prices and diminished choice from integration of previously competing businesses.

7. Paramount and WBD participate in several levels of the television and film supply chains. Their studios license films to exhibitors, which sell admissions to consumers; their national news operations supply programming through paid and free distributors, some of which sell television packages to consumers. In the narrower retail markets, Plaintiffs allege injury to the streaming subscriptions, news-bearing television packages, and theatrical admissions they purchase or concretely intend to purchase. The alternative upstream wide-release theatrical market concerns competition between studio-distributors; Plaintiffs do not allege they purchase distribution licenses or seek to recover an upstream overcharge. Rather, they seek prospective relief for the threatened loss of differentiated films that those upstream decisions make available for their downstream ticket purchases.

8. Warner Bros. Discovery stockholders approved the WBD transaction on April 23, 2026; the transaction closed on October 6, 2026 after entry of a consent decree in the States'

related litigation. The decree imposes certain safeguards but does not restore the companies' independent ownership or pricing incentives. Plaintiffs seek divestiture addressing the consummated acquisition and interim preservation of separable, viable businesses. See Skydance Corp., Current Report (Form 8-K), Oct. 6, 2026; *State of California v. Paramount Skydance Corp.*, No. 4:26-cv-07116-AMO, Dkt. 266–267 (N.D. Cal. Sept. 30, 2026).

## LEGAL STANDARDS

9. Section 7 prohibits an acquisition where, in any line of commerce and in any section of the country, "the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. The statute does not require proof that the market will become uncompetitive, that remaining rivals will be unable to compete effectively, or that higher prices, reduced output, or other consumer harms are certain to occur. Section 7 reaches anticompetitive tendencies in their incipiency and concerns probabilities rather than certainties. *Brown Shoe Co. v. United States*, 370 U.S. 294, 317, 323 (1962).

10. The Supreme Court has repeatedly recognized that corporate size carries with it an "opportunity for abuse" that cannot be disregarded when the resulting power has previously been exploited. *United States v. Swift & Co.*, 286 U.S. 106, 116 (1932); *American Tobacco Co. v. United States*, 328 U.S. 781, 796 (1946). In *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 174 (1948), the Supreme Court applied that principle to the motion-picture industry, explaining that the prior use of power derived from size to suppress competition is powerful evidence of monopolistic purpose or intent.

11. Competitive injury is not limited to a nominal price increase. Competition protects output, quality, variety, innovation, promotional terms, and consumer choice. Eliminating a competitor may leave consumers with "fewer choices, higher prices, and lower-quality products." *PLS.com, LLC v. National Association of Realtors*, 32 F.4th 824, 840 (9th Cir.

2022).

12. Section 7 prohibits precisely the accelerating consolidation that Defendants seek to justify. Defendants openly defend combining Paramount and Warner Bros. Discovery on the ground that the resulting media conglomerate must be large enough to compete with Netflix, Amazon, Apple, and other platforms. The Supreme Court has expressly rejected this rationale. In *United States v. Philadelphia National Bank*, 374 U.S. 321, 370–71 (1963), the merging banks argued that their combination was necessary to compete with much larger New York banks. The Supreme Court rejected this justification, explaining that its acceptance would mean that "every firm in an industry could, without violating § 7, embark on a series of mergers" until it became as large as the industry leader. *Id.* at 370. That is precisely the self-perpetuating cycle of consolidation Defendants seek to perpetuate: one merger creates a larger company, whose size then becomes the justification for the next merger, until entire industries are controlled by a handful of conglomerates. The existence of other competitors does not justify the elimination of independent competitors to create another. Congress enacted Section 7 to arrest that process, not accelerate it. *Brown Shoe Co. v. United States*, 370 U.S. 294, 344–45 (1962). Accordingly, *United States v. Pabst Brewing Co.*, 384 U.S. 546, 550–53 (1966), held that a merger involving 4.49 percent of national beer sales, 23.95 percent in Wisconsin, and 11.32 percent in a three-state area violated Section 7 amid increasing industry concentration, while *United States v. Von's Grocery Co.*, 384 U.S. 270, 272–79 (1966), condemned a merger resulting in approximately 7.5 percent of Los Angeles grocery sales in an increasingly concentrated industry. Defendants cannot invoke the size of their remaining competitors as justification for eliminating competition between Paramount and Warner Bros. Discovery. That argument is not a defense to the threatened lessening of competition. It illustrates the very danger Section 7 was enacted to

prevent.

13. Section 7 is not limited to mergers between direct competitors. The August 2025 acquisition principally combined an independent producer and licensor of premium programming with the owner of Paramount+, creating the ability and incentive to affect the programming supplied to rival streaming platforms. Plaintiffs also allege, as a distinct potential-competition theory, that acquisition rather than independent entry foreclosed the possibility of Skydance becoming an additional streaming-platform competitor. The October 2026 acquisition, by contrast, placed previously independent streaming services, national news operations, and major theatrical studios under common ownership. The potential-entry, vertical-access, and horizontal-loss-of-rivalry mechanisms are pleaded separately. *See FTC v. Procter & Gamble Co.*, 386 U.S. 568, 577–80 (1967); *United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 531–37 (1973); DOJ & FTC, Merger Guidelines, Guidelines 4 and 5 (2023).

14. Section 16 authorizes private plaintiffs to seek injunctive relief against "threatened loss or damage" from an antitrust violation. 15 U.S.C. § 26. Article III requires an actual or imminent, concrete and particularized injury fairly traceable to the challenged acquisition and redressable by relief; a substantial risk of future harm can suffice. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). Divestiture is available to private plaintiffs as injunctive relief under Section 16 of the Clayton Act. *California v. American Stores Co.*, 495 U.S. 271, 281–85, 295–96 (1990). The Supreme Court emphasized that divestiture has been recognized as "the most important of antitrust remedies," that it is "simple, relatively easy to administer, and sure," and that it should "always be in the forefront of a court's mind" when a Section 7 violation has been established. *Id.* at 281 (*quoting United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 331 (1961)). Plaintiffs seek divestiture to restore the independent

competition eliminated by Defendants' acquisitions and prevent the threatened economic injuries alleged herein. Plaintiffs also seek interim relief preventing further integration of the acquired businesses, including implementation of the announced Paramount+/HBO Max bundle, so that effective divestiture remains available upon adjudication.

**PARTIES**

15. Plaintiffs Pamela Faust, Len Marazzo, Lisa McCarthy, Deborah Rubinsohn, and Gary Talewsky are natural persons residing in the United States. Their individual purchasing circumstances differ. Marazzo and Rubinsohn purchased Paramount+ subscriptions and paid the January 2026 price increases. Marazzo, McCarthy, Rubinsohn, and Talewsky purchase paid television packages containing national news programming. Plaintiffs regularly purchase first-run theatrical admissions. Faust and McCarthy are prospective, rather than past-overcharge, Paramount+ purchasers, as alleged below. Their claimed injuries and requested relief are particularized in the standing allegations.

16. Defendant Skydance Corporation, formerly Paramount Skydance Corporation, is a Delaware corporation operating Paramount+, HBO Max, CBS News, CNN, the Paramount and Warner Bros. film studios and related businesses following the October 6, 2026 transaction. Defendant is referred to as "Skydance" or "the combined firm" where appropriate. See Skydance Oct. 6, 2026 Form 8-K.

17. Defendant Skydance Media, LLC, was an independent producer and financier of premium film and television programming before Skydance acquired Paramount Global. Following the closing, Skydance and Paramount operate as a single entity under David Ellison, who serves as Chairman and Chief Executive Officer.

18. Warner Bros. Discovery, Inc. was an independently controlled enterprise that owned HBO Max, HBO, CNN, Warner Bros. Pictures, New Line Cinema, and other

entertainment businesses until the October 6, 2026 acquisition. It survives as a wholly owned subsidiary of Skydance Corporation under the merger agreement. *See* Skydance Oct. 6, 2026 Form 8-K.

## JURISDICTION AND VENUE

19. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1337 because Plaintiffs seek private relief under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, for alleged violations of Section 7, 15 U.S.C. § 18.

20. This Court has personal jurisdiction over Defendants because they transact business throughout the United States and purposefully direct the challenged conduct toward United States consumers, including Plaintiffs.

21. Venue is proper under 28 U.S.C. § 1391 and Section 12 of the Clayton Act, 15 U.S.C. § 22, because Defendants transact business and the challenged conduct has effects in this District.

## FACTUAL BACKGROUND

### A. Skydance's Completed Acquisition of Paramount Global

22. On July 7, 2024, Skydance announced an approximately $8 billion transaction to acquire Paramount Global. The transaction closed on August 7, 2025.

23. Marazzo and Rubinsohn had subscribed to Paramount+ since approximately 2021. Before August 7, 2025, each purchased Paramount+ from independently managed Paramount Global. When Skydance completed the acquisition, it obtained control over Paramount+, including its prices, tiers, discounts, promotions, free trials, programming expenditures, and distribution strategy.

24. Before Skydance acquired Paramount, Skydance independently supplied premium programming to competing services, including Netflix, Apple TV+, and Amazon Prime Video.

Its productions included Grace and Frankie, The Old Guard 2, Spellbound, Foundation, Luck, The Gorge, Reacher, Cross, and Balls Up.

25. Following the acquisition, Skydance's production assets and development pipeline were placed under the same corporate control as Paramount+. Skydance's animation operations were integrated with Paramount Animation, and Skydance's film and television productions became available for coordinated development, licensing, windowing, and distribution across Paramount's platforms.

26. Following the acquisition, the new management immediately adopted a direct-to-consumer strategy emphasizing increased average revenue per user, reduced reliance on low-margin subscriptions, retirement of free trials, and elimination of discounting practices. Plaintiffs allege that the acquisition reduced the competitive constraints that otherwise would have limited Paramount's ability to impose those less favorable consumer terms. Paramount's actual post-acquisition price increase supplies a concrete example of management exercising its newly consolidated pricing authority; Plaintiffs do not contend that every increase is unlawful merely because it followed a merger.

27. In a shareholder letter filed with the Securities and Exchange Commission on November 10, 2025, Paramount Skydance announced that it would increase Paramount+ prices in the United States during the first quarter of 2026. Paramount also identified increased average revenue per user and subscriber monetization as components of its post-acquisition direct-to-consumer strategy.

28. Paramount implemented the announced increase effective January 15, 2026. The Essential monthly price increased from $7.99 to $8.99, approximately 12.5 percent, and the Premium monthly price increased from $12.99 to $13.99, approximately 7.7 percent. Marazzo

and Rubinsohn paid the increased charges.

