Jeffrey L. Kessler (*pro hac vice*)
**WINSTON TAYLOR LLP**
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-6700
Facsimile: (212) 294-4700
jeffrey.kessler@winstontaylor.com

Conor A. Reidy (*pro hac vice*)
Kevin B. Goldstein (*pro hac vice*)
**WINSTON TAYLOR LLP**
300 N. LaSalle Drive
Chicago, IL 60654-3406
Telephone: (312) 558-5600
Facsimile: (312) 558-5700
conor.reidy@winstontaylor.com
kevin.goldstein@winstontaylor.com

Jeanifer E. Parsigian (SBN 289001)
Matthew R. DalSanto (SBN 282458)
**WINSTON TAYLOR LLP**
101 California Street, 21st Floor
San Francisco, CA 94111-5891
Telephone: (415) 591-1000
Facsimile: (415) 591-1400
jeanifer.parsigian@winstontaylor.com
matthew.dalsanto@winstontaylor.com

Matthew R. Huppert (*pro hac vice*)
**WINSTON TAYLOR LLP**
1901 L Street NW
Washington, DC 20036-3506
Telephone: (202) 282-5000
Facsimile: (202) 282-5100
matt.huppert@winstontaylor.com

*Attorneys for Defendants Skydance Corporation (formerly Paramount Skydance Corporation) and Skydance Media, LLC*

[Additional counsel on signature page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

PAMELA FAUST, LEN MARAZZO, LISA McCARTHY, DEBORAH RUBINSOHN, and GARY TALEWSKY

Plaintiffs,

vs.

PARAMOUNT SKYDANCE CORPORATION (formerly Paramount Global), and SKYDANCE MEDIA, LLC,

Defendants.

Case No. 4:26-cv-03790-AMO

**DEFENDANTS SKYDANCE CORPORATION AND SKYDANCE MEDIA, LLC'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**

Hearing Date: January 14, 2027
Time: 2:00 p.m.
Judge: Hon. Araceli Martínez-Olguín
Courtroom: 5

# NOTICE OF MOTION AND MOTION

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that on January 14, 2027, at 2:00 p.m., or as soon thereafter as the matter may be heard, before the Honorable Araceli Martínez-Olguín, in Courtroom 5 of the United States District Court, Northern District of California, located at 1301 Clay Street, Oakland, CA 94612, Defendants Skydance Corporation and Skydance Media, LLC ("Defendants") will and hereby do move to dismiss with prejudice Plaintiffs Pamela Faust, Len Marazzo, Lisa McCarthy, Deborah Rubinsohn, and Gary Talewsky's ("Plaintiffs") Second Amended Complaint, ECF No. 109.

This Motion is made pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) on the grounds that Plaintiffs lack standing to assert their claims and have failed to state any claim. The Motion is based on this Notice of Motion; the accompanying Memorandum of Points and Authorities; the pleadings and other papers on file in this action; any argument; and any other evidence that the Court may consider.

Dated: November 24, 2026

Respectfully submitted,

By: */s/ Jeffrey L. Kessler*

Jeffrey L. Kessler (*pro hac vice*)
**WINSTON TAYLOR LLP**
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-6700
Facsimile: (212) 294-4700
jeffrey.kessler@winstontaylor.com

Jeanifer E. Parsigian (SBN 289001)
Matthew R. DalSanto (SBN 282458)
**WINSTON TAYLOR LLP**
101 California Street, 21st Floor
San Francisco, CA 94111-5891
Telephone: (415) 591-1000
Facsimile: (415) 591-1400
jeanifer.parsigian@winstontaylor.com
matthew.dalsanto@winstontaylor.com

Conor A. Reidy (*pro hac vice*)
Kevin B. Goldstein (*pro hac vice*)
**WINSTON TAYLOR LLP**
300 N. LaSalle Drive
Chicago, IL 60654-3406
Telephone: (312) 558-5600
Facsimile: (312) 558-5700
conor.reidy@winstontaylor.com
kevin.goldstein@winstontaylor.com

Matthew R. Huppert (*pro hac vice*)
**WINSTON TAYLOR LLP**
1901 L Street NW
Washington, DC 20036-3506
Telephone: (202) 282-5000
Facsimile: (202) 282-5100
matt.huppert@winstontaylor.com

Marguerite Sullivan (*pro hac vice*)
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
marguerite.sullivan@lw.com

Hanna Nunez Tse (SBN 346510)
**LATHAM & WATKINS LLP**
505 Montgomery St.,
Suite 2000
San Francisco, CA 94111-2562
Telephone: (415) 391-0600
hanna.nuneztse@lw.com

*Attorneys for Defendants Skydance Corporation (formerly Paramount Skydance Corporation) and Skydance Media, LLC*

# TABLE OF CONTENTS


Page

MEMORANDUM OF POINTS AND AUTHORITIES ..... 1

ISSUES TO BE DECIDED ..... 1

BACKGROUND ..... 1

- I. The Court Has Twice Dismissed Plaintiffs' Pleadings and Warned Against Further Amendment ..... 1
- II. Plaintiffs' Second Amended Complaint ("SAC") ..... 2

LEGAL STANDARDS ..... 3

ARGUMENT ..... 4

- I. Plaintiffs Continue to Lack Article III Standing to Challenge Either Merger ..... 4
  - A. The January 2026 Paramount+ Price Increase *Still* Does Not Establish Article III Standing ..... 4
  - B. The SAC's Vague Allegations of Competitive Harm From the Paramount-WBD Merger Are Also Insufficiently Concrete and Particularized to Establish Article III Standing ..... 6
- II. Plaintiffs Lack Antitrust Standing ..... 9
  - A. Plaintiffs Do Not Have Antitrust Standing to Challenge the Mergers in Their Alleged Theatrical and National News Markets ..... 9
  - B. Plaintiffs Do Not Have Antitrust Standing to Challenge the Mergers in Their Alleged Streaming and Video-Viewing Markets ..... 12
- III. The SAC Also Fails to State a Section 7 Claim ..... 13
  - A. The SAC Still Fails to Properly Allege a Relevant Antitrust Market ..... 13
    - 1. The SAC Does Not Plead Facts to Plausibly Support a Relevant Direct-to-Consumer ("DTC") Subscription Streaming Market or an Alternative Television and Video Viewing Market ..... 13
    - 2. The SAC Does Not Plead Facts to Plausibly Support a Relevant Paid National Television News Market or an Alternative National Television News Programming and Viewing Market ..... 14
    - 3. The SAC Does Not Plead Facts to Plausibly Support a Relevant Consumer Market for First-Run Theatrical Motion Pictures or an Alternative Wide-Release Theatrical Production and Distribution Market ..... 14
  - B. The SAC Does Not Plead a Plausible Substantial Lessening of Competition in Any Alleged Relevant Market ..... 15

1. The SAC Pleads No Concrete Economic Facts Showing Either Merger Is Likely to Substantially Lessen Competition ............................15

2. The SAC Alleges No Market Shares or Other Economic Data for the Alleged National News Markets ........................................................17

3. Plaintiffs' Alleged Streaming and Theatrical Market Shares Are Wholly Insufficient to Establish a *Prima Facie* Case...............................18

IV. The SAC Should Be Dismissed With Prejudice ....................................................................20

CONCLUSION ..........................................................................................................................21

# TABLE OF AUTHORITIES


Page(s)

**Cases**

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051 (9th Cir. 1999) ........ 10

*In re Apple iPhone Antitrust Litig.*, 2013 WL 4425720 (N.D. Cal. Aug. 15, 2013) ........ 4

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........ 3, 13

*Berlyn, Inc. v. Gazette Newspapers, Inc.*, 157 F. Supp. 2d 609 (D. Md. 2001) ........ 11

*Blantz v. Cal. Dep't of Corr. & Rehab.*, 727 F.3d 917 (9th Cir. 2013) ........ 7