**B. Completed October 6, 2026 Acquisition of Warner Bros. Discovery**

29. Paramount pursued WBD through successive offers in 2025 and 2026. WBD accepted its proposal, stockholders approved the transaction on April 23, 2026, and the merger closed on October 6, 2026 after the Court entered the States' consent decree. The parent company is now Skydance Corporation, and WBD is its wholly owned subsidiary. See Skydance Corp., Form 8-K (Oct. 6, 2026).

30. Before Paramount prevailed, WBD had agreed in December 2025 to sell its studio and streaming assets to Netflix, a proposed transaction that would have excluded CNN and other WBD cable properties. Netflix withdrew from the bidding process in February 2026 after Paramount made a higher competing offer. The Netflix-WBD acquisition did not close.

31. During the bidding contest for Warner Bros. Discovery, Paramount itself warned of the anticompetitive consequences of consolidating major streaming services and theatrical production. In its December 8, 2025 SEC-filed statement opposing Netflix's proposed acquisition, Paramount warned of higher consumer prices, reduced compensation for creators, and harm to theatrical exhibitors. In a December 10 SEC-filed statement, it identified paid subscription video-on-demand as a distinct market, described Paramount+ and HBO Max as competing substitutes, rejected user-generated video platforms as effective restraints on subscription prices, and acknowledged that eliminating competition among subscription services could permit higher prices without corresponding subscriber losses. These admissions came from Paramount itself, before it acquired WBD.

32. Plaintiffs warned before closing that consolidation would lead to higher subscription prices, workforce reductions, elimination of independent management, and consolidation of creative and production operations. Subsequent developments corroborate those

warnings. Seven days after the October 6, 2026 closing, discovery+ announced subscription price increases of approximately 16.7 and 20 percent. On November 9, Skydance announced an early-2027 Paramount+/HBO Max bundle, replaced James Gunn and Peter Safran as leaders of DC Studios, and outlined plans to achieve at least $6 billion in annual savings through consolidated operations. Skydance also consolidated video-game operations, laid off at least 25 employees, and scaled back development projects. See Lucas Manfredi, Skydance Games Cuts Staff Amid Reorg One Month After Warner Bros. Merger, TheWrap (Nov. 9, 2026). Workforce reductions are relevant here not as an independent claim for employees' injuries, but as evidence of an integration strategy that can remove creative capacity and reduce the number, variety, and quality of finished products offered to viewers. These announcements support Plaintiffs' specific concerns about loss of independent choices and programming output, rather than an objection to corporate restructuring alone.

33. Defendants previously dismissed these consequences as speculation. In their August 28, 2026 motion to dismiss, they attacked Plaintiffs' prediction that the acquisition would cause Paramount to "consolidate services, eliminate overlapping expenditures, defer investment, or reduce programming," calling those allegations "guesswork and not tied to any facts plausibly alleged in the FAC." (Dkt. 87 at 8.) Defendants also argued that Plaintiffs had identified no plans to reduce theatrical output. (Dkt. 36 at 11.) Their own subsequent announcements describe more selective theatrical greenlighting, centralized studio management, and new control over DC Studios. Skydance removed Gunn and Safran from leadership and transferred responsibility for the DC film, television, and animation slate to an executive reporting to combined studio management. When separately competing creative teams are reduced, or their development decisions are pooled under a single budget, fewer projects will be commissioned or completed,

and consumers lose differentiated shows and films that independent rivals otherwise had incentives to produce. Defendants' announcements thus provide concrete support for the mechanism Plaintiffs alleged before closing: consolidation will reduce the quantity, variety, and quality of competing products available for purchase. *See* Skydance Corp., Skydance Names Jeremy Latcham President and Chief Creative Officer, DC Studios (Nov. 9, 2026).

**C. Ellison's Statements Concerning Competition in the Alleged Markets**

34. On August 4, 2026, Paramount Chairman and Chief Executive Officer David Ellison publicly defended the WBD acquisition as an effort to compete for consumer attention against Netflix, Amazon, Apple, and other platforms.

35. Ellison stated that Paramount and WBD together represented nearly 20 percent of U.S. television viewing time, or roughly 13 percent if YouTube user-generated video was included. Ellison has compared competitive strength in the very metric that streaming advertisers and platforms use to value audience engagement. His discussion directly acknowledges the magnitude of consumers' viewing decisions. *See* Paramount Second Quarter 2026 earnings disclosures (Aug. 4, 2026).

36. Ellison further emphasized that "the audience—the American people—[has] the final say" in whether movies succeed and news organizations thrive. Plaintiffs rely on his acknowledgement that consumers make consequential purchasing and viewing decisions in the affected product categories. *See* David Ellison, The Critics Are Wrong About My Politics, N.Y. Times (Aug. 4, 2026).

37. Paramount's own operating disclosures confirm the same relationship in subscription streaming. Paramount measures Paramount+ performance through subscriber growth, retention, viewing hours, engagement, and the ability of particular programming to

attract and retain subscribers. In the second quarter of 2026, Paramount reported approximately 81.6 million Paramount+ subscribers, its best retention quarter, double-digit growth in viewing hours, and significant subscriber and engagement gains associated with specific programming. Consumers who subscribe, remain subscribed, cancel, change services, or devote viewing time to competing services therefore supply the demand that Paramount+ and HBO Max compete for.

38. Marazzo and Rubinsohn are among the consumers whose subscription payments and viewing choices Paramount and Warner Bros. Discovery compete to obtain. As alleged below, both presently purchase Paramount+ and HBO Max and independently decide whether to retain, cancel, upgrade, downgrade, or substitute those services based on price, programming, advertising load, promotional terms, quality, and overall value.

39. Ellison similarly described theatrical success as dependent upon audience choice. Paramount's August 4 disclosures state that the company applies audience insights and analytics to theatrical greenlighting, marketing, and distribution decisions, and evaluates those decisions based on resulting box-office performance. Ellison separately stated that the American audience has the final say in whether a movie succeeds or fails. The completed acquisition combined two studios that previously made independent decisions about which films to greenlight, produce, market, schedule, and release theatrically for consumers.

40. Plaintiffs regularly purchase admission to first-run theatrical films and choose among differentiated films based on genre, cast, director, franchise, quality, reviews, release date, theater placement, showtime, premium-format availability, and other attributes. They are therefore members of the audience whose purchasing decisions generate box-office demand, which Ellison identifies as determining whether theatrical films succeed. A reduction in independently greenlit or released films, competing release windows, genre and budget variety,

or other theatrical alternatives would reduce the number of products available for Plaintiffs to purchase.

41. Ellison made the same consumer-centered point concerning national television news. In discussing CNN and CBS News, he admitted the importance of audience trust, journalistic independence, and news organizations' ability to serve the people who rely on them. He admitted that whether a news organization "thrives or withers" ultimately depends upon the audience. Those admissions recognize that independence, credibility, reporting quality, and audience trust are competitive attributes affecting consumer demand for national television news.

42. Marazzo, McCarthy, Rubinsohn, and Talewsky pay for television packages that provide national television news and regularly consume CNN, CBS News, or competing national news programming. Their payments and viewing decisions are therefore part of the audience demand that CNN and CBS News compete for. A merger-induced reduction in original reporting, investigative output, staffing, live coverage, independence, credibility, differentiation, or other competitive attributes would reduce the value of the national news programming included in the products that those Plaintiffs purchase.

43. Ellison's descriptions provide evidence of practical industry recognition of competitive relationships in streaming, national television news, and theatrical films. Plaintiffs plead three principal markets and three alternatives based on the distinct products and levels of commerce identified below. See *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962) (practical indicia of a submarket include industry recognition, distinct customers, pricing, and product characteristics).

**D. Industry-Wide Consolidation Trend**

44. The completed acquisitions occurred amid accelerating consolidation of independently operated film, television, and streaming businesses. In 2019, Disney acquired major entertainment assets of 21st Century Fox, increasing its ownership of Hulu, and in June 2025, Disney acquired NBCUniversal's remaining interest in Hulu, obtaining 100% ownership. WarnerMedia and Discovery combined in 2022. Most recently, on November 6, 2026, Fox Corporation completed its acquisition of Roku, combining Fox's television programming, news, sports, and streaming operations with Roku's connected television platform and distribution network, which reaches more than 100 million households worldwide. These transactions illustrate the continuing concentration of programming, streaming services, and consumer distribution under common corporate ownership.

45. Following the WarnerMedia-Discovery combination, WBD placed HBO, Warner Bros., CNN, Discovery, and significant programming libraries under common corporate ownership and integrated some Discovery programming into HBO Max. This prior integration illustrates the practical ability of common ownership to coordinate platform and content decisions.

**E. Debt Load, Deleveraging, and Dependence on Streaming Cash Flow**

46. Paramount's own transaction presentation projected approximately $79 billion in net debt upon completion of the Warner Bros. Discovery acquisition. Its November 9, 2026 SEC-furnished shareholder letter subsequently confirmed approximately $87 billion in gross debt and $10 billion in cash following closing. The magnitude of this indebtedness is extraordinary, even by the standards of the largest media companies. By comparison, Netflix reported approximately $7.1 billion in net debt as of September 30, 2026, while The Walt Disney Company reported approximately $40.9 billion as of June 27, 2026. The combined company's

approximately $79 billion in projected net debt is therefore more than eleven times Netflix's net debt and nearly twice Disney's. More significantly, Skydance disclosed in its November 9, 2026 Form 10-Q that the acquisition would result in approximately $6 billion in annual interest payments, equivalent to $500 million every month and more than $16 million every day, merely to service its indebtedness. The company also disclosed approximately $20.29 billion in debt obligations maturing within five years. Its projected annual interest expense alone equals the entire $6 billion in annual cost savings that Defendants have promised to achieve through consolidation over the next three years, before accounting for the approximately $4 billion in anticipated integration costs.

47. Skydance expressly acknowledged in its SEC filing that insufficient cash flow could force it to reduce spending on content and programming, defer investments, dispose of assets, or dedicate an unsustainable portion of operating cash flow to debt service. Skydance Corp., Quarterly Report (Form 10-Q), at 110–111 (Nov. 9, 2026) (Part II, Item 1A, Risk Factors). The acquisition has placed previously independent studios, streaming services, and news organizations under a common owner facing enormous debt-service obligations and powerful financial incentives to increase subscription revenue, eliminate overlapping operations, and reduce investments in independently produced programming. Those incentives, combined with the elimination of independent competition, substantially heighten the threatened harm to the prices, quantity, quality, and variety of the products Plaintiffs purchase.

48. Paramount's own presentation connects that financial plan directly to direct-to-consumer streaming. David Ellison stated that "DTC growth will be essential to the success of the combined company" and that Paramount will combine the two companies' streaming portfolios "into one stronger platform."