*Brantley v. NBC Universal, Inc.*, 675 F.3d 1192 (9th Cir. 2012) ........ 11

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ........ 16

*California v. Sutter Health Sys.*, 130 F. Supp. 2d 1109 (N.D. Cal. 2001) ........ 15, 18

*Citizen Publ'g Co. v. United States*, 394 U.S. 131 (1969) ........ 17

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ........ 8

*Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36 (1977) ........ 11

*Coronavirus Rep. v. Apple, Inc.*, 85 F.4th 948 (9th Cir. 2023) ........ 13, 14

*DeHoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758 (9th Cir. 2018) ........ 6, 15, 16

*Demartini v. Microsoft Corp.*, 662 F. Supp. 3d 1055 (N.D. Cal. 2023) ........ 6, 15, 16, 17

*Epic Games, Inc. v. Apple Inc.*, 67 F.4th 946 (9th Cir. 2023) ........ 14

*Freeland v. Nippon Steel Corp.*,
827 F. Supp. 3d 1241 (N.D. Cal. 2026) .......... 6

*Fry v. Cap. One Fin. Corp.*,
2026 WL 751422 (N.D. Cal. Mar. 17, 2026) .......... *passim*

*FTC v. Meta Platforms Inc.*,
654 F. Supp. 3d 892 (N.D. Cal. 2023) .......... 12, 13

*FTC v. Microsoft Corp.*,
136 F.4th 954 (9th Cir. 2025) .......... 5, 15

*FTC v. Microsoft Corp.*,
681 F. Supp. 3d 1069 (N.D. Cal. 2023), *aff'd*, 136 F.4th 954 (9th Cir. 2025) .......... 5

*Ill. Brick Co. v. Illinois*,
431 U.S. 720 (1977) .......... 10

*Kendall v. Visa U.S.A., Inc.*,
518 F.3d 1042 (9th Cir. 2008) .......... 3

*Kumar v. Koester*,
131 F.4th 746 (9th Cir. 2025) .......... 8

*Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*,
140 F.3d 1228 (9th Cir. 1998) .......... 10

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .......... 5

*Malaney v. UAL Corp.*,
2010 WL 3790296 (N.D. Cal. Sep. 27, 2010), *aff'd*, 434 F. App'x 620 (9th Cir. 2011) .......... 17

*Malheur Forest Fairness Coal. v. Iron Triangle, LLC*,
164 F.4th 710 (9th Cir. 2026) .......... 9, 10

*McDermott v. Ampersand Pub., LLC*,
593 F.3d 950 (9th Cir. 2010) .......... 11

*N. Sec. Co. v. United States*,
193 U.S. 197 (1904) .......... 17

*New York v. Kraft Gen. Foods, Inc.*,
926 F. Supp. 321 (S.D.N.Y. 1995) .......... 18, 19

*Newcal Indus., Inc. v. Ikon Off. Sol.*,
513 F.3d 1038 (9th Cir. 2008) .......... 13

*Rebel Oil Co. v. Atl. Richfield Co.*,
51 F.3d 1421 (9th Cir. 1995) .......... 20

*Reilly v. Apple Inc.*,
578 F. Supp. 3d 1098 (N.D. Cal. 2022) .......... 13, 14

*Reilly v. Hearst Corp.*,
107 F. Supp. 2d 1192 (N.D. Cal. 2000) .......... 11

*Safe Air for Everyone v. Meyer*,
373 F.3d 1035 (9th Cir. 2004) .......... 3

*Somers v. Apple, Inc.*,
729 F.3d 953 (9th Cir. 2013) .......... 9, 10

*Sonoma Cnty. Ass'n of Retired Emps. v. Sonoma Cnty.*,
708 F.3d 1109 (9th Cir. 2013) .......... 20

*St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*,
778 F.3d 775 (9th Cir. 2015) .......... 13, 16, 18

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 4

*United States v. Anthem, Inc.*,
855 F.3d 345 (D.C. Cir. 2017) .......... 15

*United States v. Baker Hughes Inc.*,
908 F.2d 981 (D.C. Cir. 1990) .......... 20

*United States v. Falstaff Brewing Corp.*,
410 U.S. 526 (1973) .......... 12

*United States v. Marine Bancorporation, Inc.*,
418 U.S. 602 (1974) .......... 12

*United States v. Oracle Corp.*,
331 F. Supp. 2d 1098 (N.D. Cal. 2004) .......... 18, 19

*United States v. Pabst Brewing Co.*,
384 U.S. 546 (1966) .......... 16

*United States v. Paramount Pictures, Inc.*,
334 U.S. 131 (1948) .......... 17

*United States v. Von's Grocery Co.*,
384 U.S. 270 (1966) .......... 16

*United States v. Waste Mgmt., Inc.*,
743 F.2d 976 (2d Cir. 1984) .......... 20

*Whalen v. Albertsons Co.*,
2023 WL 8812882 (N.D. Cal. Dec. 20, 2023) .......... 6

*Yoshimoto v. Alaska Airlines, Inc.*, 2026 WL 1121960 (D. Haw. Apr. 24, 2026) .......... 4, 6

*Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981 (9th Cir. 2009), *as amended* (Feb. 10, 2009) .......... 21

**Statutes**

15 U.S.C. § 18 .......... 15

Clayton Act § 7 .......... *passim*

**Other Authorities**

Fed. R. Civ. P. 12(b)(1) .......... 3

Fed. R. Civ. P. 12(b)(6) .......... 3

Fed. R. Civ. P. 65 .......... 3

Todd Spangler, *Discovery+, Now Owned by Skydance, Hikes Prices Effective Immediately*, Variety (Oct. 13, 2026), https://variety.com/2026/tv/news/discovery-plus-raises-prices-effective-immediately-1236910057 .......... 8

U.S. Const. amend. I .......... 11

U.S. Const. art. III .......... *passim*

## MEMORANDUM OF POINTS AND AUTHORITIES

For the third time, Plaintiffs have filed a complaint that does not allege standing, antitrust injury, or plausible Section 7 claims. The Court twice identified the same fatal defect: Plaintiffs fail to plead a concrete injury traceable to a lessening of competition. The Second Amended Complaint ("SAC") proves once and for all that it is not possible for Plaintiffs to cure this defect through amendment. It recycles the January 2026 Paramount+ price increase that predates the Warner Bros. Discovery ("WBD") transaction and remains unconnected to any Skydance-created loss of competition. That price increase does not give any of the Plaintiffs standing or a concrete antitrust injury. The SAC also repackages grievances about the quality of national news coverage that this Court has already held are not antitrust injuries. It adds a new wholly speculative claim that Skydance was a potential entrant into a video streaming market prior to merging with Paramount. The claim is not just speculative, it is completely implausible—the SAC concedes that Skydance never launched, announced, or committed to a streaming platform. Finally, the SAC pleads "alternative" markets that contradict its primary markets and do nothing to advance a viable Section 7 claim. After three complaints, two dismissal orders, and an express warning by the Court that any further leave to amend is "very unlikely," enough is enough. The SAC should be dismissed with prejudice.

## ISSUES TO BE DECIDED

Whether Plaintiffs have standing to assert, and have stated a claim for, violation of Section 7 of the Clayton Act with respect to the Skydance-Paramount merger or the Paramount-WBD merger.

## BACKGROUND

### I. The Court Has Twice Dismissed Plaintiffs' Pleadings and Warned Against Further Amendment

Plaintiffs filed the original Complaint on April 30, 2026. ECF No. 1. The Court dismissed it on August 5 for lack of Article III and antitrust standing, holding that the only concrete injury alleged for any Plaintiff—the January 2026 Paramount+ price increase—was not fairly traceable to the challenged mergers and that Plaintiffs' remaining asserted harms were too vague and speculative. ECF No. 79 ("MTD Order") at 4–9.

Plaintiffs then filed the First Amended Complaint ("FAC"), again relying on the same Paramount+ price increase, allegations about a diminution in the quality of national news coverage, and revised market allegations. ECF No. 81. The Court dismissed again, holding that Plaintiffs still offered no factual connection between the challenged mergers and reduced competition, no concrete injury from generalized threats, and no cognizable antitrust injury. ECF No. 102 ("MTD FAC Order") at 4–9. The Court allowed one more amendment, indicating that further leave to amend was "very unlikely." *Id.* at 9.