49. The same November 9, 2026 shareholder letter describes a unified leadership structure across television and direct-to-consumer operations intended to align distribution, advertising, and content sales. Management states that the consolidated company can decide how to distribute and monetize its film and television slate across streaming, broadcast, cable, and third-party channels. The earnings call likewise confirmed plans to apply more selective film greenlighting and integrated streaming economics to the acquired WBD operations. These post-October 2026 statements bear on the threatened effects of the WBD acquisition, not on the cause of the January 2026 Paramount+ price increase. Skydance Corp., Third Quarter 2026 Shareholder Letter (Nov. 9, 2026), at 8–9; Q3 2026 Earnings Call (Nov. 9, 2026).

50. Paramount's conduct following the 2025 Skydance-Paramount acquisition demonstrates that post-acquisition integration leads to programming reductions. In its filing covering the post-closing period beginning August 7, 2025, Paramount disclosed that a content portfolio review led it to abandon certain Skydance content, principally development projects, and to record programming charges.

## RELATED PROCEEDINGS AND CONSENT DECREE

51. On September 30, 2026, Judge Martínez-Olguín entered a consent decree in the States' related action and dissolved the restriction against closing. The decree requires theatrical release and window commitments, certain employment safeguards, and a news editorial-independence board. Plaintiffs acknowledge those protections but allege that they do not restore independent studio greenlighting, streaming pricing, or newsroom investment decisions. See *State of California v. Paramount Skydance Corp.*, No. 4:26-cv-07116-AMO, Dkt. 266–267.

52. In the States' July 20, 2026 proceeding, this Court credited evidence of approximately 27 percent combined share in wide-release theatrical distribution, a 359-point HHI increase, and a post-merger HHI of 2,074.

## RELEVANT MARKETS AND ANTICOMPETITIVE EFFECTS

### A. Direct-to-Consumer ("DTC") Subscription Streaming Market

53. The relevant product market is the distribution of premium film and television programming to United States consumers through paid, direct-to-consumer subscription streaming services (the "Direct-to-Consumer Subscription Streaming Market"). Participants include Paramount+, HBO Max, Netflix, Disney+, Hulu, Apple TV+, Amazon Prime Video, and comparable paid subscription services.

54. These services compete for consumers' limited subscription budgets and viewing time through price, tiers, discounts, free trials, advertising load, bundles, library depth, exclusive programming, release cadence, genre and budget variety, interface quality, and the ability to subscribe, cancel, and rotate among services.

55. Short-form user-generated video, social-media video, free broadcast programming, physical media, and theatrical exhibition are not reasonably interchangeable substitutes for a paid, on-demand library of professionally produced premium film and television programming. Paramount itself distinguished premium paid subscription streaming from short-form user-generated and social-media video in materials filed with the Securities and Exchange Commission on December 10, 2025, opposing Netflix's proposed acquisition of Warner Bros. Discovery. Paramount identified Netflix, Amazon Prime Video, Disney+, Paramount+, Apple TV+, and HBO Max as substitutable services offering professionally produced, long-form film and television programming. Paramount expressly rejected Netflix's effort to expand the relevant market to include YouTube, TikTok, Instagram, X, Snapchat, Twitch, and other user-generated video platforms, explaining that those services are not reasonably interchangeable with premium subscription-streaming services and do not impose competitive constraints on subscription prices. Paramount further acknowledged that competition among subscription-streaming services

restrains prices paid by consumers and that eliminating such competition can confer market power permitting higher subscription prices without corresponding subscriber losses. Paramount Skydance Corp., Exhibit (a)(5)(F), SEC Filing (Dec. 10, 2025).

56. The relevant geographic market is the United States because services are marketed and priced nationally, content rights are negotiated subject to United States territorial restrictions, and the material competitive conditions are substantially national.

57. In the alternative to the narrower Direct-to-Consumer Subscription Streaming Market, Plaintiffs allege a broader United States market for the distribution and consumption of television and long-form audiovisual programming and associated viewing time (the "Television and Video Viewing Market"). This market encompasses professionally produced programming distributed through subscription and advertising-supported streaming, broadcast television, cable television, satellite television, and live-TV services, including major online-video platforms to the extent they compete for viewing time. A substantial paid retail component consists of subscriptions and television packages purchased by residential viewers. Its geographic scope is the United States because the viewing measurements, advertising demand, programming rights, and national distribution strategies described by management concern United States audiences.

58. Ellison measured the combined enterprise's reach by total United States television viewing time and described it as second only to YouTube among distributors under Nielsen's Gauge. The November 9 shareholder letter likewise treats broadcast, cable, and paid and free streaming as a coordinated portfolio competing for audiences. Those descriptions provide practical evidence of competitive activity in the broader viewing field. In this alternative market, the 2026 acquisition joined previously independent sources of premium video and programming distribution under common ownership. Marazzo and Rubinsohn participate through paid

streaming subscriptions, and Marazzo, McCarthy, Rubinsohn, and Talewsky participate through paid television packages. Their alleged threatened injuries arise from the price, programming, or quality of those paid products, not merely from their membership in the overall viewing audience. Skydance Corp., Third Quarter 2026 Shareholder Letter (Nov. 9, 2026), at 3, 6–9.

**i. Effects and Threatened Effects of the 2025 Skydance-Paramount Acquisition in Streaming**

59. The August 2025 Skydance-Paramount acquisition is challenged through two analytically distinct mechanisms. Principally, it vertically integrated an independent supplier of valuable films and scripted television programming with Paramount+, a downstream subscription-streaming platform. Additionally, Plaintiffs allege a loss of potential independent competition: Skydance participated downstream through acquisition rather than launching a separately owned streaming service. The potential-entry theory concerns competition that independent entry could have added; the vertical theory concerns the impact of common control over differentiated programming already licensed to Paramount+'s rivals.

60. Before the acquisition, Skydance produced and financed premium films and scripted television programming, maintained established commercial relationships with major streaming services, and controlled programming that could attract subscribers. It also obtained financing sufficient to acquire an established downstream streaming business.

61. Entry through internal expansion and entry through acquisition have different potential competitive consequences. Had Skydance instead established an independently controlled subscription service, it could have added a competing platform seeking customers through differentiated programming, introductory offers, subscription pricing, and promotional terms. Acquisition of Paramount did not add such an independently owned downstream competitor. Plaintiffs allege, in the alternative to their principal vertical theory, that Skydance's

pre-acquisition production capabilities, customer relationships, and financial resources made it a potential source of independent entry into the paid subscription-streaming market. The acquisition foreclosed any such entry by Skydance as a separately controlled rival to Paramount+. A potential entrant constrains incumbents when entry is reasonably probable or when firms perceive a credible entry threat. *See FTC v. Procter & Gamble Co.*, 386 U.S. 568, 577–80 (1967); *United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 531–37 (1973) ("Suspect also is the acquisition by a company not competing in the market but so situated as to be a potential competitor and likely to exercise substantial influence on market behavior. Entry through merger by such a company, although its competitive conduct in the market may be the mirror image of that of the acquired company, may nevertheless violate § 7 because the entry eliminates a potential competitor exercising present influence on the market."); DOJ & FTC, Merger Guidelines, Guideline 4 (2023).

62. Independent of the elimination of potential entry, the acquisition also reduced competition by combining Skydance's programming business with Paramount's downstream streaming operations. Premium motion pictures and television series are differentiated by title, franchise, creative personnel, exclusivity, and audience demand. They help competing streaming services attract and retain subscribers. A service deprived of timely access to a popular Skydance production cannot necessarily obtain an equivalent substitute from another producer. Accordingly, the ownership and distribution of differentiated programming are competitively significant in the subscription-streaming market.

63. Paramount need not categorically deny rival streaming services access to Skydance programming to diminish their ability to compete. The combined company can reserve selected productions for Paramount-controlled platforms, delay or shorten licensing windows,

impose less favorable exclusivity or licensing terms, alter distribution priorities, or otherwise make rival access less timely or valuable. Such conduct can reduce the attractiveness of competing services and weaken their ability to constrain Paramount+ subscription prices, even where rival services continue to obtain some Skydance programming.

64. Before the acquisition, Skydance had independent economic incentives to maximize production and licensing revenues from distributors competing with Paramount+. Its SEC-filed financial statements report that Apple, Netflix, and Amazon accounted for approximately 92 percent of Skydance's 2024 revenue, while Apple and Amazon accounted for approximately 95 percent of its revenue during the first half of 2025. Those commercial relationships establish Skydance's substantial role as an independent supplier to competing streaming distributors. Following the acquisition, the company operating Paramount+ acquired control over Skydance's differentiated programming and its licensing, exclusivity, windowing, and platform-allocation decisions. The combined company could thereafter consider not only licensing revenue, but also whether providing favorable access to Skydance programming would strengthen services competing against Paramount+. This change in incentives is a separate and additional mechanism through which the acquisition threatened substantially to lessen competition.

65. On May 13, 2026, Paramount's Chief Financial Officer Dennis Cinelli acknowledged that the January 2026 Paramount+ subscription price increase initially caused subscriber churn, which later moderated, while reporting approximately 14 percent first-quarter growth in average revenue per user. Churn is the cancellation or nonrenewal of subscriptions. It is a price-disciplining mechanism because a dissatisfied subscriber can shift recurring payments to a competing service, depriving the first service of revenue. A provider considering a price

increase must weigh the added revenue from subscribers who remain against the revenue lost from those who leave. Cinelli's admission confirms that subscribers reacted to the increase by canceling, while subsequent moderation in churn and higher average revenue per user show that Paramount was able to sustain increased revenue per subscriber. Plaintiffs allege that the 2025 acquisition weakened the competitive constraints limiting that increase. In the 2026 WBD transaction, the constraint is weakened differently: switching from Paramount+ to HBO Max no longer necessarily deprives their common owner of the customer's subscription revenue.

66. Effective January 15, 2026, the Essential monthly subscription price increased from $7.99 to $8.99, approximately 12.5 percent, and the Premium monthly subscription price increased from $12.99 to $13.99, approximately 7.7 percent. Marazzo and Rubinsohn paid the increased charges. Plaintiffs allege that, absent the August 2025 acquisition and its anticompetitive effects on competition in subscription streaming, the competitive prices for the same services would have been lower. The difference between the amounts paid and the but-for competitive prices is their claimed injury under Section 4. The vertical mechanism and the additional potential-entry theory explain how the acquisition allegedly weakened competitive pricing constraints; neither theory treats changed management incentives as a separately compensable injury. The later October 2026 WBD acquisition is not alleged to have caused the January 2026 increase.