## II. Plaintiffs' Second Amended Complaint ("SAC")

Plaintiffs filed the SAC on November 12, 2026. ECF No. 109. The SAC asserts two Section 7 counts: Count I challenges the completed Skydance-Paramount merger and seeks damages for alleged Paramount+ overcharges, divestiture, and related injunctive relief; Count II challenges the completed Paramount-WBD merger and seeks divestiture, hold-separate, and anti-integration relief. *Id.* ¶¶ 143–58, Prayer ¶¶ 1–6. The SAC largely recycles the dismissed FAC, with four principal changes:

- It seeks post-closing divestiture and hold-separate relief for both the completed Skydance-Paramount and Paramount-WBD mergers. SAC ¶¶ 1, 14, 148–49, 157–58, Prayer ¶¶ 3, 5;
- It adds a potential-entry theory of competitive harm for the Skydance-Paramount merger, claiming that the merger resulted in the "loss of Skydance as a potential independent streaming entrant," while conceding that Skydance never launched, announced, or committed to a streaming platform. SAC ¶¶ 59–61, 122, 145;
- It pleads three "alternative" markets that contradict Plaintiffs' primary markets—expanding streaming to a television/video-viewing market, expanding paid national news to an all national television news market, and recasting the consumer-facing theatrical-admissions market as an upstream theatrical production-and-distribution market. *Id.* ¶¶ 4, 53, 57–58, 100, 104–05, 151; and
- It requests interim, emergency relief, despite three past failed preliminary injunction/temporary restraining order motions. *See id.* ¶¶ 5, 14, 157–58, Prayer ¶ 5; ECF

Nos. 12, 69, 92, 96, 100, 108.[1]

The SAC does not cure the standing and antitrust injury defects this Court has twice found dispositive. The reason is straightforward: Plaintiffs still have not alleged that they have suffered a concrete injury traceable to a lessening of competition from either challenged merger.

## LEGAL STANDARDS

A court must dismiss a complaint for lack of subject matter jurisdiction under Article III of the Constitution if plaintiffs lack standing. *See* Fed. R. Civ. P. 12(b)(1). "A Rule 12(b)(1) jurisdictional attack may be facial or factual." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). In a factual attack, "the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Id.* "In resolving a factual attack on jurisdiction, the district court may review evidence beyond the complaint," and "need not presume the truthfulness of the plaintiff's allegations." *Id.* Here, Defendants make both a facial and a factual attack on Plaintiffs' allegation that they have Article III standing to bring their antitrust claims.

A court must also dismiss a complaint that fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To survive dismissal, plaintiffs must plead "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). The plausibility requirement "asks for more than a sheer possibility that a defendant has acted unlawfully"; the well-pleaded facts must show that plaintiffs are entitled to relief. *Id.* Allegations that are merely "labels and conclusions" or "'naked assertion[s]' devoid of 'further factual enhancement'" are not well-pleaded facts entitled to be credited. *Id.* Rather, the complaint must include sufficient "evidentiary facts," *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008), to permit a "reasonable inference that the defendant is liable for the misconduct alleged," *Iqbal*, 556 U.S. at 678.

[1] A complaint's prayer for preliminary relief is not a Rule 65 motion. Plaintiffs cannot obtain extraordinary interim relief by pleading it as a remedy rather than moving for it and satisfying Rule 65's procedural and evidentiary requirements.

## ARGUMENT

### I. Plaintiffs Continue to Lack Article III Standing to Challenge Either Merger

The SAC fails at the threshold. Like the original Complaint and FAC, it does not establish Article III standing for either claim, for any form of relief, in any alleged market. The Court can and should dismiss on that basis alone. *See* MTD Order at 3 (plaintiffs must demonstrate standing "for each claim," "for each form of relief they seek," and "in each alleged market" (citing *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) and *In re Apple iPhone Antitrust Litig.*, 2013 WL 4425720, at *6 (N.D. Cal. Aug. 15, 2013)).

#### A. The January 2026 Paramount+ Price Increase *Still* Does Not Establish Article III Standing

Plaintiffs continue to rely on the January 2026 Paramount+ price increase implemented five months after the Skydance-Paramount merger as their only factual allegation of a concrete and particularized harm. *See* SAC ¶¶ 123–25. But this price increase remains incapable of providing any Plaintiff with Article III standing because it is not plausibly connected to either challenged merger. *See* MTD Order at 4–5. Instead of curing past pleading defects, the SAC follows the same failed playbook.[2] It relies on the January 2026 price increase even though it cannot plead any plausible connection between that price increase and any alleged lessening of competition caused by the Skydance-Paramount merger (or the Paramount-WBD merger).[3]

*First*, because Skydance operated no streaming service pre-merger, the January 2026 price increase—even if paid by Marazzo and Rubinsohn—cannot be traced to any increased concentration in the alleged direct-to-consumer subscription streaming market. *See* ECF No. 87 ("Defs.' MTD FAC") at 5. Plaintiffs admit this. *See* SAC ¶ 122 (Plaintiffs "do not allege that Skydance had already launched, announced, or committed itself to a separate platform"); *see also, e.g.*, *Yoshimoto v. Alaska Airlines, Inc.*,

---

[2] As in the FAC, only Marazzo and Rubinsohn are alleged to be Paramount+ subscribers who paid the price increase. *See* SAC ¶¶ 15, 66, 124, 131; FAC ¶¶ 19, 25, 76, 79.

[3] Plaintiffs concede that the Paramount-WBD merger has nothing to do with the alleged Paramount+ price increase from January 2026, which happened more than nine months before the merger closed. *See* SAC ¶ 66 ("The later October 2026 WBD acquisition is not alleged to have caused the January 2026 increase."); *id.* ¶ 129 ("The WBD acquisition did not cause the January 2026 Paramount+ price increase."); *id.* ¶ 145 ("Neither this Count nor the related damages claim attributes the earlier price increase to the subsequent WBD acquisition.").

2026 WL 1121960, at *8–9 (D. Haw. Apr. 24, 2026) (dismissing merger challenge where one party was not a competitor pre-merger).

*Second*, Plaintiffs' recycled "vertical integration" theory is still implausible. *See* SAC ¶ 121. Plaintiffs allege that, before its merger with Paramount, Skydance operated as an independent "producer and licensor of premium film and television programming" to other streaming services that competed with Paramount+. *Id.* According to Plaintiffs, Paramount gained control over "Skydance's differentiated programming and associated licensing, windowing, exclusivity, and platform-allocation decisions," which supposedly weakened Paramount's "rivals' ability to constrain Paramount+ pricing." *Id.* But Plaintiffs fail to allege facts showing that any rivals were foreclosed or that vertical foreclosure was the cause of the January 2026 price increase. That gap is fatal to Plaintiffs' vertical injury theory. *See FTC v. Microsoft Corp.*, 681 F. Supp. 3d 1069, 1089–100 (N.D. Cal. 2023) (discussing standard for evaluating vertical mergers), *aff'd*, 136 F.4th 954 (9th Cir. 2025). The SAC does not allege facts that: (1) identify any specific Skydance content that was foreclosed to rivals; (2) show that any such content was significant enough to downstream competitors that its withholding would "probably substantially lessen competition" or harm Plaintiffs in any way, *Microsoft*, 681 F. Supp. 3d at 1090; or (3) indicate that Paramount would have the economic incentive to forgo revenue it would earn from licensing Skydance content to competing streaming services, *see id.* at 1090–97; *see also* Defs.' MTD FAC at 7. Alleging the possibility of foreclosure, SAC ¶ 63, is not enough: "The mere fact that, after a vertical merger, a company might make some of its newly acquired intellectual property exclusive to its platforms does not, without more, show a substantial lessening of competition"; a plaintiff "must make a 'fact-specific' showing." *FTC v. Microsoft Corp.*, 136 F.4th 954, 970–71 (9th Cir. 2025).[4] Plaintiffs' vertical-integration theory is entirely "conjectural or hypothetical" and cannot establish Article III standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation marks omitted).