#### ii. Effects of the Completed Paramount–Warner Bros. Discovery Acquisition in the DTC Market

67. Before the WBD acquisition, Paramount+ and HBO Max separately chose subscription prices, promotions, programming, and tiers. A subscriber could reject Paramount+ and instead pay HBO Max, causing Paramount to lose revenue to an independent rival, or do the reverse. After closing, a switch between those same brands keeps the subscription revenue within

the same corporate family. That change gives the owner less reason to have each service undercut the other on price or programming value, even while competition from Netflix and other remaining services continues. The consumer may still choose between two brands, but no longer has the choice between those two independent sellers. This is the merger-specific change in competitive incentives that Plaintiffs allege threatens their recurring purchases.

68. Industry analyst FlixPatrol estimates that Paramount+ had approximately 59.15 million subscribers in the United States, while Warner Bros. Discovery's streaming services, including HBO Max, HBO, and Discovery+, accounted for approximately 63 million. By comparison, FlixPatrol estimates approximately 87.75 million Netflix subscribers, 75 million Amazon Prime subscribers, 64.1 million Hulu subscribers, 55.27 million Disney+ subscribers, and 44 million Peacock subscribers. These figures show the scale of Paramount's and WBD's streaming operations relative to the other services listed.




**Figure 1.** Estimated U.S. streaming subscriptions by listed service (figures are not necessarily unique customers). FlixPatrol, *Top Streaming Services by Subscribers in the United States* (accessed October 28, 2026).

69. Before October 6, 2026, Paramount+ and WBD's streaming businesses were independently owned and reported approximately 59.15 million and 63 million U.S. subscriptions in FlixPatrol's estimates. Each separately controlled prices, promotions, programming investments, and subscription retention. FlixPatrol's WBD category already includes HBO, Discovery+, and other WBD services; its separately listed Discovery+ subscribers are not added again. Figure 2 depicts those portfolios before the acquisition.




**Figure 2.** Estimated U.S. streaming subscriptions by corporate owner, before Skydance's October 6, 2026 acquisition of Warner Bros. Discovery. FlixPatrol, *Top Streaming Services by Subscribers in the United States* (accessed October 28, 2026).

70. After the acquisition, approximately 59.15 million reported Paramount+ subscriptions and 63 million reported WBD streaming subscriptions were placed under common

ownership, a gross aggregate of approximately 122.15 million reported subscriptions. Figure 3 depicts the change in corporate control.




**Figure 3.** Estimated U.S. streaming subscriptions by corporate owner following Skydance's October 6, 2026 acquisition of Warner Bros. Discovery, showing approximately 122.15 million gross reported subscriptions under common ownership, including potentially overlapping subscriptions. FlixPatrol, *Top Streaming Services by Subscribers in the United States* (accessed October 28, 2026).

71. Figures 1–3 illustrate the shift from two independent owners to one, not a count of unique customers. The economic point is straightforward: before the acquisition, a dissatisfied Paramount+ customer could take a monthly payment to independently owned HBO Max, and the loss of that customer disciplined Paramount's pricing. After the acquisition, the same switch can preserve revenue for the common parent. The two product labels may remain, but the

independent choice and the corresponding incentive to compete for that customer are gone. Plaintiffs allege that this loss of independent rivalry threatens the prices, discounts, and programming value of the two subscriptions they purchase.




**Figure 4.** Illustrative 2025 U.S. concentration changes in broader industry categories, not the pleaded consumer markets. P. Popiel & A. deWaard, MACRO Lab, "Market Shares" (June 26, 2026).

72. Independent researchers Popiel and deWaard estimate that, in a broader 2025 U.S. online-video-services market, the combined entities' shares were 7.2 and 9.1 percent, and market concentration rose from 1,413 to 1,543 HHI points. The increase of approximately 130 points reflects a nontrivial change in this broader market. *See* MACRO Lab, "Market Shares" (June 26, 2026).

73. Independent estimates using consistent denominators within each dataset quantify the two firms' pre-acquisition positions in premium subscription streaming. Antenna estimated that, at year-end 2025, Netflix accounted for approximately 25 percent of U.S. Premium SVOD subscriptions, Hulu 15 percent, Disney+ 14 percent, Paramount+ 13 percent, Peacock 10 percent, and HBO Max 9 percent. Paramount+ and HBO Max therefore represented approximately 22

percent of subscriptions measured by Antenna when their separately reported shares are added. *See* Antenna, State of Subscriptions: Premium SVOD 2025 Year in Review (Feb. 2026); Wayne Friedman, Premium Streamers' Growth Slowed to 7% in 2025, MediaPost (Feb. 25, 2026).

74. Other independent measures likewise show that Paramount+ and HBO Max were substantial competing services before closing. Based on U.S. consumer interactions from January through September 2025, JustWatch reported 7 percent of measured SVOD engagement for Paramount+ and 13 percent for HBO Max, or 20 percent together, compared with 21 percent for Prime Video and 20 percent for Netflix. Separately, economist John M. Yun's January 7, 2026 prepared congressional testimony cited S&P Global estimates attributing 7.7 percent of streaming subscription revenue to Paramount+ and 10.7 percent to HBO Max, approximately 18.4 percent combined. See JustWatch, U.S. Streaming Market Report: Acquisition Scenarios for Warner Bros. Discovery (Nov. 2025); John M. Yun, Prepared Statement, H. Judiciary Subcomm. Hearing, Full Stream Ahead: Competition and Consumer Choice in Digital Streaming, at 8 (Jan. 7, 2026) (citing S&P Global data reported by Business Insider on Dec. 15, 2025).




**Figure 4A.** Illustrative pre-acquisition U.S. streaming shares from three separate sources: Antenna (Premium SVOD subscriptions, year-end 2025), JustWatch (SVOD engagement, Jan.–Sept. 2025), and S&P Global (subscription revenue, as cited in Yun congressional testimony, Jan. 7, 2026).

75. Consumer subscription records provide evidence about the relationship between the merging services beyond their overall scale. In a study published August 21, 2026, YipitData examined 46,461 active HBO Max subscribers in a U.S. e-receipt panel covering February 15 through August 15, 2026. It identified 13,483 consumers also paying for Paramount+, or 29.0 percent of its HBO Max cohort and 19.4 percent of its 69,420-person Paramount+ cohort. Paramount+ appeared among HBO Max subscribers at approximately 1.6 times its incidence in a comparison population of other streaming subscribers without HBO Max. *See* YipitData Research, 29.0% of HBO Max Subscribers Also Paid for Paramount+ (Aug. 21, 2026).

76. Separate cancellation data also indicate reallocation of spending among paid streaming services. YipitData examined 2,028 established direct-billed HBO Max subscribers who canceled between July 2025 and January 2026. Approximately 207 began or reactivated a tracked competing service during the cancellation month, compared with an average of 107 per month in the preceding six months; 158 started one in the following month. The tracked services included Paramount+, Netflix, Disney+, Hulu, Peacock, and Starz. These observations show that

consumers respond to a service's value by redirecting spending, and that the threat of losing subscribers to a rival has an economic consequence. A switch to Paramount+ once deprived independently owned HBO Max of a subscription while rewarding a different owner; after the acquisition, that diversion can be internalized by the common owner. See YipitData Research, HBO Max Cancelers Started Rival Services at ~1.9x Their Prior Monthly Rate (Aug. 21, 2026).

77. On November 9, 2026, Skydance disclosed a concrete sequence of streaming integration steps. Its SEC-furnished third-quarter shareholder letter announced a Paramount+/HBO Max bundle beginning in early 2027, convergence of their technology systems within approximately one year, and the eventual creation of a unified streaming product. The first step is scheduled to occur while Plaintiffs continue paying for both subscriptions. *See* Skydance Corp., Third Quarter 2026 Shareholder Letter, Ex. 99 to Form 8-K (Nov. 9, 2026), at 3, 6–7.

78. When an analyst asked about raising stand-alone prices and discounting the proposed bundle, Ellison responded that bundling would begin the unification process and permit Skydance to capture "consumer monetization benefits" in advance of a fully unified product. He further confirmed that additional subscription price increases were contemplated as part of the company's ongoing strategy, with consumer feedback affecting only the timing and implementation of those increases, rather than whether they would occur. The disclosed objective and timing identify the decisions now being made by a single owner rather than by independent rivals. Skydance Corp., Q3 2026 Earnings Call (Nov. 9, 2026).

79. The planned integration threatens Plaintiffs through a concrete loss of independent consumer choice. Before the acquisition, Paramount+ and HBO Max each risked losing recurring revenue to the other when it increased prices, withdrew discounts, or failed to

offer attractive programming. The acquisition eliminated that rivalry between independent sellers. Skydance now obtains financial returns from both services and has announced a bundle as the first step toward a unified streaming product. A common owner can weigh a price increase or programming cut against the combined returns from both brands, rather than bear the full loss when subscribers switch between them. Bundling is the means by which the company proposes to market and monetize those newly unified interests. Plaintiffs therefore face a substantial risk of higher aggregate prices, diminished stand-alone offers, and fewer independently chosen programs, even if they remain technically able to subscribe to either brand. That is a threatened loss in the price and quality-adjusted value of Marazzo's and Rubinsohn's recurring purchases, not an abstract preference for a particular number of corporate owners.

80. On October 13, 2026, only seven days after the Paramount-Warner Bros. Discovery acquisition closed, discovery+, a subscription-streaming service acquired in the transaction, announced increases in both of its United States subscription tiers. The monthly price of its advertising-supported service increased from $5.99 to $6.99, approximately 16.7 percent, while its advertising-free service increased from $9.99 to $11.99, approximately 20 percent. The increases took effect immediately for new subscribers, with existing subscribers generally scheduled to pay the increased prices beginning with billing dates on or after November 12, 2026. The discovery+ increases provide additional factual support for the threatened consumer injury arising from the elimination of independent competition between Paramount+ and HBO Max. As the Supreme Court recognized in *Swift*, *American Tobacco*, and *Paramount Pictures*, the manner in which a company has previously exercised its economic power is relevant to assessing the danger presented by an expansion of that power.

81. The Supreme Court has condemned arrangements that replace independent

financial incentives with common returns. In *Northern Securities Co. v. United States*, 193 U.S. 197, 327–28 (1904), the Court sustained relief against common control of competing railroads. In *Citizen Publishing Co. v. United States*, 394 U.S. 131, 135–36 (1969), it explained that pooling newspaper profits reduced incentives to compete and affirmed relief restoring an independent competitor. In *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 149–51 (1948), it sustained dissolution of agreements under which normally competing theaters operated as a unit and shared profits. The economic principle is directly pertinent to this Section 7 claim: when competing businesses cease to bear independent gains and losses, they have less incentive to win customers from one another. Here the acquisition already pooled the economic returns to the common parent, and the announced bundle and product unification are steps toward exploiting those combined returns. Plaintiffs challenge the merger's threatened substantial lessening of competition, not a bundle as an automatic per se violation.