[4] Plaintiffs' reliance on Skydance's pre-merger licensing revenue is self-defeating. SAC ¶¶ 64, 121. Those figures *support* the conclusion that Skydance had no plausible incentive to forgo substantial licensing fees that were "critical to its financial success." *Microsoft*, 681 F. Supp. 3d at 1091. If anything, the licensing figures speak to *Skydance's* pre-merger reliance on Apple, Netflix, and Amazon to financially support its operations through the licensing of content; they say nothing about the competitive importance of Skydance's content to those entities.

*Finally*, any alleged connection between the Skydance-Paramount merger and the January 2026 price increase is "severely undermined," MTD Order at 5, by the prevalence of similar price increases across the streaming industry. *See* Defs.' MTD FAC at 6. The SAC still fails to explain how a single Paramount+ price increase can be plausibly traced to the Skydance-Paramount merger when Paramount's competitors were raising prices too. *See* MTD Order at 5. And the SAC's new allegation that the increase "initially caused subscriber churn," SAC ¶ 65—that is, subscribers left for rival services—confirms that competitors continued to constrain Paramount+ after the Skydance-Paramount merger. The SAC again asks the Court to "infer causation from a temporal sequence," which "fail[s] to satisfy" Article III. MTD Order at 5.

### B. The SAC's Vague Allegations of Competitive Harm From the Paramount-WBD Merger Are Also Insufficiently Concrete and Particularized to Establish Article III Standing

Plaintiffs' generalized allegations of competitive harm from the completed Paramount-WBD merger fare no better. The SAC again invokes non-specific and wholly conclusory allegations of higher prices, reduced output, lower quality, and fewer independent choices, *see, e.g.*, SAC ¶¶ 1, 3, 47, 79, 128, but still "fail[s] to allege any facts to plausibly show how those claimed harms have materialized or would materialize," *see* MTD Order at 6.[5]

The SAC contains the conclusory assertion that the completed Paramount-WBD merger "eliminated" customers' ability to choose between two independent suppliers and that Plaintiffs' monthly streaming subscriptions now "expose them directly to a common owner's stand-alone and bundled prices,

[5] Courts in this Circuit have repeatedly dismissed Section 7 consumer merger challenges brought by these same Plaintiffs' counsel for similar pleading deficiencies as the SAC's. *See DeHoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758, 765 (9th Cir. 2018) (plaintiffs' assertion that post-merger entity "will adopt the distribution practices of" the acquiring firm was "a classic speculative conclusion" that "stops short of the line between possibility and plausibility"); *Fry v. Cap. One Fin. Corp.*, 2026 WL 751422, at *2–3 (N.D. Cal. Mar. 17, 2026) (no Article III standing because plaintiffs' "theory of harm is attenuated and conclusory" and lacks "individualized allegations"); *Whalen v. Albertsons Co.*, 2023 WL 8812882, at *1 (N.D. Cal. Dec. 20, 2023) (no Article III standing because plaintiffs "barely say anything" to demonstrate particularized and imminent injuries); *Freeland v. Nippon Steel Corp.*, 827 F. Supp. 3d 1241, 1249 (N.D. Cal. 2026) (no antitrust standing because "no Plaintiff participates in this relevant market, directly or indirectly, either as a consumer or a competitor") (cleaned up); *Demartini v. Microsoft Corp.*, 662 F. Supp. 3d 1055, 1062–63 (N.D. Cal. 2023) (dismissing complaint where plaintiffs made only "general allegation[s] that the merger may cause 'higher prices, less innovation, . . . and other potential anticompetitive effects'"); *Yoshimoto*, 2026 WL 1121960, at *8–9 (dismissing merger challenge where one party was not a competitor pre-merger).

promotional terms, advertising load, and programming decisions." SAC ¶ 126. The SAC further alleges that "common ownership" and an announced Paramount+/HBO Max bundle will "increase what [Plaintiffs] must pay in the aggregate, eliminate discounts or other separately negotiated offers, or reduce the distinct programming available for their recurring subscription expenditures." *Id.* ¶ 128. But, once again, the SAC alleges no facts to make these conclusory assertions of competitive harm and injury plausible.

Absent specific factual allegations making Plaintiffs' asserted injury plausible, the SAC must be dismissed. *See* MTD Order at 6. Bundling two streaming services in the future is not itself injury; Plaintiffs still must plead facts showing that the bundle will substantially lessen competition and concretely harm them through higher prices, reduced output, or diminished quality. *See Fry*, 2026 WL 751422, at *3 (allegations that, as a result of a proposed merger, "prices and rates *may* be increased; rewards *may* be lowered or eliminated; the quality of the services *may* be decreased; and the benefits of competition will be substantially and adversely impacted if not completely eliminated" were too "attenuated and conclusory" to support Article III standing) (emphases in original). The SAC does not come close to meeting this pleading standard. "[N]aked assertions devoid of further factual enhancement" are insufficient to establish Article III standing. *Blantz v. Cal. Dep't of Corr. & Rehab.*, 727 F.3d 917, 927 (9th Cir. 2013); MTD Order at 6.

Indeed, the SAC's own allegations establish vigorous competition among the streaming services. Plaintiffs concede that "competition from Netflix and other remaining services continues." SAC ¶ 67; *see also id.* ¶ 68 (alleging Netflix and Amazon Prime have higher subscriber numbers than Paramount+ and HBO Max); *id.* ¶ 76 (alleging HBO Max subscribers who cancel switch to Netflix, Disney+, Hulu, Peacock, and Starz—not just Paramount+). Any consumer dissatisfied with Paramount+ has ample alternatives, and Plaintiffs' vague injury claims from the combination of Paramount+ and HBO Max are not supported by any plausible facts.

Nor can Plaintiffs establish Article III standing from the Discovery+ price increase announced a week after the merger closed. *Id.* ¶ 80. Discovery+ is not one of the streaming services that Plaintiffs claim to have used. *See id.* ¶¶ 126–28. They cannot premise Article III standing on an increase they never paid. Further, Plaintiffs allege no facts to plausibly connect this price increase—which was planned before the

merger closed[6]—to any lessening of competition caused by the merger. All that is pled is another "temporal sequence," which the Court has already rejected as a factual predicate for Article III standing. MTD Order at 5.

Even more far afield are Plaintiffs' vague and conclusory allegations regarding post-merger layoffs, planned cost savings, "scal[ing] back" of development projects, or "consolidat[ion] [of] video-game operations." SAC ¶ 32. The SAC fails to allege any specific facts to show that these generalized complaints about the post-merger entity's business decisions caused any injury to Plaintiffs in a "personal and individual way." *See Kumar v. Koester*, 131 F.4th 746, 751 (9th Cir. 2025).

The SAC's continued speculation about Paramount's debt obligations likewise does not confer Article III standing. *See* SAC ¶¶ 46–50. The SAC hypothesizes that insufficient cash flow "could force [Skydance] to reduce spending on content and programming, defer investments, dispose of assets, or dedicate an unsustainable portion of operating cash flow to debt service." *Id.* ¶ 47. But as before, this alleged harm is pure speculation and not traceable to any alleged lessening of competition purportedly caused by the merger because a company's debt load is not a competitive effect. *See* Defs.' MTD FAC at 8.

Similarly, the SAC's new allegation that the post-merger entity has consolidated its leadership structure for television and direct-to-consumer operations, SAC ¶ 49, does not show any imminent or individualized harm to Plaintiffs. Article III standing cannot rest on such "a highly attenuated chain of possibilities." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013); *see also Fry*, 2026 WL 751422, at *3 (dismissing complaint on standing grounds because its "theory of harm is attenuated and conclusory").