82. Marazzo and Rubinsohn currently purchase both subscriptions and have lost the ability to choose between Paramount+ and HBO Max as independent competitors. The announced early-2027 bundle threatens to make that change operational through common pricing and marketing before this action can be adjudicated. Plaintiffs accordingly seek interim relief prohibiting implementation of the proposed bundle and further integration of the two services' pricing, subscriber relationships, and operations pending adjudication, to the extent necessary to preserve effective divestiture and independent competition. A hold-separate order would preserve distinct businesses and records; divestiture would restore the rivalry that previously constrained the cost and value of their recurring subscriptions.

**B. Paid National Television News Market**

83. A relevant product market is nationally distributed television news programming made available to consumers through paid cable, satellite, and subscription live-TV streaming

packages in the United States (the "Paid National Television News Market"). The retail products purchased by Plaintiffs are paid television packages containing national news, rather than wholesale carriage rights. CNN and CBS News supply programming for those packages and compete for national viewers, correspondents, original reporting, distribution, advertisers, and consumer trust. The alleged merger effect concerns the output, differentiation, and quality of the national news programming received in those paid products.

84. National television news programming supplied through paid television packages is not reasonably interchangeable with local television news, newspapers, radio, podcasts, social-media posts, or digital written journalism. Those products may provide information about some of the same events; however, they do not provide the same combination of nationwide audiovisual newsgathering, correspondents and bureaus, immediate live coverage of national and international events, studio programming, interviews, continuous or regularly scheduled national television presentation, and institutional television-news production.

85. CNN and CBS News license or furnish audiovisual news programs or channels to third-party television distributors, which determine and bill retail package prices. Marazzo, McCarthy, Rubinsohn, and Talewsky participate as purchasers of paid television packages containing national news, not as purchasers of wholesale carriage rights. Their asserted future injury is diminished independent coverage, original reporting, and programming value within those paid subscriptions. This does not depend on distributors passing through a higher wholesale carriage fee; a distributor cannot independently produce the particular investigation or competing national coverage that a merged owner elects not to fund.

86. The relevant geographic market is the United States because distribution, branding, carriage, advertising, and competitive effects are national in scope.

87. In the alternative to the Paid National Television News Market, Plaintiffs allege a broader United States National Television News Programming and Viewing Market encompassing nationally distributed live and recorded television news supplied through cable, satellite, broadcast, paid live-TV streaming, free digital, and over-the-air television outlets. This market includes CBS national broadcast news even where available without a separately charged subscription. News organizations compete for viewers, correspondents, investigative stories, live coverage, advertising support, reputation, and audience trust across those distribution modes. The relevant geographic market is the United States.

88. Ellison's November 9 shareholder letter identified CBS News and CNN as two news services in the combined enterprise and described a single television portfolio spanning broadcast, cable, and streaming. The company announced unified senior management across television and direct-to-consumer businesses, including coordinated distribution and content sales. Those admissions support the alternative market by identifying the news businesses as producers and distributors of competing national audiovisual news content. Skydance Corp., Third Quarter 2026 Shareholder Letter (Nov. 9, 2026), at 8–9.

89. The regulatory history of the August 2025 Skydance-Paramount acquisition demonstrates the susceptibility of CBS News programming to its corporate owner's merger interests. While FCC approval of the transfer of CBS broadcast licenses remained pending, President Donald Trump sued Paramount over ordinary editing of an October 2024 60 Minutes interview with then-Vice President Kamala Harris. CBS defended its journalistic practices and maintained that the lawsuit lacked merit. The dispute became intertwined with the pending acquisition, Paramount's owners' economic interests, and newsroom independence.

90. The suit challenged the use of two portions of Harris's answer in broadcasts of

Face the Nation and 60 Minutes. Paramount had described the suit in court as without merit, and First Amendment commentators criticized it as an effort to penalize constitutionally protected editorial decisions. During the merger review, 60 Minutes Executive Producer Bill Owens resigned in April 2025 after publicly reporting that he lacked the editorial independence necessary to run the program; CBS News executive Wendy McMahon resigned in May 2025 amid disagreements over the company's direction and settlement. Scott Pelley publicly criticized the additional corporate supervision of 60 Minutes reporting. *See* Associated Press, July 2, 2025; Los Angeles Times, July 4, 2025.

91. On July 1, 2025, before the Skydance acquisition had received FCC clearance, Paramount announced that it would pay $16 million to settle President Donald Trump's 60 Minutes lawsuit. The FCC then quickly approved the Skydance-Paramount transfer on July 24, 2025, and the acquisition closed August 7, 2025. *See* CBS News, July 2, 2025, Paramount, President Trump Reach $16 Million Settlement; FCC, Memorandum Opinion and Order, FCC 25–43 (July 24, 2025).

92. Plaintiffs allege that the payment was an improper political concession made to facilitate governmental approval of the pending acquisition, rather than a settlement justified by the merits of Trump's claim. The timing, the company's prior position that the case lacked merit, and the dependence of the transaction upon FCC consent support the alleged inference. FCC Commissioner Anna Gomez dissented from the July 24 approval, expressly criticizing the payout and related concessions as capitulation in response to a baseless lawsuit; members of Congress likewise questioned whether the settlement was connected to regulatory approval. *See* FCC Commissioner Gomez, Dissenting Statement, FCC 25–43 (July 24, 2025); Letter from Senators Warren, Sanders & Wyden to David Ellison (July 21, 2025).

93. The CBS settlement illustrates how a corporate owner's merger-related financial interests can create pressures affecting newsroom independence. Consolidation magnifies that danger by placing previously competing news organizations under a single owner. Before October 2026, CBS News and CNN separately determined their reporting priorities, newsroom investments, and programming, competing for audiences and consumer trust. Their common owner can now appoint leadership, allocate budgets, coordinate programming priorities, and determine whether both organizations fund overlapping investigative or national coverage. This is an economic competitive effect, not merely a disagreement over editorial viewpoints: common ownership can diminish the incentive to invest in distinct reporting and thereby reduce the volume, quality, and variety of the national news programming consumers receive.

94. After Skydance acquired Paramount, the new ownership materially changed CBS News management, acquired The Free Press, and appointed its founder, Bari Weiss, editor-in-chief of CBS News. Weiss was given authority over CBS News and *60 Minutes*, and Paramount publicly stated that she had the support of Paramount and David Ellison as the editorial leader overseeing both.

95. Corporate oversight of CBS News remained contested following the 2025 acquisition. In December 2025, Paramount withheld a scheduled 60 Minutes investigative report on allegations of abuse in an El Salvador prison pending additional administration comment, prompting an internal dispute over editorial control. Plaintiffs cite that episode as evidence that corporate management can affect the timing or availability of independently produced investigations, an output and quality attribute relevant to consumers of paid national television news.

96. The October 2026 acquisition placed CBS News and CNN under common

corporate ownership. Their separate operational leadership and the States' consent decree's news editorial-independence board afford safeguards, but do not require the corporate parent to maintain separately funded bureaus, investigative teams, or levels of original reporting. The 2025 settlement and subsequent CBS editorial disputes are historical examples of the economic importance of newsroom autonomy. *See* States' Consent Decree, Dkt. 267 § III.D.

97. Plaintiffs' news claim is for threatened diminution of measurable programming output and quality, not disagreement with an editorial viewpoint. If common ownership reduces independently produced investigations, bureaus, or competing national-news coverage, consumers will receive fewer distinct programs for the same recurring payment. The claimed Section 7 injury from the 2026 transaction depends on the merger-specific loss of independent competition between CBS News and CNN.

98. A nationally representative YouGov survey conducted May 25–26, 2026, among 2,102 United States adults demonstrates the substantial audience reach and competitive significance of CNN and CBS News. According to the survey, 32 percent of respondents reported obtaining news from CNN during the preceding month, while 26 percent reported obtaining news from CBS. These figures place CNN and CBS among the five most widely used national news organizations surveyed, alongside Fox News (36 percent), ABC (29 percent), and NBC (28 percent). The acquisition thus places two organizations with substantial audiences under common corporate control, eliminating their independent ownership and creating the potential for consolidated decisions concerning reporting resources, original programming, staffing, and other economically significant attributes of their competing news products.




**Figure 5.** U.S. national news-outlet audience reach, 2026. YouGov, Trust in Media 2026 (June 24, 2026; survey conducted May 25–26, 2026, among 2,102 U.S. adults).

99. Reuters Institute surveys reported that the share of U.S. respondents rating CBS News trustworthy fell from 48 percent in 2025 to 38 percent in 2026; Figure 6 shows the longer series. David Ellison has expressly identified trust as an attribute news consumers demand, describing Paramount as being "in the truth business" and "in the trust business" while identifying approximately 70 percent of Americans as potential news consumers. Trust therefore has economic significance: news organizations compete for audiences, viewing time, subscriptions, and advertising by earning and retaining it. CBS News and CNN formerly pursued that demand through independent editorial, reporting, and investment decisions. Their common owner can now influence both newsrooms' resources and priorities, weakening incentives to compete through differentiated, trustworthy reporting. The threatened injury is diminished quality and variety in the product consumers purchase, not merely disagreement with an editorial viewpoint.




**Figure 6.** CBS News brand-trust survey responses, 2023–2026. The percentage of respondents rating CBS News trustworthy declined from 52 percent in 2024 to 38 percent in 2026. The August 7, 2025 Skydance-Paramount acquisition occurred between the 2025 and 2026 surveys. Reuters Institute, *Digital News Reports 2023–2026* (U.S. brand-trust results).

### C. Consumer Market for First-Run Theatrical Motion Pictures

100. A relevant consumer-facing product market is the sale of admissions to differentiated first-run theatrical motion pictures in the United States (the "Consumer Market for First-Run Theatrical Motion Pictures"). Paramount and Warner Bros. compete for those ticket purchases by independently developing, producing, marketing, and releasing films. Although exhibitors sell admission tickets, the studios determine which films exist, when they open, and what distinct genres, budgets, and creative offerings consumers can choose. Plaintiffs regularly purchase first-run theatrical admissions and intend to continue doing so. Common ownership threatens to replace independently competing film slates and release decisions with coordinated decisions to defer, cancel, or redirect projects, reducing the number and variety of films available for Plaintiffs' ticket purchases. Their alleged injury is the loss of competing products and

quality-adjusted value in those recurring purchases, not a generalized objection to consolidation.