At bottom, the SAC still pleads only speculation about what common ownership might someday mean for prices, output, quality, programming, or business operations. That is not enough under Article III. Plaintiffs must plead facts showing that the Paramount-WBD merger creates a substantial risk of

[6] Todd Spangler, *Discovery+, Now Owned by Skydance, Hikes Prices Effective Immediately*, Variety (Oct. 13, 2026), https://variety.com/2026/tv/news/discovery-plus-raises-prices-effective-immediately-1236910057 ("The Discovery+ price increase was planned several months ahead of the merger's closing[.]").

concrete, particularized harm to them—not generalized concerns about integration, bundling, or corporate ownership. The SAC does not do so.

## II. Plaintiffs Lack Antitrust Standing

The SAC also fails the antitrust-standing requirement the Court found dispositive in dismissing the FAC. MTD FAC Order at 9. Antitrust standing requires antitrust injury, and antitrust injury requires harm suffered in the market where competition is allegedly restrained by a consumer, competitor, or other participant *in that market*. *See Malheur Forest Fairness Coal. v. Iron Triangle, LLC*, 164 F.4th 710, 733 (9th Cir. 2026) (antitrust standing requires that "the injured party be a participant in the same market as the alleged malefactors"); *Somers v. Apple, Inc.*, 729 F.3d 953, 963–64 (9th Cir. 2013) (similar). Plaintiffs fail at that threshold across the board: they do not participate in the alleged theatrical and news markets as customers or competitors of Defendants, and their streaming and video-viewing theories do not plead an injury of the type the antitrust laws protect. Recasting the same allegations under new labels does not cure those defects.

### A. Plaintiffs Do Not Have Antitrust Standing to Challenge the Mergers in Their Alleged Theatrical and National News Markets

In both their alleged theatrical and national news markets, Plaintiffs cannot show antitrust standing or injury because they do not purchase the allegedly restrained products from Defendants in those alleged markets. Their alleged harms are also too indirect, speculative, or non-economic to qualify as antitrust injury.

***Theatrical Markets.*** Plaintiffs continue to lack antitrust standing in their alleged Consumer Market for First-Run Theatrical Motion Pictures because the SAC admits that they buy admission tickets from theater exhibitors—not Defendants—in the alleged market. *See* SAC ¶¶ 7, 100, 137, 142; *see also* MTD Order at 8; Defs.' MTD FAC at 9–10. Neither Paramount nor WBD is a theater exhibitor, and relabeling the market "consumer-facing" does not change who Plaintiffs buy from. Plaintiffs are downstream purchasers from exhibitors, while Defendants allegedly compete upstream, where they license movies to exhibitors. That is not enough. *See Malheur Forest*, 164 F.4th at 733; *Somers*, 729 F.3d at 963; MTD Order at 8–9.

For similar reasons, Plaintiffs lack antitrust standing in their alleged alternative market for Wide-

Release Theatrical Production and Distribution, which Plaintiffs allege is an "upstream market" in which "major studio-distributors compete." SAC ¶ 104. While Defendants make sales in that alleged upstream market, Plaintiffs do not participate in it. *See id.* ¶ 7 (Plaintiffs "do not allege they purchase distribution licenses" in the Wide-Release Theatrical Production and Distribution Market); *id.* ¶ 137 (Plaintiffs "are not direct purchasers of upstream film production or distribution"). They therefore continue to lack antitrust standing to assert a claim in that purported market. *See* MTD Order at 8–9.

***National News Markets.*** Plaintiffs likewise lack antitrust standing to challenge the mergers in the alleged Paid National Television News Market because: (1) they are neither customers nor competitors of Defendants in that alleged market; and (2) the harms they claim in that alleged market are non-economic and not "of the type the antitrust laws were intended to prevent." *Malheur Forest*, 164 F.4th at 733; MTD Order at 7–8; Defs.' MTD FAC at 10–12.

*First*, Plaintiffs admit that with respect to national news channels, they "purchase their subscriptions from cable, satellite, or streaming distributors rather than directly from the news organizations." SAC ¶ 136. Because Plaintiffs cannot allege that Paramount or WBD sells those news packages to them in the alleged market, they lack antitrust standing, as they are neither "consumer[s] of [Paramount's] goods or services" in the alleged Paid National Television News Market nor "competitor[s] of [Paramount] in" that market. *Somers*, 729 F.3d at 963; Defs.' MTD FAC at 10–11. For the same reason, they lack antitrust standing in their alternative National Television News Programming and Viewing Market, in which Plaintiffs also do not participate. SAC ¶ 87.

Plaintiffs attempt to side-step this defect by saying that "indirect purchasers are not barred from bringing an antitrust claim for injunctive relief against manufacturers." *Id.* ¶ 136 (quoting *Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228, 1235 (9th Cir. 1998)). But that assertion reflects the Supreme Court's *Illinois Brick* doctrine, which precludes indirect purchasers from bringing damages claims under the antitrust laws. *See Ill. Brick Co. v. Illinois*, 431 U.S. 720 (1977). It does not alter antitrust standing or antitrust injury requirements, which require that "the injured party be a participant *in the same market* as the alleged malefactors, meaning the party alleging the injury must be either a consumer of the alleged violator's goods or services or a competitor of the alleged violator in the restrained market." *Somers*, 729 F.3d at 963–64 (emphasis added) (citation and internal quotation marks omitted); *Am. Ad*

*Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1057 (9th Cir. 1999) ("Antitrust injury requires the plaintiff to have suffered its injury in the market where competition is being restrained."). Plaintiffs' reliance on *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192 (9th Cir. 2012), SAC ¶ 136, backfires: *Brantley* affirmed dismissal of television subscribers' antitrust claims, holding that "allegations that an agreement has the effect of reducing consumers' choices or increasing prices to consumers does not sufficiently allege an injury to competition." 675 F.3d at 1202.

*Second*, Plaintiffs' renewed attempt to transform their "political" gripes with the purported loss of viewpoint diversity in the alleged national news markets into actionable antitrust injury still fails. *See* Defs.' MTD FAC at 11–12. Despite Plaintiffs' insistence that their alleged harm is "not merely a disagreement over editorial viewpoints," SAC ¶ 93, the SAC's allegations say otherwise. These allegations continue to center on editorial decisions that Paramount allegedly made—prior to any merger with WBD—regarding *which* stories to cover and *who* within the company makes those editorial decisions. *See id.* ¶¶ 89–95. But Plaintiffs' concern about the political implications of Paramount controlling the editorial viewpoint of CBS News or CNN, *see id.*, does not constitute a cognizable antitrust injury. Indeed, Paramount's "editorial control over its content" is protected by the First Amendment. *See McDermott v. Ampersand Pub., LLC*, 593 F.3d 950, 959 (9th Cir. 2010); *see also* Defs.' MTD FAC at 12.

Simply put, Plaintiffs continue to allege harm to abstract, non-economic concepts, *e.g.*, "independence," "credibility," "reporting quality," "audience trust," SAC ¶¶ 41–42, that are not injuries the antitrust laws were designed to protect. MTD Order at 7–8; *Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 53 n.21 (1977) ("Competitive economies have social and political as well as economic advantages," but "an antitrust policy divorced from market considerations would lack any objective benchmarks."); *Reilly v. Hearst Corp.*, 107 F. Supp. 2d 1192, 1195 (N.D. Cal. 2000) (antitrust laws "exclusively confine their scope to matters of economic consequence"); *Berlyn, Inc. v. Gazette Newspapers, Inc.*, 157 F. Supp. 2d 609, 619 (D. Md. 2001) ("stilled independent editorial voices and reduced . . . presentation and discussion of diverse viewpoints" are not antitrust injuries); *see also* Defs.' MTD FAC at 11.