101. First-run theatrical admission is distinguished from later home streaming by the release window, large-screen and premium-format presentation, communal viewing, and immediate access to new films. Consumers seeking those attributes do not necessarily regard delayed home streaming as an adequate substitute.

102. Before October 6, Paramount and Warner Bros. independently competed for opening weekends, audiences, and release slots. Common ownership permits a single owner to coordinate schedules, defer overlapping projects, or prioritize its aggregate slate in ways that eliminate previously independent release decisions and reduce the variety or timing of films available for ticket purchase.

103. The relevant geographic market is the United States because wide-release calendars, marketing campaigns, licensing, and exhibitor negotiations are planned nationally.

104. In the alternative to the Consumer Market for First-Run Theatrical Motion Pictures, Plaintiffs allege a United States market for developing, financing, producing, licensing, and nationally distributing wide-release first-run theatrical motion pictures (the “Wide-Release Theatrical Production and Distribution Market”). In this upstream market, major studio-distributors compete for talent, financing, production resources, exhibitors, screen access, desirable release dates, marketing opportunities, and nationwide distribution. The relevant geographic market is the United States.

105. Ellison and management describe Paramount Pictures and Warner Bros. as film businesses combining production scale and theatrical release slates. The November 9 letter states that the combined studio system expects at least 30 theatrical releases annually, while the call announced plans for more selective greenlighting and integration of film-studio functions.

Plaintiffs plead the upstream market alternatively because the two studios' loss of independent greenlighting and distribution decisions can reduce the differentiated films that regular purchasers encounter at theaters. Skydance Corp., Third Quarter 2026 Shareholder Letter (Nov. 9, 2026), at 5, 9; Skydance Corp., Q3 2026 Earnings Call (Nov. 9, 2026); *State of California v. Paramount Skydance Corp.*, No. 4:26-cv-07116-AMO (N.D. Cal. July 20, 2026).

106. The threatened reduction in theatrical output and consumer choice is neither speculative nor unprecedented. The completed Disney-Fox merger demonstrates how the consolidation of independently competing film studios can result in the elimination of established production operations and the loss of differentiated theatrical films that otherwise would have been available for consumers to purchase. Following its acquisition of 21st Century Fox in 2019, Disney closed Fox 2000, which specialized in mid-budget original dramas and literary adaptations, and subsequently shuttered Blue Sky Studios, Fox's animation studio. These closures eliminated independent sources of film development and production and reduced the variety of theatrical offerings available to consumers.

107. Paramount and Warner Bros. have combined previously independent film operations, while management has announced more selective greenlighting and integrated studio functions. Film and television output depends on investment in writers, directors, producers, animators, technical personnel, and development teams. Eliminating overlapping creative capacity or consolidating separate development slates can mean that projects once supported by competing studios are no longer commissioned, completed, or released. The economic injury to Plaintiffs is not loss of employment in the abstract; it is fewer separately developed films, diminished genre and budget diversity, and reduced quality-adjusted value in the theatrical admissions they buy. The Disney-Fox experience and Defendants' announced integration plans

make that threat concrete.

108. Behavioral concessions requiring specific theatrical film counts do not replicate the competitive discipline once provided by two separately owned studios. Title quotas and limited-window commitments do not replace independent greenlighting, diverse original production, or distinct marketing strategies.

109. The same Court evaluating this action previously credited an economic showing that the WBD combination would result in approximately 27 percent share of wide-release theatrical distribution, an HHI increase of approximately 359 points, and a post-merger HHI of approximately 2,074. The corresponding pre-merger HHI was approximately 1,715. These figures pertain to theatrical film distribution to exhibitors, and Plaintiffs separately allege how competition between studio-distributors affects the quantity and variety of differentiated films available for consumers to buy admission to. *See State of California v. Paramount Skydance Corp.*, No. 4:26-cv-07116-AMO, Dkt. 141 at 4–6 (July 20, 2026).




**Figure 7.** Upstream wide-release theatrical distribution concentration (not retail ticket sales) from the States' expert showing credited in Judge Martínez-Olguín's July 20, 2026 TRO (Dkt. 141 at 4–6).

110. Ellison admits that the combined company would account for approximately 18 percent of domestic box office over the preceding twelve months and approximately 22 percent

over two years. Those admissions confirm a substantial existing share under Paramount's own measure.

111. The Consumer Market for First-Run Theatrical Motion Pictures is an economically measurable market in which consumers purchase admission to differentiated theatrical films. Although theatrical exhibitors sell admission tickets to consumers, studio-distributors supply the films made available for those purchases and determine which films to develop, finance, produce, market, and release. Consumer demand is measurable through domestic box-office receipts and theatrical admissions attributable to each studio's films. Those measures identify the commercial significance of competing studio-distributors to consumers purchasing theatrical admission, rather than merely the value of upstream licensing transactions between studios and exhibitors.

112. Publicly available data show that consumer ticket purchases are substantially concentrated in films supplied by the major studio-distributors. According to Statista's May 29, 2026 report, Ranking of Movie Studios in the United States in 2025, by Domestic Market Share of Ticket Sales, films distributed by Warner Bros. accounted for approximately 21 percent of domestic theatrical ticket sales in 2025, while Paramount accounted for approximately 6 percent. Together, their films represented about 27 percent of domestic theatrical ticket sales. Disney accounted for approximately 28 percent, Universal approximately 20 percent, and Sony approximately 7 percent. These percentages measure ticket sales attributed to the films supplied by the respective studio-distributors, rather than their shares of the separate upstream market for licensing films to exhibitors or their ownership of theatrical exhibition facilities.




**Figure 8.** Domestic theatrical ticket-sales shares by major studio-distributor in 2025, including the pro forma 27 percent combined Paramount-Warner Bros. share calculated from historical 2025 ticket sales (not measured after the acquisition). Source: Statista, *Ranking of Movie Studios in the United States in 2025, by Domestic Market Share of Ticket Sales* (May 29, 2026).

113. The direct economic relationship between studio output and consumer purchases is confirmed by the exhibitors' own financial disclosures. AMC Entertainment Holdings reported in its 2025 Form 10-K that films supplied by its seven largest studio distributors accounted for approximately 83 percent of its United States admissions revenues. Cinemark Holdings likewise reported that six major film distributors accounted for approximately 84 percent of United States box-office revenues and 45 of the 50 highest-grossing theatrical films during 2025. The studios' decisions on production, distribution, release timing, and the availability of differentiated films therefore determine which theatrical products consumers can purchase.

114. The claimed theatrical injury is not a passed-through studio licensing surcharge. It is the loss of independently determined film offerings that moviegoers otherwise could purchase. Under separate ownership, Paramount and Warner Bros. made distinct greenlighting and release

decisions to attract audiences from one another. A common owner will internalize that competition, coordinate releases, or abandon projects that would otherwise be produced. An exhibitor cannot sell admission tickets to a film the controlling studio elects not to produce or release.

115. Before the acquisition, Paramount and Warner Bros. Discovery also competed independently over the terms and placement through which their films reached moviegoers. They negotiated with exhibitors concerning box-office revenue splits, minimum ticket prices, discounting, complimentary tickets, exclusivity periods, release dates, screen allocation, and premium-format placement. Separate ownership gave exhibitors alternatives and incentivized each studio to secure superior placement for its own films.

116. Entry or expansion by smaller studios would not be timely enough to replace the competition the acquisition eliminated. Wide theatrical release at scale requires established relationships with theater chains, coordinated nationwide screen allocation and release planning, substantial marketing infrastructure, and sufficient capital to absorb large production and marketing expenditures when a film underperforms.

117. Those barriers are greater for anticipated top-grossing films. Sustaining a slate of such films commonly requires valuable franchise intellectual property, large-scale production and visual effects resources, established marketing capabilities, international distribution relationships, and an ancillary revenue infrastructure involving licensing and merchandising. Those capabilities have been developed over many years and cannot be replicated quickly in response to Warner Bros. Discovery's elimination as an independent studio competitor.

118. The completed acquisition also threatens the likelihood of coordination among the remaining major studio-distributors. Major theatrical release schedules are unusually transparent

because studios publicly announce release dates months or years in advance. A studio's decision to move a major release into or out of another studio's release window is therefore readily observable to competitors.

119. Reducing the number of independent major studios makes it easier for the remaining firms to avoid competing release windows, detect deviations from established release patterns, and accommodate one another's major releases. With four studios accounting for approximately 93 percent of the box-office revenue generated by films released in more than 3,000 theaters, reduced rivalry diminishes the competitive pressure to increase output, develop differentiated films, and compete aggressively during desirable release windows.

## ARTICLE III STANDING

120. Article III of the United States Constitution extends judicial power to "Cases" and "Controversies." U.S. Const., art. III, § 2. A future injury satisfies Article III when it presents a "substantial risk" of occurring. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). Section 16 separately permits injunctive relief "against threatened loss or damage" resulting from an antitrust violation. 15 U.S.C. § 26.

### A. Completed Skydance-Paramount Acquisition

121. Before the August 7, 2025 acquisition, Skydance operated independently as a producer and licensor of premium film and television programming to streaming services competing with Paramount+. Its SEC-filed financial statements report that Apple accounted for approximately 62 percent of Skydance's revenue and Amazon approximately 33 percent during the six months ended June 30, 2025; Apple, Netflix, and Amazon collectively accounted for approximately 92 percent of revenue in 2024. Skydance therefore had established, commercially significant licensing relationships with competing services. After the acquisition, the owner of Paramount+ controlled Skydance's differentiated programming and associated licensing,

windowing, exclusivity, and platform-allocation decisions. Plaintiffs allege that this vertical integration weakened those rivals' ability to constrain Paramount+ pricing. *See* Skydance Media, LLC, SEC Exs. 99.1 and 99.2 (2025). This allegation concerns the 2025 transaction alone; the 2026 Paramount-WBD combination and its subsequently announced integration plans are addressed separately.

122. In addition to the principal vertical integration theory, Plaintiffs allege that Skydance's programming assets, distribution relationships, and resources could have supported entry through an independent subscription service. Purchasing Paramount instead did not introduce an additional independent downstream competitor. Plaintiffs plead this foregone-entry possibility as an alternative potential-competition effect. They do not allege that Skydance had already launched, announced, or committed itself to a separate platform. The independently documented licensing relationships support the principal vertical-access mechanism irrespective of whether potential independent entry can ultimately be established.

123. Paramount raised its monthly subscription charges effective January 15, 2026. Plaintiffs allege that the acquisition's effects on competition permitted the company to impose or maintain charges above the prices that would have prevailed without the acquisition. The asserted monetary injury is the actual difference between the prices they paid and those but-for competitive prices, not every dollar of a management-directed increase solely because the increase followed closing.