Further, to the extent the SAC contains conclusory allegations of "threatened loss in the quantity and quality of news programming," SAC ¶¶ 133–34, such allegations are devoid of plausible factual

support. The SAC fails to allege facts showing that any reductions to news output, independent coverage, or original reporting are planned or imminent. To the contrary, it concedes that CBS News and CNN retain "separate leadership" and an "editorial-independence board." *Id.* ¶ 133. And the SAC's allegations concerning unified senior management across the television and direct-to-consumer businesses, *id.* ¶¶ 49, 88, say nothing about the quantity or quality of planned content offerings.

### B. Plaintiffs Do Not Have Antitrust Standing to Challenge the Mergers in Their Alleged Streaming and Video-Viewing Markets

The SAC fails to plead antitrust injury in either its alleged Direct-to-Consumer Subscription Streaming Market or its alternative Television and Video Viewing Market. As to the Paramount-WBD merger, Plaintiffs do not allege that they paid any merger-related streaming or other video-viewing price increase. Instead, they speculate that the merged company's management philosophy or debt obligations might someday increase prices or reduce product quality. SAC ¶¶ 46–50. The Court has already rejected that kind of theory: debt load and management incentives are not antitrust injuries unless tied to a lessening of competition caused by the merger. *See* MTD FAC Order at 5–9.

As for the Skydance-Paramount merger, Plaintiffs cannot manufacture antitrust injury by labeling Skydance a lost potential entrant. SAC ¶¶ 122, 124, 145. Skydance did not operate a streaming service before the 2025 merger, and the SAC concedes that Skydance had not "launched, announced, or committed itself to a separate [streaming] platform." *Id.* ¶ 122. Nor does the SAC allege facts showing that Skydance was likely to launch a streaming service, that Paramount+ viewed Skydance as a potential competitive threat, or that Skydance's hypothetical entry constrained Paramount+ pricing before the merger.

The potential-competition doctrine requires more than threadbare speculation that a well-financed firm could enter someday. A plaintiff must plead facts showing either that the alleged potential entrant was positioned on the edge of the market and exerted present competitive influence, *United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 532–34 (1973), or that independent entry was realistically probable rather than an "ephemeral possibilit[y]," *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 623–25 (1974). *FTC v. Meta Platforms Inc.* underscores the point: even where Meta had "considerable financial and VR engineering resources" and clear interest in VR fitness, the FTC failed to prove actual

potential competition because Meta lacked the market-specific capabilities and a feasible, reasonably probable path to entry. 654 F. Supp. 3d 892, 926–28, 931–38 (N.D. Cal. 2023). The SAC pleads far less, alleging, at most, that Skydance had production assets, licensing relationships, and financial resources—not that Skydance was a probable streaming entrant or a competitive entrant threat in either alleged market. Those allegations do not plead antitrust injury in any streaming or video-viewing market.

## III. The SAC Also Fails to State a Section 7 Claim

### A. The SAC Still Fails to Properly Allege a Relevant Antitrust Market

The SAC still does not plead a relevant market, a "necessary predicate" to a Section 7 claim. *See St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 783–85 (9th Cir. 2015). A relevant market must include all reasonably interchangeable substitutes, and Plaintiffs must plead facts showing why excluded products would not constrain price or output in the alleged market. *See Coronavirus Rep. v. Apple, Inc.*, 85 F.4th 948, 955–57 (9th Cir. 2023); *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008). The SAC fails this test for each of its six relevant markets.

#### 1. The SAC Does Not Plead Facts to Plausibly Support a Relevant Direct-to-Consumer ("DTC") Subscription Streaming Market or an Alternative Television and Video Viewing Market

Both pleaded video markets fail for the same reason: the SAC alleges no facts showing why video options excluded from these alleged markets would not constrain price or output. The alleged DTC market excludes user-generated, free, broadcast, and other viewing options based solely on conclusory labels, and the terms "premium" and "professionally produced" remain undefined. SAC ¶¶ 53, 55. The SAC's broader Television and Video Viewing Market then includes the very viewing-time substitutes that the alleged DTC market excludes. *Id.* ¶¶ 57–58. A market cannot both exclude and include YouTube and other video platforms without pleading facts showing how consumer interchangeability and cross-elasticity of demand justify that line. *See Reilly v. Apple Inc.*, 578 F. Supp. 3d 1098, 1109 (N.D. Cal. 2022); *Coronavirus Rep.*, 85 F.4th at 955. No such facts are alleged for either video market, and that failure is decisive. *See Reilly*, 578 F. Supp. 3d at 1109 (a complaint is "legally insufficient" if it "fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand"); *Coronavirus Rep.*, 85 F.4th at 955 (cross-elasticity of demand is "required to define a market"); *Iqbal*, 556

U.S. at 678 (complaint must be dismissed if it fails to contain "sufficient factual matter" to state a claim for relief).

**2. The SAC Does Not Plead Facts to Plausibly Support a Relevant Paid National Television News Market or an Alternative National Television News Programming and Viewing Market**

Both alleged national news markets fail for the same reason. The SAC pleads no facts showing that newspapers, wire services, digital outlets, social media, broadcast news, or other free sources of national news would not constrain paid national television news. The Paid National Television News Market excludes free and broadcast national news, while the alternative National Television News Programming and Viewing Market includes free and paid national television news. SAC ¶¶ 83–87. The SAC offers no economic facts about consumer substitution or cross-elasticity of demand explaining those inconsistent boundaries. *See id.* That is fatal in defining a relevant market. *See Reilly*, 578 F. Supp. 3d at 1109; *Coronavirus Rep.*, 85 F.4th at 955. Nor do Mr. Ellison's comments about integrated management cure these pleading defects. *See* SAC ¶ 88. Operational integration says nothing about cross-elasticity of demand, consumer substitution, or the boundaries of a relevant market. *See Coronavirus Rep.*, 85 F.4th at 957.

**3. The SAC Does Not Plead Facts to Plausibly Support a Relevant Consumer Market for First-Run Theatrical Motion Pictures or an Alternative Wide-Release Theatrical Production and Distribution Market**

Both theatrical markets fail because the SAC again skips the consumer-interchangeability question. Plaintiffs allege that first-run theatrical releases differ from later home streaming, SAC ¶ 101, but they plead no economic facts showing that enough consumers would not switch to streaming or other video entertainment after a price increase for theatrical films. *Id.* ¶¶ 100–04; *see Epic Games, Inc. v. Apple Inc.*, 67 F.4th 946, 975 (9th Cir. 2023). Labels about release windows, large screens, and communal viewing do not substitute for facts about reasonable interchangeability or cross-elasticity of demand.

The alternative Wide-Release Theatrical Production and Distribution Market has the same problem and one additional defect. It moves the alleged market upstream from consumer ticket purchases to studio production and distribution, but still pleads no facts showing why other theatrical films, later streaming availability, or other video entertainment would not constrain prices or output for "wide-release" films. SAC ¶¶ 7, 104, 137.

**B. The SAC Does Not Plead a Plausible Substantial Lessening of Competition in Any Alleged Relevant Market**

Even if the Court were to find that Plaintiffs have standing and that their relevant markets were well pled (it should not), the SAC would still have to be dismissed because it does not plead facts plausibly showing that the effect of either of the challenged mergers in any of the alleged relevant markets "may be substantially to lessen competition." 15 U.S.C. § 18. To survive dismissal, Plaintiffs must allege facts plausibly showing a "reasonable probability" that a merger will substantially lessen competition in a relevant market. *Microsoft*, 136 F.4th at 964. In applying this standard, courts use a burden-shifting framework that requires plaintiffs to first "establish a prima facie case that a merger is anticompetitive." *DeHoog*, 899 F.3d at 763. The SAC fails to meet that burden for either merger in any alleged relevant market.[7] It pleads no concrete economic facts showing a lessening of competition with respect to either transaction, no market shares or concentration data for the national news markets, and only misaligned or insufficient market-share allegations for the alleged streaming, video-viewing, and theatrical film markets. *See Demartini*, 662 F. Supp. 3d at 1062–63.