124. Marazzo and Rubinsohn paid Paramount+ directly and seek Section 4 damages for the merger-related overcharges they personally incurred. Plaintiffs allege a plausible causal connection through the acquisition's change to independent programming-supply incentives and, alternatively, loss of potential entry. The extent to which those effects caused the price increase,

in whole or in part, is ultimately a factual question for the jury. *See Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 700–01 (1962). Plaintiffs separately seek relief against threatened continuing effects on their purchases under Section 16.

125. Marazzo's and Rubinsohn's alleged past overcharges are concrete and particularized injuries traceable to the 2025 acquisition through the competitive mechanisms pleaded above and redressable by damages under Section 4. Their Section 16 theory concerns threatened future injury from continuing vertically integrated control of programming supplied to rivals and the resulting competitive constraints on the subscription services they continue to purchase; it is not based merely on the already-incurred overcharge.

**B. Completed October 6, 2026 Paramount–Warner Bros. Discovery Acquisition**

126. Marazzo and Rubinsohn currently pay for both Paramount+ and HBO Max and intend to continue purchasing premium streaming programming. Before the merger, their subscriptions gave them two independent suppliers competing for their monthly payments; either could reward consumers with a lower price, more attractive offer, or more valuable programming to win or retain their business. The merger eliminated that independent choice. Their monthly expenditures now expose them directly to a common owner's stand-alone and bundled prices, promotional terms, advertising load, and programming decisions.

127. The October 2026 acquisition eliminated independent ownership of those services. Skydance's November 9 announcement identifies the next steps: an HBO Max/Paramount+ bundle in early 2027, shared technology, and an eventual unified product. Ellison described the bundle as a means of obtaining consumer monetization benefits before full unification and discussed a phased pricing strategy. A subscriber who previously could transfer payment from Paramount+ to the independent HBO Max now may transfer it only within the same corporate group. This substantially reduces the incentive to preserve competing stand-alone

offers between those two services and threatens the prices and programming choices available to Marazzo and Rubinsohn. See Skydance Corp., Third Quarter 2026 Shareholder Letter, Ex. 99 to Form 8-K (Nov. 9, 2026), at 6–7; Q3 2026 Earnings Call (Nov. 9, 2026).

128. The threatened injury is economic, not simply an objection to consolidation. Marazzo and Rubinsohn face a substantial risk that common ownership and the planned bundle will increase what they must pay in the aggregate, eliminate discounts or other separately negotiated offers, or reduce the distinct programming available for their recurring subscription expenditures. They have already lost the competitive protection of being able to move those payments between two independently owned rivals. The planned integration threatens to translate that lost protection into reduced purchasing value.

129. The WBD acquisition did not cause the January 2026 Paramount+ price increase. The prospective claim instead concerns purchases continuing after the completed October 2026 acquisition and the announced early-2027 integration. Divestiture can restore the independent owners and pricing incentives removed by that acquisition and thereby redress the alleged threatened loss of value.

130. Until divestiture can be adjudicated and implemented, an order preserving separately identifiable subscriber accounts, pricing and promotional decisions, programming assets, financial records, and business operations would help prevent irreversible integration from frustrating effective relief.

131. Faust and McCarthy have considered purchasing Paramount+ but did not pay the January 2026 Paramount+ increase and seek no Section 4 damages based on that increase. They assert prospective interests in the prices and programming choices presented by the contemplated Paramount+/HBO Max integration; Talewsky likewise asserts prospective rather than past-

overcharge streaming relief.

### C. Paid National Television News Market

132. Marazzo purchases DirecTV and Hulu + Live TV; McCarthy purchases DirecTV's Ultimate package; Rubinsohn purchases Verizon FiOS, Hulu + Live TV, and Philo; and Talewsky receives Hulu + Live TV through a T-Mobile package and also purchases traditional cable service. These four Plaintiffs obtain national news programming through paid television arrangements, regularly watch competing national news programs within those arrangements, and intend to continue doing so. They participate as purchasers in the narrower market for paid national television news programming and in the paid-distribution component of the broader alternative national-news market. They do not allege that their consumption of free news, standing alone, constitutes a monetary antitrust injury.

133. The October 2026 acquisition placed the previously independent CNN and CBS News operations under one corporate parent. Although separate leadership and an editorial-independence board afford safeguards, common ownership permits coordinated reductions in reporting investments, bureaus, production teams, or competing news output. Plaintiffs allege threatened loss in the quantity and quality of news programming supplied in the packages they buy.

134. CNN and CBS News maintain separate journalists, producers, editors, correspondents, reporting teams, and original programming. Corporate consolidation threatens elimination of overlapping expenditures and will reduce the separately produced investigative and live-news output available to subscribers. Such loss would affect the programming itself rather than depend upon any carriage-fee increase being passed through by a distributor.

135. The alleged link between the studios' and news organizations' production decisions and Plaintiffs' purchases is a product-level output or quality loss, not a passed-through

licensing overcharge. Even where networks license content upstream, the threatened failure to commission a competing investigation, operate an independent bureau, or produce distinct live coverage affects what the consumer can obtain within the existing television package.

136. Although Plaintiffs purchase their subscriptions from cable, satellite, or streaming distributors rather than directly from the news organizations, that distinction does not preclude their standing to seek injunctive relief against anticompetitive conduct affecting the programming they purchase. The Ninth Circuit has expressly recognized the distinction between the upstream market in which television programmers supply channels to distributors and the downstream market in which distributors sell those channels to consumers. *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1195 (9th Cir. 2012). Moreover, "indirect purchasers are not barred from bringing an antitrust claim for injunctive relief against manufacturers." *Lucas Automotive Engineering, Inc. v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228, 1235 (9th Cir. 1998); *see also Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1145 (9th Cir. 2003) ("*Illinois Brick* doesn't apply to equitable relief."*)*. In the television-programming context, the Ninth Circuit noted that the availability of injunctive relief to subscribers purchasing DirecTV telecasts was undisputed in a case challenging upstream restraints involving NFL broadcasting rights. *In re NFL's Sunday Ticket Antitrust Litigation*, 933 F.3d 1136, 1156 n.6 (9th Cir. 2019). Likewise, Plaintiffs' purchases of television packages containing CNN and CBS News place them among the ultimate consumers directly affected by competition between those news organizations. Plaintiffs therefore seek prospective relief under Section 16 for threatened injury to their economic interests.

**D. Consumer Market for First-Run Theatrical Motion Pictures**

137. Each Plaintiff regularly purchases tickets to first-run theatrical films and intends to continue such purchases after the October 6, 2026 acquisition. Plaintiffs choose among

differentiated films based on genre, cast, franchise, creative personnel, release timing, exhibitor, showtime, and premium-format availability. They participate as buyers in the consumer admission market. They are not direct purchasers of upstream film production or distribution licenses, even though decisions in that alternative upstream market determine what films exhibitors can offer them.

138. The October 6, 2026 acquisition placed Paramount's and Warner Bros. Discovery's greenlight, production, slate, and release decisions under common corporate ownership. Senior oversight of both film studio brands was assigned to Dana Goldberg and Josh Greenstein.

139. The injury from those decisions reaches Plaintiffs without any necessary intervening decision by an independent exhibitor. A theater cannot sell Plaintiffs admission to a film that Paramount or Warner Bros. does not greenlight, cancels, does not produce, removes from the theatrical slate, delays to avoid another release, or redirects to streaming. Once the combined studio eliminates the film or its theatrical release, the corresponding purchasing opportunity ceases to exist.

140. Plaintiffs allege a substantial threat that future coordinated greenlighting, production, and release decisions will reduce independently supplied film offerings and therefore diminish the differentiated tickets available for their recurring purchases. The threat concerns loss of competing film output and choices, not a speculative increase in upstream licensing fees. Plaintiffs seek prospective and structural relief, including divestiture, to prevent that alleged product-level injury.

141. The alternative Wide-Release Theatrical Production and Distribution Market identifies the upstream competition between Paramount and Warner Bros. studio-distributors that

supplies and constrains the downstream assortment of films. Plaintiffs' Section 16 claim is that common control over production and distribution poses a substantial risk that independently developed films will not be greenlit, produced, or theatrically released, depriving them of future opportunities to purchase tickets to those films. The upstream market is thus a separate alternative theory of the competitive process impaired by the merger, with the alleged consumer injury occurring in the downstream ticket market.

142. Plaintiffs' participation in the affected theatrical market and their standing to seek injunctive relief do not depend upon purchasing theatrical distribution rights directly from Paramount or Warner Bros. Plaintiffs regularly purchase admissions to first-run theatrical motion pictures from exhibitors, which obtain the films made available through the competing studio-distributors. The Ninth Circuit has expressly recognized that "indirect purchasers are not barred from bringing an antitrust claim for injunctive relief against manufacturers." *Lucas Automotive Engineering, Inc. v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228, 1235 (9th Cir. 1998). In the distribution of entertainment programming, the Ninth Circuit also noted that injunctive relief was undisputedly available to DirecTV subscribers challenging upstream restraints involving NFL broadcasting rights. *In re NFL's Sunday Ticket Antitrust Litigation*, 933 F.3d 1136, 1156 n.6 (9th Cir. 2019). Likewise, Plaintiffs' purchases of theatrical admissions place them in the downstream market directly affected by Defendants' control over theatrical production and distribution. Plaintiffs allege that the elimination of independent competition between Paramount and Warner Bros. threatens to reduce the number, variety, and quality of differentiated first-run films available for their continuing ticket purchases. Their threatened injury therefore concerns the very theatrical products whose availability and competitive characteristics are determined by the challenged acquisition, rather than an incidental economic consequence of activity in an

unrelated market. Plaintiffs seek prospective relief under Section 16 against that threatened injury, notwithstanding that the underlying films reach them through theatrical exhibitors.

143. The 2025 and 2026 acquisitions support different forms of private relief. Marazzo and Rubinsohn seek Section 4 damages solely for overcharges paid following the 2025 Skydance-Paramount acquisition and alleged to arise from that transaction's vertical effects and loss of potential entry. Their additional Section 16 claims address future subscription injury. The 2026 Paramount-WBD acquisition supports prospective Section 16 claims concerning independent competition between Paramount+ and HBO Max, CBS News and CNN, and the two theatrical studios.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of Section 7 of the Clayton Act, 15 U.S.C. § 18; Damages Under Section 4, 15 U.S.C. § 15; and Injunctive Relief Under Section 16, 15 U.S.C. § 26 (Completed Skydance-Paramount Acquisition)

144. Plaintiffs reallege and incorporate the preceding allegations.

145. Skydance's completed August 7, 2025 acquisition of Paramount Global is alleged to violate Section 7 in the Direct-to-Consumer Subscription Streaming Market and, to the extent applicable to the distribution of the same premium programming, in the alternative Television and Video Viewing Market. It was not a merger of two existing retail streaming-platform competitors. Plaintiffs principally allege a vertical mechanism: the acquisition joined an independent supplier of differentiated film and television programming with Paramount+, enabling the combined company to affect rival distributors' access through licensing, exclusivity, windowing, and platform-allocation decisions. Plaintiffs additionally allege loss of Skydance as a potential independent streaming entrant because acquiring an incumbent did not add a separately controlled distributor, while acknowledging that the objective likelihood of

independent entry is a distinct factual issue. They allege that the acquisition weakened constraints on Paramount+ pricing and contributed to the January 2026 overcharges paid by Marazzo and Rubinsohn. Neither this Count nor the related damages claim attributes the earlier price increase to the subsequent WBD acquisition. See DOJ & FTC, Merger Guidelines, Guidelines 4 and 5 (2023).