**1. The SAC Pleads No Concrete Economic Facts Showing Either Merger Is Likely to Substantially Lessen Competition**

The SAC—like the original Complaint and FAC—is devoid of any concrete allegations of economic facts that could plausibly support Plaintiffs' claims. Section 7 does not condemn every horizontal acquisition that increases market concentration to any degree. Rather, to state a *prima facie* Section 7 claim, Plaintiffs must allege facts showing that a merger will likely result in "undue" market concentration. *See United States v. Anthem, Inc.*, 855 F.3d 345, 349 (D.C. Cir. 2017) (*prima facie* case requires "showing that the transaction will lead to undue concentration") (internal quotation marks omitted); *California v. Sutter Health Sys.*, 130 F. Supp. 2d 1109, 1118 (N.D. Cal. 2001) (requiring "an initial statistical showing that the transaction will lead to undue concentration in the market"). To make that showing, modern Section 7 jurisprudence requires a plaintiff to put forward economic facts—such as market shares, market concentration, barriers to entry, or other alleged market characteristics—showing

[7] The SAC pleads no market shares, HHI figures, or concentration metrics for the Skydance-Paramount merger at all. *See generally* SAC.

"that the merger will probably lead to anticompetitive effects." *St. Alphonsus*, 778 F.3d at 783–85 (requiring "statistical evidence" to establish *prima facie* case).

Plaintiffs again try to bypass this requirement by treating the elimination of a rival as sufficient by itself. *See* SAC ¶¶ 67, 79, 93, 102, 152–54. But courts, including in this District, reject that approach: "Merely alleging the elimination of a rival does not plausibly support an inference of an appreciable danger of anticompetitive effects in a relevant market." *Demartini*, 662 F. Supp. 3d at 1065; *see* Defs.' MTD FAC at 17–18; MTD FAC Order at 7.

While Plaintiffs now disclaim pleading any "per se violation from common ownership alone," SAC ¶ 4, their allegations of competitive harm remain grounded in that flawed premise. Rather than allege economic facts to support their claims, Plaintiffs allege that the completed Paramount-WBD merger resulted in competitive harm by placing HBO Max and Paramount+ under one corporate owner, *id.* ¶¶ 67, 79, that "common ownership" of CNN and CBS News "can diminish the incentive to invest in distinct reporting," *id.* ¶ 93, and that "common ownership" in film production "permits a single owner to coordinate schedules, defer overlapping projects, or prioritize its aggregate slate[.]" *Id.* ¶ 102. Such conclusory assertions of competitive harm, based solely on the allegation that the merging parties were competitors to some degree, are not a legally sufficient substitute for allegations of economic facts capable of stating a *prima facie* Section 7 claim. *See* Defs.' MTD FAC at 18–19; MTD FAC Order at 9.

Plaintiffs' recycled reliance on an "incipiency" theory drawn from 1960s Supreme Court decisions like *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962), *United States v. Von's Grocery Co.*, 384 U.S. 270 (1966), and *United States v. Pabst Brewing Co.*, 384 U.S. 546 (1966) once again ignores modern merger standards. *See* SAC ¶¶ 9, 12. The Ninth Circuit expressly rejected such an incipiency argument in *DeHoog*. 899 F.3d at 764–65 (holding that plaintiffs' assertion that a post-merger entity "will adopt the distribution practices of" the acquiring firm was "a classic speculative conclusion" that "stops short of the line between possibility and plausibility"). "Merely stating that" a post-merger entity "is likely to have incentives to change its practices," "without more, is insufficient." *Id.* at 762, 765.

The SAC is devoid of any allegations of economic facts that might plausibly establish a likelihood that competition will be substantially lessened in any of the alleged relevant markets, *i.e.*, that there exists a "monopolistic tendenc[y]" worthy of being curbed "in [its] incipiency." *Brown Shoe*, 370 U.S. at 317

n.32. Instead, the SAC continues to treat as sufficient the merger of two firms with some allegedly overlapping businesses, the loss of one independent owner through the merger, and conclusory assertions about post-merger incentives. These allegations are insufficient. *See Malaney v. UAL Corp.*, 2010 WL 3790296, at *7 (N.D. Cal. Sep. 27, 2010), *aff'd*, 434 F. App'x 620 (9th Cir. 2011) (rejecting the position that "any non-trivial acquisition of a significant rival is per se violative of the Clayton Act" as "wrong"); *Demartini*, 662 F. Supp. 3d at 1065 ("Merely alleging the elimination of a rival" is insufficient to state a claim); MTD FAC Order at 7 n.1 (noting that Plaintiffs "advance no legal authority that such 'incentives' or 'strategies' are cognizable antitrust harms").

Plaintiffs cite three early- to mid-20th century cases to support their claim that the "Supreme Court has condemned arrangements that replace independent financial incentives with common returns." SAC ¶ 81 (citing *N. Sec. Co. v. United States*, 193 U.S. 197, 327–28 (1904); *Citizen Publ'g Co. v. United States*, 394 U.S. 131, 135–36 (1969); *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 149–51 (1948)). But none of these cases is on point. *Northern Securities* and *Paramount Pictures* are not Section 7 challenges and have nothing to do with merger analysis. Similarly, *Citizen Publishing* condemned "price-fixing," "profit pooling," and "market control" between two separate entities in violation of Sections 1 and 2 of the Sherman Act. 394 U.S. at 135. Nothing of the sort is alleged here. None of these cases relieve Plaintiffs of the modern Section 7 pleading burden to allege economic facts showing a reasonable probability of a substantial lessening of competition.

### 2. The SAC Alleges No Market Shares or Other Economic Data for the Alleged National News Markets

In Plaintiffs' two alleged national news markets, the SAC remains an empty shell: it alleges neither market shares nor any method of measuring market concentration, such as the Herfindahl-Hirschman Index ("HHI"). *See* Defs.' MTD FAC at 19–20. This is fatal to Plaintiffs' Section 7 claims. *See Demartini*, 662 F. Supp. 3d at 1062–63. The SAC says nothing at all about the size or competitive significance of any competitor in these two alleged markets. It identifies no revenues, market shares, market concentration figures, or other economic facts that could potentially form the basis of a Section 7 claim. The SAC's reliance on a YouGov survey measuring "audience reach" and "trust" for various news channels, *see* SAC

¶¶ 98–99, does not cure this defect. "Audience reach" and "trust" are not measures of market concentration and have no relevance to showing a merger's competitive effects.

Instead of economic facts, the SAC continues to make political grievances about a lack of "trust" in news coverage. *See id.* ¶¶ 89–99. These grievances have no place in antitrust litigation. Alleged injuries to "audience trust" and "journalistic independence," *id.* ¶ 41, are not "cognizable economic harms protected by antitrust laws," MTD Order at 8; *see supra* p. 11, and they are far afield from the economic factual allegations that are required to support a plausible Section 7 claim. *See, e.g.*, *St. Alphonsus*, 778 F.3d at 783–85; *Sutter Health*, 130 F. Supp. 2d at 1118.[8]

### 3. Plaintiffs' Alleged Streaming and Theatrical Market Shares Are Wholly Insufficient to Establish a *Prima Facie* Case

Plaintiffs' own market-share allegations confirm that the SAC does not plead a *prima facie* Section 7 case in the alleged streaming, video-viewing, or theatrical markets. The alleged streaming shares are too low to support a presumption of anticompetitive effects; the streaming HHI figures are calculated for a different, broader market; and the theatrical figures either concern an upstream market Plaintiffs do not buy in or rely on one-year ticket-sales data that does not plausibly show likely competitive harm.

***The Alleged Streaming and Video-Viewing Market Shares.*** The SAC alleges statistics purportedly showing that Paramount+ and HBO Max together account for between 18.4% and 22% of subscription streaming, SAC ¶¶ 73–74, but even if these shares were correct, they would fall well below the levels courts have identified as necessary to support a *prima facie* Section 7 case. *See United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1123 (N.D. Cal. 2004) ("A presumption of anticompetitive effects from a combined share of 35% in a differentiated products market is unwarranted."); *Fry*, 2026 WL 751422, at *6 ("some courts hold that a plaintiff can satisfy their prima facie burden by showing that the merger will yield a combined market share of over 30%" and dismissing a complaint alleging a combined 16.2% share); *New York v. Kraft Gen. Foods, Inc.*, 926 F. Supp. 321, 366 (S.D.N.Y. 1995) (rejecting a challenge to a proposed merger resulting in a combined share below 35%). And even these shares exclude YouTube, which is one of the most powerful streaming competitors.