146. Marazzo and Rubinsohn sustained economic injury by paying the increased Paramount+ subscription charges implemented following the acquisition. Plaintiffs seek damages under Section 4 of the Clayton Act for the portion of those charges attributable to the acquisition's anticompetitive effects, together with costs and reasonable attorneys' fees.

147. Marazzo and Rubinsohn also seek Section 16 relief against threatened continuing effects of the 2025 acquisition on the streaming services they purchase. Independent of past damages, Skydance's control of programming formerly licensed as an independent supplier to Netflix, Apple TV+, Amazon Prime Video, and other services poses the alleged ongoing threat of weakened rivals, reduced programming competition, and higher quality-adjusted subscription prices. Plaintiffs seek relief against those prospective consequences, not solely to redress historical payments.

148. Plaintiffs therefore seek an order requiring divestiture sufficient to restore the competition eliminated by Skydance's acquisition of Paramount Global, including divestiture of the acquired Paramount assets or divestiture of the Skydance programming and licensing assets necessary to restore an independently operated supplier of differentiated premium programming.

149. Plaintiffs further seek appropriate transitional and ancillary relief to preserve the competitive viability of the divested business and prevent continued anticompetitive integration pending implementation of the divestiture. Section 16 of the Clayton Act authorizes private

plaintiffs to obtain divestiture as a form of injunctive relief against threatened antitrust injury. *California v. American Stores Co.*, 495 U.S. 271, 284–85 (1990). Divestiture is particularly appropriate where restoration of an independent supplier is necessary to remove the competitive harm created by vertical integration. *Ford Motor Co. v. United States*, 405 U.S. 562, 573–75 (1972).

**COUNT II**
**Violation of Section 7 of the Clayton Act, 15 U.S.C. § 18; Injunctive Relief Under Section 16, 15 U.S.C. § 26 (Completed Paramount-Warner Bros. Discovery Acquisition)**

150. Plaintiffs reallege and incorporate the preceding allegations.

151. Skydance Corporation's completed October 6, 2026 acquisition of Warner Bros. Discovery, Inc. ("WBD") is alleged to violate Section 7 in the three principal markets: (1) the Direct-to-Consumer Subscription Streaming Market, where Paramount+ and HBO Max previously competed; (2) the Paid National Television News Market, where independently owned CBS News and CNN supplied competing national news programming; and (3) the Consumer Market for First-Run Theatrical Motion Pictures, where competing studio output determines the differentiated films available to ticket purchasers. Plaintiffs alternatively plead (4) the broader United States Television and Video Viewing Market; (5) the United States National Television News Programming and Viewing Market, including free and paid delivery; and (6) the United States Wide-Release Theatrical Production and Distribution Market, an upstream studio-distributor market.

152. The acquisition eliminated WBD's independent ownership and control of HBO Max, CNN, and Warner Bros.' theatrical motion-picture operations. Before the acquisition, Paramount+ and HBO Max, CBS News and CNN, and Paramount Pictures and Warner Bros. independently determined their respective competitive strategies, programming investments, pricing or licensing arrangements, and product offerings. The acquisition placed these formerly

independent businesses under common corporate ownership and control, eliminating competition between them at the ownership and decision-making levels.

153. The 2026 acquisition's alleged effects differ by competitive activity and by market. In paid subscription streaming, common ownership internalizes consumer substitution between Paramount+ and HBO Max and permits coordination of prices, promotions, programming, and service integration. In the broader viewing market, the same acquisition combines previously independent sources of professionally produced content and paid television distribution competing for consumer attention; the named Plaintiffs' asserted economic injuries arise through subscriptions and paid television packages. In the narrower and broader national news markets, common ownership eliminates independent corporate decisions about CBS News and CNN investigative reporting, bureaus, staffing, and differentiated coverage, allegedly reducing the programming value contained in Plaintiffs' paid news-bearing packages. In theatrical admissions, the threatened loss is a reduced set of differentiated films consumers can buy tickets to; in the alternative upstream production and distribution market, the threatened mechanism is coordinated studio greenlighting, financing, licensing, and release decisions that produce that downstream loss. Plaintiffs do not seek upstream pass-through damages for news or films.

154. Following closing, Skydance announced a Paramount+/HBO Max bundle for early 2027 as the first step toward a unified service, contemplated pricing changes, and technology convergence within approximately one year. As the acquisition already placed both services' financial returns under common ownership, the proposed bundle is a concrete means of replacing competition for one another's subscribers with coordinated monetization of the combined customer base. This resembles the economic incentive problem identified in *Citizen*

*Publishing Co. v. United States*, 394 U.S. 131, 135–36 (1969), and *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 149–51 (1948), without alleging that a lawful consumer bundle is itself equivalent to an unlawful agreement between independent firms. Management also described centralized distribution and content decisions, more selective theatrical greenlighting, and at least $6 billion in anticipated annual run-rate synergies. For Marazzo and Rubinsohn, these statements identify a near-term threat to independent subscription choices, prices, and product value; for the other Plaintiffs, the threatened injury is fewer independently funded news investigations and theatrical productions. See Skydance Corp., Third Quarter 2026 Shareholder Letter (Nov. 9, 2026), at 3, 6–9; Q3 2026 Earnings Call (Nov. 9, 2026).

155. The threatened injuries pleaded under Section 16 are personal to the products Plaintiffs buy or have sufficiently concrete plans to purchase. Marazzo and Rubinsohn face announced integration and possible coordinated pricing of the Paramount+ and HBO Max services they currently subscribe to. Marazzo, McCarthy, Rubinsohn, and Talewsky face threatened loss of competing CNN and CBS News programming contained in their paid television packages. All Plaintiffs regularly purchase first-run theatrical admissions and face threatened loss of separately developed film choices. Faust, McCarthy, and Talewsky assert additional prospective streaming interests only insofar as their own purchasing plans and threatened expenditures satisfy Article III. The asserted threats arise from the eliminated competition and specific post-closing integration plans, not common ownership in the abstract.

156. The September 30, 2026 consent decree in the States' case imposes safeguards concerning theatrical releases, news operations, and other matters. However, it does not restore WBD as an independently owned enterprise, independent Paramount+ and HBO Max pricing incentives, separate ownership of CNN and CBS News, or competing ownership of the two

theatrical studios. Plaintiffs allege that divestiture is required to restore the competitive decision-making that the acquisition eliminated.

157. Plaintiffs seek divestiture under Section 16, including an order requiring Skydance to divest WBD as an independent, economically viable competitor. Alternatively, Plaintiffs seek divestiture of sufficient streaming, national news, and theatrical businesses or assets, including HBO Max, CNN, and Warner Bros.' studio operations, to restore effective competition in the markets alleged. Pending adjudication and divestiture, Plaintiffs request a hold-separate order preserving independent pricing and promotional authority, stand-alone subscriber options, business operations, assets, financial records, and the ability to compete. In particular, they seek to prevent implementation of the announced Paramount+/HBO Max bundle and coordinated pricing or technological integration that would materially impair the restoration of independent competition. Ancillary transitional measures should preserve the divested businesses' competitive viability.

158. Section 16 authorizes divestiture in actions by private plaintiffs who establish threatened injury to their own interests. *California v. American Stores Co.*, 495 U.S. 271, 284–85, 295–96 (1990). Quoting *United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 331 (1961), American Stores described divestiture as "simple, relatively easy to administer, and sure" and stated that it should remain "in the forefront of a court's mind" upon a Section 7 violation. 495 U.S. at 281. The Court also cited Professors Areeda and Turner's conclusion that divestiture is the ordinary remedy for an unlawful merger whether sought by the government or a private plaintiff. Id. at 294 n.28 (citing 2 P. Areeda & D. Turner, *Antitrust Law* § 328b (1978)). The Supreme Court has likewise emphasized that, when unlawful integration has occurred, an injunction against future violations may be insufficient if it leaves the competitive structure

intact. *Schine Chain Theatres, Inc. v. United States*, 334 U.S. 110, 128–30 (1948). Plaintiffs seek divestiture to restore separate competition, and a hold-separate order to preserve meaningful relief before the announced bundle and unified platform are implemented.

## JURY TRIAL DEMAND

Plaintiffs demand a jury trial on all claims and issues for which a jury trial is available.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request judgment and the following relief:

1. Declaring that Skydance's acquisition of Paramount Global violated Section 7 of the Clayton Act;

2. Awarding Marazzo and Rubinsohn threefold their proven antitrust damages, costs of suit, and reasonable attorneys' fees pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15;

3. Ordering divestiture sufficient to restore competition affected by the completed August 2025 Skydance-Paramount acquisition, including divestiture of Paramount assets or the Skydance programming and licensing assets necessary to restore an independent supplier of premium programming;

4. Declaring that the October 6, 2026 acquisition of WBD violates Section 7 of the Clayton Act;

5. Preliminarily ordering Skydance to maintain Paramount+ and HBO Max, and any other businesses necessary for effective divestiture, separate and apart pending adjudication; preserving independent pricing, promotions, subscriber options, records, operations, and assets; and prohibiting the announced bundle or further integration that would impair effective divestiture;

6. Permanently ordering divestiture of WBD or sufficient constituent businesses and assets to restore independent competition impaired by the completed October 2026 acquisition;

7. Awarding all costs and attorneys' fees recoverable by law; and

8. Ordering such transitional and ancillary measures as are necessary to implement divestiture and maintain the competitive viability of independently operated successor businesses.

DATED: November 12, 2026

ALIOTO LAW FIRM

/s/ *Joseph M. Alioto*
Joseph M. Alioto, Esq.
Attorneys for Plaintiffs

**FOREMAN & BRASSO**

/s/ *Ronald D. Foreman*
Ronald D. Foreman, Esq.
Ian A. Hansen, Esq.
Attorneys for Plaintiffs