[8] Ironically, the SAC concedes that CBS national broadcast news is available "without a separately charged subscription," SAC ¶ 87, so CBS News is not even in Plaintiffs' primary alleged "paid" television news market, *see id.* ¶ 83.

The SAC's other video-viewing statistics are equally unavailing. For example, the HHI figures Plaintiffs claim demonstrate a "nontrivial change" in market concentration are calculated for what Plaintiffs admit is a "broader 2025 U.S. online-video-services market." SAC ¶ 72. Plaintiffs do not explain how HHI statistics for a different market—which they do not claim to be a relevant market—plausibly show a substantial lessening of competition in the streaming market they allege. Plaintiffs also rely on scattered statistics showing the number of subscriptions held by each streaming service and number of subscribers, *see id.* ¶¶ 68–71, but those statistics do not measure market concentration in any alleged market and thus cannot plausibly support Plaintiffs' claim of substantially lessened competition.

***The Alleged Theatrical Market Shares.*** The SAC's allegations of competitive harm in the Consumer Market for First-Run Theatrical Motion Pictures are based on recycled allegations about the Disney-Fox merger. *See id.* ¶ 106. Those allegations are of no relevance in light of the SAC's failure to allege facts plausibly suggesting that the impact of the Disney-Fox merger from seven years ago is in any way predictive of the competitive effect of either of the completed Paramount mergers they challenge. *See* Defs.' MTD FAC at 21.

The HHI statistics that Plaintiffs borrow from the State AG litigation also do not support their consumer-facing theatrical market. The SAC itself says those figures pertain to upstream wide-release theatrical distribution, not retail ticket sales. SAC ¶ 109. Plaintiffs do not buy in that upstream market. *See id.* ¶¶ 7, 109, 137.

Nor can Plaintiffs save their Section 7 claims in the theatrical markets by citing Mr. Ellison's alleged statement that the combined entity would account for 18% of domestic box-office revenue over the preceding twelve months and 22% after two years. *See id.* ¶ 110. These shares, once again, fall well below the levels necessary for Plaintiffs to state a *prima facie* Section 7 claim. *See, e.g.*, *Oracle*, 331 F. Supp. 2d at 1123; *Fry*, 2026 WL 751422, at *6; *Kraft Gen. Foods*, 926 F. Supp. at 366.

The SAC's 2025 box-office share allegations, SAC ¶¶ 112–13, do not help Plaintiffs. Even taken at face value, Plaintiffs' pro forma 27% combined share of 2025 domestic ticket sales, *id.* ¶ 112, falls below the levels courts have required to support a *prima facie* case. *See Oracle*, 331 F. Supp. 2d at 1123; *Fry*, 2026 WL 751422, at *6. And the allegations rest on a single historical year of ticket sales in a business where annual shares depend heavily on the success of each studio's film slate. A one-year snapshot,

without more, does not plausibly show that either completed merger is reasonably likely to substantially lessen competition.

Finally, the SAC's cursory treatment of barriers to entry, *see* SAC ¶¶ 116–17, does not plausibly allege that established competitors—like Amazon MGM, Lionsgate, and A24—could not expand film output in response to any attempted price increase or output reduction by Defendants. It is implausible that existing smaller studios that already produce films for nationwide distribution would be deterred from expanding given their marked success in the market. *See United States v. Baker Hughes Inc.*, 908 F.2d 981, 984–85, 987–89 (D.C. Cir. 1990) (finding ease of entry "would likely avert anticompetitive effects"); *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1441 (9th Cir. 1995) (no market power as a matter of law where "competitors have expanded output in the recent past, or have the ability to expand output in the future"); *United States v. Waste Mgmt., Inc.*, 743 F.2d 976, 983 (2d Cir. 1984) (current market shares "are not an accurate proxy for market power" when "potential competition [can] respond quickly to price increases").

## IV. The SAC Should Be Dismissed With Prejudice

Leave to amend may be denied for "repeated failure to cure deficiencies by amendments previously allowed" or "futility of amendment." MTD FAC Order at 9 (quoting *Sonoma Cnty. Ass'n of Retired Emps. v. Sonoma Cnty.*, 708 F.3d 1109, 1117 (9th Cir. 2013)). Both considerations strongly support the Court dismissing the SAC with prejudice and without any further leave to amend. The Court has twice dismissed Plaintiffs' complaint, twice explained the defects in their complaint, and, after noting that Plaintiffs had "now presented two deficient pleadings," expressly warned that it is "very unlikely to permit further amendment as to any claim not sufficiently pleaded in the next amended complaint." *Id.* Plaintiffs have now presented a third deficient pleading.

With the benefit of two orders, two full rounds of briefing, and the post-closing public record of the WBD transaction, Plaintiffs still cannot allege a single fact tying either merger to a concrete injury to any of the Plaintiffs that flows from a lessening of competition. Their new allegations are mostly concessions: Skydance never took any step toward entering streaming, SAC ¶ 122; the WBD transaction did not cause the only price increase any Plaintiff paid, *id.* ¶¶ 66, 129; "competition from Netflix and other remaining services continues," *id.* ¶ 67; and Plaintiffs buy news and movie tickets from distributors and

exhibitors, not from Defendants, *id.* ¶¶ 7, 136–37. Where a plaintiff's best effort after repeated opportunities confirms the defects in its pleadings, dismissal with prejudice is warranted. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1007 (9th Cir. 2009), *as amended* (Feb. 10, 2009) (affirming denial of leave to amend because plaintiff's failure to correct pleading deficiencies in its second amended complaint was "a strong indication" that plaintiff had "no additional facts to plead"). Neither Defendants nor the Court should be subjected to another defective pleading.

**CONCLUSION**

For all the foregoing reasons, the Court should dismiss the SAC in its entirety, with prejudice.

Dated: November 24, 2026

Respectfully submitted,

By: */s/ Jeffrey L. Kessler*

Jeffrey L. Kessler (*pro hac vice*)
**WINSTON TAYLOR LLP**
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-6700
Facsimile: (212) 294-4700
jeffrey.kessler@winstontaylor.com

Jeanifer E. Parsigian (SBN 289001)
Matthew R. DalSanto (SBN 282458)
**WINSTON TAYLOR LLP**
101 California Street, 21st Floor
San Francisco, CA 94111-5891
Telephone: (415) 591-1000
Facsimile: (415) 591-1400
jeanifer.parsigian@winstontaylor.com
matthew.dalsanto@winstontaylor.com

Conor A. Reidy (*pro hac vice*)
Kevin B. Goldstein (*pro hac vice*)
**WINSTON TAYLOR LLP**
300 N. LaSalle Drive
Chicago, IL 60654-3406
Telephone: (312) 558-5600
Facsimile: (312) 558-5700
conor.reidy@winstontaylor.com
kevin.goldstein@winstontaylor.com

Matthew R. Huppert (*pro hac vice*)
**WINSTON TAYLOR LLP**
1901 L Street NW
Washington, DC 20036-3506
Telephone: (202) 282-5000
Facsimile: (202) 282-5100
matt.huppert@winstontaylor.com

Marguerite Sullivan (*pro hac vice*)
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
marguerite.sullivan@lw.com

Hanna Nunez Tse (SBN 346510)
**LATHAM & WATKINS LLP**
505 Montgomery St.,
Suite 2000
San Francisco, CA 94111-2562
Telephone: (415) 391-0600
hanna.nuneztse@lw.com

*Attorneys for Defendants Skydance Corporation (formerly Paramount Skydance Corporation) and Skydance Media, LLC*